**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

KEVIN M. DONOVAN,

Plaintiff,

v.

BENT CREEK HOMEOWNERS ASSOCIATION, INC.; TIMMONS PROPERTIES, INC.; KAMAN & CUSIMANO, LLC; LYNN BURKA, individually and as agent of Timmons Properties; ROBERT STEVE CODY, individually and as President of the Board; JEREMY EDGE, individually and as Board Member; DAVID RAISSI, individually and as Board Member; JARED BURKE, individually and as Board Member; MELISSA PLANK, individually and as Vice President; SUSANNAH MILLAR, individually and as former Secretary and former Board Member; TIM BARRY, individually and as Board Member; SCOTT D. WEISS, individually and as agent of K&C; KIEL KOVALCIK, individually and as agent of K&C; DANIEL J. MISKE, individually and as agent of K&C,

Defendants.

Case No. 3:26-cv-00700

District Judge Waverly D. Crenshaw, Jr.
Magistrate Judge Lynda M. Hill

JURY DEMAND

**SECOND AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**

PRELIMINARY STATEMENT ON THE FORM OF THIS PLEADING: This Second Amended Complaint states each factual allegation in a separately numbered paragraph, each

limited as far as practicable to a single set of circumstances, and pleads each count with element-specific incorporations rather than blanket realleging. Its paragraph count is a product of that structure: Defendants' motions at Doc. Nos. 23, 24 asked the Court to require Plaintiff to separate his allegations into discrete numbered paragraphs and to state each claim distinctly, and this pleading provides the form those motions requested. *See* Fed. R. Civ. P. 8(a)(2), 8(d)(1), 10(b).

## I. INTRODUCTION

1. Plaintiff Kevin M. Donovan ("Plaintiff" or "Donovan"), by and through this Complaint, brings this action against the above-named Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968; the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619; the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692p; the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101 *et seq.*; and various common law causes of action arising from a campaign to impose unauthorized fines, escalate enforcement actions, and retaliate against Plaintiff through the instrumentalities of a homeowners association.

2. This action arises from a campaign by the Bent Creek Homeowners Association ("HOA"), its Board of Directors, its management company Timmons Properties, Inc. ("Timmons"), and its legal counsel Kaman & Cusimano, LLC ("K&C"), to target Plaintiff and his family through:

(a) the imposition of fines without any provision in the recorded CC&Rs or the twenty-five recorded amendments authorizing such fines (Exhibit A);

(b) systematic misuse and diversion of HOA reserve funds;

(c) retaliatory enforcement actions after Plaintiff exercised his rights to request reasonable accommodations and to inspect HOA records;

(d) public defamation accusing Plaintiff of being a "perpetrator" of stalking and threats; and

(e) directing law enforcement to Plaintiff's residence.

3. Plaintiff seeks compensatory damages, treble damages under RICO, statutory damages, punitive damages, injunctive relief, declaratory relief, costs of suit, and reasonable attorney's fees if and to the extent permitted by law.

4. The exhibits identified in the Exhibit Schedule at the conclusion of this Complaint (Exhibits A through W) are attached to this Complaint and are incorporated by reference pursuant to Federal Rule of Civil Procedure 10(c).

## II. PARTIES

### A. Plaintiff

5. Plaintiff Kevin M. Donovan is a natural person, an attorney licensed in the State of Michigan (Bar No. P79530) and the State of Tennessee (BPR No. 43740), and a resident and homeowner at 6008 Christmas Drive, Nolensville, Tennessee 37135, within the Bent Creek subdivision.

6. Plaintiff is a person with a disability as defined under the Fair Housing Act, 42 U.S.C. § 3602(h).

### B. Defendants

7. Defendant Bent Creek Homeowners Association, Inc. ("the HOA" or "Bent Creek HOA") is a Tennessee nonprofit corporation organized under the Tennessee Nonprofit Corporation Act, Tenn. Code Ann. § 48-51-101 *et seq.*, with its principal office located at the offices of Timmons Properties in Nashville, Davidson County, Tennessee. The HOA governs the Bent Creek residential subdivision located in Nolensville, Williamson County, Tennessee.

8. Defendant Timmons Properties, Inc. ("Timmons") is a Tennessee corporation with its principal office in Nashville, Davidson County, Tennessee.

9. Timmons has served as the property management company for the Bent Creek HOA since approximately 2023, managing day-to-day operations including violation enforcement, fine issuance, and financial management through the Vantaca portal system.

10. Timmons regularly collects assessments, fines, and related charges from Bent Creek homeowners for a fee, including from Plaintiff, without holding a Tennessee Collection Service license as required by Tenn. Code Ann. §§ 62-20-102 and 62-20-105(a).

11. Defendant Kaman & Cusimano, LLC ("K&C") is a law firm organized under the laws of Ohio, with offices in Ohio, Kentucky, Wisconsin, and Tennessee.

12. K&C serves as legal counsel to the Bent Creek HOA and regularly engages in the business of collecting assessments and fines on behalf of community associations, including sending collection communications and threatening legal action for disputed fines against Plaintiff and other Bent Creek homeowners.

13. K&C holds itself out as a community-association law firm that provides collection, enforcement, litigation, operations, and Fair Housing Act defense services to homeowner associations. K&C's own website states that "our firm's philosophy is communication; not litigation."

14. K&C's role in this matter was not limited to passive legal advice after a dispute arose; K&C supplied the legal enforcement framework through which the HOA and Timmons continued to assert disputed fines, escalate collection pressure, and resist Plaintiff's accommodation and records-inspection efforts.


Case 3:26-cv-00070 Document 27 Filed 03/17/26 Page 4 of 79 PageID #: 745

15. Defendant Lynn Burka ("Burka") is a natural person who serves as President and Managing Partner of Timmons Properties, Inc. Burka is named individually and in her capacity as agent of Timmons.

16. Defendant Robert Steve Cody ("Cody") is a natural person who serves as President of the Bent Creek HOA Board of Directors. Cody resides in the Bent Creek subdivision. Cody is named individually and in his capacity as a fiduciary of the HOA.

17. Defendant Jeremy Edge ("Edge") is a natural person who serves as a member of the Bent Creek HOA Board of Directors. Edge resides in the Bent Creek subdivision. Edge is named individually and in his capacity as a fiduciary of the HOA.

18. Defendants David Raissi, Jared Burke, and Tim Barry are natural persons who serve as members of the Bent Creek HOA Board of Directors. Defendant Melissa Plank is a natural person who serves as Vice President of the Association and a member of the Board. Each is named individually and in his or her capacity as a fiduciary of the HOA.

19. Defendant Susannah Millar ("Millar") is a natural person who served as Secretary and a member of the Board of Directors during 2025, when the fines, fees, and enforcement actions described herein were imposed, and has since been succeeded in that office. Millar is named individually, in her capacity as a fiduciary of the HOA, and for conduct occurring during her tenure.

20. Defendant Scott D. Weiss ("Weiss") is a natural person and attorney associated with K&C (BPR No. 020552). Weiss is named individually and as agent of K&C.

21. Weiss participated in the collection and enforcement actions against Plaintiff. On July 28, 2025, Weiss acknowledged receipt of Plaintiff's physician documentation.


Case 3:26-cv-00700 Document 1 Filed 08/14/26 Page 5 of 79 PageID #: 751

22. In the same July 28, 2025 communication, Weiss responded that the physician's statement "does not assert or confirm that you have a disability" and that the Association would be "unable to continue to consider" Plaintiff's request unless Plaintiff produced further documentation confirming disability and necessity on the Association's own forms, notwithstanding the treating provider's signed statement.

23. Defendant Kiel Kovalcik ("Kovalcik") is a natural person and attorney associated with K&C. Kovalcik is named individually and as agent of K&C. Kovalcik participated in the collection and enforcement actions against Plaintiff.

24. Defendant Daniel J. Miske ("Miske") is a natural person and attorney associated with K&C (Wisconsin Bar No. 1010608). Miske is named individually and as agent of K&C.

25. Miske filed a bar complaint against Plaintiff with the Michigan Attorney Grievance Commission on July 10, 2025. The Michigan Attorney Grievance Commission dismissed the bar complaint forty-nine days after filing, on August 28, 2025 (AGC File 25-1797).

26. The filing of the bar complaint occurred after Plaintiff engaged in protected activity under the Fair Housing Act.

**III. JURISDICTION AND VENUE**

27. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claims arising under RICO (18 U.S.C. §§ 1961–1968), the Fair Housing Act (42 U.S.C. §§ 3601–3619), and the FDCPA (15 U.S.C. §§ 1692–1692p).

28. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims, which arise from the same case or controversy as the federal claims.

29. This Court has jurisdiction under 42 U.S.C. § 3613(a)(1)(A), which provides that an aggrieved person may commence a civil action in an appropriate United States district court to obtain appropriate relief with respect to a discriminatory housing practice.

30. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Williamson County, Tennessee, within the Middle District of Tennessee, and because Defendants Bent Creek HOA, Timmons, Cody, Edge, and other individual Defendants reside or conduct business in this district.

31. This Court has personal jurisdiction over each Defendant.

32. Defendants Bent Creek HOA, Cody, Edge, Raissi, Burke, Plank, Millar, and Barry reside in or operate within this District and directed enforcement actions, fines, communications, and common-area restrictions at Plaintiff's property in Williamson County, Tennessee.

33. Defendants Timmons Properties, Inc. and Burka maintain their principal place of business in Davidson County, Tennessee, and conducted daily management, violation enforcement, portal charges, and accommodation processing directed at properties within this District.

34. Defendants Kaman & Cusimano, LLC, Weiss, and Kovalcik maintain a law office at 9020 Overlook Boulevard, Suite 314, Brentwood, Williamson County, Tennessee, regularly conduct business in this District, and purposefully availed themselves of this forum by repeatedly transmitting collection demands, enforcement notices, and the July 28, 2025 response to Plaintiff's physician documentation into this District on behalf of their Tennessee client.

35. Defendant Miske purposefully directed suit-related conduct at this forum: his July 10, 2025 bar complaint was filed in retaliation for, and expressly concerned, Plaintiff's Fair Housing Act-protected activity respecting a Tennessee dwelling; it attached and relied upon Plaintiff's communications in the Tennessee dispute, including Plaintiff's July 3, 2025 brief, which, on information and belief, Miske obtained from the K&C personnel handling that dispute; and, on information and belief, it was undertaken in coordination with K&C's Tennessee-based


Case 3:26-cv-00070 Document 21 Filed 03/14/26 Page 7 of 79 PageID #: 653

enforcement of the same dispute. Miske's suit-related conduct thus created a substantial connection with Tennessee itself, not merely effects felt by a Tennessee resident. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985); *Calder v. Jones*, 465 U.S. 783 (1984); *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

## IV. FACTUAL ALLEGATIONS

### A. Background

36. Plaintiff purchased his home at 6008 Christmas Drive in the Bent Creek subdivision in Nolensville, Tennessee, in or about August 2016. The Bent Creek subdivision is governed by Covenants, Conditions, and Restrictions ("CC&Rs") and is managed by the HOA through its Board of Directors.

37. Plaintiff resides at the property with his wife and three children, two of whom are minors.

38. Plaintiff suffers from a qualifying disability under the Fair Housing Act. As documented in a Supplementary Attending Physician's Statement dated July 21, 2025, completed by Dr. Justin Dearing, D.C., Plaintiff has a chronic medical condition that substantially limits one or more major life activities. Plaintiff has been disabled since March 18, 2025, the onset date certified by his treating provider in that Statement; the underlying health conditions and the functional limitations they cause predated that certification, and Plaintiff had disclosed health-related limitations to Timmons beginning in January 2025. (Exhibit L.)

39. The condition substantially limits Plaintiff's mobility, pace, energy level, and capacity to perform physical tasks, including the exterior property maintenance demanded by the HOA within compressed timeframes. Plaintiff requires the reasonable accommodation of additional time to cure exterior violations.

40. In approximately 2023, the HOA engaged Timmons Properties, Inc. as its property management company and Kaman & Cusimano, LLC as its legal counsel.

**B. The Unauthorized Fining Practices**

41. Prior to Timmons assuming management of the HOA, fining revenue at Bent Creek was minimal. HOA financial records show the following fining revenue trajectory: $230 in 2021; $110 in 2022; $6,620 in 2023 (the first year under Timmons management); $8,520 in 2024; and $9,980 in 2025. (Exhibits A, B, C.)

42. The increase in fining revenue coincided precisely with the engagement of Timmons as management company and K&C as legal counsel.

43. Neither the HOA's annual budgets for 2023, 2024, nor 2025 included any line item for fining revenue, indicating that the fining program was not authorized through the normal budgetary process.

44. Fines were issued through a systematic process in which Timmons property manager Kaley Vaughn would send violation notices with a uniform 10-day cure period, followed by escalating fines of $50, $100, and $150 per the Fine Policy, followed by referral to K&C for collection.

45. This process was applied to Plaintiff and to other homeowners selectively. The instances set forth in this Complaint are illustrative only; they are a sample of many violations and enforcement actions that have surfaced as Plaintiff raised concerns about the HOA's malfeasance over the past year, and Plaintiff expects discovery to reveal the full scope.

46. Other homeowners were subjected to the same enforcement apparatus, including the homeowners whose experiences are detailed in Paragraph 139 below.

47. The basis for these allegations includes Plaintiff's contemporaneous review of HOA financial records, witness statements from these homeowners, and HOA enforcement

correspondence reviewed by Plaintiff. Plaintiff expects to develop the full pattern through discovery of board records and Timmons' enforcement files, which are peculiarly within Defendants' control.

48. The Bent Creek HOA is organized as a Tennessee nonprofit corporation under Tenn. Code Ann. § 48-51-101 *et seq.* A complete review of the CC&Rs and all twenty-five recorded amendments reveals that the governing documents contain no provision authorizing the imposition of monetary fines against homeowners. (Exhibit A.)

49. The CC&Rs authorize only: (a) liens for unpaid assessments; (b) injunctive relief; and (c) regular and special assessments.

50. The Fine Policy adopted by the Board in September 2022 and revised in June 2025 (Exhibits B, C) claims authority under Tenn. Code Ann. § 48-53-102, but that statute enumerates the general powers of nonprofit corporations and does not include the power to impose fines on members.

51. Tennessee Code Annotated § 48-53-102 empowers a nonprofit corporation to "impose dues, assessments, admission, service and transfer fees upon its members." A monetary penalty imposed for an alleged rule violation is not a due, an assessment, or a fee for a service rendered, and the fines and violation-based administrative charges assessed against Plaintiff accrued on disputed rule-violation penalties, not on any service rendered to Plaintiff or on any assessment duly levied. The General Assembly has demonstrated that it knows how to confer fining authority on a community association when it so intends: the Tennessee Condominium Act of 2008 expressly empowers a unit owners' association, "after notice and an opportunity to be heard," to "levy reasonable fines for violations of the declaration, bylaws, and rules and regulations of the association." Tenn. Code Ann. § 66-27-402(a)(11). Bent Creek is a lot

subdivision, not a condominium regime; no comparable grant appears in the Nonprofit Corporation Act, in any statute applicable to the Association, or in its recorded covenants.

52. The copy of the September 2022 Fine Policy in the record (Exhibit B) is unexecuted. Its adoption recital and signature page are blank in every field: no adoption date, no date of the board meeting recited as having adopted it, no president's name, no signature, and no completed notarial acknowledgment.

53. The September 2022 Fine Policy provided that "[t]he Board of Directors will contact the Association attorney" after the final notice. The June 2025 revision changed this provision to read "[t]he Board of Directors or management company will contact the Association attorney," expressly adding the management company to the enforcement chain. (Exhibits B, C.)

54. The June 2025 revision also increased the architectural fine from $250.00 to $500.00 and expanded the continuing-violation recurrence window from thirty (30) to one hundred eighty (180) calendar days. These changes were adopted while the enforcement activity against Plaintiff was ongoing. (Exhibits B, C.)

55. The fines imposed on Plaintiff and other homeowners are therefore not authorized by the recorded Declaration or by statute, and are void.

56. On information and belief, the HOA's former legal counsel, Mary Beth Hagan, advised the Board that the Association lacked authority to impose fines under the governing documents. Defendant Cody thereafter terminated her engagement, in the presence of other Association officers.

57. The allegation in the preceding paragraph, pleaded on information and belief, rests on statements made by former board officials present at meetings where fining authority was discussed, and on the timing of that counsel's termination shortly after such concerns were


Case 3:26-cv-00700 Document 27 Filed 03/17/26 Page 11 of 79 PageID #: 457
Case 3:26-cv-00700 Document 21 Filed 03/14/26 Page 12 of 80 PageID #: 448

raised. A former officer who witnessed the termination has made consistent statements regarding Ms. Hagan's advice and her termination to multiple other members of the community. Both the underlying advice and the termination minutes are matters peculiarly within Defendants' control, and Plaintiff expects to confirm the substance of this allegation through discovery of board minutes and related communications.

58. Restrictive covenants and the enforcement powers of a homeowners association are strictly construed under Tennessee law; they are in derogation of the owner's right to the free use and enjoyment of property and will not be extended to any power not clearly and expressly conferred by the plain terms of the recorded governing documents. *See Pandharipande v. FSD Corp.*, 679 S.W.3d 610 (Tenn. 2023).

59. Where the governing documents are silent or ambiguous as to a claimed power, the ambiguity must be resolved against the party seeking to enforce the restriction and in favor of the owner's unrestricted use of the property. *See Lone Mountain Shores Owners Ass'n v. Bennafield*, No. E2024-00569-COA-R3-CV, 2025 WL 1627229 (Tenn. Ct. App. June 9, 2025) ("[I]t is the prohibited uses of property that must be expressly and unambiguously stated in a restrictive covenant for the prohibition to take effect."); *see also Burkett v. Milligan*, No. 3:24-cv-506 (E.D. Tenn. July 9, 2026) (copy attached as Exhibit V) (*applying Lone Mountain Shores* and concluding that covenant provisions that did not unambiguously prohibit a use could not be read to bar it).

60. Under these principles, the Association's fining practices exceed the powers conferred by the recorded governing documents.

61. Because the Bent Creek CC&Rs and all twenty-five recorded amendments contain no provision clearly and expressly authorizing monetary fines, the Association possessed no authority to impose them, and the fines levied against Plaintiff and other homeowners are void.

62. Even if the CC&Rs purported to authorize fines, the HOA's own Fine Policy requires that before any fine may be imposed, the homeowner must receive notice of the alleged violation and an opportunity to be heard before the Board.

63. The HOA failed to provide Plaintiff with any hearing prior to imposing fines. Appeals were processed by Timmons through a paper form, not through a hearing before the Board. The Fine Policy itself prescribes a hearing procedure that was never followed.

64. Aside from the annual meeting required by the governing documents, the Board has not held a meeting open to the membership in several years.

65. At the most recent annual meeting of the membership, no opportunity for member questions was provided. When Plaintiff raised a motion to allow questions, Defendant Cody adjourned the meeting and directed Plaintiff to "talk to our lawyers."

66. The challenged fining practices were not unique to Plaintiff but were applied to other homeowners within the community, demonstrating that the conduct was systemic rather than isolated.

**C. Financial Irregularities and Reserve Fund Misuse and Diversion**

67. Analysis of the HOA's financial statements from 2021 through 2025 reveals significant financial irregularities, including systematic operating budget overruns, unauthorized expenditures, and reserve fund depletion.

68. The HOA's reserve fund declined from $1,333,728 in December 2021 to approximately $955,748 in December 2025, a net decline of $377,980 (28.3%). The unallocated reserve specifically declined from $543,728 to $181,248, a loss of 66.7%. (Exhibit F.)


Case 3:26-cv-00700 Document 27 Filed 03/17/26 Page 13 of 79 PageID #:759

69. Significant unauthorized expenditures from reserve funds include:

(a) Contractor Renovation (Falling Water Entrance) of $159,522 in 2024;

(b) One-Time Capital Expenses of $107,385 in 2025 (not budgeted);

(c) Tree Removal of $56,640 in 2025 versus a $7,500 budget (655% over budget);

(d) Landscaping of $112,801 in 2022 versus a $10,000 budget (1,028% over budget);

(e) Pest Control of $75,580 in 2023 — an anomalous, non-recurring charge that the Association's own 2024 budget correspondence described as "a one off" for which the Association "no longer ha[s] a contract" (not budgeted); and

(f) Pool Furniture of $39,899 in 2023 (not budgeted).

70. On June 1, 2025, Defendant Jeremy Edge, in his capacity as a Bent Creek HOA Board member, publicly admitted in a post on the Bent Creek Neighborhood -Uncensored- Facebook group (Exhibit Q) that the Falling Water Entrance project was completed in three phases at a total cost of approximately $230,000. Edge described the phases as follows:

(a) removal of the existing entrance monument and replacement of pavement, approximately $60,000;

(b) construction of a new entrance monument and installation of electrical systems, approximately $40,000; and

(c) construction of a new sitting area with landscaping (including trees, plants, flower beds), lighting, and irrigation, approximately $130,000, including engineering and architectural drawings.

71. Edge further admitted via social media that the project's design and construction commenced over seven years prior to the post, that approval was obtained from the Nolensville

Planning Commission, and that the project was rebid due to issues with the contract and engineer.

72. The Association's meeting minutes available to members contain no record of the project's approval, bidding, or phasing.

73. The HOA's Reserve Study effective June 26, 2020 (Exhibit T) defines reserves as funds for "repair or replace" of existing reserve components only. The Reserve Study budgets the "Signage, Renovation, Entrance Monuments" reserve component at line items totaling approximately $73,000 across its outlook for the renovation of existing entrance monuments.

74. The Falling Water Entrance project, as described by Edge, includes elements that exceed both the budget and the scope of any reserve component identified in the Reserve Study. In particular, Phase 3 of the project — which Edge himself described as the construction of "a sitting area, landscaping including trees, plants, flower beds, lighting, and irrigation" at a cost of approximately $130,000 — is not the "repair or replace" of an existing reserve component but rather the construction of a new common-area amenity that did not previously exist.

75. A sitting area, new landscaping, new lighting, and new irrigation are not within the scope of the "Signage, Renovation, Entrance Monuments" reserve component. The remainder of the project — including the installation of two new monuments where the prior entrance had only one — further exceeds both the budget and the scope of any reserve component identified in the Reserve Study.

76. The Association's 2024 Year-End Financial Statement (Exhibit F4) confirms that approximately $159,522 of the project was expended in 2024 and posted to "UNAPPROP. RESERVE — Task I Fee — Falling Water Entrance," with additional Falling Water-related expenditures continuing into 2025 (Exhibit F5).

77. Plaintiff publicly questioned the propriety of the project on the same Facebook thread, asking where the project was listed in meeting minutes, who voted for it, where the bids were, and how it was approved to come out of reserve funds when it was not an existing project. (Exhibit Q.)

78. The HOA's Reserve Study (Exhibit T), last commissioned June 26, 2020, expressly recommends that the Board "budget for an Update to this Reserve Study in two- to three years." More than six years have elapsed since the Reserve Study was issued, and Defendants have not commissioned an updated study.

79. When an update is eventually performed, the depleted reserve fund will likely trigger a special assessment against all homeowners to replenish the reserves, exposing Plaintiff, as a dues-paying member, to that future liability.

80. On information and belief, the Association also expended member funds to install "SkyCop" surveillance cameras, including license-plate readers, at the subdivision entrances without any authorizing vote recorded in the Association's minutes. A former Board member has stated that the installation was not properly authorized.

81. Operating expenses exceeded budget by a total of $316,103 across the 2021–2025 period: $16,242 in 2021; $105,994 in 2022; $102,209 in 2023 (11 months); $71,973 in 2024; and $19,685 in 2025.

82. No board meeting minutes or vote records have been produced for any of these overruns. Such records are peculiarly within Defendants' control and are expected to be produced in discovery.

**D. The "First Instance" Statement and Prior Disability Disclosures**

83. On May 19, 2025, Defendant Burka transmitted a written communication to Plaintiff stating: "This is the first instance in which you've mentioned a disability that may impact your mobility or indicated a desire to request a reasonable accommodation." (Exhibit E.)

84. The statement quoted in the preceding paragraph was demonstrably false. Plaintiff had disclosed his disability or health-related limitations to the HOA and/or Timmons on at least five prior occasions:

(a) On or about January 2025, Plaintiff reported health issues through the Vantaca portal system. In a March 2025 email, Timmons property manager Kaley Vaughn acknowledged Plaintiff's health-related disclosures, stating that Plaintiff's situation was "being monitored," thereby confirming that Timmons had received Plaintiff's communications regarding his health problems and his intent to place his home on the market.

(b) On February 28, 2025, Plaintiff emailed Timmons stating: "We were sick and haven't been able to get the part." (Exhibit D, p. 11.)

(c) On March 27, 2025, Plaintiff emailed Timmons stating: "I've been dealing with health issues and am preparing to sell my house." (Exhibit D, p. 18.)

(d) On March 28, 2025, Plaintiff emailed Timmons stating: "I was really sick when this was going on and have had some lingering issues since." (Exhibit D, p. 22.)

(e) On April 30, 2025, Plaintiff emailed Timmons stating: "I am currently off work with disability. I'll pay this when I have the means." (Exhibit D, p. 28.)

85. Despite these five documented prior disclosures, Defendant Burka stated on May 19, 2025 that Plaintiff's disability claim was the "first instance" of such disclosure. (Exhibit E.)


Case 3:26-cv-00700 Document 2-1 Filed 08/14/26 Page 17 of 79 PageID #: 56

86. The statement was made to justify delaying the interactive accommodation process, to continue enforcement of fines during the pendency of the accommodation request, and to impose a restriction prohibiting Plaintiff from "walking past [Board members'] homes and standing on the sidewalk" within the community. (Exhibit E.)

**E. Retaliation Against Plaintiff**

87. After Plaintiff submitted written requests for reasonable accommodation, requesting additional time to cure exterior violations due to his disability, the Defendants escalated their enforcement actions rather than engaging in the interactive accommodation process required by law.

88. In late April 2025, Plaintiff's father parked a Class C recreational vehicle, lawfully registered in Ohio, at Plaintiff's residence. Defendant Cody video-recorded Plaintiff's father parking the vehicle and walking between the vehicle and Plaintiff's home.

89. The following day, Nolensville police officers were dispatched to Plaintiff's residence concerning the camper. The responding officer confirmed that the vehicle was lawfully parked.

90. Plaintiff explained to the responding officer that he was experiencing health issues and would need a few days to load the camper and remove it.

91. The next day, Nolensville police were dispatched to Plaintiff's residence a second time regarding the same camper. The responding officer indicated to Plaintiff that the HOA had caused him to be sent out.

92. When Plaintiff asked the second responding officer whether the person who had called was Defendant Cody, the officer indicated that the name matched that of the person who had called the police.

93. On Friday, May 16, 2025, at approximately 5:49 p.m. — after business hours, and less than twenty-four hours after Plaintiff returned from an out-of-town trip and spoke with

Defendant Burka regarding the camper — Timmons transmitted a Second Reminder Notice for the camper (Case No. XN1108821), threatening a $50.00 fine.

94. The Association's April 2026 board-meeting minutes record Timmons manager Kaley Vaughn explaining that inspections are scheduled every three weeks on Thursdays and that violations are often sent the following day.

95. At that time, the recorded covenants prohibited parking any trailer, boat, truck, or other vehicle other than an automobile on any street in the subdivision "for a period in excess of one (1) twenty-four (24) hour period in any calendar year." (Exhibit A.) Plaintiff raised with Defendants that, as applied to a camper, the rule was impossible to satisfy: an owner could not both depart with the vehicle and return with it in the same calendar year without exceeding a single twenty-four hour period.

96. When the Association issued revised Rules and Regulations in June 2025, the camper provision was changed to permit parking for loading and unloading for up to twenty-four hours twice in a one-year period. Defendants did not withdraw or credit any of the charges previously imposed on Plaintiff's account, which remained outstanding until the unnoticed reversals described in Paragraphs 172 through 189.

97. On May 19, 2025, Plaintiff submitted a request for accommodation by email to Timmons, the Association's managing agent, after the Association's Reasonable Accommodation Request Form proved unable to capture the information Plaintiff needed to provide. Defendant Burka responded by email the same day. (Exhibit E.)

98. On or about May 15, 2025, after business hours and shortly after a telephone call in which Plaintiff explained that the HOA's rule permitting a recreational vehicle to remain only twenty-four hours, once per year, was impossible for Plaintiff to satisfy and failed to

accommodate his disability, Timmons posted an additional administrative fee to Plaintiff's Vantaca account (Account No. ending in 4619).

99. The timing of the after-hours charge, immediately following Plaintiff's accommodation-related communication, reflects the retaliatory and non-accommodative character of Defendants' enforcement.

100. On June 1, 2025, Plaintiff submitted a formal written accommodation request to Timmons. (Exhibit G.) Rather than engaging in the interactive process, Defendants referred the matter to K&C for legal escalation.

101. On July 21, 2025, Plaintiff obtained a Supplementary Attending Physician's Statement from Dr. Justin Dearing documenting his disability, diagnosis, and functional limitations. (Exhibit L.)

102. On July 24, 2025, Plaintiff hand-delivered the physician statement to K&C's office. Vicki Thomas, K&C's Office Manager, signed a receipt confirming delivery. (Exhibit M.)

103. On July 28, 2025, Defendant Weiss acknowledged receipt of the physician statement by email but declined to act on it, stating that the statement did not "confirm that you have a disability" or that the requested accommodations were "necessary," and conditioning any further consideration on Plaintiff's completion of the Association's Reasonable Accommodation Request and Verification forms — a demand for additional, repetitive documentation following a treating provider's signed statement, in lieu of engaging the interactive process.

104. Plaintiff had also transmitted to Weiss written confirmation from his employer that Plaintiff was off work on disability. Weiss likewise declined to treat that employer confirmation as sufficient.

105. On July 10, 2025, Defendant Miske filed a bar complaint against Plaintiff with the Michigan Attorney Grievance Commission. The complaint was dismissed forty-nine days after filing, on August 28, 2025 (AGC File 25-1797). (Exhibit N.)

106. The copy of the Request for Investigation served on Plaintiff shows on its face that the written communication Miske submitted to the Commission as his supporting document — Plaintiff's July 3, 2025 brief — was altered before submission: portions of its text were rendered blank.

107. The blanked portions include the completion of Plaintiff's quotation of a statement by Defendant Weiss — described in the brief as made in a June 30, 2025 Zoom call — which appears in the submitted copy only as the opening words of the quotation, terminating mid-sentence with the remainder rendered blank.

108. The submission removed material concerning Weiss's own statements and conduct while quoting to the Commission, from the same document, the passage on which Miske relied against Plaintiff.

109. The filing of this bar complaint constituted retaliation for Plaintiff's exercise of protected rights under the Fair Housing Act, including requesting reasonable accommodation and challenging the HOA's enforcement practices.

110. On information and belief, the alterations described in Paragraphs 105 through 108 were made to withhold from the Commission material reflecting the statements and conduct of Miske's own law partner, Defendant Weiss, and to induce an investigation that a complete submission would not have supported.

111. The selectivity of the redactions demonstrates that Miske read and understood the significance of the material he removed.

112. Plaintiff alleges that Miske's knowing submission of materially altered evidence and omission of material facts in connection with a disciplinary matter constituted retaliatory conduct and, if proved, would implicate Wisconsin Supreme Court Rule 20:8.4(c), the rule of Miske's licensing jurisdiction prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation, applicable to Miske as a lawyer admitted only in Wisconsin, see SCR 20:8.5(b)(2)(i).

113. This allegation is pleaded as evidence of conduct and retaliatory purpose; the cited rule does not itself create a civil cause of action or determine whether any civil privilege applies.

114. On May 19, 2025, Defendant Burka directed Plaintiff to "cease and desist from all direct and indirect contact with the Bent Creek HOA Board members," including "walking past their homes and standing on the sidewalk staring at their house." (Exhibit E.)

115. This restriction barred Plaintiff from using public sidewalks in his own community — common areas maintained by the HOA using homeowner dues that Plaintiff pays — and was imposed on the same day as the false "first instance" statement.

116. On June 17, 2025, Board member Jeremy Edge posted publicly on the Bent Creek Neighborhood -Uncensored- Facebook group: "At a significant cost, the Board has elected to hire security for the pool. This comes after a multitude of incidents, resident complaints, and significant amounts of poor behavior from unsupervised children. Issues can now be handled in real time and with urgency and immediacy." (Exhibit Q.)

117. On information and belief, this expenditure targeted Plaintiff and other residents whom the Board singled out for enforcement.

118. On June 23, 2025, Edge escalated by writing in the same Facebook group: "Maybe if residents dont threaten, stalk, and harass, this won't be an issue. You clearly don't care that

board members and their families are suffering, are frightened, and their children are scared." (Exhibit Q.)

119. In the same thread, Edge wrote: "we are looking at serious threats, stalking, attempts to engage with my children from the sidewalk while my kids were playing, and the ability of the perpetrator to walk a fine line keeping any real legal action unavailable. Unfortunately, we are past the point of return as our safety is in question." (Exhibit Q.)

120. These statements identify Plaintiff by context and were confirmed by community members as referring to Plaintiff.

121. On June 24, 2025, Edge posted: "Anyone who knows me or has been on the other Bent Creek group for more than 4 years or so, knows that I used to be VERY anti HOA. Can you guess the reason? It was all of the violation letters I used to get for my small childrens' toys in my front yard." (Exhibit Q.)

122. This statement constitutes an admission that Edge experienced the same fining practices he now enforces against others.

123. Edge further publicly admitted on or about June 23, 2025 in the same Facebook group: "If some of your dues go to security systems and cameras for board members because of threats then that is just what has to happen. I am sure it will cost less than the legal fees if something adverse happens to one of my family members." (Exhibit Q.)

124. In this statement Edge publicly defended the direction of homeowner dues to private security and camera systems for board members.

125. Law enforcement was dispatched to Plaintiff's residence on at least two occasions at the direction of Defendant Cody, the HOA Board President, as described in Paragraphs 89 through 92.

126. On a separate occasion, when Plaintiff appeared at a Bent Creek HOA Board meeting to deliver a records-inspection demand, Defendants Cody and Edge caused law enforcement to be summoned, resulting in the issuance of a civil trespass warning to Plaintiff regarding Cody and Edge. Community member Erin Bowles Perry publicly reported witnessing law enforcement being summoned during the Board-meeting incident.

127. Plaintiff asked the responding officers to confirm that he had made no threats toward the Board members. After speaking with Defendants Cody and Edge and then with Plaintiff, the officers confirmed that Plaintiff had not made any threats.

128. Plaintiff told the officers that Defendants claimed to possess video of threatening conduct. The officers stated that they had asked the Board members for that evidence and that none had been provided.

129. Bent Creek Board meetings are held at the private residence of Defendant Cody and are not open to the membership for comment, records inspection, or appeals.

130. The HOA and its agents blocked Plaintiff as a member of the Bent Creek Neighborhood social media, preventing him from viewing Board member communications and community updates posted by Edge and others, while simultaneously using those platforms to defame and accuse Plaintiff.

131. After Plaintiff attempted to discuss the enforcement actions by telephone, K&C blocked Plaintiff's telephone number from reaching its offices, and subsequently blocked the telephone number of Plaintiff's wife.

132. In a July 2, 2025 video conference, Defendant Weiss acknowledged that he had personally directed the blocking of Plaintiff's telephone number.

133. On June 19, 2025, in a recorded telephone call with Plaintiff, Defendant Kovalcik repeated the assertion that Defendants possessed video recordings of Plaintiff making threats, stating "there's a video"; when Plaintiff responded "then provide it," Kovalcik stated that he would "determine what we're providing." Plaintiff made no such threats, and no such video recording has ever been produced.

134. In the same July 2, 2025 video conference, Defendant Weiss stated, regarding his clients' accusations against Plaintiff, that he did not "have a duty to ask" whether the accusations were true.

**F. Pattern of Targeting Families with Children**

135. The Defendants' discriminatory enforcement pattern extends beyond Plaintiff. Benita Chapman, a homeowner at 600 Nevins Place in Bent Creek, has provided a written statement documenting substantially similar treatment. (Exhibit S.) Ms. Chapman adopted five biracial children in December 2021, shortly after moving to Bent Creek in August 2021.

136. Ms. Chapman received multiple violations processed by the same Timmons property manager (Kaley Vaughn) with the same 10-day cure periods: parking violations (fined $50 on May 5, 2025 when the vehicle was not present), landscaping violations, trash can placement, mailbox color, mailbox font, and unauthorized ARC work (fined $100).

137. Ms. Chapman's appeal of the parking fine was denied on May 23, 2025.

138. Ms. Chapman stated: "My kids are biracial and I have thought on more than one occasion that I was being harassed because of the kids' race." She further stated: "Since Steve Cody became President I have gotten more letters." Ms. Chapman's experience corroborates a pattern of selective enforcement targeting families with children.

139. The Defendants' pattern of selective enforcement and harassment extends to additional homeowners:

(a) Homeowner Wright reported that Defendants Cody and Edge repeatedly stalled resolution of a drainage issue in which water from the common area was washing away her home's foundation, while simultaneously demanding that she repaint her house within a 10-day window. Wright retained her own attorney to address the matter.

(b) Homeowner Jaime Reiter, an attorney, was harassed for having a canopy on his children's trampoline. Reiter identified the legal deficiency in the HOA's fining authority and confronted the Board, which resulted in a stalemate.

(c) Homeowner Rebekah Bartlett reported that the HOA contacted her husband's employer to complain about him parking his work truck in the driveway for approximately three hours while cleaning it out; and

(d) On information and belief, another homeowner was issued fines over a fence that existed on the property at the time she purchased her home, on the assertion that she had erected it without approval.

140. On information and belief, additional witnesses and homeowner experiences will be developed through discovery of HOA enforcement files and Vantaca portal records, which are peculiarly within Defendants' control.

**G. Unlicensed Debt Collection by Timmons and K&C**

141. The collection notices demanding payment of the disputed fines and charges were generated and transmitted to Plaintiff by Timmons through the Vantaca system (Case Nos. XN867602, XN1054197, and XN1108821) and threatened referral to "a collection attorney" if payment was not made.

142. K&C regularly engages in collecting, or attempting to collect, the disputed fines on behalf of the Bent Creek HOA, including by directing collection strategy, receiving accounts

escalated under the notices described in Paragraph 141, and transmitting the July 28, 2025 collection communication described in Paragraph 103, over fines for which the recorded governing documents provided no authority.

143. K&C's collection activity makes it a "debt collector" subject to the Fair Debt Collection Practices Act, 15 U.S.C. § 1692a(6), and its conduct is further addressed in Count IV.

144. K&C and Miske were also on specific notice of the FDCPA's application to community-association debt collection. On June 21, 2024, a putative class action styled *Oie v. Kaman & Cusimano LLC*, No. 2:24-cv-00775 (E.D. Wis. filed June 21, 2024), was filed against K&C, alleging that K&C, as a debt collector under 15 U.S.C. § 1692a(6), violated 15 U.S.C. §§ 1692e, 1692f, and 1692g in connection with a letter collecting a homeowners-association debt.

145. Defendant Miske appeared as counsel for K&C in *the Oie* action and signed K&C's answer on August 15, 2024.

146. On March 31, 2026, the court in *Oie* certified a settlement class and entered final judgment approving a class-wide settlement. The *Oie* action placed K&C and Miske on notice of FDCPA claims and litigation risk in the community-association context before the collection conduct directed at Plaintiff alleged herein.

147. Timmons likewise operates as an unlicensed collection service in Tennessee. Timmons regularly collects the HOA's delinquent and past-due fines, assessments, and related charges from homeowners for a fee — including by issuing demand letters, posting charges and fees through the Vantaca portal, and threatening referral to counsel and further escalation — without holding a Tennessee Collection Service license as required by Tenn. Code Ann. §§ 62-20-102 and 62-20-105(a).


Case 3:26-cv-00700 Document 27 Filed 08/17/26 Page 28 of 80 PageID #:764

148. As a managing agent collecting debts owed to another — the HOA — for a fee, Timmons is not within any exemption under Tenn. Code Ann. § 62-20-103, and the unauthorized fines it collects are not obligations secured by a valid consensual lien on a dwelling.

149. On May 30, 2025, the Bent Creek HOA and Timmons — under letterhead identifying the sender as Bent Creek HOA, "Professionally Managed by Timmons Properties, Inc." — mailed Plaintiff a 10-Day Collection Letter demanding $290, comprising $200 in fines, $75 in administrative charges, and $15 for certified mailing, and threatening referral to "a collection attorney" if the balance was not paid within ten days. (Exhibit H.)

150. On June 28, 2025, Plaintiff sent a written dispute and verification demand pursuant to 15 U.S.C. § 1692g. (Exhibit I.) Defendants failed to provide adequate validation and continued collection activity.

151. The May 30, 2025 letter overstated the debt. The HOA's own Vantaca ledger (Exhibit P) showed $150 in fines — a $50.00 fine posted February 6, 2025 and a $100.00 fine posted February 27, 2025 — and a total delinquency of $240.00 as of May 30, 2025. The letter nonetheless demanded $290, including "$200" in fines.

152. The demand falsely represented the character and amount of a debt, 15 U.S.C. § 1692e(2)(A), and attempted to collect amounts not expressly authorized by the agreement creating the obligation or permitted by law, 15 U.S.C. § 1692f(1).

153. K&C further directed the conduct of the HOA Board, including controlling board communications. On June 23, 2025, Defendant Edge publicly admitted in the Bent Creek Neighborhood -Uncensored- Facebook group (Exhibit Q): "Legal matters cannot be discussed. I tend to do what our lawyers advise me to do."


Case 3:26-cv-00700 Document 27 Filed 03/17/26 Page 29 of 80 PageID #: 7675

154. This admission, made in response to a homeowner's request for transparent answers to community questions, confirms that K&C exercised substantial control over Board communications and policy discussions, directing the conduct of the HOA Board including controlling Board responses to homeowner inquiries. K&C's role extended beyond the provision of legal advice to directing the Board's responses to homeowner inquiries.

**H. Defendants' Knowledge That the Recorded Covenants Conferred No Authority to Fine**

155. Defendants Scott Weiss and Daniel J. Miske are experienced community-association attorneys who hold themselves out to the public as authorities on the scope of a homeowners association's enforcement powers.

156. Defendant Weiss is a partner and the Tennessee office chair of Kaman & Cusimano, LLC, in Brentwood, Tennessee. He is a Fellow of the Community Associations Institute's College of Community Association Lawyers ("CCAL") and serves on the CCAL Board of Governors.

157. Defendant Miske is a Kaman & Cusimano attorney and a CCAL Fellow.

158. The Fine Policy adopted September 2022 states on its face: "THIS INSTRUMENT PREPARED BY: SCOTT D. WEISS, ESQ., CCAL, Ortale Kelley Law Firm." (Exhibit B.)

159. The revised Fine Policy adopted June 2025 bears the same preparer designation, including the same CCAL credential and the same firm name. (Exhibit C.)

160. Defendant Weiss therefore prepared the instrument by which the Association claims authority to fine. As alleged in Paragraph 50, that instrument cites only Tenn. Code Ann. § 48-53-102 and identifies no provision of the recorded Declaration conferring such authority.

161. The Fine Policy's own recital states that it applies "to the extent enforcement provisions do not already exist" — contemplating that the recorded governing documents might contain no enforcement provision and supplying one by Board policy. (Exhibits B, C.)

162. Weiss departed the Ortale Kelley firm and joined Kaman & Cusimano, LLC in January 2024. The June 2025 revision nonetheless continues to bear the "Ortale Kelley Law Firm" preparer designation.

163. The June 2025 revision was adopted while the enforcement activity against Plaintiff described in Paragraphs 87 through 134 was ongoing.

164. By reason of their training, credentials, and self-professed expertise, Weiss and Miske knew, at all times relevant to this Complaint, that under Tennessee law:

(a) a homeowners association possesses only those enforcement powers clearly and expressly granted by its recorded covenants;

(b) powers restricting an owner's free use and enjoyment of property will not be implied or extended beyond the covenants' plain terms; and

(c) any ambiguity is construed against the party seeking to enforce the restriction. *See Pandharipande v. FSD Corp.*, 679 S.W.3d 610 (Tenn. 2023).

165. Defendants' knowledge of this standard is confirmed by their own published statements. In the May/June 2026 issue of Common Ground, the national magazine of the Community Associations Institute, Defendant Miske co-authored an article titled "Short Stays, Long Consequences." (Exhibit U.) The standards recited in Paragraph 164 were settled Tennessee law throughout the period of the conduct alleged; the 2026 publications evidence knowledge that these Defendants held by reason of their practice and credentials, and are not the source of that knowledge.

166. In the article, Miske stated that an association's authority derives from its governing documents; that documents which are "silent, vague, or use general language" create ambiguity;

and that in many states courts "are reluctant to interpret restrictions unless they are clearly stated."

167. The article stated that the "general trend" of courts across the country "is clear: Restrictions must be clear, explicit, and properly adopted"; that "[b]oards can't override a declaration through rules"; and that any such restriction "must be clearly authorized in the recorded covenants."

168. The same article summarized a 2025 Tennessee decision, reporting that "[t]he court held that the association's covenants were too ambiguous" to support the claimed restriction and that "[a]ssociations must include clear, specific restrictions in their governing documents."

169. In the same issue, Defendant Weiss authored an article titled "Signal Upgrade" (Exhibit U), in which he classified governing-document provisions that "are silent or open to differing interpretations" among the provisions that "must be changed or updated," and illustrated that governing documents must address matters expressly "to remove any ambiguity" as to responsibility.

170. Notwithstanding this knowledge, Defendants caused fines, charges, and liens to be assessed and pursued against Plaintiff and other Bent Creek owners under the Association's CC&Rs, which contain no provision authorizing fines. Defendants thus asserted and sought to collect monetary penalties they knew the recorded covenants did not authorize.

171. Defendants' conduct was knowing and willful, undertaken with intent to collect amounts not owed and not authorized by the governing documents, and was not the product of a good-faith dispute over an unsettled question of law or of a bona-fide error, because Defendants possessed — and publicly professed — knowledge of the very standard their conduct violated.

**I. Alteration of Account Records After Notice of the Duty to Preserve, and Undisclosed Fee Practices**

172. After Plaintiff placed Defendants on written notice of their duty to preserve evidence on July 16, 2025, Defendants altered the very account records at issue.

173. The HOA's own authenticated Vantaca ledger, generated February 16, 2026 (Exhibit P), showed Plaintiff's account (Account No. ending in 4619) carrying a $240.00 balance, itemized as two "Fine – Exterior Maintenance" charges ($50.00 posted February 6, 2025 and $100.00 posted February 27, 2025), five $15.00 administrative fees, and one $15.00 certified-letter fee.

174. A current transaction-history report for the same account, generated by the same reporting system on July 1, 2026, shows that the two "Fine – Exterior Maintenance" charges have been deleted from the account's transaction history in their entirety — not credited, but erased — with the running balance recomputed as though those fines had never been assessed. (Exhibit P2.)

175. The same July 1, 2026 report shows an adjustment credit of ($90.00) — recorded in the account only as a transaction type "Adj" and bearing a blank description, with no reason code or reference — entered on April 13, 2026, reversing the five administrative fees and the certified-letter fee. (Exhibit P2.)

176. The account that Defendants' own ledger showed carrying a $240.00 balance now reflects a balance of $0.00, with no record that the $150.00 in fines was ever imposed. Both reports were produced by the same system-of-record reporting engine, establishing that the change was made in Defendants' underlying account database and then re-exported.

177. Defendants gave Plaintiff no notice of either change. Plaintiff discovered the alteration only upon generating the current report on July 1, 2026.

178. The reversal and deletion occurred approximately one month after the litigation in *Burgess v. Bradford Hills Homeowners Ass'n* concluded.

179. On March 13, 2026, the Tennessee Court of Appeals affirmed the trial court's judgments in the homeowner's appeal, leaving final the trial court's December 15, 2023 declaratory judgment, which found the association's restrictive covenants "vague, ambiguous, and invalid as applied" to the homeowner. *Burgess v. Bradford Hills Homeowners Ass'n*, No. M2024-00102-COA-R3-CV (Tenn. Ct. App. Mar. 13, 2026) (copy attached as Exhibit W).

180. Defendant Timmons Properties, Inc. served as the management company for the association *in Burgess,* and Defendants Lynn Burka and Scott D. Weiss were named as defendants in that case.

181. The timing, the absence of any notice, and the unlabeled character of the credit support a reasonable inference that Defendants reversed Plaintiff's charges to reduce their exposure in this litigation while concealing that they had done so, rather than as any good-faith reassessment disclosed to Plaintiff.

182. Defendants' own records reflect that when the Board waives, reduces, or denies a fine or fee for any other homeowner, it does so only by a recorded motion identified by property, and that the management company "does not have the ability to alter" a fine decision.

183. The Association's published minutes confirm this practice. The minutes of the October 28, 2024 Board meeting record a homeowner appeal request decided by unanimous Board vote.

184. On information and belief, based on descriptions of the Association's board-meeting packets returned by the Association's own portal document system, the Board likewise voted in October 2024 to waive fines for at least two other properties, voted on additional homeowner

fine appeals in February and July 2025, and stated in September 2024 board materials that no single person may overturn a charge without Board review and approval.

185. The silent, off-record reversal of Plaintiff's charges — with no appeal, no motion, and no entry in any meeting minutes — was a departure from Defendants' stated procedure and was selective as to Plaintiff.

186. Defendants' own written procedure for removing a charge requires that the Board first approve the removal, that the approval be recorded, and that management or accounting then execute it; a documented May 2023 example reflects that sequence expressly.

187. The April 13, 2026 reversal of Plaintiff's charges followed none of these steps — no recorded board approval, no minutes, and a blank, unlabeled "Adj" entry — and thus departed from the Association's own stated procedure for legitimate charge removals.

188. Defendants' own monthly financial statements reflect that the Association continued to assess and book fine revenue against other homeowners throughout 2026 — including $645.00 in April 2026 and $970.00 in May 2026, and $3,230.00 year-to-date through May 2026 — during the same period in which Defendants silently reversed and deleted Plaintiff's fines without any board vote or notice.

189. Defendants' erasure of the charges on which their enforcement and collection demands were based — after the duty to preserve attached, without notice, and shortly after the affirmance described in Paragraph 178 — evidences their knowledge that the charges were never valid and supports the inference that the alteration was undertaken in anticipation of scrutiny of those records.

190. On July 15, 2026, a written preservation demand was served in this matter, specifically identifying the deleted fine entries and the April 13, 2026 credit and requesting

written confirmation of a litigation hold within seven days and identification of any lost or altered material within fourteen days. No confirmation, identification, or other response was received.

191. The administrative, certified-mailing, and processing fees charged against homeowner accounts, including Plaintiff's, were not fixed in the recorded CC&Rs or amendments. Instead they were set and revised by Timmons and the Board through an internal "Community Fee Form" executed only by a board member or the developer and by Timmons Properties (signed by Timmons agent Kaley Vaughn), without any vote of or notice to the membership.

192. The administrative notice fee charged to Plaintiff was $15.00 per notice in 2025, while Defendants' 2026 Community Fee Form sets that fee at $20.00 and the certified-mailing fee at $20.00, reflecting that Defendants changed the fee amounts unilaterally and without membership approval.

193. Defendants' own 2026 Community Fee Form provides that the administrative notice fee is triggered only by a past-due balance meeting a "Minimum Balance" of $85.00 aged at least 31 days — a delinquent-assessment threshold.

194. Plaintiff's assessments were current at all times (paid monthly by automatic ACH); the administrative fees assessed against his account accrued on disputed, unauthorized fines rather than on any delinquent assessment, and therefore did not satisfy Defendants' own stated trigger for the fee.

195. In addition, the $20.00 certified-mailing fee listed on the 2026 Community Fee Form exceeded the Association's actual certified-mailing cost reflected in its own financial records (approximately $15.00 or less per item). On information and belief, Defendants likewise

assessed processing and related fees against owner accounts in varying amounts that did not correspond to any published schedule.

196. The $15.00 certified-letter fee charged to Plaintiff's account on May 30, 2025 was for a certified mailing of the 10-Day Collection Letter that Plaintiff never received by certified mail.

197. Because the fee amounts were neither disclosed to nor approved by the membership, were changed unilaterally, and were charged against Plaintiff's account without satisfying Defendants' own stated trigger, the charges were not authorized by any agreement creating the obligation or permitted by law.

### J. Disclosure of Plaintiff's Medical Information Through the Portal Artificial-Intelligence System

198. On July 1, 2026, the "Ask HOAi" artificial-intelligence assistant embedded in the Timmons/Vantaca homeowner portal, in response to ordinary owner questions submitted through Plaintiff's authorized owner account, returned excerpts from and citations to Board executive-session materials concerning Plaintiff's own reasonable-accommodation matter, including Plaintiff's protected medical and disability information.

199. Plaintiff immediately ceased review, quarantined the materials, and the same day transmitted a written notice consistent with Tennessee Supreme Court Rule 8, RPC 4.4(b) to Defendant Weiss, offering sequestration of the materials.

200. The notice also reiterated the data-handling concern Plaintiff had raised with the Association in 2025, when Defendants demanded that Plaintiff submit medical documentation without providing any secure channel for doing so.

201. No Defendant ever responded to the notice.

## V. CLAIMS FOR RELIEF

**COUNT I: Violation of the Fair Housing Act — Failure to Make Reasonable Accommodation (42 U.S.C. § 3604(f)(3)(B))**

**(Against Bent Creek HOA, Inc.; Timmons Properties, Inc.; Lynn Burka; Kaman & Cusimano, LLC; and Scott Weiss)**

202. Plaintiff realleges and incorporates by reference Paragraphs 5 through 35 (Parties, Jurisdiction, and Venue), Paragraphs 36 through 40 (Background), Paragraphs 41 through 66 (Unauthorized Fining Practices), Paragraphs 83 through 86 (the "First Instance" Statement and Prior Disability Disclosures), and Paragraphs 87 through 134 (Retaliation Against Plaintiff), and Paragraphs 198 through 201 (Disclosure of Plaintiff's Medical Information Through the Portal Artificial-Intelligence System) as though fully set forth herein.

203. K&C's conduct was consistent with its broader role as an HOA-industry enforcement firm. K&C did not merely respond to an isolated dispute after the fact. Rather, K&C used its collection practice, community-association enforcement experience, and control over Board communications to normalize, defend, and perpetuate enforcement practices that Plaintiff alleges were unauthorized, retaliatory, and misleading.

204. After Plaintiff placed Defendants on notice that the governing documents did not authorize monetary fines, that prior disability disclosures existed, and that the continued enforcement activity interfered with protected Fair Housing Act rights, K&C continued to maintain the enforcement posture, pursue collection pressure, and advise the Board to restrict public discussion of the dispute.

205. Plaintiff has a qualifying disability as defined under the FHA, 42 U.S.C. § 3602(h), as documented by Dr. Justin Dearing, D.C. in a Supplementary Attending Physician's Statement dated July 21, 2025. (Exhibit L.)

206. Defendants knew or reasonably should have known of Plaintiff's disability based on at least five prior disclosures between January and April 2025, as set forth in ¶ 84(a)-(e) above.

207. Plaintiff requested a reasonable accommodation — additional time to cure minor exterior violations — which is a common and routine accommodation for mobility- and fatigue-related disabilities that imposes no financial or administrative burden on the HOA. Plaintiff submitted a formal written request for reasonable accommodation on June 1, 2025. (Exhibit G.)

208. Each Defendant named in this Count engaged in the following conduct:

(a) Defendant Bent Creek HOA (i) approved the May 19, 2025 sidewalk restriction (Exhibit E); (ii) ratified the continuing enforcement actions described in Paragraphs 83 through 134 above; and (iii) did not timely evaluate or act on Plaintiff's accommodation request under 42 U.S.C. § 3604(f)(3)(B), notwithstanding the prior disability disclosures stored in Timmons' records (¶ 84(a)-(e), Exhibit D);

(b) Defendant Timmons Properties received and stored the five prior disability disclosures (¶ 84(a)-(e)) and continued posting fines and administrative fees against Plaintiff's Vantaca account during the pendency of the accommodation request;

(c) Defendant Lynn Burka issued the May 19, 2025 "first instance" email and imposed the same-day sidewalk restriction; and

(d) Defendant Kaman & Cusimano, LLC received the Supplementary Attending Physician's Statement on July 24, 2025 (Exhibit M), and on July 28, 2025, through Defendant Scott Weiss, declined to act on it unless Plaintiff produced additional documentation confirming disability and necessity on the Association's forms, despite the treating provider's signed statement.

209. Plaintiff's disability impairs his ability to perform exterior repair work within standard cure deadlines due to fatigue, temperature sensitivity, and neurological limitations,

making extended compliance periods necessary to afford equal use and enjoyment of the property.

210. The requested accommodation was reasonable and necessary to afford Plaintiff equal use and enjoyment of his dwelling within the meaning of 42 U.S.C. § 3604(f)(3)(B). *See Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531 (6th Cir. 2014) (setting out the elements of Fair Housing Act reasonable-accommodation and reasonable-modification claims against a Tennessee homeowners association).

211. Despite receipt of physician documentation and prior written disclosures, Defendants continued enforcement and maintained the assessed charges without modifying deadlines or suspending enforcement during the pendency of the request, which constitutes constructive denial of the requested accommodation under 42 U.S.C. § 3604(f)(3)(B).

212. Defendants' failure to provide reasonable accommodation violates 42 U.S.C. § 3604(f)(3)(B).

213. Plaintiff seeks compensatory damages for emotional distress, economic losses including the additional carrying costs occasioned by the forced withdrawal of his home from the market and the continuing encumbrance on its marketability created by Plaintiff's obligation to disclose this pending dispute to prospective purchasers, punitive damages, and injunctive relief.

**COUNT II: Violation of the Fair Housing Act — Retaliation (42 U.S.C. § 3617)**

**(Against Bent Creek HOA, Inc.; Timmons Properties, Inc.; Lynn Burka; Kaman & Cusimano, LLC; Scott Weiss; Kiel Kovalcik; Daniel J. Miske; Robert Steve Cody; and Jeremy Edge)**

214. Plaintiff realleges and incorporates by reference Paragraphs 5 through 35 (Parties, Jurisdiction, and Venue), Paragraphs 36 through 40 (Background), Paragraphs 41 through 66 (Unauthorized Fining Practices), Paragraphs 83 through 86 (the "First Instance" Statement and Prior Disability Disclosures), Paragraphs 87 through 134 (Retaliation Against Plaintiff), and

Paragraphs 135 through 140 (Pattern of Targeting Families with Children), and Paragraphs 198 through 201 (Disclosure of Plaintiff's Medical Information Through the Portal Artificial-Intelligence System) as though fully set forth herein.

215. Plaintiff engaged in protected activity under the FHA by requesting reasonable accommodations, protesting discriminatory enforcement, submitting formal requests to inspect the HOA's books and records, and asserting his rights under the Fair Housing Act.

216. Each Defendant named in this Count engaged in the following conduct:

(a) Defendants Bent Creek HOA, Cody, and Edge (i) ratified the continued enforcement actions described above; (ii) authorized the private community security retention publicly announced by Defendant Edge on or about June 17, 2025 (Exhibit Q); and (iii) directed law-enforcement contact to Plaintiff's residence;

(b) Defendants Timmons Properties and Burka imposed the May 19, 2025 sidewalk restriction the same day as Plaintiff's May 19, 2025 request for accommodation (¶ 97) and continued enforcement during the pendency of the request;

(c) Defendants Kaman & Cusimano, LLC, Weiss, and Kovalcik rejected the physician statement and continued collection activity;

(d) Defendant Daniel J. Miske filed the Michigan bar complaint against Plaintiff on July 10, 2025, which was subsequently dismissed by the Michigan Attorney Grievance Commission (File 25-1797, dismissed August 28, 2025); and

(e) Defendant Edge authored the June 17, June 23, and June 24, 2025 Facebook posts (Exhibit Q).

217. Each retaliatory act occurred within days or weeks of a specific protected activity: the "first instance" statement and the sidewalk restriction issued the same day as Plaintiff's May

19, 2025 accommodation request; the 10-Day Collection Letter issued eleven days after that request, on May 30, 2025; and the rejection of Plaintiff's physician statement issued four days after its hand delivery (July 24 to July 28, 2025).

218. While routine violation notices predated Plaintiff's protected activity, the severity and escalation of enforcement — including referral to counsel, additional fines, public defamation, the sidewalk restriction, and the bar complaint — occurred only after Plaintiff requested accommodation and filed formal complaints.

219. The temporal proximity, escalating severity, and coordinated nature of these acts demonstrate retaliatory motive. The escalation of enforcement following protected activity, coupled with Defendants' refusal to correct factual inaccuracies despite notice, supports a plausible inference of retaliatory motive.

220. This conduct violates 42 U.S.C. § 3617. Plaintiff seeks compensatory damages for emotional distress, economic losses including the additional carrying costs occasioned by the forced withdrawal of his home from the market and the continuing encumbrance on its marketability created by Plaintiff's obligation to disclose this pending dispute to prospective purchasers, punitive damages, and injunctive relief.

**COUNT III: Breach of the Recorded Covenants**
**(Against Bent Creek HOA, Inc.)**

221. Plaintiff realleges and incorporates by reference Paragraphs 5 through 35 (Parties, Jurisdiction, and Venue), Paragraphs 41 through 66 (Unauthorized Fining Practices), and Paragraphs 172 through 197 (Alteration of Account Records After Notice of the Duty to Preserve, and Undisclosed Fee Practices) as though fully set forth herein.

222. The recorded Declaration of Covenants, Conditions and Restrictions and its twenty-five recorded amendments (Exhibit A) run with the land and constitute a contract between the

Association and Plaintiff as a Lot owner. Under Tennessee law, restrictive covenants arise from contractual transactions and are viewed as contracts and examined as such; their construction is a question of law. Because they are in derogation of the right to free use and enjoyment of property, they are strictly construed, and any doubt or ambiguity is resolved against the party seeking to enforce the restriction. *See Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 474–75, 480–81 (Tenn. 2012); *Pandharipande v. FSD Corp.*, 679 S.W.3d 610 (Tenn. 2023).

223. Plaintiff has performed his obligations under the Declaration, including payment of the periodic assessments duly levied against his Lot. (Exhibit P.)

224. As alleged in Paragraphs 48 through 61, the Declaration authorizes only liens for unpaid assessments, injunctive relief, and regular and special assessments. Neither the Declaration nor any recorded amendment authorizes the imposition of monetary fines, violation-based administrative fees, or related enforcement charges.

225. The Association breached the Declaration by imposing on Plaintiff's account charges the recorded instrument does not authorize — $150.00 in fines, $75.00 in violation-based administrative fees, and a $15.00 certified-letter fee between February 6, 2025 and May 30, 2025 (Exhibit P) — and by demanding payment of those charges under a ten-day deadline and threat of referral to a collection attorney (Exhibit H).

226. The Association further exceeded its contractual authority by threatening a security interest it had no right to assert: its May 30, 2025 collection letter stated that "[a] lien will be filed on your property and other legal action may be taken to collect the money owed" and that "[a] lien on your property may prevent the sale or refinance of your home." (Exhibit H.) The Declaration authorizes liens only for unpaid assessments; it authorizes no lien for fines, and no such lien could lawfully have been filed.

227. The unauthorized charges were maintained on Plaintiff's account and pursued through the Association's agents from February 2025 until their unexplained deletion in April 2026 (Paragraphs 172 through 197).

228. As a direct and foreseeable result of the Association's breach, Plaintiff suffered damages, including the costs of responding to and disputing the unauthorized charges and the consequential losses arising from the May 2025 withdrawal of his home from the market during the enforcement campaign, including carrying costs incurred during the fourteen-month delay in sale, in amounts to be determined at trial.

229. The foreseeability of harm to the marketability of Plaintiff's home is established by the Association's own collection letter, which warned that "[a] lien on your property may prevent the sale or refinance of your home." (Exhibit H.)

230. The Association's deletion of the charges in April 2026 neither cures nor moots the breach: it was a voluntary cessation undertaken without notice or explanation after the duty to preserve those account records attached in July 2025 (Paragraphs 172 through 197), and it cannot serve simultaneously as a defense to liability and as a neutral record-keeping event. Plaintiff remains entitled to recover his damages and, at minimum, nominal damages for the breach itself.

**COUNT IV: Violation of the Fair Debt Collection Practices Act (15 U.S.C. §§ 1692–1692p) (Against Timmons Properties, Inc.; Kaman & Cusimano, LLC; Scott Weiss; Kiel Kovalcik; and Daniel J. Miske)**

231. Plaintiff realleges and incorporates by reference Paragraphs 5 through 35 (Parties, Jurisdiction, and Venue), Paragraphs 41 through 66 (Unauthorized Fining Practices), Paragraphs 83 through 86 (the "First Instance" Statement and Prior Disability Disclosures), Paragraphs 141 through 154 (Unlicensed Debt Collection), Paragraphs 155 through 171 (Defendants'


Case 3:26-cv-00070 Document 27 Filed 08/17/26 Page 43 of 79 PageID #: 7689

Knowledge), and Paragraphs 172 through 197 (Alteration of Account Records After Notice of the Duty to Preserve, and Undisclosed Fee Practices) as though fully set forth herein.

232. Defendants Timmons Properties, K&C, Weiss, Kovalcik, and Miske are "debt collectors" within the meaning of 15 U.S.C. § 1692a(6), regularly collecting debts owed to another using instrumentalities of interstate commerce.

233. The sums sought arose from Plaintiff's obligation as a homeowner to pay monetary assessments imposed in connection with property ownership and therefore constitute "debts" incurred primarily for personal, family, or household purposes within the meaning of 15 U.S.C. § 1692a(5).

234. The statute reaches "any obligation or alleged obligation of a consumer to pay money arising out of a transaction": Defendants asserted that the fines and related charges were valid obligations arising under the recorded Declaration and enforceable against Plaintiff's Lot — the Fine Policy itself declares such fines "a charge on the land and a continuing lien against the Lot" (Exhibits B, C).

235. That asserted obligation is a "debt" under § 1692a(5) whether or not the charges were in fact owed. *See Agrelo v. Affinity Mgmt. Servs., LLC*, 841 F.3d 944 (11th Cir. 2016) (homeowners-association fine constituted a "debt" where the governing documents tied the obligation to the property).

236. Homeowners association assessments and related charges arising from property ownership constitute debts under the FDCPA because they represent obligations to pay money for personal, family, or household purposes pursuant to a consumer transaction, and Plaintiff's obligation, arising from his status as a homeowner within a consumer residential subdivision,


Case 3:26-cv-00700 Document 1 Filed 08/14/26 Page 45 of 80 PageID #: 690

constitutes a consumer debt. *See Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 698 F.3d 290, 293–94 (6th Cir. 2012) (Haddad I), cert. denied, 569 U.S. 904 (2013).

237. The FDCPA imposes strict liability for violations; knowledge of falsity is not required, subject only to the narrow statutory defense of 15 U.S.C. § 1692k(c).

238. Timmons regularly collects the HOA's fines and assessments from homeowners for a fee, using the mails and interstate wires.

239. The charges at issue in this Count are not periodic assessments serviced in the ordinary course: they are violation-based penalty charges that Plaintiff disputed in writing from their inception and that Timmons thereafter continued to collect.

240. On information and belief, although Timmons administered Plaintiff's account generally, its authority to undertake collection of these particular violation-based charges — as distinct from its routine servicing of periodic assessments — arose only after the charges became disputed and delinquent; the management agreement and account records that establish the timing and scope of that collection authority are within Defendants' possession.

241. Collection of delinquent charges is a regular part of the services Timmons provides for compensation, not an activity incidental to any bona fide fiduciary obligation: under Tennessee law, a property manager's relationship with a homeowners association is not fiduciary per se. *See Condo. Mgmt. Assocs., Inc. v. Fairway Vill. Owner's Ass'n*, No. W2009-00688-COA-R3-CV, 2010 WL 424592, at *9–10 (Tenn. Ct. App. Feb. 8, 2010). Timmons' own collection letter describes referral of unpaid accounts to "a collection attorney" (Exhibit H).

242. Defendants violated the FDCPA as follows:

(a) falsely representing the character, amount, and legal status of alleged debts by demanding payment of sums not permitted by law and misrepresenting them as

legally enforceable debts, including the May 30, 2025 demand for $290 — representing "$200" in fines — when the HOA's own Vantaca ledger showed $150 in fines and a total delinquency of $240.00 as of that date (¶ 151, Exhibits H, P) (15 U.S.C. § 1692e(2)(A));

(b) collecting or attempting to collect amounts not expressly authorized by the agreement creating the obligation or permitted by law, including the overstated May 30, 2025 demand described in ¶ 151 (15 U.S.C. § 1692f(1));

(c) failing to provide verification after Plaintiff's timely written dispute (15 U.S.C. § 1692g(b)) (*see Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 758 F.3d 777 (6th Cir. 2014) (Haddad II));

(d) failing to cease collection of the debt while validation was outstanding, in violation of 15 U.S.C. § 1692g(b);

(e) using false, deceptive, or misleading representations or means in connection with the collection of any debt, including misrepresenting fines as enforceable obligations (15 U.S.C. § 1692e(10)); and

(f) threatening to take action that cannot legally be taken, including the May 30, 2025 representation that "[a] lien will be filed on your property and other legal action may be taken to collect the money owed," when the recorded governing documents authorize no lien for fines or related charges and no such lien was ever filed (Exhibit H) (15 U.S.C. § 1692e(5)).

243. Defendants' violations were knowing and were not the result of a bona-fide error. As alleged in Section IV.H, Defendants K&C, Weiss, and Miske possessed, and publicly professed,

knowledge that the recorded covenants conferred no authority to impose fines; accordingly, Defendants cannot establish the bona-fide-error defense under 15 U.S.C. § 1692k(c).

244. To the extent Defendants rely on a mistaken interpretation of the FDCPA's own requirements, the defense is unavailable as a matter of law. *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 604–05 (2010).

245. To the extent Defendants rely on a mistaken understanding of the enforceability of the charges under Tennessee law, the defense fails on its own terms: § 1692k(c) excuses only violations that are unintentional and that occur despite procedures reasonably adapted to avoid them, and the violations alleged herein were knowing rather than unintentional; Defendants' representation of the fines as legally enforceable debts was made with knowledge of its falsity.

246. K&C and Miske were further on specific notice of FDCPA claims and litigation risk in the community-association context by reason of the *Oie* action described in Paragraphs 144 through 146.

247. Each collection communication alleged in this Count constitutes a discrete violation of the FDCPA. The May 30, 2025 collection letter and the July 28, 2025 collection communication each occurred within one year of the commencement of this action, and this Count is timely under 15 U.S.C. § 1692k(d). This Count arises out of the conduct, transactions, and occurrences set forth in Plaintiff's original Complaint (Doc. 1), which identified the May 30, 2025 collection letter and the charges it demanded and named every Defendant named in this Count; the claims in this Count — including those arising from the July 28, 2025 communications and from the failure to verify or cease collection following Plaintiff's June 28, 2025 written dispute — therefore relate back to the May 27, 2026 filing of the original Complaint under Fed. R. Civ. P. 15(c)(1)(B).


Case 3:26-cv-00700 Document 27-1 Filed 08/17/26 Page 47 of 80 PageID #: 7893

248. Pursuant to 15 U.S.C. § 1692k, Plaintiff is entitled to actual damages, statutory damages of $1,000 pursuant to 15 U.S.C. § 1692k(a)(2)(A), costs of suit, and reasonable attorney's fees if and to the extent permitted by law in the event counsel appears.

**COUNT V: Violation of the Tennessee Consumer Protection Act (Tenn. Code Ann. § 47-18-104)**

**(Against Timmons Properties, Inc.; Lynn Burka; Kaman & Cusimano, LLC; Scott Weiss; Kiel Kovalcik; and Daniel J. Miske)**

249. Plaintiff realleges and incorporates by reference Paragraphs 5 through 35 (Parties, Jurisdiction, and Venue), Paragraphs 41 through 66 (Unauthorized Fining Practices), Paragraphs 83 through 86 (the "First Instance" Statement and Prior Disability Disclosures), Paragraphs 141 through 154 (Unlicensed Debt Collection), and Paragraphs 172 through 197 (Alteration of Account Records After Notice of the Duty to Preserve, and Undisclosed Fee Practices) as though fully set forth herein.

250. Timmons and K&C are compensated service providers that provide property management and debt collection services to homeowners associations in exchange for fees, and engaged in those services in the regular course of trade or commerce as defined under Tenn. Code Ann. § 47-18-103.

251. Defendants Timmons Properties and Lynn Burka misrepresented the validity of charges to Plaintiff via the Vantaca portal and mass-email communications. Defendants Kaman & Cusimano, LLC, Scott Weiss, Kiel Kovalcik, and Daniel J. Miske misrepresented the status and enforceability of debts through formal collection communications, including the July 28, 2025 response to physician documentation.

252. Defendants engaged in unfair or deceptive acts or practices affecting the conduct of trade or commerce, described in Tenn. Code Ann. § 47-18-104(b) and declared unlawful by the Tennessee Consumer Protection Act — including the practice described in § 47-18-104(b)(12),

representing that a consumer transaction confers or involves rights, remedies, or obligations that it does not have or involve — in that Defendants engaged in the following:

(a) making materially false factual statements about Plaintiff's conduct and account history, including the false "first instance" characterization of Plaintiff's May 2025 disability accommodation request (¶ 84(a)-(e), Exhibit E) and the false "has not moved" characterizations transmitted on April 25, 2025 and May 12, 2025 (Exhibits J, K);

(b) misrepresenting the status, character, and amount of debts owed by Plaintiff, including representing the listed fines and administrative charges as valid and enforceable obligations notwithstanding the absence of any fining provision in the recorded CC&Rs and twenty-five recorded amendments (¶¶ 41 through 66, Exhibit A);

(c) using deceptive collection communications, including the July 28, 2025 communication declining to act on Plaintiff's physician documentation and demanding additional disability-and-necessity documentation on the Association's own forms; and

(d) demanding payment of $290, including "$200" in fines, in the May 30, 2025 10-Day Collection Letter when the HOA's own Vantaca ledger showed $150 in fines and a total delinquency of $240.00 as of that date — an unfair and deceptive overstatement of the amount owed (¶ 151, Exhibits H, P).

253. This Count is timely under Tenn. Code Ann. § 47-18-110. Plaintiff brought this action within one year of discovering the unfair and deceptive character of the acts and practices alleged, and within five years of the transactions giving rise to them.


Case 3:26-cv-00700 Document 1 Filed 08/14/26 Page 49 of 79 PageID #: 75

254. Defendants' deceptive representations regarding the validity, amount, and enforceability of the charges continued through at least the July 28, 2025 communication and the continued maintenance of the charges on Plaintiff's account thereafter, until their deletion on April 13, 2026.

255. To the extent any communication alleged in this Count predates May 27, 2025, it is pleaded as background and context; the actionable practices include the May 30, 2025 collection letter, the July 28, 2025 communications, and Defendants' continued maintenance and representation of the charges as valid, enforceable obligations through April 13, 2026.

256. This Count arises out of the conduct, transactions, and occurrences set forth in Plaintiff's original Complaint (Doc. 1) and relates back to its May 27, 2026 filing under Fed. R. Civ. P. 15(c)(1)(B).

257. As a direct and proximate result of these acts, Plaintiff suffered an ascertainable loss of money or property within the meaning of Tenn. Code Ann. § 47-18-109(a)(1), including the costs incurred responding to and disputing the unauthorized charges and the consequential carrying costs arising from the May 2025 withdrawal of his home from the market.

258. If Plaintiff proves a willful or knowing violation, the Court may award treble damages under Tenn. Code Ann. § 47-18-109(a)(3). Plaintiff also seeks costs of suit and reasonable attorney's fees if and to the extent permitted by law in the event counsel appears.

**COUNT VI: Breach of Fiduciary Duty**

**(Against Robert Steve Cody; Jeremy Edge; David Raissi; Jared Burke; Melissa Plank; Susannah Millar; Tim Barry; and Timmons Properties, Inc.)**

259. Plaintiff realleges and incorporates by reference Paragraphs 5 through 35 (Parties, Jurisdiction, and Venue), Paragraphs 41 through 66 (Unauthorized Fining Practices), Paragraphs 67 through 82 (Financial Irregularities and Reserve Fund Misuse and Diversion), and Paragraphs

172 through 197 (Alteration of Account Records After Notice of the Duty to Preserve, and Undisclosed Fee Practices) as though fully set forth herein.

260. The individual Board member Defendants owe fiduciary duties of care, loyalty, and good faith in the conduct of the Association's affairs, and the conduct alleged in this Count was directed at Plaintiff individually and at his Lot.

261. Timmons' duties to Plaintiff do not rest on any per se fiduciary status: they arise from the special relationship created by Timmons' receipt and handling of Plaintiff's funds, its exclusive dominion and control over Plaintiff's account, its records, and his personal information, and Plaintiff's necessary reliance on Timmons' administration of that account. *See Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 410 (Tenn. 2002) (stating the general Tennessee standard: a confidential relationship is one in which confidence is placed by one party in another who thereby gains the ability to "influence and exercise dominion and control over" the party reposing the confidence).

262. Unlike the Association itself, an individual homeowner has no oversight capacity over the managing agent: no role in its selection or retention, no access to its books, and no ability to audit the ledger it maintains for his account.

263. These duties arise under Tennessee law from Defendants' positions as directors and as managing agent, respectively; they exist independently of the recorded covenants, and they are owed by persons who are not parties to the contractual obligations alleged in Count III.

264. Plaintiff, as the member whose Lot and account were the direct object of the conduct alleged, suffered injury distinct from any injury to the Association or its membership generally.

265. Each Defendant named in this Count engaged in the following conduct:

(a) Defendant Robert Steve Cody, as President and as the sole invoice-approving authority of the Association, unilaterally approved expenditures including the diversion of approximately $230,000 to Falling Water Entrance construction without documented separation of duties or member approval;

(b) Defendants Edge, Raissi, Burke, Plank, Millar, and Barry, as Board members, ratified or failed to challenge the pattern of expenditures exceeding budgeted amounts and failed to require member approval for reserve transfers; and

(c) Defendant Timmons Properties, as the Association's agent and property manager, administered the unauthorized expenditures, posted fines through the Vantaca portal, and failed to disclose the financial irregularities to members.

266. Defendants breached their fiduciary duties by:

(a) approving expenditures exceeding budgeted amounts by $316,103 across 2021–2025 without member approval;

(b) depleting reserve funds from $1,333,728 (2021) to $955,748 (2025), a net decline of $377,980, including approving the $230,000+ Falling Water Entrance expenditure from unappropriated reserves in deviation from the budgeted Signage/Renovation/Entrance Monuments line items in the Reserve Study;

(c) approving reserve fund expenditures and transfers without member approval and in deviation from the purposes documented in the Association's Reserve Study effective June 26, 2020 (Exhibit T), including the expenditure of approximately $230,000 on Falling Water Entrance construction in 2024–2025, which substantially exceeded the Signage/Renovation/Entrance Monuments line items budgeted in the


Case 3:26-cv-00700 Document 27 Filed 08/14/26 Page 52 of 79 PageID #: 789

Reserve Study and was paid from unappropriated reserve funds without separate member approval;

(d) approving expenditures on private community security services without documented procurement procedures or member disclosure, as reflected in Defendant Edge's public statement on or about June 17, 2025 announcing the retention of private security (Exhibit Q), including through testimony of former Board member Stacey Brans;

(e) implementing a fining program without legal authority, generating $25,120 in fines (2023–2025) not authorized by the CC&Rs;

(f) failing to hold open meetings or provide financial transparency;

(g) refusing or declining delivery of certified-mail requests, notices, and records demands transmitted by Plaintiff; and

(h) at the most recent Annual Board meeting, refusing to allocate time for member questions and, when Plaintiff sought to raise governance concerns, directing Plaintiff to "talk to our lawyers" (per Defendant Cody) and adjourning the meeting; and

(i) approving and maintaining surveillance camera systems, including license-plate readers, without recorded authorization or disclosure to the membership.

267. Each breach caused direct economic harm to Plaintiff as a dues-paying member whose funds were diverted to unauthorized purposes and whose account was assessed fines the HOA lacked authority to impose.

268. Each Defendant named in this Count, during his or her tenure, acted with willful, wanton, or gross negligence, including by continuing the fining program after written notice that

the recorded covenants did not authorize it and by the alteration of Plaintiff's account records after the duty to preserve them attached (Paragraphs 172 through 197).

269. Plaintiff first discovered the facts underlying these breaches upon obtaining the Association's year-end financial statements and the Reserve Study beginning in December 2025 and completing his review in February 2026.

270. Defendants' closed meetings, refusal of certified mail, and nondisclosure of the financial irregularities concealed those facts from Plaintiff and the membership, and this Count is timely under Tenn. Code Ann. § 48-58-601, having been brought within one year of that discovery, with Defendants' concealment tolling both the one-year limitation and the three-year outer period as to earlier conduct.

271. Plaintiff's claim is premised primarily on individualized harm arising from unauthorized fines and targeted enforcement actions uniquely imposed upon his property — separate and apart from any injury to the Association.

272. The reserve and expenditure practices described in Paragraphs 67 through 82 are alleged as evidence of the Board's breaches of its duties of care and oversight — the same failures of governance that enabled the unauthorized fining and targeted enforcement directed at Plaintiff — and not as a separate theory of Association-wide injury.

273. Plaintiff has been harmed by the imposition and maintenance on his account of $240.00 in unauthorized fines and fees — the instruments of the enforcement scheme — and by the consequential carrying costs and delay in sale caused by the forced withdrawal of Plaintiff's property from the market in May 2025 and the continuing encumbrance on marketability created by his obligation under Tennessee law to disclose the pending dispute and this litigation to prospective purchasers.

**COUNT VII: Defamation (Libel)**

**(Against Jeremy Edge, individually)**

274. Plaintiff realleges and incorporates by reference Paragraphs 5 through 35 (Parties, Jurisdiction, and Venue) and Paragraphs 118 through 120 (the June 23, 2025 Edge publications) as though fully set forth herein.

275. Defendant Edge published false statements of fact to the Bent Creek community via the Bent Creek Neighborhood -Uncensored- Facebook group on multiple occasions. On June 23, 2025, Edge wrote: "Maybe if residents dont threaten, stalk, and harass, this won't be an issue. You clearly don't care that board members and their families are suffering, are frightened, and their children are scared." (Exhibit Q.)

276. In the same thread, Edge stated: "we are looking at serious threats, stalking, attempts to engage with my children from the sidewalk while my kids were playing, and the ability of the perpetrator to walk a fine line keeping any real legal action unavailable." (Exhibit Q.)

277. These statements are actionable under Tennessee law because they impute the commission of crimes — stalking (Tenn. Code Ann. § 39-17-315) and making threats — to Plaintiff. Plaintiff suffered actual injury as a result of the statements, including impairment of his reputation and standing in the community, personal humiliation, and mental anguish.

278. Accusations of "stalking," "threats," and being a "perpetrator" constitute verifiable factual assertions implying criminal conduct, not mere opinion or rhetorical hyperbole.

279. Plaintiff did not engage in stalking, threats, or any criminal conduct. Edge knew that Plaintiff had not engaged in stalking or criminal conduct and had never been charged with, arrested for, or convicted of any such offense.

280. The statements were published to the community with knowledge of their falsity or with reckless disregard for their truth.

281. The statements caused damage to Plaintiff's reputation, standing in the community, and emotional well-being. Plaintiff is entitled to recover compensatory damages for these injuries in an amount to be determined at trial.

**COUNT VIII: Civil RICO — Conduct of Enterprise Through Pattern of Racketeering Activity (18 U.S.C. § 1962(c))**

**(Against Lynn Burka and Scott D. Weiss)**

282. Plaintiff realleges and incorporates by reference the following paragraphs, identified by the element each supports: Paragraphs 5 through 35 (parties, jurisdiction, and venue); Paragraphs 41 through 66 (the unauthorized fining practices through which the scheme operated); Paragraphs 67 through 82 (the financial practices the fine revenue served); Paragraphs 83 through 134 (the false statements and enforcement escalation constituting the predicate conduct); Paragraphs 135 through 140 (enforcement directed at other homeowners); Paragraphs 141 through 154 (Timmons' and K&C's collection roles and control); Paragraphs 155 through 171 (Defendants' knowledge that the recorded covenants conferred no authority to fine); and Paragraphs 172 through 197 (the alteration of account records after notice of the duty to preserve).

283. Pursuant to *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001), the "person" liable under 18 U.S.C. § 1962(c) must be distinct from the "enterprise" through which the conduct occurs.

284. Plaintiff alleges the enterprise as an association-in-fact comprising the Bent Creek HOA, Timmons Properties, Inc., and Kaman & Cusimano, LLC — and therefore those entities are not named as Count VIII defendants. Defendants Burka and Weiss, the persons named in this Count, are alleged to have conducted the affairs of that enterprise through a pattern of racketeering activity; the remaining Defendants are named in Count IX.

**A. The Enterprise (18 U.S.C. § 1961(4))**

285. At all relevant times, the Bent Creek HOA, Timmons Properties, Inc., and Kaman & Cusimano, LLC associated in fact as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"). *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

286. Defendants Burka and Weiss are not part of the Enterprise as pleaded; they are the "persons" under 18 U.S.C. § 1962(c) who conducted or participated in the conduct of the Enterprise's affairs, and each is distinct from the Enterprise itself. That Burka is an officer of Timmons and Weiss a member of K&C does not defeat distinctness: a natural person is distinct from the corporation through which he or she acts. *See Cedric Kushner,* 533 U.S. at 163.

287. The Enterprise had a common purpose: to deploy an enforcement-and-collections apparatus that used deceptive communications to coerce compliance, deter challenges, and restrict owner oversight and accountability.

288. The Enterprise had ongoing relationships and structure among its three components, each performing a distinct function.

289. The Board authorized enforcement and restrictions.

290. Timmons implemented inspections, notices, mailings, and portal charges.

291. K&C supplied the legal enforcement framework, provided escalation support, drafted and approved enforcement positions, and maintained pressure through collection communications and refusal to correct known falsehoods.

292. K&C's role was not limited to giving detached legal advice; through Weiss, Kovalcik, and Miske, K&C helped operationalize, defend, and escalate the HOA's enforcement-and-collection apparatus after notice of legal and factual defects.

293. The Enterprise functioned as a continuing unit from at least 2023 through the present, repeatedly using the same methods and channels (mail, email, and portal communications) against Plaintiff and other owners.

**B. Participation in Conduct of Enterprise Affairs (Reves)**

294. The HOA Board directed the affairs of the Enterprise by authorizing enforcement actions and restrictions, approving or ratifying communications, directing escalation, and using enforcement communications to deter oversight.

295. Cody, as President, chair of the Architectural Review Committee, chair of the Compliance Committee, and the sole board-level invoice approver, directed the inspection and enforcement activity through which the predicate communications were generated.

296. According to the Association's own committee rosters, no other Board member chairs either committee and no other Board member holds invoice-approval authority: the same individual controls architectural review, compliance enforcement, and payment approval, without any recorded check, balance, or oversight on his decisions.

297. Cody personally photographed and filmed Plaintiff's property and family members, and directed law-enforcement contacts against Plaintiff.

298. The Board members — Cody, Edge, Raissi, Burke, Plank, Millar, and Barry — adopted and maintained the Fine Policy under which the predicate demands issued.

299. The Board approved the June 2025 revision of that policy while the enforcement campaign against Plaintiff was ongoing, and ratified the enforcement and collection communications after Plaintiff had disputed their false factual premises in writing.

300. The predicate communications transmitted through Timmons and K&C issued under the policies the Board adopted and the direction it supplied.


Case 3:26-cv-00700 Document 27 Filed 03/17/26 Page 58 of 79 PageID #: 795

301. Through Burka and Vaughn, Timmons participated in the operation and management of the Enterprise by generating and transmitting the core enforcement communications and account charges — by mail and via interstate electronic systems — and by executing escalation even after being provided contrary facts and corrections.

302. Defendant Burka — President and Managing Partner of Timmons and, on information and belief, the Timmons principal responsible for the Bent Creek account — personally directed and supervised that activity: she supervised the records and Vantaca portal through which the charges issued, and personally authored the May 19, 2025 communications described in Predicate 3.

303. On information and belief, Burka directed or approved the transmissions described in Predicates 1, 2, 4, and 5. Burka thereby conducted and participated in the conduct of the Enterprise's affairs.

304. Through Weiss, Kovalcik, and Miske, K&C participated in the operation and management of the Enterprise by acting as the legal escalation gatekeeper, supplying the enforcement rationale used by the HOA and Timmons, and maintaining the enforcement posture after notice of factual and legal defects, including adopting positions designed to avoid correcting the file record and continuing collection pressure. Defendant Weiss, as Partner and Tennessee Office Chair of K&C, personally performed the escalation described in Predicate 6 and thereby conducted and participated in the conduct of the Enterprise's affairs.

305. Timmons administered the enforcement apparatus, the HOA Board authorized the policies, and K&C executed and escalated collection activity, each playing a distinct role in directing the enterprise's affairs.

**C. The Scheme to Defraud (Mail Fraud, 18 U.S.C. § 1341; Wire Fraud, 18 U.S.C. § 1343)**

306. The Enterprise carried out a course of conduct to defraud Plaintiff of money and property by transmitting written demands and public accusations that contained materially false statements of fact — including statements that were verifiable at the time made and contradicted by Defendants' own records — calculated to induce payment, restrict communications, and chill oversight.

307. On a broader scale, the unauthorized fines served to generate revenue used to offset and obscure the unauthorized and undisclosed expenditures in the Association's budget and reserves, while simultaneously increasing Timmons' fee-based profits from enforcement and collection activity and increasing K&C's legal billings for enforcing the unauthorized rules.

308. This enforcement-and-collection apparatus conferred no benefit on the Bent Creek community; if anything, it generated more disputes and division than existed before the enforcement campaign began.

309. The course of conduct relied on repeated use of the U.S. mails and interstate wires, and it continued after Defendants were placed on notice that key factual assertions were false.

**D. Predicate Acts — Rule 9(b) Schedule**

310. The following predicate acts demonstrate a repeated pattern of knowingly false factual statements, transmitted by mail or interstate wire, used to induce payment of unauthorized charges, delay the interactive accommodation process, and chill Plaintiff's protected activity. Predicates 1 through 5 allege transmissions made by or through Timmons personnel; as alleged in Paragraph 301, those transmissions issued under Defendant Burka's direction and supervision, and Burka thereby caused each such mailing and wire transmission within the meaning of 18 U.S.C. §§ 1341 and 1343.

311. Each act of mail fraud violates 18 U.S.C. § 1341, and each act of wire fraud violates 18 U.S.C. § 1343; each such act constitutes "racketeering activity" as defined in 18 U.S.C. §

1961(1)(B). A mailing or wire transmission in furtherance of a scheme to defraud need not itself contain a false statement. *See Schmuck v. United States*, 489 U.S. 705, 710–12, 715 (1989).

**Predicate 1 — Wire Fraud: Public Vehicle-Status Accusation (May 12, 2025)**

312. On May 12, 2025, Defendant Lynn Burka caused Timmons Properties, Inc. to transmit via mass email (interstate wire) to the Bent Creek community a notice regarding a vehicle belonging to Plaintiff stating, in pertinent part: the vehicle "has been parked on Fishing Creek Road since Thursday of last week and has not moved" and "will be towed." (Exhibit K.)

313. This statement was false. The vehicle was not abandoned in place: it was lawfully parked, had been temporarily relocated to that location by Plaintiff's real estate agent, while Plaintiff was out of town, in connection with an open-house showing for Plaintiff's then-active property listing, and was in active use in connection with that listing. The characterization of the vehicle as stationary and subject to towing misrepresented the vehicle's status, as circumstances known to or readily verifiable by Timmons — including through its own inspection records — would have shown.

314. The same vehicle appears in the photograph accompanying Timmons' own February 27, 2025 exterior-maintenance violation notice to Plaintiff (Case No. XN867602), parked in Plaintiff's driveway. Timmons' own inspection records thus showed that the vehicle was Plaintiff's and was regularly present at his residence.

315. Burka knew or recklessly disregarded the falsity because the circumstances of the vehicle's lawful placement — including the active property listing and open-house schedule — were readily ascertainable from Timmons' own enforcement records, maintained under her supervision, and Plaintiff's prior correspondence with Timmons concerning the listing.

316. Burka and Timmons used the false statement to publicly brand Plaintiff as violating community rules, coerce compliance, and reinforce the validity of outstanding monetary charges against him.

**Predicate 2 — Wire Fraud: "Has Not Moved" Tow Threat (April 25, 2025)**

317. On April 25, 2025, Kaley Vaughn — Timmons' Association Manager for Bent Creek, acting on behalf of Timmons Properties, Inc. and, on information and belief, under the direction and supervision of Defendant Lynn Burka — transmitted via email (interstate wire) to Plaintiff a notice regarding Plaintiff's camper stating, in pertinent part: the camper "was dropped off a few days ago and has not moved," coupled with a same-day towing threat. (Exhibit J.)

318. This statement was false. The camper was Plaintiff's, was placed openly in connection with Plaintiff's accommodation, and was in active use: Plaintiff's family members made repeated trips between Plaintiff's residence and the camper. The "dropped off" and "has not moved" characterizations were contradicted by that observed activity and by Timmons' own observation records and inspection logs maintained for Bent Creek properties.

319. Burka and Timmons knew or recklessly disregarded the falsity because the inspection logs and prior correspondence contradicting the assertions were within Timmons' possession and under Burka's supervisory control.

320. Defendants knew the camper was Plaintiff's and was in active use: Defendant Cody personally filmed Plaintiff's family members as they made trips back and forth between Plaintiff's residence and the camper, contradicting the "dropped off" and "has not moved" characterizations.

321. Burka and Timmons used the false statement to threaten enforcement action against Plaintiff, escalate pressure for compliance, and threaten the deprivation of Plaintiff's personal property by same-day towing.


Case 3:26-cv-00700 Document 27 Filed 08/14/26 Page 63 of 79 PageID #: 798

**Predicate 3 — Mail and Wire Fraud: False "First Instance" Disability Statement (May 19, 2025)**

322. On May 19, 2025, Defendant Lynn Burka sent Plaintiff an email (Exhibit E) stating: "This is the first instance in which you've mentioned a disability that may impact your mobility or indicated a desire to request a reasonable accommodation."

323. This statement was false. Plaintiff had previously disclosed his disability and health-related limitations to Timmons on at least five occasions: (a) a January 2025 Vantaca portal report acknowledged by Kaley Vaughn's March 2025 email; (b) a February 28, 2025 email ("We were sick…"); (c) a March 27, 2025 email; (d) a March 28, 2025 email; and (e) an April 30, 2025 email ("I am currently off work with disability…"). (See ¶ 84(a)-(e) and Exhibit D.)

324. Burka knew the statement was false because the prior disclosures were stored in Timmons' own records and Vantaca portal, which Burka supervised.

325. Burka used the false statement to delay the interactive accommodation process, impose a sidewalk restriction the same day (Exhibit E), and continue fines and enforcement actions while Plaintiff's accommodation request remained pending.

**Predicate 4 — Mail Fraud: 10-Day Collection Letter (May 30, 2025)**

326. On May 30, 2025, Defendant Lynn Burka caused Timmons Properties, Inc. to transmit via U.S. Mail to Plaintiff a 10-Day Collection Letter demanding $290 — comprising $200 in fines, $75 in administrative charges, and $15 for certified mailing — and threatening referral to "a collection attorney" for collection if not paid within ten days. (Exhibit H.)

327. The letter contained false representations:

(a) it represented the listed fines as valid and enforceable obligations, when the recorded CC&Rs and twenty-five recorded amendments contain no provision authorizing such fines (Exhibit A);



Case 3:26-cv-00700 Document 27/21 Filed 08/17/26 Page 63/64 of 79/80 PageID #: 3709/3700

(b) it demanded $290, including "$200" in fines, when the HOA's own Vantaca ledger (Exhibit P) showed $150 in fines and a total delinquency of $240.00 as of May 30, 2025 (¶ 151); and

(c) it relied on "first instance" and vehicle-status factual premises that were false and contradicted by Plaintiff's prior written disclosures and by Timmons' own records.

328. The delivery timing of the mailed demands was itself conspicuous: because Timmons transmits its notices by bulk mail, the mailed notices consistently arrived at or about the expiration of the ten-day window measured from the notice date, leaving Plaintiff little or no practical opportunity to respond before the deadline had passed.

329. Burka knew or recklessly disregarded the falsity because the absence of fining authority appeared on the face of the recorded governing documents and the prior disability disclosures and the true vehicle-status circumstances were reflected in Timmons' own records, which Burka supervised, and in Plaintiff's correspondence.

330. Burka and Timmons used the letter to coerce payment under a compressed deadline and to set up the K&C escalation that followed.

**Predicate 5 — Wire Fraud: Portal-Based Demands After Notice of Falsity**

331. Between February 6, 2025 and May 30, 2025, Defendant Lynn Burka caused Timmons Properties, Inc. to transmit via the Vantaca portal (portal.timmonsproperties.com) interstate electronic demands and posted charges to Plaintiff's account (Account No. ending in 4619), each posting a separate wire transmission: (a) a $50.00 fine on February 6, 2025; (b) a $100.00 fine on February 27, 2025; (c) a $15.00 administrative fee on March 28, 2025; (d) a $15.00 administrative fee on April 14, 2025; (e) a $15.00 administrative fee on April 30, 2025; (f) a $15.00 administrative fee on May 15, 2025; (g) a $15.00 administrative fee on May 30, 2025; and (h) a $15.00 certified-letter fee on May 30, 2025. Subparagraphs (a) through (e) are

alleged as background describing the construction of the account balance on which the later demands rested; the transmissions alleged as predicate acts are those described in subparagraphs (f) through (h).

332. The predicate transmissions described in subparagraphs (f) through (h) were false at the time made: each issued after Plaintiff's five prior written disability disclosures (¶ 84(a)-(e), Exhibit D); after the April 25 and May 12, 2025 vehicle-status assertions had been contradicted by the circumstances of the vehicles' actual placement and use, circumstances reflected in Timmons' own records and observations (¶¶ 313-314, 318-320); and, as to the May 30, 2025 postings, after the May 19, 2025 "first instance" statement had issued notwithstanding the prior disclosures stored in Timmons' records. Each transmission nonetheless represented the posted charges as valid, enforceable obligations.

333. Burka knew or recklessly disregarded the falsity because the falsity of both factual premises was apparent from Plaintiff's prior written disclosures and from Timmons' own records and Vantaca portal, which Burka supervised.

334. Burka and Timmons used the portal demands to maintain a continuing record of indebtedness against Plaintiff, coerce payment, and justify the continued enforcement posture against him.

**Predicate 6 — Wire Fraud: K&C Escalation Maintaining the False Record (Two July 28, 2025 Transmissions)**

335. On July 28, 2025, Defendant Scott Weiss transmitted two emails to Plaintiff via interstate wire: (a) a communication stating that Plaintiff's treating physician's statement did not "confirm that you have a disability" or that the requested accommodations were "necessary," and conditioning further consideration on Plaintiff's submission of additional documentation on the Association's forms; and (b) a second communication, sent later that day, stating that the

Association would decide Plaintiff's accommodation requests within seven business days and "will advise you of that decision promptly." No decision was thereafter communicated to Plaintiff. Each email was a separate wire transmission in furtherance of the scheme.

336. Weiss transmitted these communications despite having received and acknowledged a complete Supplementary Attending Physician's Statement signed by Dr. Justin Dearing, D.C., identifying diagnosis, functional limitations, and disability date (March 18, 2025) — documentation typically sufficient to evaluate accommodation requests. (Exhibit L.)

337. Weiss used these communications to prolong enforcement, sustain the account charges, and forestall the interactive accommodation process Plaintiff had requested under the Fair Housing Act; the transmissions exerted continued payment pressure on Plaintiff's account and perpetuated the unauthorized fines and fees on Plaintiff's Vantaca ledger.

338. At the time of the second July 28, 2025 transmission, Weiss did not intend that any decision would be communicated to Plaintiff.

339. That then-present intent is evidenced by the Association's failure to communicate any decision at any time thereafter, by the simultaneous continuation of the charges and enforcement posture that a decision would have resolved, and by Weiss's contemporaneous conduct alleged in Paragraphs 129 through 134, including the blocking of Plaintiff's telephone number and the statement that he had no duty to ask whether his clients' accusations were true.

340. Defendant Weiss took these actions after having been involved in *Burgess v. Bradford Hills Homeowners Ass'n*, No. 20C1835 (Davidson Cnty. Cir. Ct. Dec. 15, 2023) (declaratory judgment that the CCRs were vague, ambiguous, and invalid as applied to the homeowner in that case), judgment affirmed on the homeowner's appeal (leaving the declaratory judgment final), No. M2024-00102-COA-R3-CV (Tenn. Ct. App. Mar. 13, 2026) (Exhibit W),

both as counsel of record and as a named defendant, in a case presenting substantially similar enforcement practices.

**E. Pattern (Relatedness + Continuity)**

341. The falsity alleged in these predicate acts does not rest on a disputed interpretation of the governing documents.

342. The recorded Declaration and its twenty-five recorded amendments contain no fining provision of any kind; the absence is apparent on the face of the recorded instruments, was known to Defendants, and was called to their attention in writing before and during the conduct alleged.

343. A representation that a charge is a valid and enforceable obligation, made by parties who know that no instrument authorizes it, is a false statement of fact, not an interpretive position.

344. Defendant Burka (personally and through Timmons personnel, including Vaughn, acting under her direction) and Defendant Weiss (acting on behalf of K&C) repeatedly communicated specific factual representations — including that Plaintiff's disability disclosure was the "first instance," that vehicles had not moved and were subject to towing, and that enforcement deadlines had lawfully expired — that were demonstrably false at the time made and were used to induce payment of charges and fees.

345. The coordinated repetition of materially false characterizations across multiple written communications, even after Plaintiff's written disclosures and documentary proof contradicting them, permits a reasonable inference of intent to obtain payment through deception.

346. Defendants Cody, Edge, Raissi, Burke, Plank, Millar, Barry, Burka, Weiss, Kovalcik, and Miske were not only placed on notice by Plaintiff but also by other homeowners

and former board officials who questioned the legality of the fining authority and escalation procedures. Continued issuance of notices containing materially false factual representations after such notice supports a strong inference of intent.

347. Defendants' knowledge that the recorded covenants conferred no authority to fine — alleged in Section IV.H and confirmed by their own published statements — further demonstrates that the predicate acts were not the product of a good-faith dispute over the interpretation of governing documents.

348. Defendants Weiss and Miske publicly articulated the governing legal standard requiring clear and express authority in the recorded covenants while simultaneously directing and pursuing the collection of fines the covenants did not authorize, supporting a strong inference of intent to obtain payment through deception.

349. The predicate acts are related: they shared common participants, common methods (mail, email, and portal demands), common targets (Plaintiff and owners challenging enforcement), and common objectives (coercion, compliance, and deterrence of oversight).

350. Defendants have applied the same enforcement-and-collection apparatus to multiple families within the Bent Creek community and in other communities Timmons and K&C serve; the pattern predated Plaintiff's challenges and has continued after them.

351. On information and belief, attorneys at K&C, including Weiss — who holds himself out as a Fellow of the College of Community Association Lawyers — and Miske, present and teach continuing-legal-education programs to community-association and management-industry audiences on drafting and enforcing rules and on defending enforcement against challenges by homeowners such as Plaintiff; Plaintiff expects to develop the substance of these materials through discovery.


Case 3:26-cv-00700 Document 27 Filed 08/14/26 Page 68 of 79 PageID #: 3054

352. The predicate acts occurred between April 25, 2025 and July 28, 2025, with the resulting charges and enforcement posture maintained on Plaintiff's account until the April 13, 2026 deletion; they involved multiple distinct communications, and were executed through standardized enforcement procedures implemented by the HOA, Timmons, and K&C.

353. These acts reflect Defendants' regular way of conducting enforcement and collection activity and present an open-ended threat of repetition: the enforcement framework remains in use, the same standardized procedures continue to be applied to Bent Creek homeowners, and the Association continued booking fine revenue in 2026 (Paragraph 354).

354. The same enforcement-and-collection apparatus operated against the Bent Creek community at large over a period of years: the Association's fining revenue rose from $230 in 2021 and $110 in 2022 to $6,620 in 2023, $8,520 in 2024, and $9,980 in 2025 (Paragraph 41), and the Association booked an additional $3,230 in fine revenue in 2026 through May (Paragraph 188). The community-wide fining activity both predated the predicate acts directed at Plaintiff and has continued after them.

355. The fining-and-collection practices described herein were implemented prior to Plaintiff's first violation notice and have continued after Plaintiff placed Defendants on notice of the falsity of specific statements.

356. Multiple homeowners, including Jaime Reiter, publicly challenged the Association's fining authority, and the Association's former counsel and treasurer were advised of those concerns. Despite such notice, Defendants continued issuing standardized violation notices and pursuing monetary charges through the same procedures.

357. The enforcement practices at issue are similarly evidenced in *Burgess v. Bradford Hills Homeowners Ass'n*, No. 20C1835 (Davidson Cnty. Cir. Ct. Dec. 15, 2023) (declaratory

judgment that the CCRs were vague, ambiguous, and invalid as applied to the homeowner in that case), judgment affirmed on the homeowner's appeal (leaving the declaratory judgment final), No. M2024-00102-COA-R3-CV (Tenn. Ct. App. Mar. 13, 2026) (Exhibit W), in which Timmons Properties, Inc. served as the association's management company and Defendants Lynn Burka and Scott D. Weiss were named as defendants. The Court of Appeals had earlier vacated the trial court's dismissal of the homeowner's declaratory-judgment claim against the association and Burka. *Burgess v. Bradford Hills HOA*, No. M2020-01565-COA-R3-CV, 2023 WL 142392, at *14 (Tenn. Ct. App. Jan. 10, 2023).

358. These allegations demonstrate that the predicate acts were part of Defendants' regular way of conducting business and present an ongoing threat of repetition extending beyond Plaintiff's individual dispute.

**F. Causation and Injury (Business or Property)**

359. By reason of Defendants' racketeering conduct, Plaintiff suffered injury to his business or property within the meaning of 18 U.S.C. § 1964(c), including:

(a) out-of-pocket costs incurred in responding to Defendants' unlawful enforcement and collection demands and in preserving his rights, including printer supplies, paper, certified mailings, and document-preparation costs, totaling approximately $1,000.00;

(b) consequential losses arising from the forced withdrawal of Plaintiff's home from the market in May 2025 during Defendants' enforcement campaign, including additional carrying costs — mortgage interest, property taxes, insurance, and assessments — incurred during the resulting delay in sale (Plaintiff was not able to return the property to the market until July 2026, approximately fourteen months after the forced withdrawal), together with the continuing encumbrance on marketability created by Plaintiff's obligation under Tennessee law to disclose the pending dispute


Case 3:26-cv-00700 Document 1-1 Filed 08/17/26 Page 70 of 79 PageID #: 376

and this litigation to prospective purchasers (Exhibit R), all in amounts to be determined at trial; and

(c) documented out-of-pocket medical expenses incurred for treatment and care, together with the economic loss associated with the resulting extension of the period during which Plaintiff was unable to work, each pleaded in the alternative and as a secondary theory of economic injury, in amounts to be proven at trial. *See Med. Marijuana, Inc. v. Horn*, 604 U.S. 593 (2025) (holding that § 1964(c) does not categorically bar recovery for an injury to business or property merely because that injury resulted from an antecedent personal injury, while declining to decide what constitutes injury to "property").

360. During the July 2026 relisting, at least one prospective purchaser expressed concerns regarding the HOA dispute disclosed in Plaintiff's seller disclosures.

361. The unauthorized fines, administrative charges, and collection-related fees assessed and demanded against Plaintiff's account (Account No. ending in 4619) — a $50.00 fine on February 6, 2025, a $100.00 fine on February 27, 2025, five $15.00 administrative fees, and a $15.00 certified-letter fee — were the instruments of Defendants' scheme and the demands that compelled Plaintiff to incur the foregoing costs and to expend resources disputing them.

362. Plaintiff does not allege that he paid those charges out of pocket.

363. Each of the foregoing injuries was directly and proximately caused by Defendants' use of materially false enforcement communications and coercive collection demands transmitted through the mails and interstate wires, without which Plaintiff would not have incurred the defense expenses, carrying costs, or the related medical costs pleaded in the alternative in Paragraph 359(c).


CCaassee33226-ccv-0007000 DDooccuummeenntt22791 FFiilleedd0881174226 PPaaggee7712ooff7890PPaaggeeIIDD##:38707

364. These injuries constitute injury to business or property within the meaning of 18 U.S.C. § 1964(c).

365. The foreseeability of the market-related injuries was established by Defendants' own May 30, 2025 collection letter, which warned that "[a] lien on your property may prevent the sale or refinance of your home." (Exhibit H.)

**G. Violation and Relief**

366. Defendants Burka and Weiss, each being employed by or associated with the Enterprise, conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

367. Plaintiff is entitled to recover treble damages and costs under 18 U.S.C. § 1964(c), and such other relief as the Court deems just and proper.

**COUNT IX: RICO Conspiracy (18 U.S.C. § 1962(d))**

**(Against Bent Creek HOA, Inc.; Timmons Properties, Inc.; Kaman & Cusimano, LLC; Robert Steve Cody; Jeremy Edge; David Raissi; Jared Burke; Melissa Plank; Susannah Millar; Tim Barry; Lynn Burka; Scott D. Weiss; Kiel Kovalcik; and Daniel J. Miske)**

368. Plaintiff realleges and incorporates by reference Paragraphs 5 through 35 (parties, jurisdiction, and venue); Paragraphs 83 through 134 (the false statements and enforcement escalation); Paragraphs 155 through 171 (Defendants' knowledge); and Paragraphs 283 through 366 (the enterprise, conduct-and-participation, predicate-act, pattern, and injury allegations).

369. The pleaded association-in-fact enterprise comprises legally distinct actors with separate roles, separate corporate identities, and separate economic incentives — the HOA setting policy, Timmons administering enforcement, and K&C escalating to collection.

370. Each Defendant agreed to participate in the affairs of the Enterprise through a pattern of racketeering activity. The agreement is inferred from: (a) the coordinated and repeated


Case 3:26-cv-00700 Document 27 Filed 08/14/26 Page 72 of 79 PageID #: 3098
Case 3:26-cv-00700 Document 29 Filed 08/17/26 Page 73 of 80 PageID #: 3719

nature of the predicate communications; (b) the distinct but interlocking roles assumed by the Board, Timmons, and K&C; and (c) the continuation of the conduct after notice of factual falsity.

371. Overt acts in furtherance of the agreement include: the Board's June 2025 revision of the Fine Policy while the enforcement campaign against Plaintiff was ongoing; Timmons' transmission of the enforcement communications described in Predicates 1, 2, 4, and 5; K&C's escalation communications described in Predicate 6; and the ratification and continuation of enforcement activity after Plaintiff's written disclosures and objections.

372. Each Board member Defendant's approval or ratification of the June 2025 revision of the Fine Policy — adopted after Plaintiff's written disclosures and objections were in the record — was an affirmative act manifesting that Defendant's agreement to the continued enforcement-and-collection scheme.

373. The agreement alleged herein runs among three separate corporate actors — the HOA, Timmons, and K&C — and their respective principals; it is not an agreement confined within a single corporate entity.

374. Plaintiff's injury resulted from overt acts of racketeering — the predicate transmissions described in Count VIII — committed by members of the conspiracy in furtherance of the agreement. *See Beck v. Prupis*, 529 U.S. 494 (2000).

375. Each Defendant named in this Count thereby violated 18 U.S.C. § 1962(d), and Plaintiff is entitled to damages as set forth above.

**COUNT X: Declaratory Relief (28 U.S.C. § 2201)**

**(Against Bent Creek HOA, Inc.; Timmons Properties, Inc.; and Kaman & Cusimano, LLC)**

376. Plaintiff realleges and incorporates by reference Paragraphs 5 through 35 (Parties, Jurisdiction, and Venue), Paragraphs 41 through 66 (Unauthorized Fining Practices), and


Case 3:26-cv-00700 Document 27 Filed 08/14/26 Page 73 of 79 PageID #: 3709
Case 3:25-cv-00700 Document 21 Filed 08/17/25 Page 74 of 80 PageID #: 3710

Paragraphs 67 through 82 (Financial Irregularities and Reserve Fund Misuse and Diversion), and Paragraphs 172 through 197 (Alteration of Account Records After Notice of the Duty to Preserve, and Undisclosed Fee Practices) as though fully set forth herein.

377. An actual controversy exists between Plaintiff and Defendants regarding:

(a) whether the recorded Declaration and its twenty-five recorded amendments authorize the fines and related charges imposed on Plaintiff and his Lot;

(b) whether the fines imposed on Plaintiff are void;

(c) whether the Association's reserve fund transfers and expenditures during 2021–2025 conformed to the Reserve Study effective June 26, 2020 (Exhibit T), as bears on the breaches of duty alleged in Count VI; and

(d) whether Plaintiff is entitled to inspect HOA books and records under Tenn. Code Ann. §§ 48-66-101 and 48-66-102.

378. Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 resolving these controversies, and further necessary or proper relief based on any such declaratory judgment pursuant to 28 U.S.C. § 2202, including injunctive relief against the continued imposition or collection of fines not authorized by the recorded governing documents.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kevin M. Donovan respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

(a) Compensatory damages in an amount to be proven at trial for all injuries sustained;

(b) Treble damages pursuant to 18 U.S.C. § 1964(c) on the RICO claims;

(c) Treble damages pursuant to Tenn. Code Ann. § 47-18-109(a)(3), upon proof of a willful or knowing violation, on the consumer protection claims;


Case 3:26-cv-00700 Document 29-1 Filed 08/17/26 Page 75 of 80 PageID #: 3720

(d) Statutory damages of $1,000 pursuant to 15 U.S.C. § 1692k(a)(2)(A) on the FDCPA claims;

(e) Punitive damages on counts for which they are available;

(f) A declaratory judgment that: (i) the recorded Declaration and its twenty-five recorded amendments do not authorize the fines and related charges imposed on Plaintiff; (ii) the fines imposed on Plaintiff are void and unenforceable, and Defendants must be enjoined from reasserting or collecting them; and (iii) Plaintiff is entitled to inspect all HOA books, records, and financial documents under Tenn. Code Ann. §§ 48-66-101 and 48-66-102;

(g) Injunctive relief requiring Defendants to cease imposing fines and related charges against Plaintiff not authorized by the recorded governing documents, prohibiting the use of materially false enforcement communications directed at Plaintiff, and requiring compliance with the Tennessee Nonprofit Corporation Act and the governing documents in Defendants' dealings with Plaintiff and his Lot;

(h) Pre-judgment and post-judgment interest at the highest rate allowed by law;

(i) Costs of suit, and reasonable attorney's fees if and to the extent permitted by law in the event counsel appears, pursuant to 18 U.S.C. § 1964(c), 42 U.S.C. § 3613(c)(2), 15 U.S.C. § 1692k(a)(3), and Tenn. Code Ann. § 47-18-109;

(j) Such other and further relief as this Court deems just and proper.

## VII. JURY DEMAND

379. Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: 8/14, 2026



Case 3:26-cv-00700 Document 2 Filed 08/14/26 Page 75 of 80 PageID #: 871

Kevin M. Donovan, Pro Se
BPR No. 43740
6008 Christmas Drive
Nolensville, Tennessee 37135
(615) 428-9896
kevin.donovan@artofplanninglaw.com

**EXHIBIT SCHEDULE**

A Covenants, Conditions & Restrictions (CC&Rs) and Governing Documents

B HOA Fine Policy (September 2022)

C Revised Fine Policy (June 2025)

D Sent Emails from Kevin Donovan (Disability Disclosures, February–April 2025)

E Email Correspondence — Lynn Burka, May 19, 2025 (#XN1137987)

F HOA Financial Statements (2021–2025) (filed with cover sheets F1 through F5)

F4 HOA 2024 Year-End Financial Statement (including "UNAPPROP. RESERVE — Task I Fee — Falling Water Entrance" posting)

F5 HOA 2025 Financial Statements (including continuing Falling Water-related expenditures)

G Plaintiff's Formal Written Reasonable Accommodation Request (June 1, 2025)

H 10-Day Collection Letter (May 30, 2025)

I FDCPA Verification Demand Letter (June 28, 2025)

J Camper Tow Email (April 25, 2025)

K Truck Email (May 12, 2025)

L Supplementary Attending Physician's Statement (July 21, 2025)

M K&C Delivery Receipt, Signed by Vicki Thomas (July 24, 2025)

N Michigan Attorney Grievance Commission Dismissal Letter (August 28, 2025, File 25-1797)

O Intentionally Left Blank

P Vantaca Transaction History (Account No. ending in 4619), generated February 16, 2026

P2 Vantaca Transaction-History Report (Account No. ending in 4619), generated July 1, 2026 (reflecting the deletion of the fine entries and the April 13, 2026 unlabeled adjustment credit)

Q Jeremy Edge Facebook Posts (June 17, 23, 24, 2025)

R Third-Party Property Valuation Reports (Zillow, Realtor.com, Trulia, Movoto — April 28, 2026)

S Benita Chapman — Written Statement of HOA Enforcement Incidents

T HOA Reserve Study, effective June 26, 2020 (Reserve Advisors, LLC; report submitted July 31, 2020)

U Common Ground, May/June 2026 (Community Associations Institute) — Miske, "Short Stays, Long Consequences"; Weiss, "Signal Upgrade" (excerpts)

V Memorandum Opinion and Order, Burkett v. Milligan, No. 3:24-cv-506 (E.D. Tenn. July 9, 2026)

W Opinion, Burgess v. Bradford Hills Homeowners Ass'n, No. M2024-00102-COA-R3-CV (Tenn. Ct. App. Mar. 13, 2026)

## CERTIFICATE OF SERVICE

I hereby certify that on the 14 day of August, 2026, the foregoing Second Amended Complaint, together with the exhibits thereto, was submitted to the Clerk of Court for filing in the Court's CM/ECF system, which will send a notice of electronic filing to the following counsel of record for all Defendants, each of whom is a registered CM/ECF user; a courtesy copy was also transmitted to counsel by electronic mail:

Marielle Westerman, Esq.
Westerman Law, PLLC
725 Cool Springs Blvd, Ste. 600
Franklin, TN 37067
mwesterman@westerman.law
Counsel for Defendants Bent Creek Homeowners Association, Timmons Properties, Lynn Burka, Robert Steve Cody, Jeremy Edge, David Raissi, Jared Burke, Melissa Plank, Susannah Millar, and Tim Barry

Lauren Paxton Roberts, Esq.
Anna Kate Ferrell, Esq.
Stites & Harbison PLLC
401 Commerce Street, Suite 800
Nashville, TN 37219
lauren.roberts@stites.com; akferrell@stites.com
Counsel for Defendants Kaman & Cusimano, LLC, Scott D. Weiss, Kiel Kovalcik, and Daniel J. Miske

Dated: 8/14, 2026

[signature]
Kevin M. Donovan, Pro Se


Case 3:26-cv-00700 Document 27 Filed 08/14/26 Page 79 of 79 PageID #: 3725