# EXHIBIT U

**Common Ground Magazine, May/June 2026**
**Community Associations Institute (excerpts)**

Excerpts captured July 27, 2026 from CAI's Common Ground digital edition (digitaleditions.walsworth.com): Daniel J. Miske co-authored article ?Short Stays, Long Consequences? and Scott D. Weiss article ?Signal Upgrade,? including author biographies identifying Weiss as partner and Tennessee office chair of Kaman & Cusimano, LLC.

digitaleditions.walsworth.com/publication/?i=863046&p=28&view=issueViewer
Relaunch to update

Multiply Your Time.
Cut Your Costs.

As the industry's largest platform, **TownSq** centralizes workflows and eliminates manual work, disconnected tools, and hidden costs—so you accomplish more with less. And it's all backed by our proven record for delivering results.

See the ROI for yourself at Booth 801 during CAI's annual expo, June 3–5.

townSq

Request a demo:
www.townsq.io/schedule-a-demo



# SHORT STAYS, LONG CONSEQUENCES

**Managing short-term rentals in condominiums doesn't have to be difficult. Clear guidelines and protocols, open communication, and building trust and transparency make a tricky situation easier.**

BY SHANNON MCCORMICK, ESQ., AND DANIEL J. MISKE, ESQ.

The short-term rental market has exploded over the past decade, transforming how people travel and how property is used. Platforms like Airbnb and VRBO have made it easy for owners to rent out their units on a nightly or weekly basis, often with little oversight or accountability. For many condominium associations, this has introduced challenges never contemplated when governing documents were drafted decades ago.

But not all short-term rentals are inherently bad. Some associations have embraced them, especially during tourist seasons, special events, or to allow owners to generate income.

The real question is: What makes sense for your association? The key to successfully managing short-term rentals lies in being proactive, intentional, and well-informed.

digitaleditions.walsworth.com/publication/?i=863046&p=30&view=issueViewer

**MOST CONFLICTS,** which include noise complaints, overcrowding, misuse of amenities, and security concerns, can be minimized or prevented if the association has well-drafted documents, clear enforcement policies, and open communication with owners. Below are six practical and legally sound steps to help your board navigate this evolving issue.

### KNOW YOUR DOCUMENTS

The first step for any board or manager is to carefully review the association's governing documents, particularly the declaration, bylaws, rules and regulations, and articles of incorporation. These documents will determine the board's authority to regulate or prohibit short-term rentals.

Some declarations specifically restrict leasing to a minimum term such as 30 days or six months, which naturally excludes short-term rentals. Others are silent, vague, or use general language like "residential-use only." This creates ambiguity, and in many states, courts are reluctant to interpret restrictions unless they are clearly stated.

If your documents do not address short-term rentals or do so ambiguously, boards should consider an amendment. While amending a declaration typically requires a supermajority vote of the owners, this is a necessary step to establish long-term, enforceable restrictions.

### ALIGN WITH YOUR COMMUNITY

Not every community wants a complete ban. Some associations want to permit limited rental activity during off-peak seasons, for owner-occupied units, or when owners use licensed property managers. The goal is to find a structure that aligns with a community's identity and values.

Here are some options to consider:

- **Minimum lease terms.** Require a minimum rental duration to discourage transient use.
- **Caps on rentals.** Limit the number or percentage of units that can be leased at any given time.
- **Owner-occupancy requirements.** Permit short-term rentals only if the owner is present during the rental.
- **Registration and approval.** Require owners to register rentals and obtain board or management approval.
- **Use zoning or time restrictions.** Allow rentals only during specific months or in designated buildings or only during specific events such as the NFL draft or other major sporting or political events in your city.

If the association decides to allow limited rental activity, it is important to create detailed rules that cover guest conduct, parking, amenity use, trash disposal, noise, and occupancy limits. These rules should be adopted by resolution, published clearly, shared regularly, and consistently enforced. Some associations have used one-time events to generate revenue for their association by prohibiting short-term rentals but making the fine tolerable during the particular event by comparison to the revenue the owner can generate.



**Well-drafted amendments and carefully crafted rules can help your community find the right balance between owner rights and community well-being.**

### ENSURE ACCOUNTABILITY

One of the primary concerns with short-term rentals is not knowing who is staying in the community. When residents are used to living next to neighbors, having a steady stream of unfamiliar guests can make people uneasy, especially in buildings with shared hallways, lobbies, or amenities.

Associations should require owners who rent their units to provide the following information before a guest's stay:

- Guest name(s) and duration of stay.
- 24/7 contact information for the owner or local agent.
- Confirmation of posted house rules inside the unit.
- Acknowledgment of compliance with association rules.

These facts help the association manage expectations, enforce rules, and respond to issues more efficiently. For communities with controlled access such as gates, key fobs, and elevators, tracking guest entry also can be a practical necessity.

### RESPOND QUICKLY

Whether it is a noise complaint at 2 a.m. or unauthorized use of the pool, timely response is key to maintaining community standards. The board or manager should establish a clear process for reporting and addressing short-term rental-related violations.

Some best practices include:

- Designating a board member or manager as the rental liaison.
- Creating a dedicated rental hotline or complaint form.
- Establishing written violation protocols such as a warning for a first offense. A second offense would trigger a fine.
- Requiring owners engaging in short-term rentals to provide a local contact who can respond in person to emergencies.

Associations also should maintain a log of violations and responses. Documentation will be critical if the board needs to pursue legal enforcement or assess fines.

### CREATE TRUST

Few topics are as controversial as short-term rentals in a residential community. Some owners may see them as a threat to community integrity; others see them as a financial lifeline. Wherever your board lands, communication is key.

Start by explaining what the board is doing and why. Hold town halls or webinars, provide FAQs, and give owners a forum to share concerns. Transparency builds trust and reduces the risk of backlash.

Once rules are in place, publish them in multiple formats including the website, newsletters, email blasts, and welcome packets for new owners. Boards that approach rentals with a collaborative spirit are more likely to earn community support even if tough choices are involved.

### BE PROACTIVE

Short-term rentals are not going away. For some associations, they provide a beneficial use of property; for others, they present risks that must be controlled. Either way, the most successful communities will be those that:

- Understand their legal authority.
- Involve their membership in decision-making.
- Use clear, enforceable rules.
- Communicate openly and often.

If your board is unsure how to proceed, consult your community association attorney early in the process. Well-drafted amendments and carefully crafted rules can help your community find the right balance between owner rights and community well-being. CG

**Shannon McCormick** is with Kaman and Cusimano in Cleveland.
smccormick@kamancus.com
**Daniel J. Miske,** a fellow in CAI's College of Community Association Lawyers, is with Kaman and Cusimano in Milwaukee.
dmiske@kamancus.com

## SHORT ORDERS

COURTS ACROSS THE COUNTRY have weighed in on short-term rentals, and the general trend is clear: Restrictions must be clear, explicit, and properly adopted. Here are some leading cases to consider:

***Mogan v. City of Chicago.* Illinois, 2024.** The court upheld a short-term rental ban where the condominium's declaration clearly prohibited rentals under 30 days and hotel-like services.
Lesson » A plainly written restriction in the declaration, such as a minimum lease term, is enforceable and will withstand legal challenge if clearly disclosed to owners.

***Lone Mountain Shores Owners Association v. Bennafield.* Tennessee, 2025.** The court held that the association's covenants were too ambiguous to ban short-term rentals because they didn't clearly prohibit them or set lease duration limits.
Lesson » Language like "residential use" or "commercial purposes" is not enough. Associations must include clear, specific restrictions in their governing documents.

***McDougald v. White Oak Plantation Homeowners Association Inc.* North Carolina, 2024.** The court struck down a 90-day minimum lease amendment as unreasonable because the original covenants were silent on rentals and gave owners no notice that short-term rentals might be restricted.
Lesson » Associations can't impose retroactive bans by amendment if the original declaration didn't suggest rentals would be limited. Clear authority must exist from the start.

***Chan v. Association of Property Owners of the Hideout Inc.* Pennsylvania, 2024.** The court struck down association rules banning short-term rentals because the original declaration expressly allowed leasing and the board's later bylaws conflicted with that right.
Lesson » Boards can't override a declaration through rules. Any short-term rental restriction must be clearly authorized in the recorded covenants or properly amended into them.

***Twin W Owners' Association v. Murphy.* Washington, 2023.** The court ruled the association's rule requiring annual short-term rental applications, fees, insurance, and liability limits went beyond its authority and was invalid.
Lesson » Associations must be careful with operational rental rules, such as requiring insurance or payment, that aren't explicitly allowed by their covenants. Adding such rules without express authority may render them unenforceable. —S.M., D.M.



digitaleditions.walsworth.com/publication/?i=863046&p=38&view=issueViewer
Relaunch to update








OUTDATED GOVERNING DOCUMENTS CAN LIMIT BOARD AUTHORITY AND CREATE CONFLICT. TAKE THE TIME TO STOP, YIELD, AND AMEND YOUR RULES TO REFLECT TODAY'S LAWS, OPERATIONS, AND NEEDS.

# SIGNAL UPGRADE

BY SCOTT WEISS, ESQ.

digitaleditions.walsworth.com/publication/?i=863046&p=40&view=issueViewer

Relaunch to update

> "THE FREQUENCY OF THE NEED TO UPDATE GOVERNING DOCUMENTS DEPENDS ON THEIR AGE, CHANGES IN THE COMMUNITY, OR THE LAW OVER TIME. THERE IS NO RULE OF THUMB."

**HAVE YOU LOOKED** at your community's governing documents and wondered, "Were these documents written in the last century?" Have you confronted an issue concerning maintenance and repair responsibilities and found nothing in the documents about who is responsible for it?

If you're wondering about these things, it may be time to think about updating your documents.

"The frequency of the need to update governing documents depends on their age, changes in the community, or the law over time. There is no rule of thumb," says Bob Diamond, an attorney with Reed Smith in McLean, Va. "The time is right when the need arises. Some would say the documents should be amended when the development is completed to delete references to the developer, but that is cosmetic and not a functional reason to make a change."

A CAI past president, a fellow in CAI's College of Community Association Lawyers, and a member of the *Common Ground* editorial advisory board, Diamond says the process will vary by community. An attorney can draft revisions quickly, but ultimate approval can take between two months to two years depending on a host of issues including notice and meeting requirements, the scope of proposed changes, and the nature of the community.

When considering updating documents, it may be helpful to think about it in terms of a traffic light. Governing document provisions that fall into the red light category must be amended. Provisions that fall into the yellow light category should be amended, and those falling into the green light category can be amended later in conjunction with updates in other categories.







### RED LIGHTS: VIOLATIONS OF LAW

Amendments that must be changed or updated include provisions that violate current state or federal laws, conflict with different sections within the same set of governing documents, and are silent or open to differing interpretations.

Disparate impact violations are present when a governing document policy, rule, or practice disproportionately and unjustifiably harms members of a protected group. These types of violations are commonly seen in association swimming pool policies where children under a certain age are prohibited from using the pool unless accompanied by an adult. This might seem like common sense, and the association may have the best of intentions. However, depending on how the swimming pool restriction is worded, these kind of provisions could be a disparate impact violation of the age/familial status protected class under the federal Fair Housing Act.

Another common violation of law found in association governing documents are restrictions or prohibitions on installing antennas and satellite dishes. The Telecommunications Act of 1996 directed the Federal Communications Commission to issue regulations prohibiting restrictions that impair residents' ability to receive direct broadcast satellite services. The FCC prohibited associations from adopting regulations that prevent, unreasonably delay, or increase the cost of antenna installation, maintenance or use, or preclude reception of an acceptable quality signal.

The regulations also invalidate association regulations that prohibit the installation of over-the-air reception devices such as satellite dishes, video, or television broadcast signals that are less than one meter in diameter.

Flags are another hot topic to consider when updating governing documents. The Freedom to Display the American Flag Act of 2005 prohibits associations from adopting any regulation or provision that restricts or prevents the display of the U.S. flag on private property. Many states adopted laws that mirror the flag act and take it a step further by prohibiting associations from adopting regulations or provisions that prevent the display of flags of the U.S. armed forces.

In addition to flags, the display of political signs and banners by owners and residents in associations also has been the subject of many state laws. In Tennessee, for example, a state law prohibits governing document restrictions or provisions that prevent homeowners and residents from displaying political signs and banners on their property 60 days before voting begins until the first day after the election ends.

Governing document provisions that create a disparate impact violation contrary to FCC regulations, the flag act, or other federal or state laws should be considered red-light level amendments.

Other red-light situations include:

**Inconsistent provisions.** Requirements in the association's declaration must be uniform throughout the documents. For example, provisions regarding lease terms must be for the same time period. Like provisions that violate laws, inconsistent provisions must be amended.

**Ambiguous provisions.** Governing document terms can be interpreted differently by various parties. For example, a provision indicating roof maintenance to be the association's responsibility but makes no mention of the gutters or chimneys located on the roofs isn't entirely clear.

When water leaks are detected, and the origin is traced to the chimney, the question of whether the association or unit owner is responsible for the repairs and any damage becomes vitally important. Like other red-light level examples, the roofing, chimney, gutters, and other components of the roof must be included in the governing documents to remove any ambiguity as to who is responsible for them.

### YELLOW LIGHTS: PROCEED WITH CAUTION

Yellow-light amendments are needed but not necessarily critical. A few common examples include:

**Quorum requirements.** A quorum is needed to call meetings to order to conduct business. Thanks to a lack of participation and complacency, one of the most common problems association members confront is obtaining the necessary quorum. Another reason is the quorum requirements are too high.

Many states, including Tennessee, have laws

## SENDING CLEAR SIGNALS

A QUICK GUIDE TO AMENDING DOCUMENTS




## FINE-TUNING DOCUMENTS

CLEAR, WELL-CRAFTED GOVERNING DOCUMENTS are the backbone of a thriving community association. When drafted properly, they reduce conflict, empower boards to address issues confidently, and provide a solid foundation for long-term stability.

It's an ongoing process. These essential documents need to be regularly reviewed, evaluated, and strengthened to keep up with changing conditions, issues, and attitudes.

Learn practical strategies to identify and fix provisions that may be outdated, unclear, or vulnerable to legal or operational challenges, spot problems before they escalate, and take steps to make precise, effective amendments that keep associations running smoothly

**» Learn more in an on-demand version of the webinar Clarity in Covenants: Better Governing Documents, Stronger Communities at www.caionline.org/webinars.**



digitaleditions.walsworth.com/publication/?i=863046&p=42&view=issueViewer

Relaunch to update








establishing a minimum quorum requirement for nonprofit corporation meetings. Amending association bylaws to lower the required quorum should be considered so that important association business such as electing the board of directors, approving budgets, and voting to approve amendments to the governing documents can be conducted.

**Virtual meetings, notices, and voting.** Many states have adopted laws that allow nonprofit corporations such as associations to conduct meetings and vote using virtual platforms. Amending association bylaws to allow all meetings to be conducted electronically will help associations handle important business. Studies have shown associations that hold virtual meetings are more likely to obtain the required quorum and enjoy greater participation.

**Remove specific dollar amounts.** Association governing documents that include specific dollar amounts or caps on assessments and other fees should be amended. With cost-of-living increases, the value a dollar is much different than it was five, 10, or 20 years ago and will be different in the future. Avoid having to adopt amendments in the future to increase specific dollar amounts to pay for increasingly expensive budget expenditures.

**Leasing restrictions.** Keeping the number of leased homes or units below a specified level, controlling short-term rentals, and leasing in general is almost always a hot topic with associations. Amending association governing documents to add new leasing regulations, provisions to enforce violations, or enhance existing leasing provisions is desirable to many associations.

### GREEN LIGHTS: A FRESH START

Associations can amend governing document provisions that are not critical or important enough to include as a standalone revision but may be included when undergoing a governing document cleanup.

A few common examples include:

- Removing references to declarant/developer if the association is no longer under developer control.
- Changing the association's principal address.
- Defining business and calendar days to remove confusion or ambiguity regarding notice requirements, compliance issues, and other time-related provisions.

Always consult an attorney well versed in community association law to review your documents, provide recommendations that fall into the red, yellow, and green categories, and draft amendments with input from the board of directors and association members. CG

**Scott Weiss** is a partner and Tennessee office chair for Kaman & Cusimano in Brentwood, Tenn. A fellow in CAI's College of Community Association Lawyers, he serves on the CCAL Board of Governors and the *Common Ground* editorial advisory board.
sweiss@kamancus.com





## DEVELOPING GROUND RULES FOR EFFECTIVE DOCUMENTS

Community associations depend on governing documents to provide a legal framework for operations. These documents help define the rules, rights, and obligations between an association and its members to protect the community and promote harmonious living.

*Guiding Principles for Community Association Governing Documents: A Resource for Lawyers*, developed by CAI's College of Community Association Lawyers, will help attorneys draft and update documents when board members and managers consider amending or restating existing governing documents.

While these guidelines do not address every issue or specific community needs, the guide emphasizes the importance of organization, consistency, clarity, and brevity as guiding principles for association governing documents.

» **Obtain your copy at www.caionline.org/shop.**











DONOVAN-000139

# EXHIBIT V

Memorandum Opinion and Order
Burkett v. Milligan, No. 3:24-cv-506 (E.D. Tenn. July 9, 2026) (Doc. 54)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| WILLIAM BURKETT, *et al.*, | ) | |
| | ) | Case No. 3:24-cv-506 |
| *Plaintiffs*, | ) | |
| | ) | Judge Atchley |
| v. | ) | |
| | ) | Magistrate Judge Poplin |
| CHARLES R. MILLIGAN, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiffs' Motion for Summary Judgment [Doc. 34]; Plaintiffs' Request for Judicial Notice in Support of Plaintiffs' Motion for Summary Judgment [Doc. 36]; Defendants' Motion for Summary Judgment [Doc. 37]; Defendants' Request for Judicial Notice [Doc. 40]; Defendants' Motion in Limine [Doc. 46]; and Plaintiffs' Motion to Continue Trial & for Amended Scheduling Order [Doc. 53]. For the following reasons, the Requests for Judicial Notice [Docs. 36, 40] are **GRANTED**; Plaintiffs' Motion for Summary Judgment [Doc. 34] is **DENIED**; Defendants' Motion for Summary Judgment [Doc. 37] is **GRANTED**; Defendants' Motion in Limine [Doc. 46] is **DENIED AS MOOT**; and Plaintiffs' Motion to Continue [Doc. 53] is **DENIED AS MOOT**.

## I. BACKGROUND

Defendants Charles R. Milligan and Anna Milligan own certain real property in the German Creek Cabin Site Subdivision in Grainger County, Tennessee (hereinafter the "Milligan Property"). [Doc. 33-2]. Defendants list the Milligan Property for short-term rental on Airbnb and VRBO. [Doc. 38-4 at ¶ 2]. More specifically, Defendants allow groups of up to nine individuals to rent out the Milligan Property for the renters' exclusive use for periods of two nights up to thirty

days, provided the renters meet certain requirements.[1] [*See* Doc. 33-1 at 68–69; Doc. 38-4 at ¶¶ 3–5, 7]. Several of Defendants' neighbors—the plaintiffs in this case—believe this conduct violates a restrictive covenant in the Milligan Property's chain of title.[2] Defendants disagree, and this disagreement ultimately ripened into this litigation.

Plaintiffs filed suit in the Circuit Court for Grainger County, Tennessee, generally seeking (i) declaratory and injunctive relief that would bar Defendants from using the Milligan Property for short-term rentals and (ii) damages. [*See* Doc. 1-1 at 5–17]. Defendants timely removed the case to this Court and successfully defeated a motion to remand. [*See* Docs. 1, 18]. Now, Plaintiffs and Defendants have filed competing motions for summary judgment, [Docs. 34, 37], both of which are ripe for review. Plaintiffs and Defendants have also each requested the Court take judicial notice of certain dictionary definitions as it interprets the at-issue restrictive covenant [Docs. 36, 40]; Defendants have filed a Motion in Limine. [Doc. 46]; and Plaintiffs have requested the Court continue the trial date and related deadlines in this matter. [Doc. 53].

The Court will first address the parties' Requests for Judicial Notice [Docs. 36, 40]. Then, it will turn to their competing Motions for Summary Judgment [Docs. 34, 37]. And because the adjudication of these motions will completely resolve this case, the Court will end by denying Defendants' Motion in Limine [Doc. 46] and Plaintiffs' Motion to Continue Trial & for Amended Scheduling Order [Doc. 53] as moot.

---

[1] These requirements include the renter being at least 25 years old and that they and their guests agree to abide by Defendants' "house rules." [Doc. 38-4 at ¶ 7].

[2] These neighbors are Plaintiffs William Burkett, Gail Burkett, Sim Stewart, Karen Stewart, James Dawson, Rebecca Dawson, Teddy White, Deborah White, Frank B. Little, Jr., Jennifer I. Little, Jeffrey Taylor, Ashley Taylor, Parker James Smith, Kelci B. Smith, Teresa Graniczny, Brantley Stewart, Katherine Moses Stewart, Jessica Greenlee, and Johnny Greenlee. [*See* Doc. 1-1 at 6–7, 18–53]. Plaintiffs Frank B. Little, Jr. and Jennifer I. Little bring suit as trustees of the Frank B. Little Revocable Living Trust and the Jennifer I. Little Revocable Living Trust, which are the owners of record for the German Creek Cabin Site property where they reside. [*Id.* at 6, 33–36].

## II. REQUESTS FOR JUDICIAL NOTICE

Plaintiffs and Defendants each request the Court take judicial notice of certain dictionary definitions pursuant to Federal Rule of Evidence 201(b). [*See generally* Docs. 36, 40]. Neither opposes the other's request.

Rule 201(b) states "[t]he [C]ourt may judicially notice a fact that is not subject to reasonable dispute because it…can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). "A dictionary is one of those sources whose accuracy cannot reasonably be questioned and, as a general rule, courts may consult a dictionary at any stage of the litigation to determine the meaning of words and phrases." *Clark v. Walt Disney Co.*, 642 F. Supp. 2d 775, 782 (S.D. Ohio 2009); *see also Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 944 (6th Cir. 1993) (finding it appropriate for a district court to take judicial notice of the dictionary definition for a relevant term). Accordingly, the parties' Requests for Judicial Notice [Docs. 36, 40] are **GRANTED**. The Court will consider their proffered dictionary definitions as it interprets the meaning of the at-issue restrictive covenant.

## III. MOTIONS FOR SUMMARY JUDGMENT

### A. Standard of Review

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). When ruling on a motion for summary judgment, the Court must

view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citations omitted). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248–49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

**B. Analysis**

The restrictive covenant at the heart of this case states, in relevant part:

> FOR THE BENEFIT OF ALL PURCHASERS OF LOTS IN THE GERMAN CREEK CABIN SITE SUBDIVISION…AND IN ORDER TO FOSTER THE DEVELOPMENT AND PROTECT THE VALUE OF ALL OF SAID LAND FOR PRIVATE RESDIENCE PURPOSES, THE GRANTEE (1) WILL USE THE LAND HEREIN CONVEYED…FOR PRIVATE RESIDENCE PURPOSES ONLY….

[Doc. 1-1 at 62–63 (capitalization in original)]. Defendants do not dispute this covenant applies to the Milligan Property, nor do they claim that lack of notice or some other defense excuses them from complying with its terms. Instead, they assert the covenant does not unambiguously prevent them from offering the Milligan Property for short-term rental, meaning they are allowed to do so. Plaintiffs vehemently disagree. They argue the covenant clearly prohibits short-term rentals and that Defendants should be enjoined from using the Milligan Property for such a purpose. After careful consideration, the Court finds Defendants have the better argument.

1. *Tennessee law disfavors restrictive covenants and strictly construes them in a manner which advances the unrestricted use of property.*

Under Tennessee law, which the parties agree governs in this case, "the interpretation of restrictive covenants, like the interpretation of other written contracts, is a question of law[.]" *Pandharipande v. FSD Corp.*, 679 S.W.3d 610, 618 (Tenn. 2023) (citation modified). "[R]estrictive covenants are not favored in Tennessee because they are in derogation of the right of free use and enjoyment of property." *Williams v. Fox*, 219 S.W.3d 319, 324 (Tenn. 2007). Consequently, courts "strictly construe[]" them to only cover those activities "clearly and expressly prohibited by [the covenant's] plain terms." *Id.* "When the terms of a covenant may [reasonably] be construed in more than one way, courts must resolve any ambiguity against the party seeking to enforce the restriction and in a manner which advances the unrestricted use of the property." *Pandharipande*, 679 S.W.3d at 620 (quoting *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 481 (Tenn. 2012)). But as with traditional contract interpretation, a court cannot

create an ambiguity in a restrictive covenant where none exists. *See id.* (noting that restrictive covenants are interpreted like contracts); *Rogers v. First Tennessee Bank Nat. Ass'n*, 738 S.W.2d 635, 637 (Tenn. Ct. App. 1987) ("Neither the parties nor the courts may create an ambiguity in the contract when no such ambiguity exists and then apply rules of construction to favor one party to the agreement."). Nor can a court declare a restrictive covenant ambiguous without first exhausting "all traditional tools of interpretation[.]" *Pandharipande*, 679 S.W.3d at 620.

2. *Tennessee courts have thrice held restrictive covenants requiring that property be used for "residential purposes" only do not bar short-term rentals.*

The Tennessee Supreme Court relied on the foregoing principles in *Pandharipande v. FSD Corporation* to evaluate whether a restrictive covenant stating "each Lot shall be used for residential and no other purposes" prohibited the plaintiff from using his property for short-term rentals. *See generally* 679 S.W.3d 610 (Tenn. 2023). The *Pandharipande* Court began its analysis "by consulting dictionary definitions of the phrase's key terms: 'used,' 'residential,' and 'purposes.'" *Id.* at 623. It found the meaning of the term "used" was reasonably clear, although "it [was] unclear *whose* use of the property [was] relevant" as the restrictive covenant employed the term "used" as "a passive verb with no subject." *Id.* (emphasis in original). The *Pandharipande* Court then looked to the term "purposes" and also found its definition "reasonably clear." *Id.* That just left the term "residential." Consulting a variety of dictionaries from around the time the restrictive covenant was created, the *Pandharipande* Court found it was ambiguous whether the term "residential" and related terms like "residence," "reside," and "resident" encompass short stays or whether they require a certain degree of permanence. *See id.* at 623–24. This ambiguity—combined with the fact that short-term renters engage in largely the same activities as permanent residents (e.g., "sleeping, eating, bathing, [and] relaxing")—meant the *Pandharipande* Court was

"unable to conclude, based on dictionary definitions alone, that the [at-issue] covenants clearly and expressly prohibit[ed] [the property owner] from leasing his property for short terms of two to twenty-eight days." *Id.* at 625.

Thus, the *Pandharipande* Court looked to the applicable restrictive covenants as a whole to see if they provided additional clarity as to the permissibility of short-term rentals. The *Pandharipande* Court first looked to the term "Lot," which the restrictive covenants themselves defined as "a portion ... of the Properties ... intended for any type of independent ownership for construction and *use as a residence* by a single family." *Id.* (ellipses and emphasis in original). The *Pandharipande* Court did not find this definition helpful in evaluating whether the restrictive covenants prevented short-term rentals because, as it had already discussed, "dictionary definitions of 'residential' and related words d[id] not unambiguously exclude transient stays. So the fact that a 'Lot' must be intended for 'use as a residence by a single family' d[id] not necessarily mean that it must be used as a permanent or long-term residence." *Id.*

The *Pandharipande* Court next looked to a separate provision of the restrictive covenants that stated, "no gainful profession, occupation, trade *or other nonresidential use* shall be conducted in any Lot." *Id.* (emphasis in original). Interpreting the phrase "other nonresidential use" to mean "an activity regularly conducted on the property as a means of earning money[.]" the *Pandharipande* Court found that short-term rentals did not fall within the scope of the prohibition, stating that while "using a property as a short-term rental ordinarily generates income for the owner…the only activities that are regularly conducted on the property when it is being used as a short-term rental are things like eating and sleeping[,]" i.e., residential activities. *Id.* Thus, short-term rentals did not qualify as a prohibited "nonresidential use" of the property. *See id.*

Finally, the *Pandharipande* Court looked to a separate provision of the restrictive covenants describing a property owner's ability to delegate certain rights to "tenants," finding this presupposed some types of rentals were permitted, but that it provided little clarity as to the permissibility of short-term rentals specifically. *Id.* at 625–26. The *Pandharipande* Court found this lack of clarity reinforced its conclusion that the restrictive covenants were ambiguous and did not clearly prohibit short-term rentals. *Id.* at 626.

Having concluded the restrictive covenants—whether viewed in their entirety or in the specific context of the residential use restriction—did not unambiguously prohibit short-term rentals, the *Pandharipande* Court next discussed how other states' courts have addressed similar restrictive covenants, noting that many courts have held "similar residential-purposes provisions either unambiguously allow short-term rentals or do not unambiguously prohibit them[.]" *Id.* at 626–28 (emphasis omitted). The *Pandharipande* Court then went on to "join those courts that have found residential-purposes provisions ambiguous with respect to whether short-term rentals are allowed" and resolve this ambiguity in favor of the unrestricted use of property. *Id.* at 628. Said differently, the *Pandharipande* Court held that because the "residential-purposes provision" did not clearly prohibit a property owner from using their property as a short-term rental, such use was permitted.[3]

In the years since *Pandharipande*, the Tennessee Court of Appeals has been called upon at least twice to evaluate the effect of other restrictive covenants limiting property's use to

[3] The *Pandharipande* Court then went on to hold that a later amendment to the restrictive covenants setting a thirty-day minimum on lease lengths did prohibit short-term rentals. *See* 679 S.W.3d at 628. Because no similar restrictive covenant is at issue in this case, this portion of the *Pandharipande* Court's analysis is not discussed further.

"residential purposes" on the permissibility of short-term rentals. And in both cases, the Tennessee Court of Appeals sided in favor of allowing short-term rentals.

*First*, the Tennessee Court of Appeals was asked in *Lone Mountain Shores Owners Association, Inc. v. Bennafield* to decide whether the following provisions of a set of restrictive covenants prohibited property owners in the Lone Mountain Shores Subdivision from using their property for short-term rentals:

> Section 2.14 **"Single Family Residential Purposes"** shall mean the property, consisting of just one primary Dwelling and all ancillary buildings on it shall be occupied by just one legitimate single housekeeping unit as distinguished from unaffiliated individuals or groups occupying a motel, hotel, bed & breakfast, or boardinghouse. Additionally, allowances are made for one accessory living quarters, such as a mother-in-law suite, without violating the "single family residential use" provided this secondary living quarters meets the requirements of Section 6.05 of these Covenants. Any rental accommodations and services such as those provided by hotels, motels, bed & breakfasts, rooming or boarding houses, apartment buildings or condominiums are excluded by this definition.
>
> * * *
>
> Section 6.04 **Residential Use Only.** All Lots shall be used for single family residential purposes only, and no commercial use is permitted. This restriction is not to be construed to prevent rental of any Lot or any dwelling for private single family residential purposes or to prevent an Owner from conducting home occupations in a Dwelling, provided such occupations: (a) are subordinate to the primary residential use; (b) occupy no more than twenty percent (20%) of the Dwelling's floor area; and (c) employ not more than two (2) persons.
>
> Examples of prohibited commercial uses of a Lot or any dwelling include providing the services of or operating as a restaurant, an inn, a boarding house, or a bed-and-breakfast or providing other atypical rental services of a commercial nature.
>
> Examples of non single family residential purposes uses of a Lot or any dwelling include, but are not limited to: occupancy by two or more unaffiliated individuals or groups that function as independent housekeeping units; owners or their agents occupying any part of the property at the same time as renters; utilizing the Lot or any dwelling as a fraternity, sorority or dorm complex; or using the Lot or any dwelling as a Group Home or institution of any kind.
>
> * * *
>
> Section 6.07 Rental. Lots and Dwellings may be rented only for private single-family residential purposes subject to the following provisions:

> a. The renting to unaffiliated individuals or groups at the same time is prohibited;
> b. Tenants are required to abide by all [Lone Mountain Shores] Governing Documents;
> c. Owners are responsible for the actions of their tenants. Each Owner shall take appropriate steps and should put in place additional rules, limitations and restrictions as necessary to ensure that tenants do not conduct deleterious activities or otherwise create a nuisance to other Owners;
> d. All rules, regulations, or use restrictions of these Covenants promulgated pursuant hereto that govern the conduct of Owners and that provide for sanctions against Owners also apply to all occupants of any Lot.

No. E2024-00569-COA-R3-CV, 2025 WL 1627229, at *2 (Tenn. Ct. App. June 9, 2025) (emphasis in original). The Tennessee Court of Appeals, like the trial court before it, found these provisions did not unambiguously bar short-term rentals and that, as a result, it was permissible to use property in the Lone Mountain Shores Subdivision for such a purpose. *See id.* at *9.

To reach this conclusion, the Tennessee Court of Appeals first considered whether Section 2.14's definition of "single family residential purposes" clearly excluded short-term rentals. *See id.*at *5–7. The Lone Mountain Shores Owners Association argued it did, asserting that Section 2.14 excluded short-term rentals by implication when it stated that "[a]ny rental accommodations and services such as those provided by hotels, motels, bed & breakfasts, rooming or boarding houses, apartment buildings or condominiums are excluded" from the definition of "single family residential purposes." *Id.* at *5–6. The Owners Association claimed that because short-term rentals operate similarly to hotels, motels, and the like (e.g., providing overnight lodging billed daily; providing housekeeping or similar services; and providing complimentary consumables to guests), the drafters of the restrictive covenants must have intended to exclude short-term rentals from the definition of "single family residential purposes." *See id.*

The Court of Appeals was not convinced. It noted that while short-term rentals shared common characteristics with *some* of Section 2.14's expressly excluded uses (hotels, motels, etc.),

those commonalities did not extend to all the excluded uses. *See id.* at *6. Specifically, Section 2.14 excluded condominiums and apartment buildings—which do not provide the kind of services seen in hotels, motels, and the like—from the definition of "single family residential purposes." *See id.* at *6–7. This led the Court of Appeals to evaluate whether there was a separate common thread underlying *all* the expressly excluded uses. The Court of Appeals found this thread in the trial court's conclusion that each of the expressly excluded uses "pertain[ed] to buildings or facilities that contain many parts or rooms which are used by unaffiliated groups or individuals." *See id.* at *7. Considering this, Section 2.14 in its entirety, and the fact that other provisions of the restrictive covenants (including Sections 6.04 and 6.07) prohibited or otherwise restricted "the number of unaffiliated guests or occupants allowed on a property at any given time," the Court of Appeals found it reasonable to interpret Section 2.14's definition of "single family residential purposes" as excluding the simultaneous use of property by unaffiliated groups rather than prohibiting any use that provided short-stay accommodations and related services. *See id.* at *7–8. Under this reasonable interpretation, property owners would be permitted to use their property for short-term rentals, meaning the Court of Appeals was required to hold that such use was permissible under the applicable restrictive covenants. *See id.* at *8–9.

*Second*, the Tennessee Court of Appeals was asked in *Salem v. Galbraith* to decide, among other things, whether restrictive covenants dictating that property "be used for residential purposes only" and prohibiting "trade and commercial activity" on the relevant properties prohibited short-term rentals. No. E2024-00337-COA-R3-CV, 2025 WL 3632698 (Tenn. Ct. App. Dec. 15, 2025). The Court of Appeals found these restrictive covenants "mirror[ed] the 'residential and no other purposes' covenant found ambiguous in *Pandharipande*" and that *Pandharipande* therefore

controlled. *See id.* at *4–5. Accordingly, the Court of Appeals held the restrictive covenants did not bar property owners from using their properties for short-term rentals. *See id.* at *5.

*   *   *

In short, Tennessee courts have held restrictive covenants requiring that property be used for "residential and no other purposes[;]" "single family residential purposes" only; and "residential purposes only" do not clearly prohibit short-term rentals. And because restrictive covenants only cover those activities "clearly and expressly prohibited by [the covenant's] plain terms[,]" *Williams*, 219 S.W.3d at 324, this lack of a clear prohibition means short-term rentals are permitted under the foregoing covenants. Now, this Court must decide whether a similar covenant, one requiring that property be used for "private residence purposes only," calls for the same result.

3. *The restrictive covenant requiring that Defendants use the Milligan Property "for private residence purposes only" does not bar short-term rentals.*

The restrictive covenant at issue in this case requires that Defendants use the Milligan Property "for private residence purposes only[.]" [Doc. 1-1 at 62–63 (capitalization altered)]. This phrase is not defined anywhere in the German Creek Cabin Site Subdivision restrictive covenants, so to determine its meaning, the Court must look to contemporary dictionary definitions of the relevant terms. *See Pandharipande*, 679 S.W.3d at 623.

Starting with "purposes" and "only," the Court agrees with the parties that their meanings in the context of the "private residence purposes only" restriction are reasonably clear. [*See* Doc. 35 at 17 n. 14; Doc. 38 at 16; Doc. 42 at 7]. "Purpose" means "[t]he object, effect, or result aimed at, intended or attained; as, to speak to the purpose." *Purpose*, WEBSTER'S COLLEGIATE DICTIONARY (3rd ed. 1930); *see also Purpose* BLACK'S LAW DICTIONARY (4th ed. 1951) ("That which one sets before him to accomplish; an end, intention, or aim, object, plan, project");

*Purpose*, WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY (unabridged ed. 1949) ("That which a person sets before himself as an object to be reached or accomplished; the end or aim to which the view is directed in any plan, measure, or exertion; intention; design."). And "only" means "solely; merely; for no other purpose; at no other time; in no otherwise; alone; of or by itself; without anything more; exclusive; nothing else or more." *Only*, BLACK'S LAW DICTIONARY (4th ed. 1951); *see also Only*, WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY (unabridged ed. 1949) ("1. In a manner or for one purpose alone; simply; merely; barely….2. Solely; no other than.").

Looking next to the term "residence," its meaning is less clear. Specifically, "residence" suffers from the same issue as "residential" in *Pandharipande*: it is ambiguous whether the term requires a degree of permanence. "Several dictionaries define the term[] 'residence'…in a manner that connotes permanence." *Pandharipande*, 679 S.W.3d at 624; *see also Residence*, WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY (unabridged ed. 1949) ("1. The act of residing or dwelling in a place for some continuance of time…2. Place of abode; a dwelling; a permanent habitation."); But at the same time, other definitions of "residence" and related terms appear to encompass shorter stays as well. *See Pandharipande*, 679 S.W.3d at 624; *Residence*, BLACK'S LAW DICTIONARY (4th ed. 1951) (defining "residence" as "[a] factual place of abode. Living in a particular locality. It requires only bodily presence as an inhabitant of a place" and stating in the accompanying commentary that "[r]esidence means living in a particular locality, but domicile [a different term] means living in that locality with the intent to make it a fixed and permanent home" (internal citations omitted)); *Residence*, WEBSTER'S COLLEGIATE DICTIONARY (3rd ed. 1930) ("The place or house where one resides; dwelling place…Syn. Sojourn, stay; dwelling, mansion."); *Sojourn*, WEBSTER'S COLLEGIATE DICTIONARY (3rd ed. 1930) (defining "sojourn," a synonym of


Case 3:26-cv-00700 Document 30-2 Filed 08/20/26 Page 20 of 40 PageID #: 977
DONOVAN-000153

"residence" as "[a] a temporary residence; hence: a delay; stay."). Given these competing definitions, the Court cannot say that limiting the Milligan Property's use to "residence purposes" unambiguously prohibits short-term rentals.

Turning to the term "private," it provides some additional clarity regarding the type of "residence purposes" the Milligan Property may be used for, but it does not resolve the ambiguity surrounding the permissibility of short-term rentals. Plaintiffs argue the use of the term "private" demonstrates short-term rentals are prohibited because such use opens the property to the general public. [*See* Doc. 35 at 13 n.5, 16 (citing *Private*, WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY (unabridged ed. 1949))]. But this argument ignores that only those individuals who meet certain requirements may rent the Milligan Property and that once the Milligan Property is rented, the renters have exclusive use of the Property. [*See* Doc. 38-4 at ¶¶ 3–5, 7]. Thus, and contrary to Plaintiff's position, the Milligan Property is not open to the general public. Rather, it is used exclusively by select individuals and groups for specific periods of time, much like a restaurant may rent out a "private" room for birthdays and anniversaries or a film club may arrange a "private" screening of a particular movie. In these circumstances, what makes the space "private" is not that it may never be used by someone else. Instead, it is that while the individual or their group is using the space, that space is "not accessible to people in general[.]" *Private*, WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY (unabridged ed. 1949). Accordingly, while limiting use of the Milligan Property to "*private* residence purposes only" may bar Defendants from, for example, renting the Property to multiple unaffiliated individuals and groups at the same time or otherwise allowing the Property to be used for communal living, the Court cannot say this limitation unambiguously prohibits short-term rentals.

This, however, does not end the Court's analysis as there is one final portion of the restrictive covenant that must be addressed. The restrictive covenant states "the Grantee (1) will use the land herein conveyed…for private residence purposes only…." [Doc. 1-1 at 63 (capitalization altered)]. Plaintiffs contend that because the covenant includes the phrase "the Grantee…will use[,]" the Court must look to Defendants' specific use of the Milligan Property—rather than how any renter/occupant may use the Property—when evaluating whether the restrictive covenants have been breached. [*See* Doc. 35 at 14–15; Doc. 42 at 6 n.5, 7 n.10]. And because Defendants rent the Milligan Property out rather than use it as a personal residence, Plaintiffs contend they are not using the Milligan Property for a "private residence purpose." [*See* Doc. 35 at 14–15; Doc. 42 at 6 n.5, 7 n.10]. Plaintiffs are mistaken.

The term "use" can reasonably be interpreted to encompass a wider range of activities than Plaintiffs appear to acknowledge. "Use" means "[t]o employ; to handle, hold, occupy, or move, for some purpose[.]" *Use*, WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY (unabridged ed. 1949); *see also Use*, WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY (1963) ("to put into action or service: avail oneself of: employ…"). "Employ," a key component of the definition of "use" and its synonym, in turn means "to devote to or direct toward a particular activity or person." *Employ*, WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY (1963). These definitions clearly encompass Defendants utilizing the Milligan Property as their own private residence. But it is not unreasonable to interpret them as also permitting Defendants to allow others to utilize the Milligan Property—such as through short-term rentals—provided that the only purposes the renters utilize the Property for are "private residence purposes." In other words, the restrictive covenant can be reasonably interpreted as requiring Defendants to dedicate the Milligan Property to "private

residence purposes only" without also requiring that Defendants themselves be the only ones permitted to utilize the Milligan Property for "private residence purposes."

This interpretation is reasonable not only based on the language of the at-issue covenant itself but also when considering the stated purpose of the German Creek Cabin Site Subdivision restrictive covenants more generally. The restrictive covenants were adopted "[f]or the benefit of all purchasers of lots in the German Creek Cabin Site Subdivision…and in order to foster the development and protect the value of all of said land for private residence purposes[.]" [Doc. 1-1 at 62–63 (capitalization altered)]. Requiring that Defendants be the only ones permitted to use the Milligan Property for "private residence purposes" would be in line with this goal. But it would also be in line with the restrictive covenants' purpose to allow Defendants to offer the Milligan Property as a short-term rental provided Defendants ensure their renters also use the Milligan Property for "private residence purposes." In either case, the Milligan Property would still be used for "private residence purposes," just like the other properties in the German Creek Cabin Site Subdivision.

Considering the foregoing and that other provisions of the German Creek Cabin Site Subdivision restrictive covenants do not shed additional light on the permissibility of short-term rentals, the Court finds it ambiguous whether the restrictive covenants' "private residence purposes only" restriction prohibits short-term rentals. Under Tennessee law, the Court "must resolve [this] ambiguity against the party seeking to enforce the restriction and in a manner which advances the unrestricted use of the property." *Pandharipande*, 679 S.W.3d at 620 (quoting *Hughes*, 387 S.W.3d at 481). The Court therefore holds that the German Creek Cabin Site Subdivision's restrictive covenants do not prohibit Defendants from using the Milligan Property for short-term

rentals. Defendants' Motion for Summary Judgment [Doc. 37] is **GRANTED**, and Plaintiffs' Motion for Summary Judgment [Doc. 34] is **DENIED**.

## IV. REMAINING MOTIONS

The grant of summary judgment to Defendants fully resolves this case. Accordingly, Defendants' Motion in Limine [Doc. 46] and Plaintiffs' Motion to Continue Trial & for Amended Scheduling Order [Doc. 53] are **DENIED AS MOOT**.

## V. CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** the following:

1. Plaintiffs' Request for Judicial Notice in Support of Plaintiffs' Motion for Summary Judgment [Doc. 36] is **GRANTED**;
2. Defendants' Request for Judicial Notice [Doc. 40] is **GRANTED**;
3. Plaintiffs' Motion for Summary Judgment [Doc. 34] is **DENIED**;
4. Defendants' Motion for Summary Judgment [Doc. 37] is **GRANTED**;
5. Plaintiffs' claims are **DISMISSED WITH PREJUDICE**;
6. Defendants' Motion in Limine [Doc. 46] is **DENIED AS MOOT**; and
7. Plaintiffs' Motion to Continue Trial & for Amended Scheduling Order [Doc. 53] is **DENIED AS MOOT**.

A separate judgment shall enter. There being no more matters to resolve, the Clerk is **DIRECTED** to close the file.

**SO ORDERED**.

*<u>/s/ Charles E. Atchley, Jr.</u>*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT W

Opinion, Monsieur Shawnellias Burgess v. Bradford Hills HOA et al.,
No. M2024-00102-COA-R3-CV (Tenn. Ct. App. Mar. 13, 2026)

FILED
03/13/2026
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 8, 2025 Session

**MONSIEUR SHAWNELLIAS BURGESS v. BRADFORD HILLS HOA ET AL.**

**Appeal from the Circuit Court for Davidson County**
**No. 20C1835 Joseph P. Binkley, Jr., Judge**
**Roy B. Morgan, Jr., Judge**

---

**No. M2024-00102-COA-R3-CV**

---

This is a dispute between a neighborhood homeowners' association ("HOA") and a homeowner in the HOA's neighborhood. On remand after a prior appeal, the trial court entered a declaratory judgment in favor of the homeowner. The homeowner appealed the declaratory judgment and then filed multiple motions in the trial court seeking inherent authority sanctions and costs against certain attorneys who had been involved in the case. The trial court denied the motions, and the homeowner appealed those determinations. We affirm the trial court's decisions in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Monsieur Shawnellias Burgess, Nashville, Tennessee, pro se.

Jonathan Cole, Nashville, Tennessee, for the appellee, Joseph P. Binkley, Jr.

Christopher B. Fowler, Nashville, Tennessee, pro se.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

This is a consolidated appeal of a case that is before us for the second time. *See Burgess v. Bradford Hills HOA*, No. M2020-01565-COA-R3-CV, 2023 WL 142392 (Tenn. Ct. App. Jan. 10, 2023) (hereinafter, "*Burgess I*"). In July 2020, Monsieur Shawnellias Burgess filed a civil warrant in the General Sessions Court for Davidson

County alleging that the Bradford Hills Homeowners' Association ("the HOA") and Lynn Burka (collectively, "the Defendants"), an employee of the company that managed the HOA, violated the HOA's Covenants, Conditions and Restrictions ("CCRs") by levying fines against him for certain conditions on his property. *Burgess I*, 2023 WL 142392, at *1. The Defendants responded by filing a motion to remove the case to the Circuit Court for Davidson County. *Id.* Attached to the motion for removal was an affidavit of Chris Fowler, an attorney for the Defendants, stating that removal would "'avoid duplicative and unnecessary litigation' because the defendants had 'compulsory counterclaims for (1) an injunction and (2) declaratory judgment to determine the rights, status, and legal relations of the parties.'" *Id.* The general sessions court granted the motion, and the case was assigned to Circuit Court Judge Joseph P. Binkley, Jr. *Id.*

Mr. Burgess then filed a series of amended complaints in the circuit court asserting various causes of action against the Defendants, including an allegation "that the court should assess sanctions against Mr. Fowler under Tenn. R. Civ. P. 11 because the motion to remove the case to the circuit court was not supported by any legal basis." *Id.* at *2. After receiving numerous pleadings and motions from the parties and hearing arguments, the circuit court entered an order dismissing the claims against the Defendants. *Id.* The court determined that the case should be dismissed because the gravamen of Mr. Burgess's complaint was a challenge to the HOA's authority to enforce the CCRs, which could only be brought as a derivative action—a claim that Mr. Burgess failed to assert. *Id.* The court then denied Mr. Burgess's request for Rule 11 sanctions against Mr. Fowler because Mr. Burgess failed to comply with the notice requirement in Tenn. R. Civ. P. 11.03(1)(a).[1] *Id.*

On appeal, this Court determined that the gravamen of Mr. Burgess's complaint was not a challenge to the HOA's authority to enforce its CCRs, but rather, a claim that the HOA should not have fined him because he had not violated the CCRs. *Id.* at *9. Thus, we concluded that the gravamen of his complaint was a request for the court to declare the parties' rights and status under the CCRs—in essence, a declaratory judgment. *Id.* We then vacated the dismissal of the claims against the HOA and Ms. Burka and remanded for further proceedings. *Id.* We affirmed the circuit court's decision in all other respects. *Id.* at *14.

Upon remand, Mr. Burgess filed a motion to amend his complaint to allege due process violations, civil rights claims, and conspiracy claims against Judge Binkley. The

---

[1] Tennessee Rule of Civil Procedure 11.03(1)(a) states as follows:

> A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision 11.02. It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected.



Case 3:26-cv-00700 Document 30-2 Filed 08/20/26 Page 27 of 40 PageID #: 984
DONOVAN-000160

Tennessee Supreme Court assigned Judge Roy B. Morgan, Jr., to hear the claims against Judge Binkley. On October 25, 2023, Judge Morgan entered an order denying Mr. Burgess's motion to amend because the allegations against Judge Binkley were barred by judicial immunity as they all related to conduct that occurred while he was acting in his judicial capacity. Mr. Burgess did not appeal this decision.

After the motion to amend to add the claims against Judge Binkley was denied, the claims against the HOA and Ms. Burka moved forward in the trial court with the parties filing a plethora of motions and responses. As relevant to this appeal, Mr. Burgess filed a motion entitled "Motion for Court Sanctions Against The Attorneys of Record & Defendants Pursuant To The Court's Inherent Powers To Sanction" on November 30, 2023. Mr. Burgess requested that the court use its "inherent authority" to impose sanctions against the defendants, the attorneys of record (including Mr. Fowler, though he had been permitted to withdraw from representing the HOA at the conclusion of *Burgess I*), and their law firms "for Bad Faith, Frivolous Defenses and misrepresentations in this litigation." The trial court[2] entered an order on December 13, 2023, denying Mr. Burgess's motion because he "failed to comply with the 21-day safe harbor provision of Rule 11.03." The court also found that the Defendants had not "operated in bad faith, nor h[ad] they set forth any frivolous defense or misrepresentation in this litigation that merit imposition of sanctions by the Court."

On the morning of December 15, 2023, Mr. Burgess filed a motion to alter or amend the denial of his motion for sanctions. Later that same day, the trial court entered two orders. The first order denied the motion to alter or amend, and the second order addressed the claims against the HOA and Ms. Burka. In the second order, the trial court applied this Court's mandate to consider Mr. Burgess's arguments in the context of a declaratory judgment action and found that the HOA's CCRs were vague, ambiguous, and invalid as applied to Mr. Burgess. Lastly, the court dismissed Ms. Burka from the lawsuit because she was "no longer necessary to this litigation." Mr. Burgess timely appealed these orders on January 13, 2024, and that appeal was assigned the following case number: M2024-00102-COA-R3-CV.

Following entry of the order declaring that the HOA's CCRs were vague, ambiguous, and invalid as applied to him, Mr. Burgess continued his quest in the trial court for sanctions against Mr. Fowler and his law firm for having the case removed from the general sessions court. On January 5, 2024, Mr. Burgess filed a motion "For Perjury Sanctions" and "Inherent Powers Sanctions For Frivolous Claims/Defenses." He argued that the court should use its "inherent authority" to impose sanctions against Mr. Fowler and his law firm for acting in bad faith or in a reckless manner by filing the affidavit of Mr. Fowler in support of the motion to remove the case to the circuit court. Specifically, Mr. Burgess contended that Mr. Fowler's affidavit was "perjurious and misle[ading]." To

[2] References to the trial court in this opinion relate to the matters determined by Judge Binkley.

support his argument, Mr. Burgess relied on the fact that none of the Defendants' attorneys ever filed the alleged compulsory counter claims, an injunction, or a declaratory judgment as stated in Mr. Fowler's affidavit. Mr. Burgess also relied on the declaratory judgment order to argue that the court's findings "destroy[ed] any legal basis" to support Mr. Fowler's "false affidavit." On January 25, 2024, the trial court entered an order denying Mr. Burgess's motion for sanctions, finding that Mr. Fowler and his law firm did not act in bad faith or conduct themselves in a reckless manner when filing Mr. Fowler's affidavit.

Nearly a month later, on February 23, 2024, Jonathan Cole, Judge Binkley's attorney, filed a motion in the trial court requesting entry of a final judgment[3]. Mr. Burgess filed a response and, shortly thereafter, Mr. Cole received notice that a final order had been entered and appealed. Mr. Cole then filed a Notice to Strike the Motion for Entry of Final Judgment on March 11, 2024. The following morning, Mr. Burgess filed a motion seeking costs and sanctions against Mr. Cole and Judge Binkley for having to file a response to "the moot motion" for a final judgment. On April 15, 2024, the Supreme Court assigned Judge Morgan to hear Mr. Burgess's motion for costs and sanctions against Mr. Cole and Judge Binkley.

When Mr. Burgess filed this motion for costs and sanctions, he included Mr. Fowler on the motion's certificate of service. On April 25, 2024, Mr. Fowler filed a response to the motion for costs and sanctions. Mr. Fowler stated in the response that he was filing it "[o]ut of an abundance of caution" and argued that he should not be sanctioned because he was no longer involved in the case. He also included some assertions relating to Judge Binkley having judicial immunity. Mr. Burgess filed a response asserting that Mr. Fowler's response should be stricken because he was "in no position to file anything" as he was not Judge Binkley's attorney and had withdrawn from the lawsuit.

Judge Morgan heard the motion for costs and sanctions on April 30, 2024. Mr. Fowler appeared at the hearing and reiterated to the court that he responded to Mr. Burgess's motion "in an abundance of caution" because the motion was vague as to against whom Mr. Burgess sought costs and sanctions. After Mr. Burgess clarified that the motion was directed only at Judge Binkley and Mr. Cole, Judge Morgan requested that Mr. Fowler strike his response, which Mr. Fowler did. The hearing then continued as to Judge Binkley and Mr. Cole, and Judge Morgan entered an order on May 14, 2024, denying the motion. Mr. Burgess timely appealed, and that appeal was assigned the case number: M2024-00765-COA-R3-CV.

Four days before Judge Morgan entered the May 14, 2024 order, Mr. Burgess filed a motion in the trial court requesting costs and "inherent authority" sanctions against Mr.

---

[3] After Judge Morgan denied the motion to amend to add the claims against Judge Binkley, Mr. Cole was not served with any subsequent pleadings or orders filed in the case between Mr. Burgess and the HOA. As a result, Mr. Cole was unaware that the circuit court had entered the declaratory judgment order and that Mr. Burgess had appealed that order.



Case 3:26-cv-00700 Document 30-2 Filed 08/20/26 Page 29 of 40 PageID #: 986
DONOVAN-000162

Fowler and his law firm for having to respond to Mr. Fowler's "unauthorized response." The trial court entered an order on June 5, 2024, denying the motion based on its finding that Mr. Fowler's response was not filed in bad faith or in a reckless manner. On June 7, 2024, Mr. Burgess filed a motion to alter or amend the order and, on July 1, 2024, he filed a motion titled "Motion for Assignment of Senior Judge To Hear Plaintiff's Motions." The court entered two orders on July 9, 2024. In the first order, the court denied the motion to alter or amend, finding that Mr. Burgess failed to satisfy any of the three circumstances under which a motion to revise may be granted, but rather, was "clearly seeking to relitigate a matter which this Court already adjudicated in its June 5, 2024 order." In the second order, the court concluded that the motion for assignment of a senior judge was, in fact, a motion for recusal and then denied the motion because it failed to satisfy the requirements of Tenn. Sup. Ct. R. 10B, § 1.01. Mr. Burgess timely appealed these orders, and this Court assigned that appeal the following case number: M2024-01020-COA-R3-CV.

On June 14 and July 29, 2024, this Court entered orders consolidating the three appeals filed by Mr. Burgess. In his appellate brief, he states that the following issues are presented for our review:

1. Did the findings of Judge Binkley's Final Order change/modify the law of the case?
2. Did Judge Binkley err by not reading the CCRs which were included as an exhibit in the 1st Amended Complaint when he granted [the] motion[] to dismiss?
3. Did the [general sessions and trial courts] comply with the statutory intent of the legislature regarding T.C.A 16-15-732?
4. Did Judge Binkley err in denying Plaintiff/Appellant's motion for sanctions against Chris Fowler for filing frivolous claims/defenses and his false affidavit?
5. Did Judge Morgan err in denying the motion for inherent authority sanctions for responding to Judge Binkley's motion for a 2nd final order?
6. Did Judge Morgan err in denying Plaintiff/Appellant costs for responding to Judge Binkley's motion for a 2nd final order?
7. Did Judge Binkley err in denying inherent authority sanctions regarding Chris Fowler's unauthorized response filed regarding sanctions for Judge Binkley's filing of a motion for a 2nd final order?
8. Did Judge Binkley err in denying direct cost[s] for responding to Chris Fowler's unauthorized response?
9. Did Judge Binkley err by not recusing himself from ruling on Chris Fowler's unauthorized response?

## STANDARD OF REVIEW

We review a trial court's factual findings de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Angela E.*, 303 S.W.3d 240, 246 (Tenn. 2010). We review conclusions of law de novo with no presumption of correctness afforded to the trial court's conclusions. *Spearman v. Shelby Cnty. Bd. of Educ.*, 637 S.W.3d 719, 731 (Tenn. Ct. App. 2021).

Several of the issues presented by Mr. Burgess concern sanctions. A trial court's decision regarding the imposition of sanctions is reviewed under the abuse of discretion standard. *Pegues v. Ill. Cent. R. Co.*, 288 S.W.3d 350, 353 (Tenn. Ct. App. 2008). A court abuses its discretion when it "applie[s] an incorrect legal standard or where its decision is illogical or unreasoned and causes an injustice to the complaining party." *Id.* (citing *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004)).

## ANALYSIS

As a preliminary matter, we note that Mr. Burgess is a pro se litigant. This Court has stated the following principles about pro se litigants:

> Parties who decide to represent themselves are entitled to fair and equal treatment by the courts. The courts should take into account that many pro se litigants have no legal training and little familiarity with the judicial system. However, the courts must also be mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary. Thus, the courts must not excuse pro se litigants from complying with the same substantive and procedural rules that represented parties are expected to observe.

*Young v. Barrow*, 130 S.W.3d 59, 62-63 (Tenn. Ct. App. 2003) (citations omitted); *see also Hessmer v. Hessmer*, 138 S.W.3d 901, 903 (Tenn. Ct App. 2003). Additionally, we allow pro se litigants some latitude in preparing their briefs and endeavor to "give effect to the substance, rather than the form or terminology," of their court filings. *Young*, 130 S.W.3d at 63.

### I. Law of the case

We begin our analysis by addressing the first three issues raised by Mr. Burgess: whether the declaratory judgment order changed the law of the case, whether Judge Binkley erred in not reading the CCRs when granting the HOA's and Ms. Burka's motion to dismiss, and whether the general sessions and circuit courts complied with the statutory intent of the statute governing removal, Tenn. Code Ann. § 16-15-732. All three of these issues fall under the umbrella of the law of the case doctrine.

Our Supreme Court has explained the law of the case doctrine, in pertinent part, as follows:

> The phrase "law of the case" refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case. 5 AM. JUR. 2D *Appellate Review* § 605 (1995). In other words, under the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. *Life & Casualty Ins. Co. v. Jett*, 175 Tenn. 295, 299, 133 S.W.2d 997, 998-99 (Tenn. 1939); *Ladd v. Honda Motor Co., Ltd.*, 939 S.W.2d 83, 90 (Tenn. Ct. App. 1996). The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication. *Ladd*, 939 S.W.2d at 90 (citing other authority). The doctrine does not apply to dicta. *Ridley v. Haiman*, 164 Tenn. 239, 248-49, 47 S.W.2d 750, 752-53 (Tenn. 1932); *Ladd*, 939 S.W.2d at 90.
>
> The law of the case doctrine is not a constitutional mandate nor a limitation on the power of a court. 5 AM. JUR. 2D *Appellate Review* § 605 (1995); *Ladd*, 939 S.W.2d at 90. Rather, it is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited. *Ladd*, 939 S.W.2d at 90 (citing other cases). This rule promotes the finality and efficiency of the judicial process, avoids indefinite relitigation of the same issue, fosters consistent results in the same litigation, and assures the obedience of lower courts to the decisions of appellate courts. *Ladd*, 939 S.W.2d at 90; 5 AM. JUR. 2D *Appellate Review* § 605 (1995); 1B James W. Moore, *Moore's Federal Practice* ¶ 0.404[1] (2d ed. 1995); 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478, at 790 (1981).

*Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998). In other words, "when an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court entered after remand." *Id.*

Mr. Burgess contends that the trial court erred in entering the declaratory judgment order because, in doing so, the court "change[d]/modif[ied] the law of this case." We disagree. In *Burgess I*, this Court concluded that the trial court erred in granting the HOA's and Ms. Burka's motion to dismiss because "it incorrectly concluded that the gravamen of the amended complaint challenged the authority of the HOA to enforce the CCRs against residents of the subdivision." *Burgess I*, 2023 WL 142392, at *8. We determined that the

case was essentially "a derivative action, which Mr. Burgess failed to [assert]." *Id.* Liberally construing Mr. Burgess's complaint, we concluded that he sought a declaratory judgment "construing the CCRs and 'declar[ing] the rights, status, and other legal relations' of the parties under the CCRs to determine whether Mr. Burgess violated the CCRs." *Id.* at *9 (quoting Tenn. Code Ann. § 29-14-102). We then vacated the portion of the trial court's order granting the HOA's and Ms. Burka's motion to dismiss and remanded for the court to consider Mr. Burgess's claim against them in the context of a declaratory judgment. *Id.* On remand, the trial court followed our mandate and, after considering Mr. Burgess's arguments in the context of a declaratory judgment, entered the declaratory judgment order concluding that Mr. Burgess did not violate the CCRs. The trial court's order did nothing to change or modify the law of the case. Thus, Mr. Burgess's argument on this issue is unavailing.

As evident from the foregoing discussion, *Burgess I* addressed the issue of whether the trial court erred in granting the HOA's and Ms. Burka's motion to dismiss. The argument Mr. Burgess makes to support his second issue —whether the trial court erred in granting the HOA's and Ms. Burka's motion to dismiss—is based on the same set of facts at issue in *Burgess I*. Furthermore, his argument remains essentially the same—that the trial court erred in granting the HOA's and Ms. Burka's motion to dismiss. Our Supreme Court has recognized that "[t]here are limited circumstances which may justify reconsideration of an issue which was [an] issue decided in a prior appeal," but none of those limited circumstances are present in this case. *Memphis Publ'g Co.*, 975 S.W.2d at 306. The law of the case doctrine, therefore, prohibits us from reconsidering the issue of whether the trial court erred in granting the HOA's and Ms. Burka's motion to dismiss.

The third issue Mr. Burgess raises in this appeal concerns whether the general sessions court and the trial court failed to "comply with the statutory intent of the legislature regarding TCA 16-15-732." In *Burgess I*, we addressed Mr. Burgess's adamant contention that the case should not have been removed from the general sessions court pursuant to Tenn. Code Ann. § 16-15-732 because the Defendants never filed an answer expressly setting forth any of the legal justifications for removal that are identified in the removal statute. *Burgess I*, 2023 WL 142392, at *5. We rejected Mr. Burgess's contention, holding that it was not necessary for the defendants to file an answer expressly setting forth the legal justifications listed in the statute. Rather, we concluded that the case was properly removed from the general sessions court because Mr. Fowler's affidavit, filed in support of the motion to remove, provided sufficient information to satisfy the requirements of Tenn. Code Ann. § 16-15-732. *Id.* at *6.

Though Mr. Burgess now attempts to reframe the issue by labeling it "statutory intent," a thorough examination of his argument on this issue reveals that he presents nothing new. He merely seeks to relitigate the removal issue previously determined in *Burgess I*. His argument here, as it was in the first appeal, is that the case should not have been removed from the general sessions court because the Defendants never filed an

answer articulating any of the legal justifications for removal set forth in Tenn. Code Ann. § 16-15-732. Thus, he argues that removal under Tenn. Code Ann. § 16-15-732 was improper. Because we addressed this issue in *Burgess I* and none of the limited circumstances recognized by the Supreme Court are present in this case, the law of the case doctrine also prohibits us from reconsidering this issue.

## II. Sanctions and costs

Mr. Burgess next raises several issues related to his motions for sanctions and costs against Mr. Fowler, and his motion for sanctions and costs against Mr. Cole and Judge Binkley. We address each in turn.

### A. Against Mr. Fowler

#### 1. Sanctions for Mr. Fowler's affidavit filed in support of the motion for removal

Mr. Burgess argues that the trial court should have granted his request for inherent authority sanctions against Mr. Fowler in relation to the affidavit Mr. Fowler filed in support of the motion for removal.[4] The Tennessee Supreme Court has explained a court's inherent authority to sanction as follows:

> Completely aside from [Tenn. R. Civ. P.] 11, the courts of this state have, under the inherent power to supervise and control their own proceedings, the authority to sanction attorneys, but only for pursuing matters in bad faith or conducting themselves in a reckless manner. *Cf.*, *Cunningham v. County of Los Angeles*, 879 F.2d 481, 490 (9th Cir. 1988); *Oliveri v. Thompson*, 803 F.2d 1265 (2nd Cir. 1986); *Healey v. Chelsea Resources Ltd.*, 133 F.R.D. 449, 455 (S.D. N.Y. 1990). We note in this regard that it has traditionally been the province of the courts to set standards for the bar and that an attorney acts not only as a client's representative, but also as an officer of the court and, accordingly, has a duty to serve both masters. *Business Guides*, 111 S.Ct. at 940. "Disciplinary powers which English and American courts have for centuries possessed over members of the bar [are] incident to their

[4] In the motion for sanctions at issue here, Mr. Burgess also sought inherent authority sanctions against Mr. Fowler's co-counsel, Benjamin Goldammer, and the law firm at which Mr. Fowler and Mr. Goldammer were partners, Kay Griffin, PLLC ("Kay Griffin"). Mr. Burgess alleged that Mr. Goldammer and Kay Griffin were subject to the inherent authority sanctions as well because Mr. Fowler acted on behalf of Mr. Goldammer and on behalf of Kay Griffin when he filed the affidavit supporting the motion for removal. Because the court concluded that Mr. Fowler did not act in bad faith or recklessly when he filed his affidavit, the court denied the request for sanctions against Mr. Goldammer and Kay Griffin. Though the notice of appeal form filed by Mr. Burgess includes Mr. Goldammer and Kay Griffin as defendants, his arguments focus on Mr. Fowler. Neither Mr. Goldammer nor Kay Griffin filed an appellate brief.

> broader responsibility for keeping the administration of justice and the standards of professional conduct unsullied." *Id.*

*Andrews v. Bible*, 812 S.W.2d 284, 291 (Tenn. 1991).

The conduct Mr. Burgess challenges relates to the removal statute, which states, in pertinent part, as follows: "If the general sessions judge finds that a defendant's defense is substantial, complex or expensive to present, and that the defendant has posted a sufficient cost bond, the judge shall order the action removed to the court that would have jurisdiction of an appeal if the action had been tried in general sessions court." Tenn. Code Ann. § 16-15-732(c)(1). Here, the general sessions court ordered the case removed to the circuit court pursuant to that statutory provision based on Mr. Fowler's affidavit. As pertinent to this case, Mr. Fowler's affidavit contains the following statements:

> 5. HOA has a substantial defense to this action, which will be of such a complex and expensive nature (and amount) that the interest of justice require that the HOA not be required to present the defense at the general sessions court level. The grounds of the defense and the reasons why I believe it to be sufficiently substantial, complex, and expensive to merit the removal of the case are set forth below:
> 6. In addition, HOA has compulsory counterclaims which include causes of action for (1) an injunction, and (2) declaratory judgment to determine the rights, status, and legal relations of the parties.

According to Mr. Burgess, Mr. Fowler's failure to file on behalf of the Defendants the alleged compulsory counterclaims for injunctive and declaratory relief amounted to "bad faith" and "reckless conduct." Furthermore, Mr. Burgess contends, the trial court's findings in the declaratory judgment order show that the Defendants had no plausible compulsory counterclaim for injunctive or declaratory relief; ergo, Mr. Fowler's affidavit was perjurious, misleading, and "nothing short of bad faith."

To determine whether Mr. Fowler acted in "bad faith" or in a "reckless manner," we begin with the definitions of those terms. "Bad faith" means "[d]ishonesty of belief, purpose, or motive." *Bad faith*, BLACK'S LAW DICTIONARY (12th ed. 2024). "Reckless" is defined as "[c]haracterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless, rash." *Reckless*, BLACK'S LAW DICTIONARY (12th ed. 2024). It is conduct that "is much more than mere negligence; it is a gross deviation from what a reasonable person would do." *Id.*

A thorough review of the record reveals no evidence that Mr. Fowler possessed a dishonest belief, purpose, or motive when he asserted in the affidavit that the Defendants had a substantial, complex, and expensive defense. Indeed, the record shows that the

numerous issues raised by Mr. Burgess were substantial and complex, and that the defendants were required to prepare an appropriate defense. As the trial court pointed out, the record in this case is voluminous: the parties filed at least 760 pleadings, motions, and responses in the trial court, the court issued approximately 101 orders, and there were approximately twelve filings/orders entered in this Court. The sheer size of the record shows that this case could not, under any circumstances, have remained in the general sessions court.

The record also reveals no evidence that Mr. Fowler was acting in bad faith when he stated in his affidavit that the Defendants had compulsory counterclaims including a claim for an injunction and/or a declaratory judgment. Mr. Burgess hangs his hat on the fact that Mr. Fowler never filed an answer on behalf of his client that asserted the purported counterclaims. Contrary to Mr. Burgess's assertion, this fact does not, by itself, show that Mr. Fowler was dishonest in stating that he believed the Defendants had those claims. All it suggests is that the defense changed its strategy as the litigation progressed. We also reject Mr. Burgess's contention that the trial court's declaratory judgment order establishes that Mr. Fowler's affidavit was perjurious and misleading. Though Mr. Burgess correctly asserts that the trial court declared that he had not violated the CCRs, he incorrectly asserts that the court's findings show that there was "no plausible argument that justifie[d] Mr. Fowler's motion to remove/affidavit and the arguments/claims therein." We have thoroughly reviewed the trial court's declaratory judgment order and find no such findings, either express or implied. We, therefore, agree with the trial court's conclusion that Mr. Fowler did not pursue removal of the case in bad faith.

The question then is whether Mr. Fowler conducted himself in a "reckless manner" in pursuing the removal and later changing the defense strategy by not seeking the purported counterclaims. Because a court's inherent power to sanction is incident to the court's responsibility to maintain the standards of professional conduct, we, like the trial court, find the rules of professional conduct instructive in determining whether Mr. Fowler's conduct was a "gross deviation from what a reasonable person would do." *Id.* We agree with the trial court's determination that the rules of professional responsibility allowed Mr. Fowler's conduct in pursuing the removal and then changing the defense's strategy by not seeking the purported counterclaims. For instance, Rule of Professional Conduct 1.3 provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." TENN. SUP. CT. R. 8, RPC 1.3. This rule requires that a lawyer "act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf. A lawyer is not bound, however, to press for every advantage that might be realized for a client." TENN. SUP. CT. R. 8, RPC 1.3, cmt. 1. Rather, "a lawyer may have authority to exercise professional discretion in determining the means by which a matter should be pursued." *Id.*

Similarly, Rule of Professional Conduct 1.2 states that, "[s]ubject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of

representation and, as required by RPC 1.4, shall consult with the client about the means by which the client's objectives are to be accomplished." TENN. SUP. CT. R. 8, RPC 1.2. This means that the client has "the ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations." TENN. SUP. CT. R. 8, RPC 1.2, cmt. 1. To pursue the client's objectives, "the lawyer shall consult with the client as required by RPC 1.4(a)(2) and may take such action as is impliedly authorized to carry out the representation." *Id.* Based on the foregoing, we agree with the trial court's conclusion that Mr. Fowler did not conduct himself in a "reckless manner" when he pursued removal and later changed the defense strategy by not seeking the purported counterclaims. We conclude that the trial court did not abuse its discretion in denying Mr. Burgess's motion for inherent authority sanctions in relation to the affidavit Mr. Fowler filed in support of the motion for removal.[5]

2. Sanctions and costs for Mr. Fowler's response to the motion for sanctions and costs stemming from Judge Binkley's motion for entry of a final judgment

Mr. Burgess next contends that the trial court abused its discretion in denying his request for costs and inherent authority sanctions against Mr. Fowler in relation to Mr. Fowler's response to the motion seeking sanctions and costs for Judge Binkley's motion for entry of a final judgment in the underlying case against the HOA. We discern that Mr. Burgess's argument here is that Mr. Fowler acted in "bad faith" or in a "reckless manner" by filing his response to the motion because it constituted an "unauthorized" representation and defense of Judge Binkley. Mr. Burgess is correct that Mr. Fowler was not a party and no longer represented a party when he filed the response, but we disagree that he filed the response on behalf of and in defense of Judge Binkley. A thorough review of Mr. Fowler's response shows that he filed it as a precautionary measure because he believed that Mr. Burgess's motion for sanctions was vague about against whom Mr. Burgess sought sanctions. Notably, Mr. Fowler began his response by stating that he was filing it "in an abundance of caution" and then asserted that he should not be sanctioned because he was no longer involved in the case. Given that Mr. Burgess included Mr. Fowler on the

[5] After oral arguments before this Court, Mr. Burgess filed a motion requesting that we consider certain post-judgment facts pursuant to Tenn. R. App. P. 14, which gives this Court discretion to "consider facts concerning the action that occurred after judgment." The facts Mr. Burgess asks us to consider are that Mr. Fowler and Mr. Goldammer no longer work for Kay Griffin and that they did not file a notice in this Court informing us of "the changed circumstances." We discern that Mr. Burgess's argument is that we should consider these facts because they demonstrate that Mr. Fowler and Mr. Goldammer are "[d]eliberately withholding information that is directly relevant to the sanctions before the court." After reviewing Mr. Burgess's motion and accompanying documents, we do not believe these changed circumstances "ha[ve] any bearing on the positions of the parties in this lawsuit" and "the inclusion of these facts in our consideration would not have altered the outcome of this appeal in any way as to any issue before us." *Haiser v. Haines*, No. E2013-02350-COA-R3-CV, 2014 WL 7010723, at *6 (Tenn. Ct. App. Dec. 12, 2014). As such, we deny Mr. Burgess's motion to consider these additional facts.

certificate of service for the motion for sanctions at issue here and that, throughout this case, Mr. Burgess has repeatedly sought sanctions against Mr. Fowler and the law firm he worked for, we agree with the trial court's finding that Mr. Fowler did not act in bad faith or in a reckless manner when he responded to the motion. Because Mr. Burgess provides no reason for an award of his costs in responding to Mr. Fowler's response other than his unsuccessful argument that Mr. Fowler's response constituted bad faith or reckless conduct, we discern no abuse of discretion in the trial court's decision not to award Mr. Burgess his requested costs. We affirm the trial court's denial of Mr. Burgess's request for sanctions and costs against Mr. Fowler for filing his response to the motion for entry of a final judgment.

B. Against Judge Binkley and Mr. Cole

Mr. Burgess next contends that Judge Morgan abused his discretion in denying the motions for costs and inherent authority sanctions for having to respond to the motion filed by Mr. Cole on behalf of Judge Binkley requesting entry of a final judgment. According to Mr. Burgess, costs and inherent authority sanctions were warranted because the motion was moot due to a final judgment having already been entered in the underlying case. As such, Mr. Burgess argues, Mr. Cole's "sole purpose" in filing the "reckless" and "frivolous" motion "was delay and harassment."

Mr. Burgess supports his argument by pointing out that Mr. Cole admitted he was unaware of the status of the underlying case at the time he filed the motion. As previously mentioned in this opinion, Mr. Cole was retained to represent Judge Binkley for the limited purpose of opposing Mr. Burgess's attempt to add Judge Binkley as a party to the underlying case in the motion for leave to amend the complaint a fifth time. Because the motion for leave to amend the complaint was denied, Judge Binkley never became a party to the case, and Mr. Cole was never listed as counsel of record. Mr. Burgess also did not list Mr. Cole on his subsequent filings in the underlying case. As a result, Mr. Cole never received notice that a final order had been entered in the underlying case or that Mr. Burgess had filed an appeal. We reject Mr. Burgess's contention that Mr. Cole acted recklessly by not regularly checking the docket of a case to which his client was not a party, and we conclude that Judge Morgan did not abuse his discretion in finding that Mr. Cole did not act recklessly in filing the motion based on his reasonable belief that no final judgment had been entered in the underlying case. Therefore, we affirm Judge Morgan's determination that there was no basis to grant the request for costs and inherent authority sanctions.

III. Recusal

Lastly, Mr. Burgess contends that the trial court erred in denying the motion to recuse Judge Binkley from ruling on Mr. Burgess's motion for inherent authority sanctions and costs against Mr. Fowler for the response Mr. Fowler filed to Mr. Burgess's motion

for costs and sanctions against Judge Binkley and Mr. Cole. For the reasons discussed below, we again must respectfully disagree.

Tennessee Supreme Court Rule 10B, section 1.01 provides the procedures a litigant must follow when seeking recusal of a trial judge. Section 1.01 states as follows:

> Any party seeking disqualification, recusal, or a determination of constitutional or statutory incompetence of a judge of a court of record, or a judge acting as a court of record, shall do so by a written motion filed promptly after a party learns or reasonably should have learned of the facts establishing the basis for recusal. The motion shall be filed no later than ten days before trial, absent a showing of good cause which must be supported by an affidavit. The motion shall be supported by an affidavit under oath or a declaration under penalty of perjury on personal knowledge and by other appropriate materials. The motion shall state, with specificity, all factual and legal grounds supporting disqualification of the judge and shall affirmatively state that it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. A party who is represented by counsel is not permitted to file a pro se motion under this rule. Any subsequent motion under this section filed in the same case must state, with specificity, substantially different factual and legal grounds than those relied upon in support of a prior motion filed under this section. If a party fails to satisfy this requirement, the subsequent motion may be deemed repetitive and summarily denied as provided in section 1.03.

TENN. SUP. CT. R. 10B, § 1.01. The first sentence provides two key elements for seeking a recusal. First, a litigant must file a written motion for recusal. Second, the litigant must file the written motion "promptly after a party learns or reasonably should have learned of the facts establishing the basis for recusal." *Id.* "Courts frown upon the manipulation of the impartiality issue to gain procedural advantage and will not permit litigants to refrain from asserting known grounds for disqualification in order 'to experiment with the court . . . and raise the objection later when the result of the trial is unfavorable.'" *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998) (quoting *Holmes v. Eason*, 76 Tenn. (8 Lea) 754, 757 (Tenn. 1882)). A delay in asserting the right to an impartial judge will result "in a waiver of a party's right to question a judge's impartiality." *Id.*

A thorough review of the record shows that, when Mr. Burgess filed the motion for inherent authority sanctions and costs against Mr. Fowler, he did not file a written motion requesting the recusal of Judge Binkley. Two days after Judge Binkley entered the June 5, 2024 order denying the motion, Mr. Burgess filed a motion to alter or amend the June 5, 2024 order. Mr. Burgess again did not file a written motion requesting the recusal of Judge Binkley with the motion to alter or amend. Indeed, Mr. Burgess waited nearly a month after the order denying the motion to alter or amend the June 5, 2024 order was filed to file his

motion titled "Motion for Assignment," seeking Judge Binkley's recusal from ruling on the motion for inherent authority sanctions and costs against Mr. Fowler. Because Mr. Burgess did not file the recusal motion promptly, we agree with the trial court's conclusion that the recusal issue was waived.

We also note that Mr. Burgess's motion failed to satisfy the requirements in section 1.01 that the motion "be supported by an affidavit under oath or a declaration under penalty of perjury on personal knowledge" and that it "affirmatively state that it is not being presented for any improper purpose." TENN. SUP. CT. R. 10B, § 1.01. Compliance with these requirements is mandatory, and the failure to comply with them provides a basis for denial of a motion to recuse. *Beaman v. Beaman*, No. M2018-01651-COA-T10B-CV, 2018 WL 5099778, at *13 (Tenn. Ct. App. Oct. 19, 2018). For the foregoing reasons, we affirm the trial court's denial of the motion to recuse.

## CONCLUSION

The judgments of the trial court and of Judge Morgan are affirmed. Costs of this appeal are assessed against the appellant, Monsieur Shawnellias Burgess, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE



Case 3:26-cv-00700 Document 30-2 Filed 08/20/26 Page 40 of 40 PageID #: 997
DONOVAN-000173