IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

KEVIN M. DONOVAN,
Plaintiff,
v.

BENT CREEK HOMEOWNERS ASSOCIATION, INC., et al.,
Defendants.

Case No. 3:26-cv-00700
Judge Waverly D. Crenshaw, Jr.
**Magistrate Judge Lynda M. Hill**

APPENDIX OF UNREPORTED AUTHORITIES
TO PLAINTIFF'S RESPONSE IN OPPOSITION
TO DEFENDANT EDGE'S PETITION TO DISMISS (DOC. 36)

Submitted pursuant to Local Rule 7.03(b)(5) and as a courtesy to the Court

Tab A — FemHealth USA, Inc. v. Williams
No. 3:22-cv-00565, 2023 WL 5498055 (M.D. Tenn. Aug. 23, 2023) (ECF No. 126)

Tab B — Doe v. Bucciarelli
No. 3:24-cv-00974 (M.D. Tenn. May 22, 2025) (ECF No. 49)

Tab C — Patriot Angels Consulting Corp. v. Veterans of Foreign Wars
No. 3:24-cv-00087, 2026 WL 625680 (M.D. Tenn. Mar. 5, 2026) (ECF No. 97)

**Tab A**

**FemHealth USA, Inc. v. Williams**

No. 3:22-cv-00565, 2023 WL 5498055 (M.D. Tenn. Aug. 23, 2023)

Memorandum Opinion (ECF No. 126)

Donovan v. Bent Creek Homeowners Association, Inc.,

No. 3:26-cv-00700 (M.D. Tenn.)

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **FEMHEALTH USA, INC., d/b/a carafem,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **NO. 3:22-cv-00565** |
| | ) | |
| **v.** | ) | **JUDGE CAMPBELL** |
| | ) | **MAGISTRATE JUDGE FRENSLEY** |
| **RICKEY NELSON WILLIAMS, JR., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

Plaintiff FemHealth USA, Inc. d/b/a carafem ("carafem" or "Plaintiff") is a non-profit organization that provides women's reproductive health services. Plaintiff brings this action against twelve defendants asserting claims for violation of the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248, (the "FACE Act"), and state law claims for trespass, assault, and nuisance. (Am. Compl., Doc. No. 38).[1] The twelve named defendants are two corporations, At the Well Ministries, Inc. ("ATW"), and Operation Save America National Inc. ("OSA"), and certain of their members. Defendants Bevelyn Z. Williams, Edmee Chavannes, and Rickey Nelson Williams, Jr. are alleged to be associated with ATW.[2] (¶¶ 3-7). Defendants Jason Storms is alleged to be the national director of OSA, and Chester Gallagher, Matthew Brock, Coleman Boyd, Frank "Bo" Linam, Brent Buckley, and AJ Hurley are alleged to be OSA members. (¶¶ 8-16).

Pending before the Court are two motions to dismiss. The first motion is by Defendants OSA, Jason Storms, Matthew Brock, Coleman Boyd, Frank "Bo" Linam, and Brent Buckley (the "OSA

[1] Unless otherwise stated, facts stated herein are as alleged in the Amended Complaint (Doc. No. 38), which will be cited as "¶ __."

[2] Plaintiff alleges Bevelyn Z. Williams and Edmee Chavannes are founders and owners of ATW, and Rickey Nelson Williams, Jr. is a full-time employee of ATW. (Am. Compl., Doc. No. 38 at ¶¶ 3-7).

Defendants").[3] (Doc. No. 74). Plaintiff responded to this motion (Doc. No. 77), and the OSA Defendants filed a reply (Doc. No. 80). The second motion to dismiss is by Defendant AJ Hurley. (Doc. No. 86). Plaintiff also responded to this motion (Doc. No. 93), Hurley filed a reply (Doc. No. 94), and, with leave of Court, Plaintiff filed a sur-reply (Doc. No. 100).

Also before the Court is a motion for oral argument filed by the OSA Defendants and Hurley. (Doc. No. 109). The Court finds oral argument is not necessary to resolve the pending motion. Accordingly, the request for oral argument is DENIED. For the reasons stated herein, the motions to dismiss are DENIED.

## I. BACKGROUND

Plaintiff carafem is a non-profit organization that provides women's reproductive health services through a network of health centers. (¶ 17). Plaintiff alleges Frank "Bo" Linam and other members of OSA come to carafem several times each week to interrupt carafem's patient services (¶ 13). The claims asserted in the Amended Complaint arise out of protests outside the carafem health center at 5002 Crossing Circle in Mt. Juliet, Tennessee (the "Mt. Juliet Center") on July 26-28, 2022. At that time, carafem was providing in-person reproductive health services, including abortions, birth control, and testing for sexually-transmitted infections.[4] (¶ 1).

On July 26, 2022, a group of approximately 150 OSA members and affiliates gathered on the streets and sidewalks in front of the parking lot of the medical building in which the Mt. Juliet Center is located. (¶ 20). Members of the group held signs depicting graphic images, used megaphones, and accosted vehicles entering the parking lot in an attempt to disrupt carafem's operations. (*Id.*). After

---

[3] The Court notes that the Amended Complaint also refers to a group identified as the "OSA Defendants," which, in addition to the Defendants joining in the motion to dismiss, also includes Defendants Chester Gallagher and AJ Hurley.

[4] The Court understands from subsequent filings that Plaintiff no longer provides in-person health services at this location.

several hours, a group of approximately seven men, including Defendants Jason Storms and Chester Gallagher approached the front entrance of the medical building.[5] (¶ 21). They were confronted by building security, who instructed them to leave the property. The men refused to move from the front doors and blocked the entrance and exit from the building for several minutes. (¶ 22). Mt. Juliet police responded and eventually persuaded the men to leave the medical building property. (¶¶ 24-26). During this incident, carafem went on "lockdown" for approximately 30 minutes. (¶ 23).

Police informed carafem staff that the OSA members stated that they intended to return to the medical building each day for the remainder of the week, planned to "escalate" activities on Friday, July 29, 2022, and planned to "fill the hallways" of the clinic "sometime soon" and that they had "men out here who are willing to do what needs to be done." (¶ 27).

On July 27, 2022, approximately 30-35 individuals believed to be members or affiliates of OSA protested on the sidewalks outside the medical building property with graphic signs and megaphones. (¶ 30). Plaintiff states the amplified sound could be heard from inside patient rooms and that staff was forced to yell to complete patient care visits. (*Id.*).

On July 28, 2022, approximately 60 individuals believed to be members or affiliates of OSA, including Defendants Rickey Williams, Jr., Bevelyn Williams, and Edmee Chavannes (who are associated with ATW), arrived at the medical building. (¶ 32). The individuals again protested with graphic signs and megaphones. (*Id.*). The protesters amplified the sound of a crying baby at a volume that made it difficult for patients to hear carafem staff during their healthcare appointments. (*Id.*). At approximately 11:20 a.m. Defendants Rickey Williams, Jr., Bevelyn Williams, and Edmee

[5] Although the Amended Complaint does not specifically name Hurley as one of the men who entered the medical building property on July 26, 2022, in his Reply Brief, Hurley stated that he did not dispute that he did so. (*See* Doc. No. 94 at 5).

Chavannes entered the building, attempted to enter the clinic, and subsequently blocked the clinic entrance. (¶¶ 33-35). They were eventually escorted from the building by police.

The following day, July 29, 2023, Plaintiff initiated this action and sought a temporary restraining order against the Defendants. (Doc. Nos. 1, 2). The Court granted the motion for temporary restraining order and later entered a preliminary injunction. (Doc. Nos. 9, 66). Defendants Coleman Boyd, Matthew Brock, Brent Buckley, Frank Linam, Jason Storms, and OSA appealed the preliminary injunction. (*See* Doc. No. 67). The appeal remains pending.

The OSA Defendants and Defendant AJ Hurley moved to dismiss the Amended Complaint. (Doc. Nos. 74, 86). These motions are fully briefed and ripe for review. (*See* Doc. Nos. 75, 77, 80, 86, 93, 94, 100).

## II. STANDARD OF REVIEW

For purposes of a motion to dismiss, the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*. at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010); *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with


Case 3:23-cv-00765 Document 126 Filed 03/21/23 Page 4 of 16 PageID #: 1069

the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

## III. ANALYSIS

### A. FACE Act

1. <u>Standing</u>

Defendant AJ Hurley moves to dismiss the FACE Act claim on grounds that Plaintiff lacks statutory standing to bring claims under 18 U.S.C. § 248. (Doc. No. 86-1). As relevant to the instant motion, the FACE Act provides:

> (a) **Prohibited activities**. – Whoever –
>
> (1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services;
>
> ….
>
> (3) intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services, or intentionally damages or destroys the property of a place of religious worship,
>
> shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c), except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor.
>
> ….
>
> (c) **Civil remedies**. –
>
> (1) **Right of action**. –
>
> (A) **In general** – Any person aggrieved by reason of the conduct prohibited by subsection (a) may commence a civil action for the relief set forth in subparagraph (B), except that such an action may be brought under subsection (a)(1) only by a person involved in providing or seeking to provide, or obtaining or seeking to obtain, services in a facility that provides reproductive health services, and such an action may be brought under subsection (a)(2) only by a person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship or by the entity that owns or operates such place of religious worship.

18 U.S.C. § 248.

Hurley contends that Section 248(c)(1) allows for claims to be brought only by natural persons and that "Plaintiff carafem is not an 'aggrieved person'" under the statute. (Doc. No. 86-1 at 3-4). His initial memorandum provides no further exposition of this argument. Plaintiff responds that carafem is plainly a "person" under the statute, pointing to Congress' directive that "in determining the meaning of any Act of Congress, unless the context indicates otherwise … the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." (Doc. No. 93 at 5 (citing 1 U.S.C. § 1)).

In his reply memorandum, Hurley argues that the context of FACE Act indicates that Congress intended "person" to mean only "natural persons." First, Hurley points to section 248(a)(2), which provides for actions to be brought by "an entity that owns or operates [] a religious place of worship." (Doc. No. 94 at 1). He reasons that under the interpretive canon "*expressio unius est exclusio alterius* – the express mention of one thing excludes others," Congress' choice to specifically grant standing to entities that own or operate a religious place of worship without a parallel grant of standing to entities that own or operate reproductive healthcare facilities indicates that "aggrieved person" includes only natural persons. (*Id*.). Hurley also points to the definitions or context of certain terms that he contends indicate the use of "person" in the FACE Act refers only to "natural persons." Finally, he argues that the legislative history of the Act confirms that the civil remedies of Section 248(c)(1) are available only to natural persons. (*Id*. at 2).

The parties cite only one case that has directly considered the issue – *Planned Parenthood of Se. Penn., Inc. v. Walton*, No. Civ. A 95-2813, 1997 WL 734012 (E.D. Penn. Nov. 14, 1997).[6] The *Walton* court, considering arguments virtually identical to those presented by Hurley, found that "that

[6] Plaintiff cites a number of cases upholding civil claims and criminal charges brought under the FACE Act for threatening, intimidating, and obstructing clinics and facilities. (Doc. No. 100 at 3 (collecting cases)). Defendant has not citied any decision holding that only natural persons are authorized to bring claims under Section 248(c)(1).

under the plain language of the statute itself, the plaintiff corporation qualifies as a 'person involved in providing or seeking to provide ... services in a facility that provides reproductive health care services' within the meaning of § 248(c)(1)(A)." *Id*. at *2. The Court reasoned that the lack of symmetry in the provision of standing to certain fictional persons was to allow entities that own or operate a religious place of worship to bring claims without reference to principles of organizational standing; it did not mandate a conclusion that claims under the Face Act were otherwise limited to natural persons. *Id*.

The Court agrees with the court in *Walton*: that the inclusion of a specific provision for entities that own or operate a religious place of worship does not indicate that the word "person" means only "natural person," such that the definitions in 1 U.S.C. § 1 do not apply. While it is true that in certain contexts the "express mention of one item of [an] associated group or series excludes others left unmentioned" (*expressio unius est exclusio alterius*), the Court finds no reason to apply that canon of construction here. As explained by the Supreme Court, "[t]he force of any negative implication [] depends on context" and "applies only when 'circumstances support[ ] a sensible inference that the term left out must have been meant to be excluded.'" *N.L.R.B. v. SW General, Inc.*, 580 U.S. 288, 302 (2017) (citing *Marx v. Gen. Revenue Corp*., 568 U.S. 371, 381 (2013), and *Chevron U.S.A. Inc. v. Echazabal,* 536 U.S. 73, 81 (2002)).

The Court is not persuaded that the specific provision of standing to bring claims under subsection (a)(2) for an entity that owns or operates a religious place of worship supports a "sensible inference" that the provision of standing to bring claims under subsection (a)(1) to "a person involved in providing or seeking to provide … services in a facility that provides reproductive health services" excludes non-natural persons. A more natural reading of the subsection is that it clarifies that entities that own or operate a "religious place of worship" referenced in Section (a)(2) may also bring claims even if they are not themselves deemed to be exercising a First Amendment right of religious freedom.

No such clarification is necessary with regard to entities "providing or seeking to provide … services in a facility that provides reproductive health services."

Accordingly, the express provision of standing for entities that own or operate places of worship does not require, or even suggest, that an entity providing services in a reproductive health facility is not a "person" entitled to bring a claim under the civil remedies provision of the FACE Act.

Hurley also argues that certain terms of the FACE Act are defined with reference to a "person" that can only mean a "natural person." (Doc. No. 94 at 1). For example, the statute defines "interfere with" as "to restrict a person's freedom of movement." (*Id*. (citing 18 U.S.C. § 248(e)(2)). Hurley argues that this use of "person" must be limited to "natural person," presumably because a corporation does not have "freedom of movement" and that the use of "person" in the entire statute must, therefore, be limited to natural persons. He makes a similar argument regarding "intimidate," which is defined as "to place a person in reasonable apprehension of bodily harm to him- or herself or to another." (*Id*. (citing 18 U.S.C. § 248(e)(3)). Finally, he asserts that he terms "threat of force" and "physical obstruction" refer only to actions taken against natural persons.

Hurley's argument on this front is equally unpersuasive. True, it is difficult to imagine that a non-natural person could be "interfered with" in the sense that it could be restricted in freedom of movement in the traditional sense, such as being prevented from entering or exiting a building. The same is not the case for "intimidate" where a non-natural person could have "reasonable apprehension of bodily harm to … another." But in the overall context of the statute, the meaning of these terms is not dispositive of the meaning of "person." These terms are found in a list of prohibited conduct whereby whoever "by force or threat of force or by physical obstruction intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person" shall be subject to specified penalties and civil remedies. 18 U.S.C. § 248(a)(1). Even if a non-natural person cannot be interfered with in the sense of obstructing physical movement, it can be subject to injury

and intimidation. Therefore, the prohibition of "interfere[nce]" as one of a list of prohibitions does not suggest person has meaning other than that provided in 1 U.S.C. § 1. The final two phrases, "threat of force" and "physical obstruction," easily apply to legal as well as natural persons.

The Court concludes that, under the plain language of the FACE Act, Plaintiff carafem, a non-profit corporation, qualifies as a "person involved in providing or seeking to provide services in a facility that provides reproductive health services." Because the terms of the statute are unambiguous, the Court need not consider legislative history. *Rubin v. United States*, 449 U.S. 424, 430 (1981) ("[W]hen … the terms of a statute [are] unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances.") (internal quotation omitted).

2. <u>Failure to State a Claim</u>

The OSA Defendants argue Plaintiff fails to state a claim under the FACE Act. For the reasons stated in the Court's ruling on the motion for preliminary injunction, Plaintiff has stated a claim for relief under the FACE Act. The OSA Defendants' motion to dismiss this claim for failure to state a claim will be DENIED. (*See* Memorandum and Order Granting Preliminary Injunction, Doc. Nos. 65, 66 (finding Plaintiff stated a claim under the FACE Act and showed a likelihood of success on the merits of the claim)).

**B. Tennessee Public Participation Act**

The OSA Defendants seek to apply the procedural mechanism of the Tennessee Public Participation Act ("TPPA"), Tenn. Code Ann. §§ 20-17-101, *et seq*. (Doc. No. 75 at 3). Specifically, Defendants rely on the provisions of the TPPA that allow a defendant to petition for dismissal of a legal action "filed in response to a party's exercise of the right of free speech, right to petition, or right of association." Tenn. Code Ann. § 20-17-104(a). Under the TPPA, once the defendant makes out a prima facie case that he was exercising his First Amendment rights, "the court shall dismiss the legal action unless [the plaintiff] establishes a prima facie case for each essential element of the claim

in the legal action." *Id*. at § 20-17-105. The OSA Defendants contend Plaintiffs' claims are "merely pretexts for censoring and suppressing these Defendants' message in violation of the [TPPA]," that Plaintiff cannot establish a prima facie case for its claims, and, therefore, the claims must be dismissed. (Doc. No. 75 at 3). Plaintiff argues that the procedural mechanisms of the TPPA do not apply in federal court, and that even if they did apply, it has established a prima facie case on each of its claims. (Doc. No. 77 at 4).

The Sixth Circuit has not considered the applicability of the dismissal procedures in the TPPA or other anti-SLAPP statutes in federal court.[7] However, the majority of courts in this circuit have determined that the procedural mechanisms of the TPPA and similar anti-SLAPP statutes conflict with the procedures established in the Federal Rules of Civil Procedure governing dismissal of cases, and are, therefore not available in federal court. *See Santoni v. Mueller*, No. 3:20-cv-00975, 2022 WL 97049, at *14 (M.D. Tenn. Jan. 10, 2022); *Hughes v. Gupta*, 613 F. Supp.3d 1054, 1057 (W.D. Tenn. 2021); *Mucerino v. Martin*, No. 3:21-cv-00284, 2021 WL 5585637, at * 6 (M.D. Tenn. Nov. 30, 2021); *Lampo Group, LLC v. Paffrath*, No. 3:18-cv-01402, 2019 WL 3305143, at * 3 (M.D. Tenn. Jul. 23, 2019)).

The Court agrees with the reasoning of these decisions. "It is a long-recognized principle that federal courts sitting in diversity 'apply state substantive law and federal procedural law." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393, 417 (2010) (Stevens, J., concurring) (citing *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). "[W]hen a duly adopted Federal Rule of Civil Procedure collides with a state procedural edict in a federal court: the state requirement yields, and the Federal Rule prevails." *Mucerino*, 2021 WL 5585637, at * 6; *see also, Shady Grove*, 559 U.S. at

[7] "SLAPP" stands for "strategic lawsuits against public participation." *See Santoni v. Mueller*, No. 3:20-cv-00975, 2022 WL 97049, at *14 (M.D. Tenn. Jan. 10, 2022). The stated purpose of the TPPA is "encourage and safeguard the constitutional rights of persons to petition, to speak freely, to associate freely, and to participate in government to the fullest extent permitted by law." Tenn. Code Ann. § 20-17-102.

398 (holding that when a valid Federal Rule of Civil Procedure answers the question in dispute, the federal rule applies over a conflicting state law).

The Tennessee Court of Appeals has described the TPPA as "combin[ing] the procedural mechanism of a Tennessee Rule of Civil Procedure Rule 12.02(6) motion to dismiss, with … 'a procedure where the trial court evaluates the merits of a lawsuit using a summary-judgment like procedure at an early stage of litigation.'" *Flade v. City of Shelbyville*, No. M2022-00553-COA-R3-CV, 2023 WL 2200729, at *24 (Tenn. Ct. App. Feb. 24, 2023). The court in *Flade* also observed that the TPPA does not create a private right of action or affect the substantive law governing any asserted claim. *Id*.

The Court agrees with the other courts to have considered the issue: the burden-shifting framework established by the TPPA is procedural and in direct conflict with Federal Rules of Civil Procedure 8 and 12, which provide the criteria for assessing the sufficiency of a pleading. There is no real dispute that the Federal Rules of Civil Procedure at issue are valid. *See Lampo*, 2019 WL 3305143, at * 4 (finding these Federal Rules of Civil Procedure valid and noting that in *Shady Grove*, 559 U.S. at 407, the Supreme Court recognized that it has "rejected every statutory challenge to a Federal Rule that has come before us").

For these reasons, the Court concludes that the procedural mechanisms established by the TPPA do not apply in federal court, and the OSA Defendants' motion to dismiss on these grounds will be DENIED.

**C. Supplemental Jurisdiction**

Defendant Hurley argues the Court "cannot exercise supplemental jurisdiction over any state law claims if and when it dismisses the sole federal claim against Hurley and the other OSA Defendants because the state law claims will predominate and they will be based on different factual matters than the remaining FACE claim." (Doc. No. 86-1 at 7).

Because the court has not dismissed the federal claims, Hurley's motion to dismiss the state law claims will be DENIED. *See* 28 U.S.C. § 1367(a) (providing that the district court has supplemental jurisdiction over "all other claims that are so related to the claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution").

**D. Trespass**

1. <u>The OSA Defendants</u>

The OSA Defendants argue the claim for trespass must be dismissed for three reasons: (1) Plaintiff cannot establish a prima facie case for trespass to land because it is a tenant; (2) Plaintiff lacks standing to bring the trespass claim; and (3) Defendants are entitled to the defense of necessity. None of these arguments has merit.

Under Tennessee law, elements of a trespass claim are: "(1) an intentional entry or holdover; (2) by the defendant or a thing; (3) without consent or legal right." *Twenty Holdings, LLC v. Land S. TN*, No. M2018-01903-COA-R3-CV, 2019 WL 4200970, at *8 (Tenn. Ct. App. Sept. 5, 2019).

Defendants' argument that Plaintiff is "unable to make a prima facie case for trespass to land" because it does not own the building and the claim is not joined by the building manager or owner, or other tenants of the medical building is not supported by persuasive authority.[8] The OSA Defendants rely on *Mayfield v. Stephenson*, 65 Tenn. 397, 401-02 (1873) for the proposition that "one tenant in common could not sue alone for trespass to land." (Doc. No. 75 at 9). Nothing in the Amended Complaint suggests that Plaintiff's legal interest in the property is as a tenant in common.

---

[8] In their reply brief the OSA Defendants cite cases concerning a reasonable expectation of privacy in the context of warrantless searches and seizures. (*See* Doc. No. 80 at 5 (citing *U.S. v. Sweeney*, 821 F.3d 893, 902 (7th Cir. 2016), and *State v. Talley*, 307 S.W.3d 723, 734 (Tenn. 2010)). These cases have no bearing on Plaintiff's ability to bring a claim for trespass.

Moreover, even in 1873, the Tennessee Supreme Court recognized that "the authorities are said to be in conflict on the issue" of whether one tenant in common could sue for trespass to land. *Mayfield*, 65 Tenn. at 402.

The law has developed is the 150 years following the *Mayfield* decision. Currently, it is recognized that "a trespass action protects an owner or tenant's right to exclusive possession." *Whitford v. Vill. Groomer & Animal Inn, Inc.*, No. M2020-00946-COA-R3-CV, 2021 WL 4240989, at *5 (Tenn. Ct. App. Sept. 17, 2021). "Tennessee courts have long recognized [] that a trespass action many be brought by a person who is either in actually possession of the property at issue, or in constructive possession by virtue of holding legal title." *Morrow v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:19-cv-00351, 2020 WL 5106763, at *3 (M.D. Tenn. Aug. 31, 2020). The Amended Complaint adequately alleges that Plaintiff has legal interest in the property.

Somewhat relatedly, the OSA Defendants contend Plaintiff does not have standing to assert a claim for trespass. (Doc. No. 75 at 9-10 (citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975), and *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). The briefing is void of any developed legal argument, and the Court struggles to surmise the basis for the challenge to standing.

Standing requires the plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The allegations clearly show that Plaintiff satisfied these requirements.

Finally, the OSA Defendants argue that a claim for trespass "would not lie against these Defendants because they are entitled to the defense of necessity." (Doc. No. 75 at 10). Because the affirmative defense relies on facts outside the complaint, it cannot be resolved at the motion to dismiss stage. *See Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009) ("when evaluating an

affirmative defense in a motion to dismiss, a court must still only look to the facts alleged in the plaintiff's complaint").

In summary, the OSA Defendants have not raised any valid grounds to dismiss the claim for trespass. Accordingly, the motion to dismiss this claim will be DENIED.

2. Hurley

Like the argument presented by the OSA Defendants, Defendant Hurley argues that a claim for trespass requires that the owner or tenant has the right to "*exclusive* possession" of the property at issue and, because Plaintiff's offices are located in a multi-tenant building, the trespass claim must be dismissed. (Doc. No. 86-1 at 8, Doc. No. 94 at 4). In support of this argument, Defendant Hurley cites cases in which the courts refer the "owner or tenant's right to exclusive possession" when discussing a claim for trespass. *See Whitford*, 2021 WL 4240989, at *5; *Heatley v. Gaither*, No. M2018-00461-COA-R3-CV, 2018 WL 6706287, at *4 (Tenn. Ct. App. Dec. 19, 2018); *Morrison v. Smith*, 757 S.W.2d 678, 681 (Tenn. Ct. App. 1988). But none of the cited cases stand for the proposition that a tenant in a multi-occupancy building cannot brings claims for trespass of the common areas of the property, particularly where the alleged trespasser engages in acts inconsistent with the purposes of the business or facility.

As stated above, Plaintiff has sufficiently alleged a legal interest in the property and alleged the elements of a claim for trespass. At this stage in the litigation, this is sufficient. Therefore, Defendant Hurley's motion to dismiss the trespass claim will be DENIED.

**E. Nuisance**

"Tennessee Court have defined a private nuisance as 'anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable and extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of property.'" *Lane v. W.J. Curry & Sons*,

92 S.W.3d 355, 364 (Tenn. 2002) (quoting *Pate v. City of Martin*, 614 S.W.2d 46, 47 (Tenn. 1981) (cleaned up). A nuisance may be something that "causes discomfort or inconvenience to the occupants of the property," such as noise. *Id*. at 365.

Plaintiff brings a nuisance claim against the OSA Defendants and Defendant Hurley based on their "entrance on the medical building's property on July 26, 2022" and the amplification of sound at a volume that disturbed the reasonable and comfortable use of the facility by patients and staff. (¶¶ 61-63).

1. The OSA Defendants

The OSA Defendants allege the amplified sound on June 28, 2022, does not rise to the level of nuisance and that any injunction against these Defendants' amplified speech would amount to an unconstitutional prior restraint on speech.[9]

At this stage, the Court does not decide whether Plaintiff will prevail on the claim. All that is required is that it state a plausible claim for relief. Plaintiff's allegation that Defendants projected amplified sound in the direction of its office at such a volume that it interfered with Plaintiff's ability to provide medical care to patients states a plausible claim for relief. (*See* ¶¶ 30, 32). Therefore, the OSA Defendants' motion to dismiss the nuisance claim will be DENIED.

2. Hurley

Defendant Hurley argues Plaintiff fails to state a claim for nuisance based on the entry onto the medical building property because any interference with Plaintiff's use of its office space was caused by Plaintiff itself when it initiated a lockdown with "no reason." (Doc. No. 86-1 at 9). With regard to the amplified sound, Hurley argues that Plaintiff does not allege that he was even at the

[9] The OSA Defendants do not address Plaintiff's claims for nuisance based on the entrance onto the medical building's property on July 26, 2022. (*See* Doc. No. 75 at 12 (stating that Plaintiff's claimed nuisance "occurred on a single occasion on July 28, 2022)).

protest on July 27 and 28, 2022, let alone that he was responsible for the amplification.[10] (*Id*. (citing Am. Compl. ¶ 32 (referring generally to OSA protesters))). Finally, Hurley mimics the OSA Defendants' argument that Plaintiff fails to state a claim for nuisance based on the sound amplification, specifically because the amplification was limited to "[t]wo isolated occurrences." (*Id*. at 10).

Hurley's objection to the sufficiency of the nuisance claim is one of degree – *i.e.*, that the conduct complained of was not bad enough or of sufficient duration to constitute a nuisance. At this stage, the Court finds the allegations sufficient to state a claim for nuisance. Further, Plaintiff's claim for nuisance against the "OSA Defendants," sufficiently places Defendant Hurley on notice of the nuisance claim against him for both the entrance into the building on July 26, 2022, and the amplification of sound on July 27 and 28, 2022. Accordingly, Hurley's motion to dismiss the nuisance claim will be DENIED.

## IV. CONCLUSION

For the reasons stated herein, the OSA Defendants' Motion to Dismiss (Doc. No. 74) will be **DENIED**. Defendant Hurley's Motion to Dismiss (Doc. No. 86) will also be **DENIED**. An appropriate order will enter.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

[10] Hurley does not dispute that he was present on July 26, 2022 and that he entered the medical building property that day. (Doc. No. 94 at 5).

**Tab B**

**Doe v. Bucciarelli**

No. 3:24-cv-00974 (M.D. Tenn. May 22, 2025)

Memorandum Opinion (ECF No. 49)

Donovan v. Bent Creek Homeowners Association, Inc.,

No. 3:26-cv-00700 (M.D. Tenn.)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **JANE DOE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**COREY BUCCIARELLI, HOUSTON COUNTY BOARD OF EDUCATION, KRIS MCASKILL, officially and individually, MARK BEAL, officially and individually, ANDREA MARTIN, officially and individually,**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 3:24-cv-00974**<br>**Judge Aleta A. Trauger** |

**MEMORANDUM**

Before the court are (1) plaintiff Jane Doe's Motion for Judgment on the Pleadings ("Motion for Judgment") (Doc. No. 22) and (2) defendant Corey Bucciarelli's Amended Motion for Leave to Amend Counter-Complaint ("Motion to Amend") against Counter-Defendant Jane Doe (Doc. No. 35).

Although the Motion for Judgment seeks dismissal of Bucciarelli's original Counter-Complaint (Doc. No. 9), the plaintiff's Opposition to the Motion to Amend is based solely on the purported futility of the proposed amendment, and it largely reiterates the arguments made in the Motion for Judgment. Bucciarelli's Motion to Amend attempts to address any shortcomings in his original Counter-Complaint. The court finds that the Motion for Judgment was not mooted by the Motion to Amend but can instead be construed as addressed to the claims set forth in the proposed Amended Counter-Complaint (Doc. No. 35-1), filed with the Motion to Amend.

Further, for the reasons set forth herein, the court finds that the proposed amendment would not be futile. Accordingly, the defendant's Motion to Amend will be granted and the plaintiff's Motion for Judgment will be denied.

## I. PROCEDURAL HISTORY

Plaintiff Jane Doe, proceeding under a pseudonym, filed her original Complaint initiating this action in the Circuit Court for Houston County, Tennessee on April 24, 2024. After she filed an Amended Complaint on July 11, 2024, adding a federal claim under 42 U.S.C. § 1983, the defendants who had been served, Bucciarelli and the Houston County Board of Education, removed the case to this court on the grounds of federal question jurisdiction. (*See* Notice of Removal, Doc. No. 1; Am. Compl., Doc. No. 1-2.)

In the Amended Complaint, Jane Doe alleges that she is a former Assistant Principal in the Houston County Schools and that Bucciarelli was formerly employed as a teacher at the same school in which she worked. She alleges that she complained to school administrators about sexual harassment by Bucciarelli beginning in the spring of 2022, but the school administrators did not take her seriously, did not investigate her allegations, and did not discipline Bucciarelli. The plaintiff alleges that she was sexually assaulted by Bucciarelli in January 2023 and then raped by him on school grounds on April 25, 2023 and again on May 16, 2023. (Am. Compl. ¶¶ 17–36.)

In July 2023, Houston County Schools opened an investigation to determine whether Jane Doe had engaged in inappropriate conduct involving Bucciarelli "and/or" his wife, based on allegations brought by either Bucciarelli or his wife. (*Id.* ¶ 40.) On July 13, 2023, Jane Doe was informed that she was being suspended.[1] (*Id.* ¶ 42.) Jane Doe met with school administrators on

[1] She was later briefly reinstated but assigned to a different school and then suspended again pending resolution of the investigation and charges against Bucciarelli.

July 25, 2023 to discuss the allegations against her. During this meeting, she informed school administrators for the first time of the "multiple rapes by Bucciarelli." (*Id.* ¶ 43.)

She filed a report with the Houston County Sheriff the same day. (*Id.* ¶ 44.) On April 15, 2024, a Houston County Grand Jury indicted Bucciarelli on two counts of rape and one count of sexual battery. Those charges remain pending. (*Id.* ¶¶ 52.)

Jane Doe, meanwhile, remains suspended, or has perhaps been terminated, though she is not under criminal investigation and no charges have been brought against her that would justify termination. (*Id.* ¶¶ 54–57.)

In the Amended Complaint, Jane Doe asserts claims against Bucciarelli under Tennessee law for battery and "outrage" (which the court construes as a claim for intentional infliction of emotional distress ("IIED")). She asserts claims against Houston County for negligent hiring, negligent retention, negligence, sexual harassment and retaliation under the Tennessee Human Rights Act, violation of the PEPFA (which the court understands to be a reference to the Tennessee Public Employees Political Freedom Act, Tenn. Code Ann. § 8-50-603),[2] and violation of the Tennessee Teacher Tenure Act ("TTTA"). She asserts a claim against Houston County, Assistant Direct of Schools Mark Beal, Director of Schools Kris McAskill, and Houston County Middle School Principal Andre Martin under 42 U.S.C. § 1983 for violation of her Fourteenth Amendment rights to substantive and procedural due process.

On August 16, 2024, Bucciarelli answered the Amended Complaint and filed a Counter-Complaint. (Doc. No. 9.) The Counter-Complaint vaguely incorporates by reference his "answers

[2] A claim under the PEPFA requires retaliation based on an employee's exercise of her right to communicate with an elected official. *See* Tenn. Code Ann. § 8-50-603(a). It appears that the plaintiff may have intended instead to assert a claim under the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304.

listed [in paragraphs] 1–119" and, based on those allegations, asserts claims against Jane Doe for "outrageous conduct" (which the court construes as an IIED claim) and defamation, based on Bucciarelli's allegations that the plaintiff "intentionally and recklessly . . . made false claims of rape and unwanted sexual conduct" against Bucciarelli in order to protect her own job and that she made those statements "to school administrators and law enforcement" while knowing that they were false, causing damage to his reputation. (Counter-Complaint ¶¶ 2, 5, 7–8.)

Jane Doe responded to the Counter-Complaint by filing her Motion for Judgment, in which she argues that (1) the IIED and defamation claims are both barred by the applicable statutes of limitation; (2) the Counter-Complaint fails to state a colorable IIED claim because Bucciarelli fails to "substantiate his claims or present any facts that contradict Doe's allegations" that he raped her and, further, fails to allege "severe mental injury," as required to state an IIED claim under Tennessee law (Doc. No. 23 at 5); (3) the Counter-Complaint fails to state a colorable defamation claim, because Bucciarelli does not "describe the content or substance of any of the alleged 'false' comments made or otherwise explain how these imaginary comments are defamatory" and fails to adequately plead economic injury or damage to his reputation (*id.* at 8–9); (4) Bucciarelli's defamation claim is barred by the "'libel-proof plaintiff' defense" and the Tennessee Public Participation Act (*id.* at 9, 11); and (5) Jane Doe is immune from the claim under the absolute litigation privilege (*id.* at 10).

Bucciarelli opposed the plaintiff's Motion for Judgment, arguing both that his original Counter-Complaint stated colorable claims but also that he intended to file a motion requesting leave to amend the Counter-Complaint to include "recently obtained information" substantiating his claims. (Doc. No. 30 at 4.) Indeed, he filed his Motion to Amend, supporting Memorandum, and proposed Amended Counter-Complaint shortly thereafter. (Doc. Nos. 31, 31-1, 32.) Unlike

the original, the proposed Amended Counter-Complaint provides the factual backdrop for Bucciarelli's claims. He alleges specifically that he and the plaintiff engaged in a consensual extra-marital sexual relationship beginning in February 2023 and continuing through July 2023. (Prop. Am. Counter-Compl., Doc. No. 31-1 ¶¶ 24–30, 33.) In July 2023, Bucciarelli allegedly began to feel guilty about the relationship, confessed it to his wife, and cut off contact with Jane Doe. (*Id.* ¶¶ 35–36.) His wife then made a formal complaint about Jane Doe to school administrators, based on her engaging in an inappropriate relationship with a subordinate. (*Id.* ¶ 37.) This complaint resulted in Doe's suspension and to Doe's accusing Bucciarelli, for the first time, of rape and non-consensual sexual conduct. (*Id.* ¶¶ 38–39.)

Although Bucciarelli acknowledges that Jane Doe first told school administrators and the Houston County Sheriff on July 25, 2023 that he had raped her, he does not indicate when he learned that she had done so. He does allege that she has "repeatedly and continuously made these false allegations against Bucciarelli." (*Id.* ¶ 40.) More specifically, he claims that she has repeated these allegedly false accusations in text messages to various people on August 22, 2023, October 24, 2023, February 7, 2024, March 14, 2024, April 26, 2024, April 27, 2024, May 12, 2024, and May 22, 2024. (*Id.* ¶ 44(a)–(j).)

Based on these allegations, the proposed Amended Counter-Complaint re-asserts the claims for IIED and defamation. This time, under the IIED claim, Bucciarelli specifically asserts that "[a] woman intentionally or recklessly making false claims accusing a man of rape and unwanted sexual conduct for purposes of her own self-promotion and/or protection is not tolerated by a civilized society" and that, as a result of the false claims, he has suffered irreparable damage to his reputation and "severe stress and mental harm resulting in physical manifestations." (*Id.* ¶¶ 51–52.)

As noted above, Jane Doe opposes the Motion to Amend on the grounds of futility.[3] (Doc. No. 40.) She argues very generally that Bucciarelli has not met his burden of showing that "there are plausible facts" supporting his claim that Jane Doe was *not* raped by Bucciarelli and that "[i]t would be improper to allow a defamation suit to proceed before determining the validity of Doe's statements." (*Id.* at 2–3.) According to the plaintiff, the facts alleged in the proposed Amended Counter-Complaint are "irrelevant to whether Corey Bucciarelli raped Doe, nor does it change the fact that a grand jury indicted him for that crime." (*id.* at 3.) She continues to assert that the IIED claim accrued on July 25, 2023, when the plaintiff first reported the alleged rapes to school administrators and the Houston County Sheriff, and expired one year later, on July 25, 2024, before the defendant filed his original Counter-Complaint. She asserts that the proposed Amended Counter-Complaint fails to sufficiently allege facts supporting outrageous conduct or the requisite serious mental injury. She also continues to assert that Bucciarelli's defamation claim is subject to a six-month limitation period for spoken slander and that his claims are barred by the libel-proof plaintiff doctrine, the absolute litigation privilege, and the Tennessee Public Participation Act.

## II. THE MOTION TO AMEND

### A. Standard of Review

Federal Rule of Civil Procedure 15(a)(2) allows a party to amend its pleading only with the opposing party's consent or by leave of court. Rule 15(a)(2) adds that a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Despite this "liberal amendment policy," the denial of a motion to amend "may be appropriate when there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments

[3] The other defendants filed notices stating that they do not oppose the Motion to Amend. (Doc. Nos. 37, 41.)

previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Brown v. Chapman*, 814 F.3d 436, 443 (6th Cir. 2016) (first quoting *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002); and then *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

"A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (quoting *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000)). The party opposing a motion to amend has the burden of establishing futility. *Mason Sales, LLC v. Talent Creation, Ltd.*, No. 3:24-cv-00092, 2025 WL 696529, at *4 (M.D. Tenn. Mar. 4, 2025) (Newbern, M.J.) (citations omitted).

A motion to dismiss pursuant to Rule 12(b)(6)—like a motion under Rule 12(c)—tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996); *see also Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012) (confirming that the same standard of review applies to motions under Rule 12(b)(6) and Rule 12(c)). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007); *see also* Fed. R. Civ. P. 8(a)(2).

**B. Analysis**

Jane Doe opposes the proposed amendment solely on the basis of futility. The court is not persuaded by the plaintiff's arguments, which largely rely on defenses and factual disputes that cannot be resolved at this stage of the proceedings.

*1. Intentional Infliction of Emotional Distress*

To state a claim for intentional infliction of emotional distress under Tennessee law, a plaintiff must allege that "the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." *Lemon v. Williamson Cnty. Schs.*, 618 S.W.3d 1, 21 (Tenn. 2021) (citation omitted). "Liability for intentional infliction of emotional distress 'does not extend to mere insults, indignities, threats, annoyances, petty oppression or other trivialities.'" *Id.* (quoting *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)). "[I]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." *Id.* (quoting Restatement (Second) of Torts § 46 cmt. h).

State statutes of limitation apply to diversity actions brought in federal court. *Walker v. Armco Steel Corp.*, 446 U.S. 740, 745 (1980) (citing *Guaranty Trust Co. v. York*, 326 U.S. 99, 110 (1945)). In addition to statutes of limitation, the "closely related questions of tolling and application" are "governed by state law." *Harris v. United States*, 422 F.3d 322, 331 (6th Cir. 2005) (quoting *Wilson v. Garcia*, 471 U.S. 261, 269 (1985)). As relevant here, under Tennessee law, IIED "is a personal injury tort, governed by the general one-year statute of limitations" in Tenn. Code Ann. § 28-3-104. *Leach v. Taylor*, 124 S.W.3d 87, 91 (Tenn. 2004). However, an IIED claim may be subject to the discovery rule. *Id.* The discovery rule is an equitable doctrine that serves to "toll[] the running of the statute of limitations until the plaintiff knows, or in the exercise of reasonable care and diligence, should know that an injury has been sustained." *Durham v. Est. of Losleben*, 624 S.W.3d 492, 497 (Tenn. Ct. App. 2020) (quoting *Smith v. Hauck*, 469 S.W.3d 564, 569–70 (Tenn. Ct. App. 2015)).

Jane Doe asserts that Bucciarelli's IIED claim is time-barred, because it is undisputed that she first told school administrators and law enforcement on July 25, 2023 that he had raped her,

but the Counter-Complaint was filed more than one year later. Jane Doe does not allege, however, that Bucciarelli learned that she had made those statements on July 25, 2023, and the record does not actually reveal when he first learned that she had (allegedly falsely) accused him of rape. He was not indicted and arrested until the spring of 2024, well within the limitations period.

The statute of limitations is an affirmative defense on which the defendant bears the burden of proof. *Surles v. Andison*, 678 F.3d 452, 458 (6th Cir. 2012). Generally, it is not appropriate to grant a Rule 12(b)(6) (or Rule 12(c)) motion to dismiss on the basis of an affirmative defense, because a plaintiff is not ordinarily required to anticipate and plead facts to avoid potential defenses. *See, e.g.*, *Est. of Barney v. PNC Bank, N.A.*, 714 F.3d 920, 926 (6th Cir. 2013); *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). At the same time, the Sixth Circuit has recognized that, when the "face of the complaint discloses a failure to file within the time allowed," a plaintiff incurs an "obligation to plead facts in avoidance of the statute of limitations defense." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs.*, 958 F.2d 742, 744 (6th Cir. 1992). That is, a motion to dismiss can be granted based on the statute of limitations "if a plaintiff affirmatively pleads himself out of court." *Rembisz v. Lew*, 590 F. App'x 501, 504 (6th Cir. 2014).

Here, neither the Amended Complaint nor the proposed Amended Counter-Complaint suggests that Bucciarelli was present at either of the meetings when Jane Doe first voiced her accusations. Although the alleged facts do not reveal when the limitations period accrued, it does not affirmatively appear from the face of the Counter-Complaint that Bucciarelli's IIED claim based on Jane Doe's allegedly false rape charges is time-barred. The court finds that Bucciarelli has not "plead[ed] himself out of court." *Rembisz*, 590 F. App'x at 504. Although discovery may

ultimately reveal that he learned of the accusations more than a year before he filed suit, the court finds that dismissal on statute of limitations grounds at this stage is not warranted.

As for whether the proposed Amended Counter-Complaint states a colorable IIED claim, the court finds that, under the facts as alleged at least, false accusations of rape are sufficiently outrageous to give rise to an IIED claim. *Accord Hunt v. S. Baptist Convention*, No. 3:23-cv-00243, 2024 WL 1019276, at *5 (M.D. Tenn. Mar. 8, 2024) (denying motion to dismiss IIED claim based on allegations that the defendant intentionally published allegations against him that created a false impression that the plaintiff had criminally assaulted the wife of a fellow pastor); *see also Iglesias v. O'Neal*, No. CV 16-6291 (RBK/AMD), 2017 WL 1170835, at *3 (D.N.J. Mar. 29, 2017) (denying motion to dismiss IIED claim under New Jersey law, stating "it is certain that a false accusation of rape is intolerable in a civilized community"); *Mangan v. Rumo*, 226 F. Supp. 2d 250, 254 (D. Me. 2002) ("Intentionally false allegations of rape could amount to outrageous behavior intolerable in a civilized society." (citations omitted)).

Jane Doe's argument to the contrary is premised upon the assumption that her accusations were not false. (*See* Doc. No. 40 at 6 ("Expressing her own umbrage over being raped and telling people . . . does not meet the standard [for outrageous conduct].").) Indeed, true accusations of rape could not give rise to an IIED claim. However, for purposes of reviewing the proposed Amended Counter-Complaint, the court must accept as true Bucciarelli's allegations that he and Jane Doe engaged in a consensual sexual relationship and that he did not rape her.

The plaintiff also asserts that Bucciarelli's allegations of injury are not sufficient to state a an IIED claim. Bucciarelli alleges, however, that he suffered "permanent damage to his reputation and severe stress and mental harm resulting in physical manifestations." (Doc. No. 35-1 ¶ 52.)

While somewhat threadbare, these allegations are sufficient at the pleading stage and can be fleshed out through discovery.

The court finds that the IIED claim, as pleaded in the proposed Amended Counter-Complaint, is not futile.

2. *Defamation*

"To establish a *prima facie* case of defamation, a plaintiff must prove that: (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013) (citation omitted). In addition, "to establish any type of defamation claim, whether slander or libel, the claimant must prove that the defamation resulted in injury to the person's character and reputation." *Id.* (citation omitted). "'Publication' is a term of art meaning the communication of defamatory matter to a third person." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999) (citation omitted). "[A] new cause of action arises with each publication." *Id.* (citation omitted).

Spoken slander is subject to a six-month statute of limitations in Tennessee. Tenn. Code Ann. § 28-3-103. That short limitations period is not tolled by the discovery rule. *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 822 (Tenn. 1994). Libel, or written defamation, is governed by a one-year limitations period. Tenn. Code Ann. § 28-3-104(a)(1)(A). The limitations period accrues "on the date the alleged libel is published." *Ali v. Moore*, 984 S.W2d 224, 228 (Tenn. Ct. App. 1998). However, the discovery rule may toll the limitation period for libel claims in "limited situations where the allegedly libelous statement occurred in private or confidential publications which are not readily available to the plaintiff or the general public." *Id.* (citation omitted); *see also Clark v. Viacom Int'l Inc.*, 617 F. App'x 495, 501 (6th Cir. 2015).

In this case, insofar as Bucciarelli's defamation claim is premised upon the plaintiff's spoken iteration of her rape allegations to school administrators and the Houston County Sheriff in July 2023, any such claim is barred by the six-month statute of limitations for slander. However, Bucciarelli also alleges numerous instances of private, written, allegedly libelous statements made in text messages within the limitations period. (*See* Doc. No. 35-1 ¶ 44(a)–(j).) The proposed Amended Counter-Complaint does not state when Bucciarelli discovered these statements, but they all are alleged to have occurred within one year prior to the filing of the original Counter-Complaint. Claims based on these statements are not time-barred.[4]

Jane Doe also contends that Bucciarelli's defamation claim is futile due to the "libel-proof plaintiff" doctrine. The Tennessee Court of Appeals has explained that the libel-proof plaintiff doctrine embodies the concept that "a notorious person is without a 'good name' and therefore may not recover for injury to it." *Davis v. The Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001). It has typically been applied in situations where the plaintiff is admittedly a criminal but complains that a "publication accused him of the wrong crimes." *Id.* (collecting cases). "In essence, 'the basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation,' and logically 'a person without reputation has nothing for the law of defamation to protect.'" *Horn-Brichetto v. Smith*, No. 3:17-CV-163, 2019 WL 921454, at *15 (E.D. Tenn. Feb. 25, 2019) (quoting *Davis*, 83 S.W.3d at 128).

The principle behind the doctrine is that the plaintiff claiming defamation *already* has a poor reputation at the time of the alleged publication. It does not apply in this case, where any

[4] The proposed Amended Counter-Complaint was accompanied by the Affidavit of Bucciarelli's counsel, who avers that his office "obtained new information referenced in the proposed Amended Counter-Complaint on January 17, 2025 from [Bucciarelli's] criminal defense counsel." (Doc. No. 36-1, Potter Aff. ¶ 3.)


Case 3:24-cv-00974 Document 42 Filed 09/22/25 Page 31 of 70 PageID #: 1690

damages to Bucciarelli's reputation were allegedly caused by Jane Doe's (allegedly false) rape allegations and criminal charges. Courts generally agree that falsely accusing someone of rape may support a defamation claim. *See, e.g.*, *Elias v. Rolling Stone LLC*, 872 F.3d 97, 111 (2d Cir. 2017) (reversing trial court's dismissal of defamation claims brought by members of a university fraternity against defendants who published purportedly false allegations of gang rape in a fraternity house); *Hales v. Alexis Preston*, No. 1:24cv00045/AW/ZCB, 2024 WL 4342735, at *4 (N.D. Fla. Aug. 26, 2024) (recommending that the motion to dismiss defamation claim be denied, stating: "There are few accusations that could be more harmful to a person than false accusations of sexually abusing others."), *report and recommendation adopted*, No. 1:24-cv-45-AW-ZCB, 2024 WL 4336630 (N.D. Fla. Sept. 27, 2024); *Goldman v. Reddington*, 417 F. Supp. 3d 163, 176 (E.D.N.Y. 2019) (refusing to dismiss defamation claim based upon the defendant's reposting of allegedly false accusations of rape).

The plaintiff claims next that she is protected by the absolute litigation privilege. This privilege, when it applies, may provide complete immunity to defamation claims. Tennessee courts applying the privilege have held that "defamatory statements by a judge, witness, counsel, or party '*made in the course of a judicial proceeding*, if pertinent or relevant, are absolutely privileged, and this is true regardless of whether they are malicious, false, known to be false, or against a stranger to the proceeding.'" *Simpson Strong-Tie Co. v. Stewart, Estes & Donnell*, 232 S.W.3d 18, 23 (Tenn. 2007) (emphasis added) (quoting *Jones v. Trice*, 360 S.W.2d 48, 54 (Tenn. 1962)); *see also Lambdin Funeral Serv. Inc. v. Griffith*, 559 S.W.2d 791, 792 (Tenn. 1978) ("It is generally recognized that statements made *in the course of a judicial proceeding* that are relevant and pertinent to the issues involved are absolutely privileged . . . even in those situations where the statements are made maliciously." (emphasis added)). The plaintiff presents no legal basis to

support the proposition that allegedly defamatory text messages to Jane Doe's friends and contacts are protected by an absolute litigation privilege; nor does she provide a basis for applying the privilege to statements to school administrators during an administrative investigation or to police officers during a criminal investigation.

Finally, the court finds that the plaintiff's reliance on the Tennessee Public Participation Act ("TPPA"), Tenn. Code Ann. § 20-17-101 *et seq.*, is unwarranted. The TPPA was enacted in 2019 and "is Tennessee's version of an anti-SLAPP statute." *Charles v. McQueen*, 693 S.W.3d 262, 267 (Tenn. 2024).[5] The TPPA prescribes a specific procedure for petitioners to follow for pursuing dismissal of a lawsuit the petitioners believe to qualify as a SLAPP lawsuit. *See* Tenn. Code Ann. §§ 20-17-104 through -106.

Although the Sixth Circuit has not weighed in on this question, virtually every federal district court in Tennessee has held that the procedural mechanisms of the TPPA conflict with the procedures established in the Federal Rules of Civil Procedure governing dismissal of cases and are, therefore not available in federal court. *See, e.g.*, *Amacher v. City of Tullahoma*, No. 4:23-CV-40, 2024 WL 4778027, at *8 (E.D. Tenn. Nov. 13, 2024); *FemHealth USA, Inc. v. Williams*, No. 3:22-CV-00565, 2023 WL 5498055, at *5 (M.D. Tenn. Aug. 23, 2023) (Campbell, J.); *Santoni v. Mueller*, No. 3:20-cv-00975, 2022 WL 97049, at *14 (M.D. Tenn. Jan. 10, 2022) (Richardson, J.); *Mucerino v. Martin*, No. 3:21-cv-00284, 2021 WL 5585637, at * 6 (M.D. Tenn. Nov. 30, 2021) (Trauger, J.); *Hughes v. Gupta*, 613 F. Supp.3d 1054, 1057 (W.D. Tenn. 2021).

This court again concludes that the TPPA's procedures do not apply in federal court. And even if they did, Jane Doe has not pursued them.

[5] The acronym "SLAPP" stands for "strategic lawsuits against public participation." *Charles*, 693 S.W.3d at 267.

## III. CONCLUSION

The court finds, in sum, that Bucciarelli's claims in the proposed Amended Counter-Complaint are not futile—except insofar as he intended to bring a slander claim based on Jane Doe's allegedly slandering him at meetings with school administrators and law enforcement officials on July 25, 2023. The Motion to Amend (Doc. No. 35) will be granted, and the plaintiff's Motion for Judgment (Doc. No. 22) will be denied.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge

**Tab C**

**Patriot Angels Consulting Corp. v. Veterans of Foreign Wars of the United States**

No. 3:24-cv-00087, 2026 WL 625680 (M.D. Tenn. Mar. 5, 2026)

Memorandum Opinion (ECF No. 97)

Donovan v. Bent Creek Homeowners Association, Inc.,

No. 3:26-cv-00700 (M.D. Tenn.)

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| PATRIOT ANGELS CONSULTING CORP., | ) | |
| Plaintiff, | ) | CASE NO. 3:24-cv-00087 |
| v. | ) | JUDGE RICHARDSON |
| VETERANS OF FOREIGN WARS OF THE UNITED STATES, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Pending before the Court is a motion to dismiss (Doc. No. 36, "Motion") Plaintiff's first amended complaint (Doc. No. 31, "First Amended Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and the Tennessee Public Participation Act ("Defendant's TPPA Petition"), filed by Defendant, Veterans of Foreign Wars of the United States. Defendant filed a memorandum in support of the Motion (Doc. No. 37, "Memorandum"), and Plaintiff thereafter filed two responses in opposition to the Motion: one in opposition to Defendant's request for dismissal pursuant to 12(b)(6) (Doc. No. 45, "12(b)(6) Response"), and one in opposition to Defendant's TPPA Petition (Doc. No. 47, "TPPA Response"). Thereafter, Defendant filed a reply in support of the Motion (Doc. No. 49, "Reply"). [1]

[1] The Court emphasizes to counsel the importance of adhering to the Local Rules. Notably, L.R. 7.01 sets the page limit for response and reply memoranda to motions—a rule that counsel for both Plaintiff and Defendant have ignored.

In relevant part, L.R. 7.01(a)(3) states that "[a]ny party opposing a motion must serve and file *a* memorandum of law in response," and that such "response in opposition shall not exceed twenty-five (25) pages *without leave of Court*." L.R. 7.01(a)(3) (emphasis added). Plaintiff's response—or rather responses—is procedurally improper for two reasons. First, Plaintiff filed two separate responses—the 12(b)(6) Response (Doc. No. 45) and the TPPA Response (Doc. No. 47)—despite L.R. 7.01(a)(3)'s clear indication that one is to file "a"—i.e., one—response. L.R. 7.01(a)(3). Second, the two filings together



Dockets.Justia.com

Contemporaneous with Defendant filing its Motion, Defendant filed a request for judicial notice in support of its Motion (Doc. No. 39, "Request for Judicial Notice). Defendant filed the Declaration of Robert S. Gutierrez (Doc. No. 38, "Gutierrez Declaration") in support of its Request for Judicial Notice, Plaintiff thereafter filed a response in opposition to the Request for Judicial Notice (Doc. No. 46, "Response to the Request for Judicial Notice), whereafter Defendant filed a reply in support of its Request for Judicial Notice (Doc. No. 50, "Reply in support of its Request for Judicial Notice").

---

exceed the maximum page count by four pages. (*See* Doc. No. 45 (sixteen (16) pages total); *see also* Doc. No. 47 (thirteen (13) pages total)). Although Plaintiff could have moved the Court for permission to file two separate responses that together exceed the page limit for its response, Plaintiff failed to do so.

Notably, Plaintiff filed an "Unopposed Motion for Enlargement of Time" (Doc. No. 41, "Motion for Extension of Time") for it to respond to the Motion, and the Court granted the Motion for Extension of Time (Doc. No. 43). To the extent that Plaintiff relies on the Motion for Extension of Time, and the granting thereof, for the proposition that the Court afforded leave for Plaintiff's improper filings, such reliance is unjustified. Importantly, the Motion for Extension of Time was captioned "Plaintiff's Unopposed Motion for *Enlargement of Time*," and stated that "[p]ursuant to Local Rule 7.01(a)(1), the undersigned counsel conferred with counsel for Defendant and obtained consent *for the requested enlargement of time*." (Doc. No. 41 at 1 and 3 (emphasis added)). As part of its Motion for Extension of Time, Plaintiff mentioned that it "intend[ed] to file a response in opposition to Defendant's Motion to Dismiss, a response in opposition to Defendant's TPPA Petition, and a response in opposition to Defendant's Request for Judicial Notice," appearing to request in a footnote to "have the option to file one consolidated response brief or distinct response briefs that separately address Defendant's motions, whichever option appears to most clearly address the issues." (*Id.* at 2 and 2 n.1). If such was an attempt to request permission to file separate briefs and to exceed the page limit, it was improper because it was couched in a motion that was framed as solely asking for an extension of time. Importantly, the Motion for Extension of Time indicated that the Parties conferred and agreed to an enlargement of time, but there is no indication that such agreement also related to the filing of separate responses in excess of the page-limit. (*Id.* at 3). Further, the Motion for Extension of Time lacks any direct request for additional pages and instead comprises a general assertion of Plaintiff's intent to file multiple responses and a general request—in a footnote—for the option to file one consolidated response brief or distinct response briefs. (*Id.* at 2 and 2 n.1). Ultimately, Plaintiff should have separately and directly requested leave to exceed the page limit.

Likewise, Defendant's Reply (Doc. No. 49) is similarly violative of L.R. 7.01. In relevant part, L.R. 7.01(a)(4) states that "[a]n optional reply memorandum may be filed . . . and shall not exceed five (5) pages without leave of Court." Defendant's Reply exceeds the maximum page count by six (6) pages. (*See* Doc. No. 49 (eleven (11) pages total)). The docket is devoid of any request from Defendant for permission to exceed the page limit.

Therefore, counsel for both parties made improper filings by virtue of exceeding the page limits imposed by L.R. 7.01. The Court will consider the filings this time but cautions counsel to adhere to the Local Rules in the future.

For the reasons provided herein, the Court will **DENY** the Motion.

<u>FACTS AS ALLEGED IN THE FIRST AMENDED COMPLAINT</u>[2]

This action was filed against Defendant by Plaintiff, Patriot Angels Consulting Corporation, asserting claims of defamation and tortious interference with business relationships. (Doc. No. 31 at pp. 1 and 12-15). Plaintiff is a Tennessee-based company that assists veterans "in the application for benefits" from the United States Department of Veterans Affairs (the "VA"). (*Id.* at ¶ 9). Defendant owns and operates multiple websites and social media platforms[3] (collectively, "Defendant's Platforms"), publishing information that "purportedly impacts Veterans." (*Id.* ¶ 11).

On November 8, 2023, Defendant published an article entitled "VFW Ramps Up Efforts to Combat 'Claim Sharks'" (the "First Article"). (*Id.* at ¶ 13). Therein, Defendant defined "claim sharks" as companies that charge "illegal" fees and engage in "illegal" business activities. (*Id.*). The First Article also contains an active hyperlink to the webpage entitled, "Don't Feed the Sharks" ("Webpage") that "specifically names Plaintiff as a 'claim shark.'" (*Id.* at ¶¶ 12-13).

---

[2] The facts contained in this section come from Plaintiff's First Amended Complaint (Doc. No. 31). For purposes of the instant Motion and pursuant to the typical mechanisms of assessing motions under Federal Rule of Civil Procedure 12(b)(6), the Court accepts the facts alleged in the First Amended Complaint as true. But the Court does not accept as true any legal conclusions (even if couched as facts). As for any representation in the First Amended Complaint that the Court is *not* accepting as true, the Court generally identifies it by qualifying it (as, for example, by "Plaintiff alleges") to denote that it is not being taken as true but rather is set forth to indicate what Plaintiff *claims* to be true. Throughout this Order, except as indicated in the next sentence, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even with the awareness that any such alleged fact may ultimately prove false. Having said that, at times when assessing whether Plaintiff has alleged factual matter sufficient to support its respective claims, the Court does point out that it is basing its assessment on the facts alleged in the First Amended Complaint; in that particular context, the Court does use the phrase "Plaintiff alleges" to proceed the facts alleged, even though the Court is taking those facts as true for purposes of the Motion.

[3] More specifically, Defendant owns and operates the "Veterans of Foreign Wars VFW" Facebook page, the "Veterans of Foreign Wars" YouTube channel, as well as the following websites: vfw.org, dontfeedthesharks.org, and pactactinfo.org. (Doc. No. 31 at ¶ 11).

On December 1, 2023, after Plaintiff discovered the First Article and the Webpage, "Plaintiff sent a cease and desist [sic] letter to Defendant requesting Defendant to remove the same [sic] from its website." (*Id.* at ¶ 14). Defendant never directly responded to the aforementioned cease-and-desist letter. (*Id.*). Instead, on December 15, 2023, "Defendant posted a YouTube video entitled, 'Don't Feed The Sharks Holiday PSA,' seemingly mocking the letter," as a representative of Defendant made explicit reference to Defendant having received requests to stop with its postings in the video.[4] (*Id.*).

On January 23, 2024, Defendant published another article entitled, "VFW Says Don't Pay for Your Benefits" ("Second Article"). (*Id.* at ¶ 16). Therein Defendant again asserted that "'claim sharks' are engaged in 'illegal' and 'criminal' activities," once again providing a hyperlink to the Webpage, and a CR scannable code to "DontFeedTheSharks.org." (*Id.*). The Webpage defines a "claim shark" as follows:

- A Claim Shark is an individual or company that charges hefty fees to "assist" or "consult" veterans with filing their VA benefit claims – this practice is illegal!
- Claim Sharks are not VA accredited, meaning they aren't required to adhere to the well-established professional and ethical standards of VA accreditation, so their advice can often be misleading or even fraudulent.
- Like a "Loan Shark," once you're in, you can't get out, and may be subject to new and hidden fees whenever you get a new rating, no matter who does the work.

(*Id.* at ¶ 18; Doc. 31-3). The Webpage goes on to list some of the "predatory practices" of "claim sharks":

- Promising or guaranteeing an increased disability rating or percentage increase.
- Advertising expedited VA claims decisions.

[4] "A representative of Defendant stated in relevant part of the video:

> Recently we've been contacted by a couple of claim sharks urging us to stop saying bad things. We thought about it. You know, they're right. So we would like to apologize to real sharks everywhere. Real sharks are magnificent creatures who prey on what they need to survive only they don't profit off their prey.

(Doc. No. 31 at ¶ 14).

- Requesting login credentials to access a veteran's personal information through secure VA websites like eBenefits or VA.gov.
- Using confusing tactics or ambiguous language to mislead claimants or coerce them into signing a contract.
- Telling veterans to forego VA exams and offering health consultations within their own network of doctors.

(Doc. No. 31 at ¶ 19; Doc. No. 31-3). The Webpage ultimately classifies Plaintiff as a "claim shark." (Doc. No. 31 at ¶¶ 12 and 17). Defendant did eventually change "certain headings in the Webpage around . . . to add the word 'think.'" (*Id.* at ¶ 15). For example, the initial version of the Webpage said, "What is a 'Claim Shark,'" while the current version reads, "What we think a 'Claim Shark' is." (*Id.*). Similarly, the initial version of the Webpage said "Who are the Claim Sharks," while the current version reads, "Who we think the Claim Sharks are." (*Id.*). Although Defendant has made such changes, Defendant continues to publish both the old and new versions of the Webpage on Defendant's Platforms. (*Id.*).

As of the filing of the First Amended Complaint, Defendant has not removed the Webpage, First Article or Second Article, and likewise has not removed Facebook posts that link or attach the Webpage, First Article, and/or Second Article. (*Id.* at ¶ 23). On March 15, 2024—after the commencement of the lawsuit—Defendant posted another YouTube video entitled, "Claim Sharks want us to stop calling them Claim Sharks," wherein representatives of Defendant were acknowledging receipt of cease-and-desist letters and calling them "bullshit." (*Id.* at ¶ 24). In another YouTube video entitled "Claims Sharks Are Preying Upon Our Nation's Veterans," a representative of Defendant stated the following:

> [A]t the VFW, we're not going to stop this, because these are illicit organizations. What they are doing is illegal. And there is no room for opening up for illegal activity. Veterans will be caught up in this tragically. Our goal is to make sure that not another Veteran falls victim to their scam.

(*Id.* at ¶ 25).

In providing its services, Plaintiff "charges a reasonable fee to perform a pre-filing consultation and lengthy long-term care assessment report that provides information beyond solely VA benefits," and "clients of Plaintiff always have the ability to terminate their services and elect to represent themselves or enroll with a different representative." (*Id.* at ¶¶ 22.a and 22.c). Furthermore, Victoria Collier—Defendant's VA accredited attorney—oversees "all aspects of the long-term care assessment process and claims process for clients working with [Plaintiff]." (*Id.* at ¶ 22.b). In providing services to its clients, Plaintiff need not "ask clients for their login credentials to access Veterans' personal information through secure VA websites" because "Collier has gone through VA training and testing to obtain a VA issued identification card that provides her with direct access to the VA system." (*Id.* at ¶ 22.f).

"Plaintiff does not work with service connected disability claims and provides no guidance with disability ratings or percentage increases." (*Id.* at ¶ 22.d). Nor does Plaintiff "advertise expedited VA claims decisions . . . instead [Plaintiff] highlights that it has a streamlined process that can help the applications better go through the system." (*Id.* at ¶ 22.e). Further, "Plaintiff does not work with service connected disability claims and provides no guidance with regard to VA exams." (*Id.* at ¶ 22.h).

PROCEDURAL BACKGROUND

On January 26, 2024, Plaintiff filed the original complaint (Doc. No. 1) to initiate the instant action. Plaintiff has since filed the First Amended Complaint, asserting therein claims of defamation ("Defamation Claim") and tortious interference with business relationships ("Tortious Interference Claim") against Defendant. In the Complaint, Plaintiff alleges that by "defining (in the Webpage and Plaintiff's other publications) a 'claim shark' as a person or entity that engages in 'illegal' behavior and then identifying Plaintiff as a 'claim shark' in the Webpage, Defendant

has undoubtedly created the perception that Plaintiff's business activities are criminal and take advantage of Veterans"—a perception Plaintiff claims is false. (Doc. No. 31 at ¶ 21).

Defendant subsequently filed the instant Motion, arguing that Plaintiff's claims should be dismissed—pursuant to both Fed. R. Civ. P. 12(b)(6) and the Tennessee Public Participation Act ("TPAA")—for multiple reasons:

> First, the statements Plaintiff challenges are First Amendment-protected opinion and hyperbole and cannot form the basis of a libel claim. . . . Second, VFW's designation of Patriot Angels as a "claim shark" is protected opinion based on disclosed, true facts. . . . Third, Plaintiff's tortious interference claim, which is rooted in defamation, fails for the same reasons the [D]efamation [C]laim fails, and for the additional reason that Plaintiff cannot recover for prospective contracts that would be invalid as a matter of law.

(Doc. No. 36 at 1).

## LEGAL STANDARD[5]

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the

[5] Although Defendant seeks dismissal pursuant to both Fed. R. Civ. P. 12(b)(6) and the dismissal provision of the TPPA, because the Court finds the TPPA dismissal provision inapplicable in federal court (*infra* Section IV), the Court need not and will not outline the legal standard utilized in analyzing a claim for dismissal pursuant to the TPPA.

elements of a cause of action sufficient. *Id*. at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendants' liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

Fed. Rule of Civ. P. 12(d) states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." However, there is an exception to this Rule: "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426,

430 (6th Cir. 2008); *see also Herpst v. Parkridge Med. Ctr., Inc.*, No. E2017-00419-COA-R3-CV, 2018 WL 4052208, at *2-3 (Tenn. Ct. App. Aug. 23, 2018); *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018). "It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (cleaned up and quotation omitted). "In other words, if the authenticity, validity, or enforceability of a document is not in dispute, the court may consider it on a motion to dismiss, but a genuine dispute as to the legal sufficiency of a document requires the court to consider the issue under a motion for summary judgment standard." *Lewis Lumber & Milling, Inc. v. Mereen-Johnson, LLC*, No. 3:17-CV-00643, 2018 WL 6181356, at *2 (M.D. Tenn. Nov. 27, 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 434 (6th Cir. 2008). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

## DISCUSSION

As a threshold issue the Court will first analyze Defendant's Request for Judicial Notice. Thereafter, the Court will analyze Defendant's challenges to Plaintiff's Defamation Claim (Count

I) and to Plaintiff's Tortious Interference Claim (Count II). The Court will conclude by analyzing Defendant's petition for relief under the Tennessee Public Participation Act.

## I. Judicial Notice

As a preliminary matter, the Court must analyze Defendant's Request for Judicial Notice. (Doc. No. 39). In support of its Motion, Defendant requests the Court to take judicial notice of the following seven documents: (1) "[t]he web page titled 'Veterans Benefits Administration' as it appears on April 23, 2024 on the U.S. Department of Veterans Affairs website, available at https://www.benefits.va.gov/BENEFITS/Applying.asp" (Doc. No. 38-1, "Exhibit 1"); (2) "[t]he complete list of Accredited VSO Search Results, as it appears on April 23, 2024 within the U.S. Department of Veterans Affairs Accreditation Search, available at https://www.va.gov/ogc/apps/accreditation/accredvso.asp" (Doc. No. 38-2, "Exhibit 2"); (3) "[t]he web page titled 'Office of General Counsel > Recognized Veterans Service Organization' on the U.S. Department of Veterans Affairs website as it appears on April 23, 2024, available at https://www.va.gov/ogc/recognizedvsos.asp" (Doc. No. 38-3, "Exhibit 3"); (4) "[a] letter dated May 5, 2016, from the VA Office of General Counsel to Victoria Collier, which the VA released to VFW in response to a Freedom of Information Act request" (Doc. No. 38-4, "Exhibit 4"); (5) "[a] letter dated February 19, 2020, from the VA Office of General Counsel to Victoria Collier, which the VA released to VFW in response to a Freedom of Information Act request" (Doc. No. 38-5, "Exhibit 5"); (6) "[a] letter dated February 19, 2020, from the VA Office of General Counsel to Suzette Graham, which the VA released to VFW in response to a Freedom of Information Act request" (Doc. No. 38-6, "Exhibit 6"); and (7) "[a] Patriot Angels Long-Term Care Analysis And Assessment Report Fee Agreement ('Fee Agreement') with identifying information concerning the Patriot Angels client redacted" (Doc. No. 38-7, "Exhibit 7"). (Doc. No. 39 at 1-2).

Because Plaintiff "does not dispute that the Court may take judicial notice of the documents that are Webpages from the VA's website," (i.e., Exhibits 1-3) (Doc. No. 46 at 2 n. 2), the Court need not analyze in-depth whether it can take judicial notice of Exhibits 1-3. As Plaintiff conceded, a court may take judicial notice of a government website when ruling on a motion to dismiss. *See Cmty. Health Sys., Inc. v. Med. Univ. Hosp. Auth.*, No. 3:20-cv-00163, 2021 WL 964047, at *14 n.6 (M.D. Tenn. Mar. 15, 2021) (noting that the Court can take judicial notice of a government website when ruling on a motion to dismiss) (collecting cases), *vacated on other grounds*, No. 3:20-CV-00163, 2022 WL 1658418 (M.D. Tenn. Mar. 18, 2022); *see also Watkins v. Westin*, No. 3:21-CV-164, 2021 WL 3824808, at *1 n.2 (E.D. Tenn. Aug. 26, 2021) (indicating that a court may take judicial notice of a government website when ruling on a motion to dismiss) (collecting cases). Therefore, the Court deems it appropriate to take judicial notice of Exhibits 1-3.

The Court next addresses whether it can also properly take judicial notice of the remaining four exhibits (i.e., Exhibits 4-7, the "Documents"). The Court finds that in ruling on the Motion, it can take judicial notice of Exhibits 4-6 but not Exhibit 7. The Court therefore will exclude Exhibit 7 (and only Exhibit 7) when ruling on the Motion.

Defendant's Request for Judicial Notice requests judicial notice under Federal Rule of Evidence 201, but in the Court's view the request is not properly grounded in Rule 201 (or for that matter any rule of the Federal Rules of Evidence). Rule 201 permits courts to take judicial notice of certain "adjudicative fact[s]." Fed. R. Evid. 201(a). Notably, the Sixth Circuit has explained that Federal Rule of Evidence 201 is a "shortcut" around the normal procedures for admitting evidence. *See Abu-Joudeh v. Schneider*, 954 F.3d 842, 848 (6th Cir. 2020) (explaining that "[w]hile parties must normally submit admissible evidence to support the factual allegations in their case, sometimes a fact is so obvious that federal courts will allow a shortcut around these procedures.").

Presently, as the Court understands it, Defendant is not attempting to bypass the procedures for admitting evidence, as the *admission of evidence* is premature at the current motion-to-dismiss phase. Rather, and as Defendant itself explains, it is merely requesting that the Court consider the Documents when ruling on Defendant's Motion. (Doc. No. 39 at 1 ("[Defendant] respectfully requests that the Court take judicial notice of the public and other records mentioned below . . . in support of Defendant's Motion to Dismiss Plaintiff ['s] . . . First Amended Complaint.")). In the Court's view, such a request is not appropriately made pursuant to Federal Rule of Evidence 201, but rather pursuant to case law establishing that a "court may, in undertaking a 12(b)(6) analysis, take judicial notice of 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.'" *Elec. Merch. Sys. LLC v. Gaal* ["*Gaal*"], 58 F.4th 877, 883 (6th Cir. 2023) (quoting *Golf Vill. North, LLC v. City of Powell*, 14 F.4th 611, 617 (6th Cir. 2021) (quoting *Meyers v. Cincinnati Bd. of Educ.*, 983 F.3d 873, 880 (6th Cir. 2020))).[6] In substance, Defendant is making its request pursuant to such case law, and the Court will treat it as such.

Arguing that Defendant's Request for Judicial Notice of the Documents should be denied, Plaintiff asserts primarily that "the Documents do not contain adjudicative facts beyond reasonable controversy that would be subject to judicial review under Federal Rule of Civil Procedure [sic] 201" ("Plaintiff's Primary Argument"). (Doc. No. 46 at 3). Because—as explained above—the Court declines to treat Defendant's Request for Judicial Notice as seeking judicial notice pursuant to Fed. R. Evid. 201, Plaintiff's Primary Argument—which is premised on the requirements of

[6] Hereinafter, when the Court discusses whether it can properly take "judicial notice" of the Documents, it is referring to taking judicial notice in this sense, rather than taking judicial notice pursuant to Federal Rule of Evidence 201.

Fed. R. Evid. 201—is inapplicable.[7] And Plaintiff fails to provide any other argument for why the Court should decline to consider the Documents when ruling on the Motion. Instead, the remainder of Plaintiff's Response to the Request for Judicial Notice focuses on *how* the Court should consider the Documents—i.e., whether the Court should merely consider the existence and content of the Documents or whether the Court should accept as true the assertions therein[8]—if the Court decides to consider the Documents in ruling on the Motion.[9] Nonetheless, the Court still must assess whether it is appropriate for it to consider the Documents when ruling on the Motion.

The Documents can be broken into two categories, the second of which comprises just a single document. The first category comprises three letters that the U.S. Department of Veteran Affairs Office of General Counsel ("VA OGC") sent to Plaintiff's owner (Exhibits 4-6, "Letters"), while the second comprises (solely) Plaintiff's Long-Term Care Analysis and Assessment Report Fee Agreement (Exhibit 7, "Fee Agreement"). The Court will conduct its analysis by category.

---

[7] Having said that, the Court understands completely why Plaintiff made such an argument, given that (as noted above) Defendant did (imprudently) invoke Rule 201 in its Request for Judicial Notice.

[8] With regard to the documents it deems appropriate to consider when ruling on the Motion, the Court hereinafter will conduct an analysis concerning the extent to which it will consider such documents. *Infra* Section I.A.

[9] After Plaintiff provides its Primary Argument in its Response to the Request for Judicial Notice, what follows are not arguments against the Court taking judicial notice of the documents, but instead arguments for *how* the Court should take judicial notice if it so chooses. For example, following Plaintiff's Primary Argument, Plaintiff's Response to the Request for Judicial Notice has two sections with the following titles: (1) "If the Court Takes Judicial Notice of the Documents, it Should Only Take Judicial Notice of the *Existence* of the Documents, Not the Truth of the Matters Asserted Therein," (Doc. No. 46 at 6-7), and (2) "Even if the Court Takes Judicial Notice of the Documents, the Documents Are Ineffectual as a Matter of Law in Establishing Defendant's Truth Defense," (*id.* at 7-8). Neither of these qualify as an argument in opposition to the Court taking judicial notice of the Documents. The Court will proceed with its analysis accordingly.

A. <u>The Letters (Exhibits 4-6)</u>

Although courts generally cannot consider matters outside the pleadings when ruling on a motion to dismiss, courts may "take judicial notice of 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.'" *Gaal*, 58 F.4th at 883 (quoting *Golf Vill. North, LLC*, 14 F.4th at 617 (internal citations and quotations omitted)). That is courts may consider[10] those types of documents when ruling on a motion to dismiss. "Courts may consider public records for the truth of the statements contained within them only when the 'contents prove facts whose accuracy cannot reasonably be questioned.'" *Id.* (quoting *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005)).

In its Request for Judicial Notice, Defendant argues that the Court can properly take judicial notice of the Letters because the Letters are public records. As Defendant correctly points out in its Reply in support of its Request for Judicial Notice, "[Plaintiff] does not dispute that the Letters are public records." (Doc. No. 50 at 2). Therefore, because the Letters are properly treated

[10] It is worth addressing the Sixth Circuit's interchangeable use of the phrase "take judicial notice of" and the word "consider" when discussing what (outside of the complaint itself) a court may refer to when ruling on a motion to dismiss. It is the Court's understanding that in this context, the Sixth Circuit uses the word "consider" synonymously with "take judicial notice of." In other words, if the extra-complaint material can be *considered* by the Court, then it is necessarily something of which the Court *can take judicial notice*. That is, under the Sixth Circuit's terminology, there is not one category of material that be considered because it is subject to judicial notice, and another category of information that can be considered for some other reason; instead, *all* material that can be considered fits into a single category, namely, material subject to judicial notice.

This understanding is supported by the Sixth Circuit's statement in *Gaal* that "the court may, in undertaking a 12(b)(6) analysis, *take judicial notice of*" certain types of documents, 58 F.4th at 883 (emphasis added), but thereafter uses the word "consider"—rather than "take judicial notice of"—when discussing referring to those types of documents when ruling on a motion to dismiss. *Id.* ("Courts may *consider* public records" (emphasis added)).

Hereinafter, whenever the Court refers to "consider[ing]" material outside the complaint, the Court is referring to consideration of that material by way of the taking of judicial notice of it. And likewise, whenever the Court refers to "tak[ing]" judicial notice of material outside the complaint, it is referring to the means by which a court becomes authorized to consider that material.

herein as public records,[11] the Court finds that it is appropriate to consider the Letters when ruling on the Motion.

Importantly, and as Plaintiff points out in its Response to the Request for Judicial Notice (Doc. No. 46 at 6-7), it matters *how* the Letters are to be considered when ruling on the Motion. Notably, Defendant itself clarified that it is not asking the Court to consider the Letters for the truth of any matter asserted therein, but instead to show "the *existence* of these documents and the specific statements and/or allegations contained within the documents"—i.e., to show that the Letters exist and to show what they say (Doc. No. 50 at 2 (internal citations and quotations omitted)). If Defendants were requesting the Court to consider the Letters for the truth of matters asserted therein, the Court would deny the request because the factual assertions therein can be reasonably questioned in light of the posture of the Letters. In the Letters, although the VA expresses its understanding of relevant facts, Plaintiff correctly points out that the Letters ultimately "are mere inquiries for additional information about Plaintiff's business practices"—inquiries prompted by VA's understanding at that time of relevant facts—that seek from Plaintiff a response that provides information that would clarify (or refine or confirm) the VA's understanding.[12] (Doc. 45 at 11). Importantly, Plaintiff disputes that its business practices are illegal, asserting the following:

---

[11] Notably, Plaintiff did not dispute that the Letters would qualify as public records, and the Court declines to raise *sua sponte* whether the Letters would so qualify. Instead, the Court will assume that the Letters are public records for purposes of the Motion.

[12] Notably, the Letters do not suggest that the VA's claimed understanding is necessarily correct, as opposed to what the VA claims it to be—i.e., merely VA's present understanding. This is apparent from the Letters' qualifying language such as "it is our understanding" (Doc. No. 38-4 at 2), "it appears that you may have," (*id.*), "our office has not reached any definitive conclusions regarding your conduct" (Doc. No. 38-5 at 4), and that the "matter is being referred to the Tennessee Attorney General *for consideration* as to whether your actions may have implications under the State's . . . laws" (Doc. No. 38-6 at 4 (emphasis added)).

> Plaintiff's business practices are not illegal. Plaintiff is not required to be officially recognized by the VA in order to perform its current services. *See* 38 C.F.R. § 14.629. Nor is Plaintiff prohibited from charging a fee for certain services it provides. The services it charges a fee for are outside the scope of the statutory sections cited in Defendant's brief.

(*Id.*).

Ultimately, though having found it proper to take judicial notice of the Letters, the Court will not consider the Letters for the truth of the matters asserted therein. Rather, the Court will consider only the existence of the Letters and what the Letters *say* (to the extent that the bare fact of what they say is relevant).

B. <u>The Fee Agreement (Exhibit 7)</u>

Notably, in Plaintiff's Response to the Request for Judicial Notice, there is a manifest absence of argument as to why the Court should refuse to take judicial notice of the Fee Agreement for purposes of ruling on the Motion.[13] Nonetheless, Defendant has the burden of explanation as to why it would be proper for the Court to take judicial notice of the Fee Agreement and consider it when ruling on the Motion—a burden Defendant has failed to meet.

As explained above, a "court may, in undertaking a 12(b)(6) analysis, take judicial notice of 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.'" *Gaal*, 58 F.4th 883 (quoting *Golf Vill. North, LLC*, 14 F.4th at 617 (internal citations and quotations omitted)). In *Gaal*, the Sixth Circuit went on to acknowledge that in

[13] Although Plaintiff clearly disputes the Court's ability to take judicial notice of the Letters (i.e., Exhibits 4-6), it is less clear that Plaintiff disputes the Court's ability to take judicial notice of the Fee Agreement (i.e., Exhibit 7). As it relates to the Fee Agreement—and whether Plaintiff opposes the Court taking judicial notice of such—Plaintiff's Response to the Request for Judicial Notice is inconsistent. (Doc. No. 46 at 2 and 8). The Response to the Request for Judicial Notice begins by stating that "Plaintiff objects to Defendant's requested judicial review with respect to . . . [the Fee Agreement]," (*id.* at 2) but by the end of the Response to the Request for Judicial Notice—after Plaintiff itself cited to the Fee Agreement multiple times in support of points being made therein—Plaintiff asks the Court only to "deny Defendant's Request for Judicial Notice with respect to the Documents (Docket Entries 38-4–38-6)" (*id.* at 8). Notably, Plaintiff's reference to "Docket Entries 38-4–38-6" encompasses only the Letters, not the Fee Agreement.

addition to the aforementioned types of documents of which a court can take judicial notice, the Sixth Circuit has also allowed courts to take judicial notice of documents that are "referred to in the complaint and are central to the claims contained therein." *Id.* at 883 (quoting *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011) (internal citation and quotation omitted)).

The Court concludes that the Fee Agreement does not qualify as a public record,[14] order, item appearing in the record of the case, or exhibit attached to the complaint. Although Defendant argues that the Court can take judicial notice of the Fee Agreement because it is "central to [Plaintiff's] claims," (Doc. No. 39 at 4), the Court disagrees, finding that the Fee Agreement is not central to Plaintiff's claims and—not having been referred to in the First Amended Complaint—could not be considered even if it was.

The Sixth Circuit—as well as the undersigned—has clarified that a court "may consider the complaint along with any document not formally incorporated by reference or attached to the complaint as part of the pleadings if [(1)] the 'document is referred to in the complaint and [(2)] is central to the plaintiff's claim.'" *Gardner v. Quicken Loans, Inc.*, 567 F. App'x. 362, 364-365 (6th Cir. 2014) (quoting *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999)

---

[14] Although neither Party appears to argue that the Fee Agreement would qualify as a "public record," the Court nonetheless will briefly explain why the Fee Agreement indeed would not so qualify. The Court draws a distinction between a "public record" and a "publicly available record"; the first category of records is substantially narrower than the second category of records. The Court understands that a "public record" is a record that is both created by and maintained by a public (i.e., government) agency. But there are of course records that are "publicly available," in the sense that they are easily accessible (via, for example, the Internet), without qualifying as "public records" because they are not created or maintained by a public agency. For purposes of illustration, imagine a private company posting on its website certain historical financial information about itself that it created and maintained on its own. Although such posted material seems easily to fit the category of "publicly available record," it would not properly be classified as a "public record." Although a court properly can take judicial notice of any record falling into the category of "public record," it can take judicial notice of a "publicly available record" only if it falls also within the (narrower) category of "public record."

Similarly, in the present case, although the Fee Agreement would likely fall into the category of a "publicly available record," it surely would not fall into the category of a "public record," because it seems clear that it was not created or maintained by a public agency.

(internal quotation marks omitted). *Accord Gil v. Bridgestone Ams., Inc.*, No. 3:22-cv-00814, 2024 U.S. Dist. LEXIS 147572, at *7 (M.D. Tenn. Aug. 19, 2024) (Richardson, J.) (finding that it is proper for the Court to consider a document that "is referred to in the pleadings and is integral (central) to the claims," when ruling on a motion to dismiss without having to convert it "into one for summary judgment." (citations omitted)); *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335-36 (6th Cir. 2007) ("[W]hen a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." (citation omitted)); *Armengau v. Cline*, 7 F. App'x. 336, 344 (6th Cir. 2001) ("If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings." (Citing *Jackson v. City of Columbus,* 194 F.3d 737, 745 (6th Cir. 1999), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002))). The Court finds that with respect to the Fee Agreement, Defendant has failed to satisfy either of these two requirements.

Defendant has failed to point to any instance where Plaintiff referred to the Fee Agreement in the Complaint, and thus has failed to satisfy requirement 1.[15] And the Fee Agreement "cannot

[15] Nor was the Court able to find any such reference on its own.

The Court recognizes that there is some support for the assertion that a document can be deemed to have been "referred to" in a complaint even without explicit mention therein of the document in question. *Cf Bernard v. ADS Sec., LP*, No. 5:17-CV-93-TBR, 2017 U.S. Dist. LEXIS 211362, at *5-6 (W.D. Ky. Dec. 22, 2017) (finding that a contract was integral to the complaint—even though a complaint did not have attached a copy of a contract or even reference the contract—in light of an allegation in the complaint that plaintiff "was a paying customer," which "presupposes the existence of an agreement between the parties."); *McKinley by & Through Bault v. Lexington Ins. Co.*, No. 1:17-CV-00051-GNS, 2018 U.S. Dist. LEXIS 237215, at *10 (W.D. Ky. Jan. 3, 2018) ("In considering whether a document has been referenced in a complaint, the focus is on function over form. A referenced document must be 'integral' to the complaint, meaning that the plaintiff has relied upon the terms and effect of a document in drafting the complaint." (citation omitted)), *report & recommendation adopted sub nom. McKinley v. Lexington Ins. Co.*, No. 1:17-CV-00051-GNS-HBB, 2018 U.S. Dist. LEXIS 237216, 2018 WL 4868984 (W.D. Ky. Mar. 7, 2018). However, Defendant did not develop any argument based on such assertion, and the Court declines to do so itself. *Cf Boynton v. Headwaters, Inc.*, 737 F. Supp. 2d 925, 930 (W.D. Tenn. 2010) ("It is not [a court's] job, especially in a counseled civil case, to create arguments for someone who has not made them. . . ." (quoting *Yeomalakis v. FDIC,* 562 F.3d 56, 61 (1st Cir.2009))); *see also Rop v. Fed. Hous. Fin. Agency*, 50

reasonably be deemed 'central' to Plaintiff's claims as required" for satisfaction of requirement 2. *Gil*, 2024 U.S. Dist. LEXIS 147572, at *23 (Richardson, J.). "A document is considered central—or 'integral'—to the complaint 'where the plaintiff (1) has actual notice of the document and its information and (2) has relied upon the[] documents in framing the complaint.'" *West v. Chase N.A.*, No. 3:24-cv-01219, 2025 U.S. Dist. LEXIS 137424, at *13 (M.D. Tenn. July 18, 2025) (quoting *Gomez v. Nat'l Fin. Network, Inc.*, No. CV 20-1968 (GRB) (AKT), 2021 U.S. Dist. LEXIS 145513, 2021 WL 8084337, at *11 (E.D.N.Y. Aug. 2, 2021) (internal quotation omitted)). Plaintiff did not *rely upon the Fee Agreement in framing the Complaint*;[16] the Court could draw no other conclusion even if it were to conclude (which it does not) that Plaintiff is properly deemed to have somehow *"referred to" the Fee Agreement in the Complaint*.

Defendant's argument that the Fee Agreement is central to Plaintiff's claims is unavailing. Defendant asserts that Plaintiff has "expressly put the terms of its Fee Agreements with clients at issue" by alleging in its Complaint that "Plaintiff charges a reasonable fee to perform a pre-filing consultation and lengthy long-term care assessment report that provides information beyond solely VA benefits," and that "clients of Plaintiff always have the ability to terminate their services and elect to represent themselves or enroll with a different representative." (Doc. No. 39 at 4 (internal citations and quotations omitted)). But even assuming arguendo that these assertions are true, that does not mean that the Fee Agreement is *central to Plaintiff's claims*; it means only that *Plaintiff's claims put the Fee Agreement at issue.* Just because a complaint puts a document at issue does not mean that the document was relied on by the plaintiff in framing the complaint. Imagine a plaintiff

---

F.4th 562, 583 n.8 (6th Cir. 2022) (Thapar, J., dissenting) ("It's not the court's job to invent arguments for parties. Since [the defendant] did not develop the . . . argument, I will not either.").

[16] For example, the Court does not see how the existence or content of the Fee Agreement would help Plaintiff establish any element of either of its claims.

bringing a single-count complaint asserting negligence against an amusement park operator, and the amusement park operator thereafter relying on an alleged written waiver by the plaintiff of its liability. In that scenario, the complaint might reasonably be said to put the (alleged) written waiver at issue—at least once the amusement park operator raises the issue—but it cannot reasonably be said that the plaintiff relied on the written waiver in framing the complaint.

Ultimately, because the Court finds that the Fee Agreement was neither referred to in Plaintiff's First Amended Complaint, nor central to Plaintiff's claims therein, the Court finds that it would be improper to consider it when ruling on the Motion and declines to do so. Therefore, the Court will exclude the Fee Agreement when ruling on the Motion finding that it would be inappropriate to take judicial notice of such.

In sum, the Court can and will take judicial notice of the Exhibits 1-6 when ruling on the Motion, without converting (or having to convert) the Motion into a motion for summary judgment. But the Court declines to consider the Fee Agreement, finding that it would be improper for the Court to take judicial notice of the Fee Agreement.

## II. Defamation Claim (Count I)

To establish a claim of defamation in Tennessee, the plaintiff must show that: "1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l. Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999) (citations omitted). Crucially, only statements that are false can support a claim for defamation. *See West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn. 2001) ("In defamation law only statements that are false are actionable, truth is, almost universally, a defense."). And "the burden to show the falsity of a statement is on the party asserting the

defamation claim." *Hendrix, Harvey, Johnson & Mitchell, PLLC*, No. W2022-01636-COA-R3-CV, 2024 WL 1618897, at *10 (Tenn. Ct. App. Apr. 15, 2024) (citing *Wagner v. Fleming*, 139 S.W.3d 295, 302 (Tenn. Ct. App. 2004) (citation omitted)). In other words, "[a]s an essential element of a cause of action for defamation, the plaintiffs must prove a *false and defamatory statement* concerning another." *Stones River Motors, Inc. v. Mid-S. Pub. Co.*, 651 S.W.2d 713, 717 (Tenn. Ct. App. 1983) (emphasis added) (citing *Restatement (Second) of Torts* § 558 (1977)).

Defendant asserts, alternatively, two primary arguments against Plaintiff's Defamation Claim, asserting that its statement that Plaintiff is a "claim shark" is (1) protected opinion (doc. No. 37 at 12-14) and (2) based on disclosed, substantially true facts (*id.* at 15-22). Both arguments center on the requirement that for statements to be categorized as defamatory they must be provably false. *Cf Hibdon v. Grabowski*, 195 S.W.3d 48, 63 (Tenn. Ct. App. 2005) (finding that because the statements were not "provably false" they could "not provide a legal basis for defamation").

To properly analyze Plaintiff's Defamation Claim, the Court must first identify which of Defendant's statements Plaintiff claims were defamatory. Broadly speaking, Plaintiff bases its Defamation Claim on Defendant's statement that Plaintiff is a "claim shark," but what Plaintiff appears ultimately to take issue with are the implications that follow therefrom. (Doc. No. 31 at ¶ 29; Doc. No. 45 at 6-7). More specifically, Plaintiff takes issue with Defendant referring to it as a "claim shark" because of the insinuations that flow from how Defendant itself defines a "claim shark"—an individual or company (1) that is "[l]ike a 'Loan Shark,' once you're in, you can't get out;" (2) that is "not VA accredited," and (3) that charges illegal consultation fees." (Doc. No. 31 at ¶ 18; Doc. 31-3; Doc. No. 45 at 7). For present purposes, and construing the First Amended

Complaint in Plaintiff's favor[17] as is required at the current (motion-to-dismiss) phase, the Court finds that by designating Plaintiff as a "claim shark," Defendant has asserted that Plaintiff falls within Defendant's definition of a "claim shark." Put another way, the Court finds that Defendant—by virtue of calling Plaintiff a "claim shark"—has concurrently asserted that Plaintiff possesses the characteristics that Defendant has affirmatively stated a "claim shark" has, that is that Plaintiff is like a "Loan Shark" (implying that "once you're in, you can't get out"),[18] that Plaintiff is "not VA accredited," and that Plaintiff charges illegal consultation fees. (Doc. No. 31 at ¶ 18).[19] (The Court refers to these respectively as "Statement 1," "Statement 2," and "Statement 3"). Plaintiff asserts that the three aforementioned statements are defamatory. The Court will analyze each statement in turn.

[17] This construction is in Plaintiff's favor because it treats as invalid the possible defense that Defendant did not defame Plaintiff if Defendant never *directly* asserted that Plaintiff in particular had the three defining features of a "claim shark."

[18] Importantly, in defining a "claim shark," Defendant stated not only that a "claim shark" is "[l]ike a 'Loan Shark,' once you're in, you can't get out," but also that one "*may* be subject to new and hidden fees whenever you get a new rating, no matter who does the work." (Doc. No. 31 at ¶ 18 (emphasis added)). Ultimately, by calling Plaintiff a "claim shark," the Court concludes that Defendant effectively asserted that Plaintiff is "[l]ike a 'Loan Shark,' once you're in, you can't get out," because Defendant's definition categorically states that "claims sharks" are like "Loans Sharks," in that "once you're in you can't get out." (*Id.*).

However, the Court finds it improper to conclude that Defendant asserted that Plaintiff charges "new and hidden fees" by virtue of calling Plaintiff a "claim shark." (*Id.*). Defendant's definition of "claim shark" did not categorically state that all "claim sharks" charge "new and hidden fees" but rather stated merely that persons "may" be subject to new or hidden fees from a "claim shark." (*Id.*). Therefore, there would be no merit to any potential argument that by calling Plaintiff a "claim shark," Defendant defamed Plaintiff by asserting that Plaintiff charges "new and hidden fees." (*Id.*).

[19] In addition to defining "claim shark" on Defendant's Platforms, Defendant also listed some of their (i.e., "claim sharks'") predatory practices. (Doc. No. 31 at ¶ 19). Ultimately, the Court finds it improper to conclude that by calling Plaintiff a "claim shark," Defendant implied that Plaintiff necessarily engages in all (or even any) of the listed the predatory practices because Defendant did not state that all "claim sharks" engage in all (or even any) of the listed predatory practices.

A. <u>Statement 1—that Plaintiff is "Like a 'Loan Shark'"</u>

As noted above, Statement 1 was to the effect that Plaintiff is "[l]ike a 'Loan Shark,' once you're in, you can't get out." (Doc. No. 31 at ¶ 18). The Court concludes that Statement 1 is not a defamatory statement, because in the Court's view it is mere hyperbole.

Statements that cannot reasonably be interpreted as stating facts about an entity "because they are expressed in 'loose, figurative or hyperbolic language,' and/or the content and tenor of the statements 'negate the impression that the author seriously is maintaining an assertion of actual fact' about the plaintiff are not provably false and, as such, will not provide a legal basis for defamation." *Hibdon*, 195 S.W.3d at 63 (quoting *Milkovich v. Lorain Journal,* 497 U.S. 1, 21 (1990)). Notably, the Supreme Court has clarified that rhetorical hyperbole cannot be the basis of a defamation claim. *See Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (finding that the challenged statement could not be defamatory because "even the most careless reader must have perceived that the word [blackmail] was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the plaintiff's] negotiating position extremely unreasonable."); *Jolliff v. N.L.R.B.*, 513 F.3d 600, 610 (6th Cir. 2008) ("The Court [in *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20 (1990)] further affirmed that 'rhetorical hyperbole, a vigorous epithet' and 'loose, figurative, or hyperbolic language' merit protection."). Tennessee has taken it a step further, indicating that "[m]ere hyperbole or *exaggerated statements* intended to make a point are not actionable defamatory statements." *Moses v. Roland*, No. W2019-00902-COA-R3-CV, 2021 WL 1140273, at *11 (Tenn. Ct. App. Mar. 25, 2021) (emphasis added) (quoting *Farmer v. Hersh*, No. W2006-01937-COA-R3-CV, 2007 WL 2264435, at *5 (Tenn. Ct. App. Aug. 9, 2007) (citation omitted)). *Accord Weidlich v. Rung*, No. M2017-00045-COA-R3-CV, 2017 WL 4862068, at *5 (Tenn. Ct. App. Oct. 26, 2017).

Plaintiff asserts that because “Plaintiff is not ‘like a “Loan Shark”’ and always allows its clients to terminate their services,” Statement 1 is false and defamatory. (Doc. No. 31 at ¶ 22.c). The Court disagrees. Even accepting as true Plaintiff's assertion that it is unlike a “Loan Shark” because it always allows its clients to terminate their services, Statement 1 is still not an actionable defamatory statement, because it amounts to “[m]ere hyperbole or *exaggerated statements* intended to make a point.” *Moses*, 2021 WL 1140273, at *11 (quoting *Farmer*, 2007 WL 2264435, at *5 (citation omitted)).

According to Merriam-Webster, a “loan shark” is “one who lends money to individuals at exorbitant rates of interest.” *Loan Shark*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/loan%20shark. Use of the phrase “once you're in, you can't get out,” does not literally indicate an inability to “get out,” but rather is an exaggeration (i.e., hyperbole) used when referring to “loan sharks” and their disfavored practice of lending money at high interest rates because the high-interest rates make it hard to pay-off the loan—in turn making it hard to “get out.” However, even with “loan sharks,” there is always a way to “get out”—that being to pay off the loan in full. In light of the aforementioned, the Court finds that “even the most careless reader” must have perceived that the use of the phrase “once you're in, you can't get out” was no more than rhetorical hyperbole, an exaggeration used by Defendant who disfavors Plaintiff's services, finding them to be improper.

Therefore, the Court finds that Defendant's comparison of Plaintiff to a “Loan Shark”—indicating that “once you're in, you can't get out”—is mere hyperbole and does not provide a legal basis for Plaintiff's Defamation Claim.

B. Statement 2—that Plaintiff is Not VA Accredited

As grounds for a claim of defamation, Statement 2 is a nonstarter because it is true. When defining a "claim shark," Defendant further states that "claim sharks" are "not VA accredited, meaning they aren't required to adhere to the well-established professional and ethical standards of VA accreditation, so their advice can often be misleading or even fraudulent." (Doc. No. 31 at ¶ 18). Importantly, "only statements that are false are actionable [in a defamation case]; truth is, almost universally, a defense." *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013) (quoting *West v. Media Gen. Convergence, Inc.,* 53 S.W.3d 640, 645 (Tenn.2001)).

Whether Statement 2 can support a claim of defamation requires the Court to answer whether Plaintiff is "VA accredited"—to which the Court must answer in the negative. As Defendant correctly points out in its Memorandum, "[t]he VSO database on the U.S. Department of Veterans Affairs website plainly reveals that [Plaintiff] is *not* a VA-accredited VSO." (Doc. No. 37 at 17; Doc. No. 38-2).[20] Although Plaintiff alleges that Victoria Collier—Plaintiff's *supervising attorney*—is VA accredited, Plaintiff does not allege that the same is true about *itself*. (Doc. No. 31 at ¶ 22.b). Importantly, Defendant did not state that Victoria Collier or representatives of Plaintiff were not VA-accredited; rather, by virtue of calling Plaintiff (i.e., Patriot Angels Consulting Corporation) a "claim shark," Defendant stated only that Plaintiff itself is not VA-accredited—a fact that appears to be objectively true.

Plaintiff asserts that Statement 2 is "generally misleading as only individuals [and not organizations] are referred to as 'accredited' by the VA . . . ." (Doc. No. 31 at ¶ 22.b). The Court finds this assertion to be wholly unavailing and indeed simply untrue. As is evidenced by the "Accredited VSO Search Results" on the U.S. Department of Veterans Affairs website,

[20] For the reasons stated above (*supra* Section I), it is permissible for the Court to consider the VSO database on the U.S. Department of Veterans Affairs website when ruling on the Motion.

organizations (and not just individuals) are referred to as accredited by the VA. (Doc. No 38-2 (listing "Organization[s]" under "Accredited VSO Search Results")).

In sum, because Plaintiff is not VA accredited, Defendant's statement to such effect (i.e., Statement 2) is a true statement that does not provide a legal basis for Plaintiff's Defamation Claim.

C. Statement 3—that Plaintiff Charges Illegal Consultation Fees

Statement 3 fares better. What Plaintiff appears to predominantly take issue with is Defendant's implicit assertion that Plaintiff is engaged in charging illegal fees. (Doc. No. 31 at ¶¶ 21-22.a and 29). When defining a "claim shark," Defendant states that "claim sharks" charge "hefty fees to 'assist' or 'consult' veterans with filing their VA benefit claims" a "practice [that] is illegal!" (Doc. No. 31 at ¶ 18). As discussed above, at the present motion-to-dismiss phase, the Court finds Defendant—by both defining a "claim shark" in such a manner and calling Plaintiff a "claim shark"—has effectively asserted that Plaintiff illegally charges "hefty fees to 'assist' or 'consult' veterans with filing their VA benefit claims." (*Id.*). The Court finds it plausible that such statement (i.e., Statement 3) is defamatory.

Defendant first appears to assert that the First Amended Complaint itself establishes that Statement 3 is true. More specifically, Defendant asserts that "Plaintiff admits it charges a fee for 'pre-filing consultation' . . . a business practice [that, according to Defendant] is not permitted under U.S. laws and regulations." (Doc. No. 37 at 16 (quoting Doc. No. 31 at ¶ 22.a)). However, Defendant's assertion is premised on an incomplete reading of Plaintiff's First Amended Complaint. In reality, the First Amended Complaint states, "Plaintiff charges a reasonable fee to perform a pre-filing consultation *and lengthy long-term care assessment report that provides information beyond solely VA benefits*. (Doc. No 31 at ¶ 22.a (emphasis added)). Interpreting the First Amended Complaint in the light most favorable to the Plaintiff—as the Court must on a

motion to dismiss—the Court reads Plaintiff here to allege that any fee Plaintiff charges is not solely for pre-filing consultation—which Defendant asserts would be illegal—but rather for a lengthy long-term care assessment report as well. Therefore, the Court finds that the allegations made in the First Amended Complaint do not establish the truth of Statement 3.

Defendant further argues that Plaintiff has failed to state a claim for defamation because Statement 3 "[i]s [b]ased [o]n [d]isclosed, [s]ubstantially [t]rue [f]acts." (Doc. No. 37 at 15). In support of such assertion, Defendant cites the Letters.[21] (*Id.* at 16-17). Defendant's argument stems from the Tennessee Court of Appeals' holding in *Stones River Motors, Inc. v. Mid-South Pub. Co.*, wherein the Tennessee Court of Appeals found that "[i]t is . . . a matter of constitutional law that statements of opinion or characterizations based upon disclosed non-defamatory facts are not defamatory even though they are stated in strong or abusive terms." 651 S.W.2d 721.[22] Put another

---

[21] Importantly, although Defendant too cites to the Fee Agreement—as discussed above (*supra* Section I)—the Court will not consider the Fee Agreement when ruling on the Motion and so the Court need not analyze assertions premised on such.

[22] Plaintiff does not appear to dispute Defendant's reliance on *Stones River Motors, Inc.* for the assertion that "statements of opinion or characterizations based upon disclosed non-defamatory facts are not defamatory." 651 S.W.2d at 721. Nevertheless, it is worth touching on how a U.S. Supreme Court case has affected the prior holding of the Tennessee Court of Appeals in *Stones River Motors, Inc*. In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), the U.S. Supreme Court "held [that] there is no wholesale defamation exemption for anything that might be labeled 'opinion.'" *Zius v. Shelton*, No. E1999-01157-COA-R9-CV, 2000 WL 739466, at *3 (Tenn. Ct. App. June 6, 2000) (citing *Milkovich*). The Supreme Court in *Milkovich* "reasoned that such an exemption would ignore that fact that expressions of 'opinion' often imply an assertion of objective fact." *Id.* Ultimately, this Court treats *Milkovich* as clarifying that even if an opinion or characterization is based on disclosed (true) nondefamatory facts (in which case it would be protected under *Stones River Motors, Inc.*), it may ultimately not be protected if the opinion/categorization simultaneously implies "the allegation of undisclosed defamatory facts as the basis for the opinion." *Satterfield v. Bluhm*, No. E2003-01609-COA-R3-CV, 2004 Tenn. App. LEXIS 244, at *14 (Tenn. Ct. App. Apr. 16, 2004) (citations omitted).

In the present case, because the Court cannot find at the current stage that Statement 3 is based on "true nondefamatory facts," the Court need not address herein the effect that *Milkovich* would have in the present case if Statement 3 were in fact treated as a statement of opinion (or characterization) based on (true) nondefamatory facts.

way, "[i]f the published facts being commented upon are true and nondefamatory, the writer's comments upon them are not actionable, even though they are stated in strong or abusive terms." *Id.* at 720. *Accord Weidlich*, 2017 WL 4862068, at *6 ("A writer's comments upon true and nondefamatory published facts are not actionable, 'even though [the comments] are stated in strong or abusive terms.'" (quoting *Stones River Motors, Inc.*, 651 S.W.2d at 720)). Importantly, statements are not protected if based on *substantially* true facts, rather the facts being commented upon have to be "true and nondefamatory." *Stones River Motors, Inc.*, 651 S.W.2d at 720.

As it relates to Defendant's Statement 3 (i.e., that Plaintiff is engaged in charging illegal consultation fees), the Court finds that—at the current motion-to-dismiss phase—it cannot find that the statement is protected by virtue of being based on "true nondefamatory facts." In its Memorandum, Defendant points to the following factual assertions made in the Letters from the VA OGC as support for its assertion that Statement 3 is true/is based on true facts: (a) that Plaintiff is "charging veterans and surviving spouses $795 for a consultation on potential eligibility for VA's Aid and Attendance benefit prior to an initial decision on the claim in violation of 38 U.S.C. § 5904(c) and 38 C.F.R. § 4.636(c);" (b) that any assumption "that *any* unaccredited individual could charge *any amount* for such an analysis" is incorrect; and (c) "[w]hile certain language in [Plaintiff's] consultation agreement attempts to intimate that the consultation (1) involves individuals who are not yet VA benefits 'claimants' or (2) does not constitute 'preparation' of a VA benefits claim, such assertions *are belied by the construct of [Plaintiff's] entire operation*." (Doc. No. 37 at 16-17 (quoting Doc. No. 38-5 at 1-2 and Doc. No. 38-6 at 1)). Even assuming that Defendant's Statement 3 is properly deemed to have been "based on" the Letters and the aforementioned factual assertions therein, that would not help Defendant; because the Court is not considering the Letters for the truth of any matters asserted therein, and correspondingly is not

accepting as true the factual assertions made therein, the Court cannot conclude that Defendant's Statement 3 is based on *true* facts.

In sum, because the Court cannot accept the factual assertions in the Letters—the ones on which Defendant relies—as true for purposes of ruling on the Motion, the Court cannot find that Statement 3 is true or even that it is based on true, nondefamatory facts. And of consequence at the present (motion-to-dismiss) phase, Plaintiff has alleged sufficient factual matter plausibly suggesting that its conduct was legal—rather than illegal—by virtue of alleging that the fee it charges is not only for pre-filing consultation, but also for a "lengthy long-term care assessment report that provides information beyond solely VA benefits." (Doc. No 31 at ¶ 22.a). Therefore, the Court finds that Statement 3 does provide a legal basis for Plaintiff's Defamation Claim sufficient for that claim to survive on the basis of Statement 3 (and only Statement 3, given that the Court has found that Statements 1 and 2 do not provide a legal basis for Plaintiff's Defamation Claim).

So the Court will deny the Motion with respect to Plaintiff's Defamation Claim, with the caveat that such claim survives based solely on Statement 3.

## III. Tortious Interference with Business Relationships Claim (Count II)

In order to establish intentional interference with business relationships under Tennessee law, a plaintiff must "demonstrate the following: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive or improper means*; and finally, (5) damages resulting from the tortious interference." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71

S.W.3d 691, 701 (Tenn. 2002) (internal citations omitted). *Accord Am. Addiction Ctrs., Inc. v. Nat'l Ass'n of Addiction Treatment Providers*, 515 F. Supp. 3d 820, 847 (M.D. Tenn. 2021) ("In order to establish intentional (tortious) interference with business relationships under Tennessee law, a plaintiff must prove the following: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference." (internal citations omitted)).

Defendant asserts three arguments as to why Plaintiff's Tortious Interference Claim should be dismissed:

> [First, Defendant's] statements are not false, and thus the interference claim fails on First Amendment grounds . . . . Second, [Plaintiff] cannot recover compensatory damages for third-party interference with prospective contracts that illegally charge clients for assisting with VA benefits claims and are therefore invalid and unenforceable . . . . Finally, [Plaintiff] alleges [Defendant's] statements are intended to "redirect the prospective business relationships of Plaintiff to itself," but as a VA-accredited organization, [Defendant] does not charge veterans when it assists them with benefit applications.

(Doc. No. 37 at 21-22 (internal citations and quotations omitted)). (The Court refers to these respectively as "Argument 1," "Argument 2," and "Argument 3"). The Court finds none of the three arguments to be availing.

Argument 1 and Argument 2 are premised on the Court agreeing with the arguments made by Defendant in relation to the Defamation Claim—that the statements made by Defendant were true and that the services Plaintiff provides are illegal. However, as explained above, at the present (motion-to-dismiss) phase, the Court does not find it appropriate to conclude that the statements

made by Defendant were true and that Plaintiff's services are illegal. Therefore, Argument 1 and Argument 2 fall short.

Argument 3 also falls short. Even accepting Defendant's assertion that it "does not charge veterans when it assists them with benefit applications," (Doc. No. 37 at 22), the Court fails to see how such would be of consequence. Although such would tend to establish that Defendant did not receive any pecuniary gain from the alleged interference, the defendant's pecuniary gain (whether actual or intended) is not an element of a claim of tortious interference with business relationships. The Court hypothesizes that Defendant proffered Argument 3 to support the assertion that it did not have an improper motive in interfering with Plaintiff's alleged business relationships. But even if a defendant neither obtained nor intended to obtain pecuniary gain from the interference, that alone does not tend to render implausible an adequately supported assertion by the Plaintiff that Defendant's motive for the interference was improper. Still less does it tend to render implausible an adequately supported assertion by the plaintiff that Defendant's *means* of interfering was "improper." The Tennessee Supreme Court has found that "some examples of improper interference . . . [include] those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules," such as "defamation." *Trau-Med of Am., Inc.*, 71 S.W.3d at 701 n.5. Therefore, because Plaintiff alleges that Defendant interfered with its prospective business relationships by means of its alleged defamatory statements—and further because the Court, as explained above, found that Plaintiff alleged factual matter plausibly suggesting that Statement 3 was defamatory—Plaintiff has pled factual matter sufficient to plausibly suggest improper *means*[23] in the form of Defendant's making of Statement 3 in

[23] Notably, the fourth element of a tortious interference with business relationships claim requires a plaintiff to show *either* improper motive *or* improper means, not both. *See Trau-Med of Am., Inc.*, 71 S.W.3d at 701. Having found that Plaintiff alleged factual matter plausibly suggesting "improper means," the Court

particular.[24] Therefore, the Court similarly concludes that Argument 3 does not support dismissal of the Tortious Interference Claim. Thus, the Court will deny the Motion with respect to Plaintiff's Tortious Inference Claim.

**IV. Defendant's Petition under the Tennessee Public Participation Act**

In addition to its request for relief pursuant to Fed. R. Civ. Pro 12(b)(6), Defendant requests relief under the TPPA. The TPAA's stated purpose is to "encourage and safeguard the constitutional rights of persons to petition, to speak freely, to associate freely, and to participate in government to the fullest extent permitted by law." Tenn. Code Ann. § 20-17-102. The TPPA additionally states that, "[i]f a legal action is filed in response to a party's exercise of the right of free speech, right to petition, or right of association, that party may petition the court to dismiss the legal action." Tenn. Code Ann. § 20-17-104(a). Defendant argues that it is "entitled to dismissal under the TPAA if [Plaintiff] does not 'establish[] a prima facie case for each essential element' of its libel claim," because Plaintiff's "action 'is based on, relates to, or is in response to [Defendant's] exercise of the right to free speech,' and [Defendant] was engaged in speech 'made in connection with a matter of public concern.'" (Doc. No. 37 at 22-23 (quoting Ten. Code Ann. §§ 20-17-103(3), 20-17-105(a), (b))).

As Defendant acknowledged in its Motion (Doc. No. 36 at 2 n.1 ("Defendant acknowledges that this Court has declined to apply the TPPA in federal court under *Erie* principles.")), this Court has previously provided its opinion on the applicability of state-level anti-strategic lawsuit against

---

need not (and will not) analyze whether Plaintiff alternatively alleged factual matter plausibly suggesting Defendant had an "improper motive."

[24] The same cannot be said of Statement 1 or Statement 2, and as reflected in the footnote at the very end of this opinion, this reality limits the manner in which Plaintiff will be permitted to attempt to show "improper means" going forward.

public participation ("anti-SLAPP") statutes in federal court. *See Lampo Grp., LLC v. Paffrath*, No. 3:18-CV-01402, 2019 U.S. Dist. LEXIS 122523, at *3-8 (M.D. Tenn. July 23, 2019) (Richardson, J.); *see also Santoni v. Mueller*, No. 3:20-cv-00975, 2022 U.S. Dist. LEXIS 4336, at *32-34 (M.D. Tenn. Jan. 10, 2022) (Richardson, J.). In *Lampo Grp., LLC v. Paffrath*, the undersigned held, "[b]ecause Rules 8, 12, and 56 are valid under the Rules Enabling Act and the Constitution and govern the same basic question as the [state] anti-SLAPP statute, the motion-to-strike procedure created by the [state] anti-SLAPP statute cannot apply in federal court." 2019 U.S. Dist. LEXIS 122523, at *7-8. Thereafter, in *Santoni v. Mueller*, the undersigned had the opportunity to explicitly discuss the dismissal procedure of the TPPA and its significance in federal court, finding that "the TPPA's dismissal provision will not apply in federal court," relying on the same rationale from *Lampo Grp., LLC*. 2022 U.S. Dist. LEXIS 4336, at *33.

As there is still no Sixth Circuit case law on the applicability of dismissal procedures in anti-SLAPP statutes—like the TPPA—in federal court, the Court sees no reason to find differently now than it did in *Lampo Grp., LLC*. and *Santoni*. For these reasons, the TPPA's dismissal provision will not apply in federal court, and the Defendant's TPPA Petition is denied.[25]

[25] Plaintiff requests the Court to "award to Plaintiff the court costs and reasonable attorney's fees it incurred in opposing Defendant's TPPA Petition pursuant to Tenn. Code Ann. § 20-17-107(b)." (Doc. No. 47 at 2, n.2). Notably, Tenn. Code Ann. § 20-17-107(b) affords courts discretion to "award to [Plaintiff] courts costs and reasonable attorney's fees incurred in opposing the petition" if "the court finds that a [TPPA] petition . . . was frivolous or was filed solely for the purpose of unnecessary delay." Plaintiff argues that Defendant's TPPA Petition is frivolous in light of the "well-established case law (and Defendant's knowledge of the same)." (Doc. No. 47 at 2 n.2). The Court concludes that Defendant's TPPA Petition is not frivolous, because—as Defendant correctly points out—although this Court has said that the TPPA dismissal provision does not apply in federal court, "this issue has not yet been considered by the Sixth Circuit," (Doc. No. 37 at 23-24), and has resulted in a significant split of authority across the country. *See Hughes v. Malini Gupta*, 613 F. Supp. 3d 1054, 1058 (W.D. Tenn. 2021) (denying a motion to dismiss pursuant to the TPPA, finding that the TPPA does not apply in federal court; but simultaneously denying a Plaintiff's request for relief pursuant to Tenn. Code Ann. § 20-17-107(b) finding that "it cannot be said that the motion is frivolous, in light of the fact that similar issues across the country have resulted in a significant split of authority."). Therefore, it is not frivolous for Defendant to advocate for the applicability of the TPPA dismissal provision in federal court. Furthermore, because Defendant filed its TPPA Petition in conjunction with its motion to dismiss pursuant to 12(b)(6)—a procedurally unobjectionable motion risks just as much

Because the Court concludes that the dismissal procedure of the TPPA does not apply in federal court, the Court does not find it necessary to analyze Plaintiff's remaining arguments related to the substantive merit of Defendant's TPPA Petition. (Doc. No. 47 at 4-12).

## CONCLUSION

For the reasons indicated herein, the Court will **DENY** Defendant's Motion (Doc. No. 36)—including Defendant's TPPA Petition—in its entirety, albeit with the caveats reflected herein.[26]

---

delay as does a motion under the TPPA—the Court finds unavailing Plaintiff's assertion that Defendant filed its TPPA Petition for the sole purpose of delaying the case. Because the Court finds that Defendant's TPPA Petition was neither frivolous nor filed solely for the purpose of unnecessary delay, the Court lacks discretion to award court costs or attorney's fees.

Plaintiff makes a secondary argument in support of its assertion that Defendant's TPPA Petition is frivolous, claiming that it is frivolous "to the extent Defendant seeks dismissal of Plaintiff's tortious interference with business relationships claim" because "this claim does not arise out of the exercise of free speech rights." (Doc. No. 47 at 2, n.2). Whether Defendant's TPPA Petition is seeking dismissal only of the Defamation Claim or of both the Defamation Claim and the Tortious Interference Claim is unclear, but the Court is persuaded that the target of Defendant's TPPA Petition was solely the Defamation Claim.

Plaintiff itself asserted that "Defendant's TPPA Petition only mentions Plaintiff's defamation claim . . . . Thus it is Plaintiff's position and understanding that Defendant's TPPA Petition only applies to Plaintiff's defamation claim." (*Id.* at 1 n.1). The Court agrees. In further support of this conclusion is the fact that Defendant's TPPA Petition asserts only that Plaintiff "cannot establish a prima facie defamation action," while wholly failing to make a similar argument as to the Tortious Interference Claim. (Doc. No. 37 at 23). So the Court finds that Defendant's TPPA Petition does not seek dismissal of the Plaintiff's Tortious Interference Claim, so Plaintiff's secondary argument is without merit.

Even assuming *arguendo* that Defendant's TPPA Petition sought dismissal of both claims—which is at least *possible* in light of Defendant's broad assertion that the "*Action* Should Also Be Dismissed . . . Under The TPPA" (Doc. No. 37 at 22 (emphasis added))—Plaintiff's secondary argument would still be without merit. Plaintiff argues that any attempt by Defendant to obtain dismissal of Plaintiff's Tortious Interference Claim under the TPPA is frivolous because such "claim does not arise out of the exercise of free speech rights." (Doc. No. 47 at 2 n.2). To the contrary, Plaintiff appears to rely on the same allegedly false and defamatory statements/implications by Defendant in support of both its Defamation Claim and Tortious Interference Claim—the very statements Defendant claims are protected via its First Amendment free speech rights. (Doc. No. 31 at ¶¶ 40-41; Doc. No. 37 at 20).

In sum, the Court finds that Defendant's claim for dismissal pursuant to Defendant's TPPA Petition is neither frivolous nor for the sole purpose of delay, so the Court lacks discretion to award court costs or attorney's fees under Tenn. Code Ann. § 20-17-107(b).

Notably, even if the Court instead found that awarding relief pursuant to Tenn. Code Ann. § 20-17-107(b) was proper, Plaintiff would need to separately file a motion with the Court to seek such relief.

[26] As noted above, this denial is with the caveat that the Defamation Claim survives based only upon Statement 3. Along the same lines, although the Tortious Interference Claim survives, going forward the

An appropriate corresponding order will be entered.

Eli Richardson
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

Court will not countenance this claim on specific theory that the interference was committed by improper means because Statement 1 and/or Statement 2 were defamatory; as the Court has concluded as a matter of law that Statement 1 and Statement 2 were not defamatory, Plaintiff cannot show "improper means" specifically by showing that Statement 1 and/or Statement 2 are defamatory.