**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

**KEVIN M. DONOVAN,**
Plaintiff,

v.

BENT CREEK HOMEOWNERS ASSOCIATION, INC., et al.,
Defendants.

Case No. 3:26-cv-00700

Judge Waverly D. Crenshaw, Jr.
Magistrate Judge Lynda M. Hill

JURY DEMAND

# PLAINTIFF'S RESPONSE IN OPPOSITION TO THE MOTION TO DISMISS THE SECOND AMENDED COMPLAINT (DOC. 37)

## INTRODUCTION

On page three of their brief, Defendants tell this Court the governing standard: it must construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor. Nine pages later they ask the Court to adopt the movants' own characterization of a disputed fact — that a restriction on Plaintiff's movement within his neighborhood answered his "recent threatening and disruptive behavior" — and to hold that "**there is no other inference that can be made from his Complaint.**" That sentence is the motion. It asks this Court to resolve a contested question of fact in the movants' favor at the pleading stage, under a standard the same brief correctly recited a few pages earlier.

The pattern repeats. Defendants ask the Court to dismiss Count I on documents that do not say what they are said to say — including their own accommodation form, which instructs homeowners in bold type not to provide medical records. They ask the Court to dismiss Count III on a By-Law provision that their own 139-page exhibit shows was repealed in 2014. And they ask the Court to dismiss Count VI on a line of cases about a corporation's *power to act* — a

theory this pleading does not assert. Underlying all of it is a single methodological error: the standards Defendants borrow are summary-judgment standards, and the immunity opinion on which Count VI's dismissal is urged was itself reversed by the Tennessee Supreme Court.

**Defendants ask this Court to resolve contested facts in the movants' favor, on documents that do not say what they are said to say, under standards borrowed from summary judgment. The motion should be denied.**

## I. THE RULE 12 STANDARD, AND THE DOCUMENTS PROPERLY BEFORE THE COURT.

A complaint survives Rule 12(b)(6) where it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face; the court draws all reasonable inferences for the plaintiff, and the movant bears the burden of explaining why dismissal is appropriate. *Allergan, Inc. v. Revance Therapeutics, Inc.*, 711 F. Supp. 3d 873, 884–85 (M.D. Tenn. 2024); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Plaintiff does not object to the Court's consideration of the exhibits Defendants have submitted. He welcomes them, including Doc. 37-2.

Doc. 37-2 is authentic and Plaintiff does not dispute it. Its contents defeat the argument it was offered to support. On its face the form states that Plaintiff was "continuously disabled (unable to work)" beginning March 18, 2025; that he was not able to return to restricted employment; and that he was "[u]nable to return to work until capable to work a full 4 hours a day," with "[f]ull restrictions at this time" — over the printed name, specialty, license number and signature of his treating provider. Whatever the Association lacked when it demanded two

further forms on July 28, 2025, it did not lack reliable information that Plaintiff had a disability or what his functional limitations were.

The single field the form does not show is the diagnosis — the field a housing provider ordinarily may not demand. HUD and the Department of Justice have jointly stated that a housing provider "may not ordinarily inquire as to the nature and severity of an individual's disability," and that in response to an accommodation request a provider may seek only reliable information that verifies the person meets the Act's definition of disability, describes the needed accommodation, and shows the relationship between the two. Joint Statement of the Department of Housing and Urban Development and the Department of Justice, Reasonable Accommodations Under the Fair Housing Act, Answers 16 and 18 (May 17, 2004). The form Defendants authenticated supplies reliable information verifying disability and describing Plaintiff's work-related functional limitations. The remaining two categories the guidance identifies — the accommodation sought and its relationship to the limitation — are supplied by Plaintiff's written request of June 1, 2025 and by the pleading itself: additional time to cure exterior violations, needed because the condition limits his mobility, pace, energy level and capacity to perform physical tasks, including the exterior maintenance the Association demanded within compressed timeframes. (SAC ¶¶ 39, 100, 207; Ex. G.) What the form withholds is the diagnosis — which the guidance says a provider ordinarily may not demand, along with detailed medical records.

Nor does the exhibits-control principle carry the weight Defendants place on it. Applying that very rule, the court in *Morris v. Environ Towers I Condominium Ass'n*, No. 18-60586, slip op. (S.D. Fla. June 21, 2018) (ECF No. 22) — a condominium association and two of its officers moving to dismiss — denied the motion. Exhibits that do not address an allegation **cannot**

**contradict** it, and "the Defendants' denials of the Plaintiff's allegations are just that—denials—which the Defendants may properly set forth in an answer, but which are not grounds for dismissal."

## II. COUNT I STATES A CLAIM FOR FAILURE TO MAKE A REASONABLE ACCOMMODATION.

### A. Defendants had notice, and their own brief proves it.

Defendants' notice argument is that every disclosure preceding May 16, 2025 was phrased in the past tense, describing having been sick rather than being disabled. The argument fails on a sentence Defendants themselves put before this Court. At page five of their brief they reproduce Plaintiff's April 30, 2025 email: **"I am currently off work with a disability."** That is the present tense, and it uses the statutory word. Defendants quote it and never answer it.

Their leading authority does not hold otherwise. *McCall v. Montgomery Housing Authority*, 2017 U.S. Dist. LEXIS 162340 (M.D. Ala. Sept. 29, 2017), is a magistrate judge's report and recommendation, adopted without further analysis, applying Rule 12(b)(6). The sentence Defendants quote — that illness is not tantamount to a disability — is the second of four independent pleading failures the court identified: the plaintiff there never alleged that she or anyone associated with her was disabled, never alleged the accommodation she sought, never alleged that she requested one, and never alleged that any defendant denied one. Each of those four is pleaded here, and pleaded with dates.

The Second Amended Complaint alleges a diagnosed condition, the treating provider who diagnosed it, the date of onset, the functional limitations, and the connection between those limitations and the accommodation requested. (SAC ¶¶ 38–39.) It alleges a written request on

June 1, 2025, and disclosures preceding it. (SAC ¶ 100; Ex. G.) Whether the condition ultimately satisfies 42 U.S.C. § 3602(h) is not resolved on the pleadings.

The argument also fails downstream of the correspondence it parses. By July 24, 2025, the Association, through its counsel's office, held a treating provider's signed statement — delivered by hand, with a signed receipt (SAC ¶ 102) — and Defendants' own brief quotes what it says: that Plaintiff "has been continuously disabled (unable to work) from 03/18/2025 through 07/17/2025." Whatever the tense of a February email, by midsummer the Association had the statutory word over a provider's signature. The related objection that the June 1 letter says "medical condition" rather than "disability" asks for a magic-words rule the Act does not impose — and that Defendants' own form disclaims, since it requires "[o]nly a general explanation."

Defendants also observe that the earliest violations and fines predate March 18, 2025, the onset date the pleading alleges. The observation answers no element of Count I. The claim does not turn on whether the January or February violation notices should have been excused; it turns on the written request of June 1, 2025 and Defendants' conduct from that point forward — the serial refusals of July 2025, the enforcement that continued while the request was pending, and the decision that never issued. Each of those events postdates both the pleaded onset of the disability and its disclosure in the statutory term.

**B. Defendants' own Exhibit 1 defeats the argument that Plaintiff frustrated review.**

Defendants argue that they owed no duty to grant an accommodation because Plaintiff never returned their form, depriving them of a meaningful review. Their own Exhibit 1 — the Association's Reasonable Accommodation Request Form — instructs homeowners, in bold type: "**Do not provide medical records. Only a general explanation is required.**" Defendants

cannot circulate a form that disclaims medical documentation and then seek dismissal because the treating provider's signed statement Plaintiff did deliver was insufficiently documented.

The "meaningful review" language Defendants borrow comes from *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008), where it sits under the element of *refusal*, and where the very next sentence supplies the limit: a provider is not liable "if the [provider] never knew the accommodation was in fact necessary." Defendants knew. They were told in writing, repeatedly, and they received a treating provider's signed statement by hand delivery with a signed receipt.

The framework Defendants recite is not theirs either. The five elements come from *Dubois v. Ass'n of Apartment Owners*, 453 F.3d 1175, 1179 (9th Cir. 2006). Two features of that case matter here. It was decided on the fifth element alone — refusal — and the association prevailed because it **never refused**: it left a temporary exemption in place while it investigated. The same is true of *Overlook Mutual Homes, Inc. v. Spencer*, 415 F. App'x 617 (6th Cir. 2011), on which Defendants principally rely. *Overlook* is unpublished and therefore persuasive rather than binding; its recitation of the five elements at 620 is the panel describing what the district court had held on a Rule 50(a) motion — and the panel itself recites them at 621, citing *Dubois*. The appeal then narrowed to the refusal element alone. **Two of the three decisions in Defendants' own framework are no-refusal cases. This is not a no-refusal case.**

### C. The accommodation request was refused, and it has never been decided.

Defendants' third argument is that nothing was denied. The pleading says otherwise, and so does the arithmetic.

The argument answers requests Count I does not plead. Defendants divide the correspondence into four violation-specific asks and pronounce each granted because no further

notice issued on that file. But the accommodation request pleaded is the written request of June 1, 2025: that enforcement actions and communications be paused or conducted only in writing, that deadline extensions be granted in light of Plaintiff's condition, and that surveillance cease. Closing one violation file while opening the next is not a pause, and Defendants' own brief concedes the sequence — the "continued enforcement," they write, "was related to vehicle/camper parking." A pause that excludes whatever enforcement comes next is not a pause. The June 1 request itself was never granted, and never denied on any stated ground.

The refusals were serial, not singular. On July 24, 2025, the treating provider's signed statement was hand-delivered to the office of the Association's counsel, and a receipt was signed. (SAC ¶ 102.) On July 28, 2025, counsel responded that the statement did not "confirm that you have a disability" or that the requested accommodations were "necessary," and conditioned any further consideration on Plaintiff's completion of two additional Association forms — a demand for more documentation after a signed provider statement was in hand. (SAC ¶¶ 103, 335(a).) A second email later the same day stated that the Association would decide the accommodation requests within seven business days and "will advise you of that decision promptly." (SAC ¶ 335(b).)

Defendants' own lead case supplies the framework for what happened next. In *Overlook*, the Sixth Circuit recognized both forms of constructive denial this pleading alleges. First: "a housing provider that refuses to make a decision unless a requestor provides unreasonably excessive information could be found to have constructively denied the request by 'stonewalling' and short-circuiting the process." 415 F. App'x at 622. Second: "injury may result when a housing provider unreasonably delays responding to a request for an accommodation and that such a delay may amount to a denial," *id.*, collecting *Groome Resources Ltd. v. Parish of*

*Jefferson*, 234 F.3d 192 (5th Cir. 2000) (ninety-five days), and *Astralis Condominium Ass'n v. HUD*, 620 F.3d 62, 68–69 (1st Cir. 2010) (a year-long delay by a condominium association). The panel concluded that "[w]ere it not for additional factors that are present here, the Spencers would have presented a jury issue as to whether Overlook 'denied' their request." *Id.* at 622.

The "additional factors" that saved the association in *Overlook* are the measure of this case, and each cuts the other way. The association there could point to case law genuinely supporting its position on the disputed question. *Id.* at 623. Here, the pleaded July 28 refusal identified no covenant provision, no ordinance, and no authority of any kind — it rejected a treating provider's signed statement and demanded two more forms. (SAC ¶¶ 103, 335.) And *Overlook* warned against precisely that posture: "Simply claiming that the law is 'unclear' should not entitle the provider to delay and obstruct the accommodation process." *Id.* at 623.

The panel's final consideration was that the association "never began eviction proceedings" and the requested accommodation was enjoyed throughout — the animal was never removed. *Id.* at 623–24. That, the court explained, is what separated the case from *Groome* and *Astralis*, where "the delay had the effect of depriving disabled persons of the accommodation" — in *Astralis*, "when the complainants unilaterally parked in those spaces, they received violation notices." *Id.* (quoting 620 F.3d at 69). That is this case. The May 30, 2025 letter demanding payment and threatening a lien preceded the written request by two days and framed the posture into which the request was made. Enforcement then continued while the request was pending: the charges were maintained on Plaintiff's account, and the movement restriction issued and remained. Plaintiff sits on the *Groome*/*Astralis* side of the line Defendants' own case drew.

Measured against that framework, the pleaded correspondence maps cleanly. The provider's statement was delivered and receipted on July 24. The July 28 demand for two

additional forms — issued after that signed statement was in hand — is the excessive-information posture *Overlook* describes. And counsel's July 28 correspondence promised a decision. (SAC ¶¶ 102–03, 335.)

That promise started a clock. The Second Amended Complaint pleads that the Association stated it would decide Plaintiff's accommodation requests within seven business days and would advise him of the decision. (SAC ¶ 335(b).) At the pleading stage that allegation is taken as true. Seven business days from Monday, July 28, 2025 is Wednesday, August 6, 2025. **No decision has ever issued.** As of the filing of this response, the request Plaintiff made in writing on June 1, 2025 has been pending 467 days, and 401 days have passed since the Association's own stated decision date. "This denial can be both actual or constructive, as an indeterminate delay has the same effect as an outright denial." *Groome*, 234 F.3d at 199–200. And in a homeowners association case, the Fourth Circuit held that where a board twice "tabled" an accommodation request and did not seek the information it said it needed until far later, "**the HOA's failure to take any action for such an extended period operated as a constructive denial**" of the request. *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 272 (4th Cir. 2013) (citing *Groome*, 234 F.3d at 199).

Defendants may respond that *Scoggins* also held a separate claim unripe. It did, and the distinction is the point. That claim concerned plaintiffs who did not dispute that their application was incomplete and who declined to supplement it. *Id.* at 270–71. Here the documentation was delivered and receipted, and the response was a demand for two more forms followed by a promised decision that never issued. That is the tabling posture *Scoggins* calls a constructive denial, not the refusal-to-supplement posture it calls unripe.

Finally, enforcement continued while the request was pending, and the charges remained on Plaintiff's account into April 2026. A credit entered on the account long afterward does not undo an accrued violation, and it does not moot damages.

## III. COUNT II STATES A CLAIM FOR RETALIATION UNDER 42 U.S.C. § 3617.

### A. Defendants' animus standard is a summary-judgment standard.

Defendants quote *Owens v. Willow Bridge Property Co.*, No. 3:26-cv-00630, slip op. (M.D. Tenn. May 26, 2026) (ECF No. 8): "Discriminatory animus requires plaintiffs to put forth some evidence of discriminatory effect or intent on the defendant's part." The rule *Owens* restates is a summary-judgment rule. Its source is *Linkletter v. Western & Southern Financial Group*, 851 F.3d 632, 639 (6th Cir. 2017), where the sentence ends "**to survive summary judgment**" — and *Linkletter* itself **reversed** a Rule 12(b)(6) dismissal of a § 3617 claim. *Id.* at 641.

The rule's pedigree confirms it. *Linkletter* drew the sentence from *Campbell v. Robb*, 162 F. App'x 460, 474 (6th Cir. 2006) — an unpublished appeal from summary judgment, where the rule is stated in terms: "to survive summary judgment on her retaliation claim, Campbell was required to put forth 'some evidence of discriminatory effect or intent on the [Robbs'] part.'" *Michigan Protection & Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994), from which the rule descends, was a summary-judgment appeal; so was *Hidden Village, LLC v. City of Lakewood*, 734 F.3d 519 (6th Cir. 2013). And *Owens* itself was a screening dismissal under 28 U.S.C. § 1915(e) of a plaintiff who never alleged membership in a protected class. None of those postures is this one.

What *Linkletter* does supply is a description of allegations that stated a § 3617 claim. Recounting *Cooper*, the court noted that the district court there had cited allegations that the

defendant "**photographed residents**" and "**falsely accused residents of engaging in criminal activity.**" *Id.* at 636. Those are the allegations of this pleading.

**B. The timeline is three days long, and Defendants ask the Court to resolve it against the plaintiff.**

On Friday, May 16, 2025, Plaintiff invoked the Fair Housing Act by statute, stated that the Association had been "made aware, on multiple occasions" of his ongoing health issues, and announced a formal complaint to the U.S. Department of Housing and Urban Development. (Doc. 37-4.) The written communication imposing the movement restriction, and containing the statement that this was the first instance in which Plaintiff had mentioned a disability, issued over Ms. Burka's signature on or about May 19, 2025. Both statements are in the same communication. (SAC ¶¶ 86, 97; Ex. E.)

Against that sequence Defendants tell the Court that "there is no other inference that can be made" than that the restriction answered Plaintiff's own misconduct. The Second Amended Complaint pleads that the characterization is false. At this stage that allegation is taken as true, and the competing inference Defendants prefer is one a jury may or may not draw. It is not a basis for dismissal.

The pleading also permits, although it does not compel, an inference of Board-level knowledge. Count II incorporates Paragraphs 198 through 201 by targeted range (SAC ¶ 214), and Paragraph 198 alleges that the Association's own homeowner portal later returned "excerpts from and citations to Board executive-session materials concerning Plaintiff's own reasonable-accommodation matter." When that material was created, and what each director reviewed, are questions of proof rather than pleading.

Defendants' own exhibit supplies the bridge. In the same May 19, 2025 letter that contains the "first instance" statement, Burka directed Plaintiff to send his accommodation request to her and to Kaley Vaughn and promised: "Once received, we will forward it to the appropriate parties for review." (Ex. E.) Plaintiff sent it on June 1, 2025. (SAC ¶ 100; Ex. G.) The promised routing, together with Paragraph 198's allegation that Board executive-session materials concerning that request later existed, permits an inference that the matter reached the Board. The pleading does not establish which individual director reviewed it, or when; those remain questions of proof. But Defendants are not entitled to dismissal on the premise that their own stated process was never followed.

The pleading supplies the remaining allegation. The conduct alleged against Cody and Edge is that they "ratified" the continued enforcement actions and directed law-enforcement contact at Plaintiff's residence. (SAC ¶ 216(a).) Ratification presupposes knowledge; at the pleading stage, that allegation supports an inference of knowledge. Separately, and as to the Association rather than the individual directors, Plaintiff's June 1, 2025 written request went to Timmons as the Association's managing agent (SAC ¶ 100; Ex. G), so the Association is charged with what its agent knew. Defendants' contrary assertion about what Cody and Edge personally knew is factual, and it belongs in an answer. *Morris*, supra.

Defendants add that the restriction was "limited." What it reached, by their own quotation, was "visiting their homes, walking past their homes and standing on the sidewalk" — the public ways of Plaintiff's own neighborhood. (SAC ¶ 86; Ex. E.) Under the element list Defendants themselves recite, the question is whether the pleading plausibly alleges a materially adverse action, and a restriction on a resident's movement through his neighborhood, imposed

three days after he invoked the Act, plausibly is one. Narrowness goes to the weight of a justification — and the justification is the disputed characterization the pleading alleges is false.

On causation, the pleaded sequence is itself the allegation: protected activity on Friday, May 16 (Doc. 37-4); the restriction issued on or about May 19 over Ms. Burka's signature, paired in a single communication with a statement about Plaintiff's disclosure history that the pleading alleges is false (SAC ¶¶ 86, 97; Ex. E). A three-day interval, pleaded together with the paired misstatement, supports the causal inference at this stage.

To the extent Defendants contend the restriction was a justified response to threatening conduct, that is defensive matter. In *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213 (11th Cir. 2016), the Eleventh Circuit **reversed** a Rule 12(b)(6) dismissal of FHA disability claims and held that a safety-based justification — there, the Act's own direct-threat exception — "is an affirmative defense and thus does not aid [the movant] at the motion to dismiss stage." *Id.* at 1225. "It may well be" that a defendant acted reasonably, the court explained — but that is not a question a motion to dismiss can answer.

Section 3617 reaches those "in a position directly to disrupt" the exercise of a protected right. *Babin*, 18 F.3d at 347. An association that controls enforcement, fines, and access to common areas, and a managing agent that administers all three, plainly occupy that position.

## IV. COUNT III STATES A CLAIM FOR BREACH OF THE RECORDED COVENANTS, AND COUNT X IS A REMEDY TIED TO IT.

### A. Defendants' own Exhibit 3 supplies the chain, and the chain has three links.

Count III does not ask this Court to declare that the Association lacked corporate power. It alleges that Defendants demanded sums the recorded instruments do not authorize. The instruments are Defendants' own Exhibit 3, and they answer the question in three steps.

First, the By-Laws subordinate themselves. Article XII, Section 2 provides: "In the case of any conflict between the Declaration and these Bylaws, the Declaration shall control." That provision was untouched by both recorded amendments.

Second, the Declaration's enforcement provision is judicial. Article XIII, Section 1 authorizes enforcement "by any proceeding at law or in equity . . . for damages or injunction or specific performance, or for judgment for payment of money," with costs and fees recoverable in connection with "any such action or proceedings." Every remedy the section enumerates runs through a court — including "the right to sell the Lot through judicial process." The provision confers no power to impose a monetary penalty administratively, and no basis for a fifteen-dollar administrative charge or a certified-mail charge levied outside an action.

Third, the lien secures assessments. The By-Laws' Article XI — in both its original and amended form — provides a continuing lien for "annual and special assessments," not for fines. The Association's May 30, 2025 letter nonetheless warned that "[a] lien will be filed on your property." (Ex. H.)

These three limits do not depend on the exclusivity question. Even if the By-Laws authorized a fine, the Declaration governs what qualifies as an assessment, what a lien may secure, and what costs may be added to an owner's account; the charges at issue, the administrative and certified-mail fees, and the threatened lien exceed those limits on their own terms.

**B. A by-law cannot enlarge what the Declaration withholds.**

Defendants trace the fining power to Article VII, Section 1 of the By-Laws. The text their brief quotes is the superseded version: their own Exhibit 3 contains the First Amendment to the By-Laws, adopted October 7, 2014 and recorded at Book 6335, Page 168, which provides that

Article VII, Section 1 "shall be deleted in its entirety" and adopts revised language reaching rules that govern the maintenance obligations of members. The revision does not matter to the outcome, and Plaintiff does not rest on the difference. The amendment — in either form — may well authorize penalties for infractions of rules. What it did not do is amend the Declaration. Under Article XII, Section 2, where the two instruments conflict the Declaration controls — so a by-law cannot expand lien security or enforcement remedies beyond what the Declaration permits. The June 2025 Fine Policy, for its part, grounds its adoption in "the general powers granted to the Board by Tennessee Code Annotated § 48-53-102" and identifies no Declaration provision; the By-Law it invokes — Article VII, Section 1 — it invokes for the suspension of voting rights and amenity use, not for monetary penalties. (Ex. C.) The Declaration itself supplies neither the penalty power nor the lien.

Measured against the elements Defendants recite, each is pleaded. The enforceable instruments are the recorded Declaration and By-Laws, which Defendants themselves placed before the Court. The nonperformance is the demand for monetary penalties and administrative charges the instruments do not authorize, and the threat of a lien the instruments do not secure. The damages are pleaded: the charges entered and maintained on the account, the costs of responding to the collection demands, and the losses that followed the May 30, 2025 letter's warning. Whether the instruments bear Defendants' construction is a question the Court will decide — but it is a question of construction, not a pleading defect.

Defendants' anticipatory-repudiation and election argument answers a claim Plaintiff has not pleaded. Count III does not allege that Defendants repudiated a promise Plaintiff then elected to treat as continuing. It alleges that Defendants demanded sums the recorded instruments do not authorize, and threatened a lien the recorded instruments do not secure. That breach was

complete when the demands issued and the charges were entered and maintained; the lien warning is pleaded as the instrument of coercion and the source of foreseeability, not as a separate future breach awaiting a filing. A reversal of the fines entered in April 2026 may bear on the extent of damages. It does not un-breach the covenant, and Defendants cite no authority holding that a later retreat from an unauthorized demand extinguishes a completed breach. Nor do the pleaded losses depend on the charges remaining on the account: Count III seeks, as the direct and foreseeable result of the breach, the costs of responding to and disputing the unauthorized demands and the consequential losses arising from the May 2025 withdrawal of Plaintiff's home from the market during the enforcement campaign, including carrying costs incurred during the delay in sale. (SAC ¶ 228.)

**C. The ultra vires cases address a different question.**

Defendants' standing authorities rest on Tenn. Code Ann. § 48-53-104(a), which provides that, except as provided in subsection (b), the validity of *corporate action* may not be challenged on the ground that the corporation lacks or lacked power to act. *Kirby Parkway Professional Condominium Ass'n v. Cindy-Jarvis Ltd. L.P.*, No. W2019-02280-COA-R3-CV, 2020 Tenn. App. LEXIS 598 (Tenn. Ct. App. Dec. 30, 2020); *Germantown Manor Homeowners Ass'n v. GGAT Development Corp.*, No. W2016-01461-COA-R3-CV, 2017 Tenn. App. LEXIS 576 (Tenn. Ct. App. Aug. 24, 2017). That is not this claim. An ultra vires theory was deliberately removed from this pleading; Count III alleges breach of a recorded covenant. Two further features of those decisions bear noting: *Germantown Manor* held that the owners had standing under subsection (b) to bring a *derivative* proceeding, which they did not file, and *Kirby Parkway* reached this Court's issue on appeal from a bench trial, not from a Rule 12 dismissal.

**D. Count X is a remedy, and Plaintiff does not contend otherwise.**

Defendants are right that 28 U.S.C. § 2201 creates no independent cause of action, and Plaintiff does not argue that it does. *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007). *Davis* was dismissed for lack of subject matter jurisdiction because *neither* statute the plaintiff sued under supplied him a cause of action, leaving no independent basis for the court's jurisdiction. Here Counts I and II arise under the Fair Housing Act and Count IV under the Fair Debt Collection Practices Act. Jurisdiction exists already, and the Act is invoked as what it is — a remedy, framed in the pleading as declaratory relief tied to Counts I, II, and III, with further relief under 28 U.S.C. § 2202.

## V. COUNT VI STATES A DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY.

Plaintiff does not press the reserve and expenditure allegations as a separate theory of Association-wide injury. Tennessee has adopted the *Tooley* test, under which the direct-versus-derivative question turns "solely on who suffered the alleged harm — the corporation or the suing shareholder individually — and who would receive the benefit of the recovery or other remedy." *Keller v. Estate of McRedmond*, 495 S.W.3d 852, 855 (Tenn. 2016). Measured against that test, allegations of generalized reserve mismanagement belong to the Association.

The pleading already says so. It alleges the reserve and expenditure practices "as evidence of the Board's breaches of its duties of care and oversight — the same failures of governance that enabled the unauthorized fining and targeted enforcement directed at Plaintiff — **and not as a separate theory of Association-wide injury.**" Defendants' derivative-standing argument, and the derivative-standing threshold of Tenn. Code Ann. § 48-56-401(a) that follows from it, therefore reach a claim this pleading does not assert.

What remains is individual. Fines were assessed uniquely against Plaintiff's lot and enforcement was escalated against him alone. He pleads injury "distinct from any injury to the

Association or its membership generally," and any recovery would run to him. Under *Keller*, that is a direct claim.

As to Timmons, the pleading does not rest on any per se fiduciary status, and Plaintiff does not claim any. *Condominium Management Associates v. Fairway Village Owner's Ass'n*, No. W2009-00688-COA-R3-CV, 2010 WL 424592 (Tenn. Ct. App. Feb. 8, 2010), addressed a manager—association relationship and held that such a relationship is not fiduciary per se. The duty pleaded here is a confidential one, and it is pleaded by its elements: Timmons received and handled Plaintiff's funds; it held exclusive dominion and control over his account, its records, and his personal information; and he necessarily relied on its administration of that account. The asymmetry is the point. Unlike the Association, **an individual homeowner has no oversight capacity over the managing agent: no role in its selection or retention, no access to its books, and no ability to audit the ledger it maintains for his account.**

Defendants' immunity authorities do not support the standard they state, for two independent reasons. First, *Lawson v. Hawkins County* is a case about a county's immunity under the Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-205. It construes the word "negligent" in that statute's removal provision. It is not a case about the immunity of nonprofit corporate directors under Tenn. Code Ann. § 48-58-601, which is the statute this Count implicates. Second, and more fundamentally, the Court of Appeals opinion Defendants cite — dated July 14, 2021 — **was reversed by the Tennessee Supreme Court.** *Lawson v. Hawkins County*, 661 S.W.3d 54 (Tenn. 2023). The case was remanded, and the Court of Appeals issued a further opinion on December 5, 2023. Defendants cite the reversed opinion without its subsequent history.

Defendants have not established that the immunity they invoke reaches this Association. Tenn. Code Ann. § 48-58-601(c) applies only to organizations described in subsection (d), and the motion establishes only that the Association is a nonprofit corporation. That threshold is theirs to carry, and it is not carried on this record.

Director immunity does not resolve on the pleadings in any event. Tenn. Code Ann. § 48-58-601 shields directors absent willful, wanton, or gross negligence, and the Second Amended Complaint pleads exactly that: that each Defendant continued the fining program after written notice that the recorded covenants did not authorize it, and that Plaintiff's account records were altered after the duty to preserve them attached. Whether that showing is ultimately made is a question for summary judgment or trial — which is where Defendants' own authority decided it. *Urbanavage* reviewed a grant of summary judgment, and the sentence Defendants quote from it describes what a plaintiff must produce to defeat one. The court held that the plaintiffs' "bare assertions in the Amended Complaint" and their declarations "do not create a genuine issue of fact" as to willful, wanton or gross negligence. That is the summary-judgment standard by its own terms. On a Rule 12 motion the allegations are taken as true, and Defendants offer no authority that a director may be dismissed at the pleading stage on this ground.

The count is timely. Plaintiff pleads that he first discovered the underlying facts on obtaining the Association's year-end financial statements and Reserve Study beginning in December 2025, completing his review in February 2026, and that closed meetings, refused certified mail, and nondisclosure concealed those facts in the interim.

## VI. COUNTS VIII AND IX SHOULD NOT BE DISMISSED.

Beneath its rhetoric, Defendants' RICO section makes three arguments: that the predicates are not pleaded with Rule 9(b) particularity; that the pleaded statements were not

false; and that the predicates are a single act artificially fragmented. Each is answered by the pleading itself.

**A. The predicates are pleaded with the particularity Defendants' own standard requires.**

The standard Defendants recite requires a pleading to specify the fraudulent statements, identify the speaker, state where and when they were made, and explain why they were fraudulent. The Second Amended Complaint's predicate schedule does exactly that, act by act: each pleaded predicate identifies the transmission, its date, its sender, its content, and the facts rendering it false when made. (SAC ¶¶ 306–40.) Defendants' own brief demonstrates the notice: it identifies the predicates it attacks by exhibit, date, speaker, and content — Exhibit E's "first instance" statement among them. A movant that can quote each challenged statement and argue its truth has received the notice Rule 9(b) exists to provide.

The knowledge standard Defendants quote from *Foster v. Amarnek*, 2014 U.S. Dist. LEXIS 66997 (M.D. Tenn. May 14, 2014), asks for "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." The pleading sets them out: the scheme paragraph alleges statements "verifiable at the time made and contradicted by Defendants' own records" (SAC ¶ 306); the vehicle-status paragraph alleges circumstances "known to or readily verifiable by Timmons — including through its own inspection records" (SAC ¶ 313); and the July 28 transmissions issued after a signed provider's statement was received and acknowledged (SAC ¶ 336).

**B. The falsity arguments are a merits quarrel with allegations the Court must accept.**

Defendants' principal answer is that nothing pleaded was false: the vehicles were in violation, the "first instance" statement was accurate, and the Association had authority to fine. Each of those is a dispute with the pleading, not a defect in it. Defendants quote ¶ 313's

"temporarily relocated" and "out of town"; the paragraph continues: the vehicle had been relocated "by Plaintiff's real estate agent, while Plaintiff was out of town, in connection with an open-house showing for Plaintiff's then-active property listing," and was in active use. (SAC ¶ 313.) The "first instance" statement is alleged to be false because written disclosures preceded it — including the April 30, 2025 email Defendants' own brief reproduces: "I am currently off work with a disability." And the authority-to-fine defense is the construction question addressed in Part IV: the recorded instruments are before the Court, and at this stage they are read in the light most favorable to the pleading. Where the falsity of a pleaded statement is disputed, the dispute is for a factfinder, not a motion to dismiss.

The related timing point — that as of April 25, 2025 no accommodation request had been made — answers an allegation the predicate does not make. The camper predicate does not plead that an accommodation existed in April; it pleads that the vehicle-status assertions in the notices were false as statements of fact when transmitted.

### C. The predicates are discrete transmissions, not one act fragmented; and mail and wire fraud are indictable predicates by statute.

The schedule pleads discrete transmissions — separate mailings and wire transmissions, on separate dates from April through July 2025, by different senders, with different content: the vehicle notices, the May 19 communication, the May 30 collection letter, the account postings, and the July 28 emails. (SAC ¶¶ 306–40.) Each use of the mails or wires in furtherance of a scheme to defraud is a separate offense under 18 U.S.C. §§ 1341 and 1343, and the pleading tracks that structure. This is not one act renamed several times; it is a course of conduct carried out through successive transmissions, each separately pleaded.

The assertion that the predicates are "not one that are indictable" fails on the face of the statute: 18 U.S.C. § 1961(1)(B) lists mail fraud under § 1341 and wire fraud under § 1343 among the defined predicate offenses. The predicates pleaded are mail and wire fraud, pleaded with the particularity shown in Section A above. Whether those offenses are adequately pleaded is the Rule 9(b) question answered in Section A; the indictability element of § 1961(1) is a separate requirement, and it is satisfied by the statute's enumeration.

**D. Attribution is pleaded, and the contrary reading is a question of proof.**

Defendants observe that some transmissions issued over Timmons' or the Association's name rather than Ms. Burka's. The pleading alleges her role in terms: ¶ 331 alleges that Ms. Burka "caused Timmons Properties, Inc. to transmit" the account postings, and the May 19 communication issued over her own signature as President and Managing Partner. (SAC ¶¶ 97, 331; Ex. E.) Whether she in fact directed each transmission is a question of proof, not of pleading.

**E. The pleaded pattern is open-ended, and the out-of-district rhetoric describes a different case.**

The Second Amended Complaint pleads open-ended continuity: the challenged acts reflect Defendants' "regular way of conducting enforcement and collection activity" and present "an open-ended threat of repetition" — the framework remains in use, the same standardized procedures continue to be applied to other homeowners, and the Association continued booking fine revenue in 2026. (SAC ¶ 353.) That is the Supreme Court's formulation: continuity may rest on a showing that the predicates are "a regular way of conducting defendant's ongoing legitimate business," and although "the number of related predicates involved may be small and they may occur close together in time," the acts may carry "a specific threat of repetition extending

indefinitely into the future." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242–43 (1989); accord *Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393, 409–11 (6th Cir. 2012) (open-ended continuity adequately pleaded; Rule 12(b)(6) dismissal of §§ 1962(c) and (d) claims **reversed**).

The out-of-district decisions Defendants quote at length drew a different line for a different case. *Sylvan v. Quail Run on Sharon Homeowners Ass'n*, No. 3:25-cv-00889, slip op. (W.D.N.C. Mar. 12, 2026) (ECF No. 50), dismissed a claim that was, at most, that an association was not authorized to impose assessments; that plaintiff pleaded no predicate acts at all. *Pu v. Charles H. Greenthal Management Corp.*, 2010 U.S. Dist. LEXIS 21875 (S.D.N.Y. Mar. 9, 2010), recast a dispute over the meaning of condominium by-laws as federal fraud claims. This claim is anchored in specific statements of fact, each with a speaker, a date, and content, pleaded to Rule 9(b) in the schedule the Second Amended Complaint sets out. A dispute over an association's authority to charge is not a fraud claim; a demand for money supported by statements of fact alleged to be false when made is.

### F. Count IX is pleaded with the specificity Defendants say it lacks.

Defendants' conspiracy section argues that the count falls with the substantive claim and that the allegations are bare as to "the actual actions taken by the various Defendants." The substantive claim stands, for the reasons above. And the pleading identifies the agreement's period and object and the overt acts defendant group by defendant group; as to the director Defendants, it pleads an act specific to each — the approval or ratification of the June 2025 revision of the Fine Policy, adopted after Plaintiff's written disclosures and objections were already in the record. (SAC ¶¶ 368–75.)

## VII. THE RELIEF DEFENDANTS REQUEST IS NOT SUPPORTED.

Three points warrant brief mention. Defendants seek dismissal *with prejudice* for pleading defects without addressing Rule 15 at all. They request an award of attorneys' fees without citing any authority that would support one. And their opening enumeration of the counts to be dismissed omits Count X (Doc. 37 at 2–3) even as their memorandum briefs it, and describes Count II as Count V in their opening paragraphs.

## CONCLUSION

Defendants ask this Court to resolve contested facts in the movants' favor, on documents that do not say what they are said to say, under standards borrowed from summary judgment. Their own accommodation form instructs homeowners not to provide medical records. Their own exhibit contains the amendment that repealed the By-Law they quote. Their own Fine Policy grounds itself in a general-powers statute and identifies no Declaration provision. And their own brief recites the standard that decides this motion, nine pages before asking the Court to depart from it.

The motion should be denied. To the extent the Court finds any allegation insufficient, Plaintiff respectfully requests that dismissal be without prejudice and that he be permitted to seek leave to amend by motion under Rule 15 and Local Rule 15.01, identifying the claim, the defendant, and the additional facts proposed.

Respectfully submitted,

Kevin M. Donovan
6008 Christmas Drive
Nolensville, Tennessee 37135
(615) 428-9896

kevin.donovan@artofplanninglaw.com
Tennessee BPR No. 43740
Plaintiff, Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that on the 11 day of September, 2026, the foregoing was submitted to the Clerk of Court for filing in the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record, including the following, to whom a courtesy copy was also sent by electronic mail:

Marielle Westerman, Esq.
Westerman Law, PLLC
725 Cool Springs Blvd., Ste. 600
Franklin, Tennessee 37067
mwesterman@westerman.law
Counsel for Defendants Bent Creek Homeowners Association, Inc.,
Timmons Properties, Inc., Lynn Burka, Robert Steve Cody,
Melissa Plank, Susannah Millar, Tim Barry, David Raissi,
Jared Burke, and Jeremy Edge

Lauren Paxton Roberts, Esq.
Anna Kate Ferrell, Esq.
Stites & Harbison, PLLC
401 Commerce Street, Suite 800
Nashville, Tennessee 37219
lauren.roberts@stites.com
akferrell@stites.com
Counsel for Defendants Kaman & Cusimano, LLC,
Scott D. Weiss, Kiel Kovalcik, and Daniel J. Miske

Kevin M. Donovan
Plaintiff, Pro Se