IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

KEVIN M. DONOVAN,
Plaintiff,
v.

BENT CREEK HOMEOWNERS ASSOCIATION, INC., et al.,
Defendants.

Case No. 3:26-cv-00700
Judge Waverly D. Crenshaw, Jr.
**Magistrate Judge Lynda M. Hill**

# APPENDIX OF UNREPORTED AUTHORITIES TO PLAINTIFF'S RESPONSE IN OPPOSITION TO THE MOTION TO DISMISS OF THE BENT CREEK, TIMMONS, BURKA AND DIRECTOR DEFENDANTS (DOC. 37)

Submitted pursuant to Local Rule 7.03(b)(5) and as a courtesy to the Court

Tab A — Morris v. Environ Towers I Condominium Ass'n
No. 18-60586 (S.D. Fla. June 21, 2018)

Tab B — Owens v. Willow Bridge Property Co.
No. 3:26-cv-00630 (M.D. Tenn. May 26, 2026)

Tab C — Sylvan v. Quail Run on Sharon Homeowners Ass'n
No. 3:25-cv-00889 (W.D.N.C. Mar. 12, 2026)

## APPENDIX OF UNREPORTED AUTHORITIES (continued)

Tab D — Kirby Parkway Professional Condominium Ass'n v. Cindy-Jarvis Ltd. LP
No. W2019-02280-COA-R3-CV (Tenn. Ct. App. Dec. 30, 2020)

Tab E — Germantown Manor Homeowners Ass'n v. GGAT Development Corp.
No. W2016-01461-COA-R3-CV (Tenn. Ct. App. Aug. 24, 2017)

**Tab A**

**Morris v. Environ Towers I Condominium Ass'n**

No. 18-60586 (S.D. Fla. June 21, 2018)

Order Denying Motion to Dismiss (ECF No. 22)

Donovan v. Bent Creek Homeowners Association, Inc.,

No. 3:26-cv-00700 (M.D. Tenn.)

United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Pauline Morris, Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 18-60586-Civ-Scola |
| Environ Towers I Condominium Association, Inc., and others, Defendants. | ) | |

**Order on Motion to Dismiss**

This matter is before the Court upon the Defendants Environ Towers I Condominium Association, Inc. ("Association"), Richard Ross, and Michel Houle's (collectively, the "Defendants") motion to dismiss. (ECF No. 11.) The Court has carefully considered all supporting and opposing submissions, the record in this case, and the applicable law. For the reasons set forth below, the Court **denies** the motion to dismiss.

**1. Background**

The Plaintiff Pauline Morris attempted to buy a unit at Environ Towers, where she hoped to live with her severely autistic adult son, Dean. However, after attending a meeting with the Defendants Ross and Houle, who are officers of the Defendant Association, the Plaintiff was informed that the Association had rejected her application to purchase the unit. As a result, the Plaintiff individually, and on behalf of her son, is suing the Defendants for violating the Fair Housing Act, 42 U.S.C. section 3601 *et seq*. (*See* Compl., ECF No. 1.) The Defendants seek dismissal of the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Mot., ECF No. 11.)

**2. Legal Standard**

When considering a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all of the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). A pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-has-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). A



AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

plaintiff must articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Thus, a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not survive dismissal. *See Twombly*, 550 U.S. at 555. "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

Yet, where the allegations "possess enough heft" to suggest a plausible entitlement to relief, the case may proceed. *See Twombly*, 550 U.S. at 557. "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008) (citation omitted). "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citation omitted).

**3. Analysis**

In their motion, the Defendants argue that the complaint should be dismissed because the Plaintiff fails to allege that she made a request for reasonable accommodation, and that in any event, the allegations in the complaint are contradicted by the exhibits attached to it. In addition, the Defendants argue that the Plaintiff impermissibly lumps them together, and therefore, they are unable to determine which allegations in the complaint relate to each Defendant. The Court considers each argument in turn.

The FHA forbids discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2). "Such discrimination includes 'a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Overlook Mutual Homes, Inc. v. Spencer*, 415 F. App'x 617, 620-21 (6th Cir. 2011) (quoting 42 U.S.C. § 3604(f)(3)(B)). "To assert a failure to reasonably accommodate claim under

section 3604(f)(3), a plaintiff must plead four elements: (1) the plaintiff is a person with a disability within the meaning of the FHA or a person associated with that individual; (2) the plaintiff requested a reasonable accommodation for the disability; (3) the requested accommodation was necessary to afford the plaintiff an opportunity to use and enjoy the dwelling; and (4) the defendant refused to make the accommodation." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1225 (11th Cir. 2016).[1] In this case, the Plaintiff's claim turns on whether she requested a reasonable accommodation.

"However stated, a plaintiff can be said to have made a request for accommodation when the defendant has enough information to know of both the disability and desire for an accommodation." *Id.* at 1226 (quoting *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003)) (internal quotations omitted). The "circumstances must at least be sufficient to cause a reasonable housing provider to make appropriate inquiries about the possible need for an accommodation." *Id.* (internal alterations omitted).

The Plaintiff alleges that as part of the closing process for the unit at Environ Towers, she was required to complete an application for occupancy for herself and her son, requesting approval from the Association. (Compl., ECF No. 1 ¶¶ 16-17.) On her son's application, the Plaintiff plainly disclosed that he is disabled, specifically, that he is autistic, which is reflected in the exhibits to the complaint. (*See* ECF No. 1-7 at 1.) In addition, the Plaintiff attached a letter to her son's application, in which she further explains that her son "is nonverbal but independent in some skills," and offers to furnish additional information upon request. (ECF No. 1-7 at 2.) Over a month later, the Association advised the Plaintiff that it would conduct an interview with her and her son. (*Id.* ¶ 25.) During the interview, which was conducted by Defendants Ross and Houle, the Defendants expressed concerns about Dean's ability to abide by Association rules and regulations. (*Id.* ¶¶ 28-30.) In response, the Plaintiff assured Ross and Houle that Dean had never engaged in inappropriate conduct, and that he was always either in her care, or accompanied by a caretaker. (*Id.* ¶ 31.) Thereafter, Defendants Ross and Houle advised the Plaintiff that it was the Association's usual practice to read its rules and regulations to potential occupants to confirm their understanding

[1] In their motion, the Defendants discuss *Hunt* at length as supporting their contention that the Court should dismiss the instant complaint. Interestingly though, the Defendants rely on the court's order dismissing the *Hunt* plaintiff's initial complaint. *See Hunt v. Aimco Props., L.P.*, No. 14-80432, 2014 WL 12649013, at *4 (S.D. Fla. June 17, 2014) (Ryskamp, J.). After the plaintiff in *Hunt* amended the complaint, and the district court dismissed it again, the Eleventh Circuit reversed. *Hunt*, 814 F.3d at 1227.

and agreement to comply with the rules. (*Id.* ¶ 32.) The Plaintiff then reiterated to the Defendants that Dean was nonverbal and informed them in addition that he would not understand the rules or be able to express verbal acknowledgment, and stated that she and Dean's caretaker understood and agreed to abide by the rules and ensure that Dean would do so as well. (*Id.* ¶ 33.) Thus, the Plaintiff alleges, the reasonable accommodation she requested was that she and Dean's caretaker be permitted to confirm their understanding of the rules and take responsibility for ensuring that Dean complied. (*Id.* ¶ 50.) Despite being informed of Dean's disability and limitations, the Defendants proceeded to read the rules and regulations to Dean, who was unable as a result of his disability to confirm that he understood. (*Id.* ¶ 34.) The day after the interview, Ross sent an email to the Plaintiff, informing her that the Association had rejected her application to purchase the unit. (*Id.* ¶ 35.) Upon review, these allegations are sufficient.

The Defendants next contend that the complaint should be dismissed because the exhibits attached contradict the allegations that the Plaintiff requested a reasonable accommodation for Dean. When considering a motion to dismiss, in addition to the allegations in the complaint, the district court also considers "the facts derived from a complaint's exhibits as part of the plaintiff's basic factual averments," and where those exhibits contradict the complaint's allegations, the exhibits control. *F.T.C. v. AbbVie Prods. LLC*, 713 F.3d 54, 63 (11th Cir. 2013); *see also Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205 (11th Cir. 2007) ("when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern."). Specifically, the Defendants point to an email that the Plaintiff sent in response to their rejection of her application, in which she requested that they reconsider their decision, noting her view that they had applied an unfair standard to interview her disabled son, and reiterating that he is a calm individual with no history of violence or inappropriate behavior. (ECF No. 1-9.) The Defendants also point to Ross's response to that email, in which he states that the Plaintiff was asked if her son required an accommodation in order to participate in the interview, to which the Plaintiff responded no. (ECF No. 1-10.)

Here, the exhibits do not contradict the factual allegations in the complaint. Indeed, none of the attachments contain a reference to her request that she and Dean's caretaker be permitted to agree to the rules and ensure that Dean abide by them; and therefore, the exhibits cannot contradict that allegation. Moreover, the Defendants' denials of the Plaintiff's allegations are just that—denials—which the Defendants may properly set forth in an answer, but which are not grounds for dismissal of the complaint in this case.

Finally, the Defendants argue that the complaint should be dismissed because the Plaintiff impermissibly lumps them together without distinguishing which one of them took the relevant actions. Rule 8 only requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a), within the *Twombly-Iqbal* plausibility standard. Under this rule, when a complaint alleges that multiple defendants are liable for multiple claims, a court must determine whether the complaint gives fair notice to each defendant. Although a complaint against multiple defendants is usually read as making the same allegation against each defendant individually, *Crowe v. Coleman,* 113 F.3d 1536, 1539 (11th Cir. 1997), "at times, a plaintiff's grouping of defendants in a complaint may require a more definite statement." *George & Co. v. Alibaba.com, Inc.*, No. 2:10-cv-719-FtM-29DNF, 2011 WL 6181940, at *2 (M.D. Fla. Dec. 13, 2011) (citing *Veltmann v. Walpole Pharmacy, Inc.*, 928 F. Supp. 1161, 1164 (M.D. Fla. 1996)) (internal quotations omitted). Indeed, a complaint that "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct" fails to satisfy Rule 8. *Lane v. Capital Acquisitions & Mgmt. Co.,* No. 04-60602 CIV, 2006 WL 4590705, at *5 (S.D. Fla. Apr.14, 2006) (Marra, J.).

Without citing case law in support, the Defendants attempt to impose a heightened pleading standard for the Plaintiff's claim requiring that she must "delineate the specifics of each and every alleged conduct" that she asserts the Defendants engaged in individually. However, the complaint does not violate Rule 8, as this is not a case in which the Plaintiff fails to delineate which facts are applicable to each Defendant, nor must the Plaintiff allege anything more specific. As clearly alleged by the Plaintiff, the Defendants Ross and Houle are officers of the Defendant Association, Ross and Houle conducted the interview with the Plaintiff and her son, and the Association, through the acts of Ross and Houle, violated the FHA.

**4. Conclusion**

Accordingly, the Defendants' motion to dismiss (**ECF No. 11**) is **denied**.

**Done and ordered** at Miami, Florida, on June 21, 2018.

Robert N. Scola, Jr.
United States District Judge

**Tab B**

**Owens v. Willow Bridge Property Co.**

No. 3:26-cv-00630 (M.D. Tenn. May 26, 2026)

Memorandum Opinion and Order (ECF No. 8)

Donovan v. Bent Creek Homeowners Association, Inc.,

No. 3:26-cv-00700 (M.D. Tenn.)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **RYAN OWENS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:26-cv-00630** |
| | ) | **Judge Trauger** |
| **WILLOW BRIDGE PROPERTY COMPANY, et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ryan Owens, a resident of Madison, Tennessee, filed a pro se Complaint against Willow Bridge Property Company and Churchill Woodlands East LLC, claiming retaliation under the federal Fair Housing Act (FHA), 42 U.S.C. § 3617. (Doc. No. 1.) The plaintiff also filed an application for leave to proceed in forma pauperis (IFP) (Doc. No. 2), an Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Doc. No. 3), and an Emergency Motion for Expedited Review. (Doc. No. 4.)

### I. PAUPER APPLICATION

The plaintiff's IFP application lists reasonable monthly expenses that exceed his past level of monthly income, as well as his future expected monthly income. It states that his available resources came from his tax refund, which "is all [he] ha[s] to rent a hotel room as [he is] being evicted, thus the reason for the TRO." (Doc. No. 2 at 5.) He elsewhere states that he "has recently secured new employment and is actively attempting to stabilize housing and financial conditions." (Doc. No. 4 at 1.) It therefore appears that the plaintiff cannot at this time pay the $405 civil filing fee "without undue hardship." *Foster v. Cuyahoga Dep't of Health and Human Servs.*, 21 F. App'x

239, 240 (6th Cir. 2001). Accordingly, the IFP application (Doc. No. 2) is **GRANTED**. 28 U.S.C. § 1915(a).

## II. INITIAL REVIEW

A. <u>Legal Standard</u>

The court must conduct an initial review and dismiss the Complaint if it is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see also Ongori v. Hawkins*, No. 16-2781, 2017 WL 6759020, at *1 (6th Cir. Nov. 15, 2017) ("[N]on-prisoners proceeding in forma pauperis are still subject to the screening requirements of § 1915(e)."). To avoid dismissal for failure to state a claim, the Complaint must contain sufficient factual allegations to render a right to relief "plausible on its face," *Small v. Brock*, 963 F.3d 539, 540 (6th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), such that it would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010). At this stage, "the Court assumes the truth of 'well-pleaded factual allegations' and 'reasonable inference[s]' therefrom," *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 S. Ct. 1316, 2024 WL 2751216, at *3 (2024) (quoting *Iqbal*, 556 U.S. at 678–79), but is "not required to accept legal conclusions or unwarranted factual inferences as true." *Inner City Contracting, LLC v. Charter Twp. of Northville, Michigan*, 87 F.4th 743, 749 (6th Cir. 2023) (citation omitted). The court must also afford the pro se pleading a liberal construction, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), while viewing it in the light most favorable to the plaintiff. *Inner City*, *supra*.

B. <u>Allegations and Claims of the Complaint</u>

The Complaint invokes the court's federal-question jurisdiction and asserts a single claim: "retaliation/interference" under the FHA, 42 U.S.C. § 3617. (Doc. No. 1 at 1–2, 4.) It claims that

Willow Bridge Property Company (the property manager at the plaintiff's apartment complex) and Churchill Woodlands East LLC (the owner of the property) retaliated against the plaintiff for exercising his right under the FHA to lodge complaints related to safety, accessibility, and other housing concerns in the wake of the ice storm that gripped the Nashville area in January 2026. (*Id.* at 1–3.) The storm produced a prolonged and widespread power outage, during which the plaintiff's unit and "multiple [other] portions of the building" lost "power, heat, lighting, elevator access, and reliable emergency functionality." (*Id.* at 2, 3.) "The outage conditions materially interfered with Plaintiff's ability to safely use and occupy the dwelling," and he "was repeatedly required to leave the property during freezing conditions in order to obtain basic necessities, maintain communication capability, charge devices, and access safe conditions." (*Id.* at 2.)

The plaintiff observed that other "residential and commercial properties in the surrounding area appeared operational during portions of the outage period while [his] property continued experiencing disruption of essential services." (*Id.* at 3.) He informed the defendants of his dissatisfaction with the living conditions on the property "through written communications and formal complaints." (*Id.*) These "communications raised concerns relating to safe occupancy, accessibility-related limitations caused by prolonged elevator interruption within a multi-story building, emergency conditions, and interference with ordinary residential use of the property" (*id.*), as well as "loss of essential services." (*Id.* at 4.) Shortly after the plaintiff's complaints were lodged, "restoration activity occurred at the property," contributing to his "concern that the outage conditions may have involved building-level response or management issues rather than solely unavoidable regional conditions." (*Id.* at 3.)

Rather than respond to the plaintiff's complaints, the defendants allegedly moved to evict him using "legal enforcement and possession proceedings through counsel," which were initiated


Case 3:26-cv-00700 Document 43-1 Filed 05/21/26 Page 12 of 47 PageID #: 1774

"within close temporal proximity" to his complaints. (*Id.*) The plaintiff asserts that his complaints were protected activity; that the defendants were aware of them; and that the defendants' subsequent eviction action in close proximity to the plaintiff's complaints "supports an inference of retaliatory intent and interference with Plaintiff's housing rights." (*Id.* at 4.) He seeks an award of damages and "injunctive and equitable relief as appropriate." (*Id.* at 5.)

C. <u>Analysis</u>

The FHA is an anti-discrimination statute. *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 530, 545 (2015) (considering FHA in light of "two other antidiscrimination statutes that preceded it"). Under the FHA's anti-retaliation provision, 42 U.S.C. § 3617, it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. The plaintiff does not allege that he took any action to aid or encourage another person's exercise of housing rights, so to plausibly claim retaliation under Section 3617, he must first establish that he himself "exercised or enjoyed a right guaranteed by §§ 3603–06." *Lawrence Cnty. Recovery, LLC v. Vill. of Coal Grove, OH*, 784 F. Supp. 3d 1050, 1070 (S.D. Ohio 2025) (quoting *Hood v. Midwest Sav. Bank*, 95 F. App'x 768, 779 (6th Cir. 2004)); *see Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632, 639 (6th Cir. 2017) ("Section 3617 requires a nexus with the rights protected by §§ 3603–06, without requiring an actual violation of the underlying provisions."). As pertinent here, sections 3603–3606 confer rights to be free from discrimination in regard to the terms, conditions, or privileges of housing (including housing transactions and the provision of brokerage services), "because of race, color, religion, sex, [handicap,] familial status, or national origin." 42

U.S.C. §§ 3603(a), 3604(b), (f)(2), 3605(a), 3606. Thus, "[t]he plaintiff must show a discriminatory animus for section 3617 claims." *Jones v. Pontiac Housing Comm'n*, No. 2:25-CV-10681, 2025 WL 4720311, at *5 (E.D. Mich. Nov. 6, 2025) (citing *Linkletter*, 851 F.3d at 639, and *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012)).

"Discriminatory animus requires plaintiffs to put forth some evidence of discriminatory effect or intent on the defendant's part." *Linkletter*, 851 F.3d at 639 (quoting *Campbell v. Robb*, 162 F. App'x 460, 474 (6th Cir. 2006)) (cleaned up). Here, the Complaint does not charge the defendants with discriminatory intent or motive, but merely charges them with failing to "meaningfully engage" with the plaintiff's housing complaints and opting instead to seek his eviction. (Doc. No. 1 at 1.) The district court in *Jones v. Pontiac Housing Comm'n* addressed a similar complaint, as follows:

> Here, Jones claims that Defendants retaliated against her because she complained about her housing conditions. But this is not exercising a right protected by the Fair Housing Act. *See* 42 U.S.C. § 3604. Instead, the Fair Housing Act protects the right to be free of discrimination in housing-related situations. *See id.* And because Jones fails to allege that the lack of repairs was motivated by a discriminatory animus, such complaints were not an exercise of a right under the Fair Housing Act so as to qualify as a protected activity under the Act's anti-retaliation provision. *See Agbuke* [*v. Redford Villa Condo Ass'n*, 2009 WL 3271209 at *1, *3 [(E.D. Mich. Oct. 13, 2009)] (finding that making complaints cannot sustain a § 3617 claim in the absence of any showing of discriminatory animus); *see also Hood*, 95 F. App'x at 779 (requiring firstly that a plaintiff show that she "exercised or enjoyed a right guaranteed by §§ 3603–06"); *Linkletter*, 851 F.3d at 639. Therefore, Jones's retaliation claims will be dismissed.

*Jones*, No. 2:25-CV-10681, 2025 WL 4720311, at *5 (E.D. Mich. Nov. 6, 2025).

Likewise, the plaintiff in the case before this court fails to allege that discriminatory animus motivated either the defendants' initial failure to take action to restore power (and the "essential services" that require power) in the apartment building, or their initiation of eviction proceedings against him. Section 3617's implementing regulations make clear that the section prohibits acts

directed at individuals "because of" their membership in a protected class. 24 C.F.R. § 100.400(c)(2) (listing prohibited conduct to include "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons"). The plaintiff has not alleged that he is a member of a protected class who was exercising or enjoying any right to be free from discrimination in housing which the defendants interfered with, nor did his complaints about what he perceived to be a comparatively slow-footed response to the outage conditions constitute protected discrimination complaints under the FHA. Even assuming that the defendants' institution of eviction proceedings against the plaintiff was related to his complaints of their mismanagement of the outage situation, the allegations of the Complaint do not establish that he "exercised or enjoyed a right guaranteed by §§ 3603–06," *Lawrence Cnty. Recovery*, 784 F. Supp. 3d at 1070, nor do they support any reasonable inference of a discriminatory motive on the defendants' part. *Cf. Pedro v. Hilton Worldwide, Inc.*, No. 24-CV-5725, 2025 WL 220023, at *7 (E.D. Pa. Jan. 16, 2025) ("Although the Complaint baldly describes the Defendants' [filing of an ejectment action] as discriminatory and retaliatory, no facts support those accusations. Accordingly, Pedro and Fisher have not stated a discrimination or retaliation claim under the FHA … based on their ejectment[.]"). Accordingly, the Complaint fails to state a plausible claim under Section 3617 and must be dismissed.

## III. CONCLUSION

For the above reasons, this case is **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), for failure to state a claim upon which relief may be granted. In light of the dismissal, the plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Doc. No. 3) and Emergency Motion for Expedited Review (Doc. No. 4) are **DENIED** as moot.

The court **CERTIFIES** that any appeal from this dismissal would not be taken in good faith. 28 U.S.C. § 1915(a)(3).

This is the final order in this action. The Clerk **SHALL** enter judgment. Fed. R. Civ. P. 58(b)(1).

It is so **ORDERED**.

ALETA A. TRAUGER
United States District Judge

**Tab C**

**Sylvan v. Quail Run on Sharon Homeowners Ass'n**

No. 3:25-cv-00889 (W.D.N.C. Mar. 12, 2026)

Order (ECF No. 50)

Donovan v. Bent Creek Homeowners Association, Inc.,

No. 3:26-cv-00700 (M.D. Tenn.)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CIVIL ACTION NO. 3:25-CV-00889-KDB-DCK**

| | |
|---|---|
| **SYLVESTER M. SYLVAN JR.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**QUAIL RUN ON SHARON HOMEOWNERS ASSOCIATION, INC.; CEDAR MANAGEMENT GROUP, LLC; THOMAS J. THURMAN; JIXIAN MU; THURMAN, WILSON, BOUTWELL & GALVIN, P.A.; AND ROLANDO VELASQUEZ,**<br><br>**Defendants.** | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on Defendants Thomas Thurman and Thurman, Wilson, Boutwell & Galvin, P.A.'s (together, "Thurman") Motion to Dismiss (Doc. No. 34) and the Court's own motion with respect to the federal law claims against the other Defendants.[1] The Court has carefully considered this motion, the parties' briefs and exhibits and the entire record in this action. For the reasons discussed below, the Court will **GRANT** Thurman's motion and dismiss the federal claims in this action against all Defendants. The Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims, which will be dismissed without

[1] In the Amended Answer, the remaining Defendants asserted as a defense that Plaintiff's claims fail to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6); however, they made that motion under Local Rule 7.1(c)(1), which preserves rather than presents the issue to the Court for immediate review (but doesn't preclude the Court from considering the substance of the motion, if otherwise appropriate). *See* Doc. No. 40 at 1.

prejudice so that this intensely local HOA dispute can be resolved in the state courts of North Carolina, if Plaintiff chooses to pursue it further.

## I. LEGAL STANDARD

Although Plaintiff is not proceeding *in forma pauperis*, every filing in this Court is subject to review pursuant to the inherent authority of this Court to confirm that this Court has subject matter jurisdiction, the plaintiff has standing and the case is not frivolous. *See* Fed.R.Civ.P. 12(h)(3); *Aalaam v. Graham*, No. 5:24-CV-00226-KDB-SCR, 2024 WL 4536478, at *1 (W.D.N.C. Oct. 21, 2024); *Ferguson v. Wooton*, 741 F. App'x 955 (4th Cir. 2018) (collecting cases and explaining that "[f]rivolous complaints are subject to dismissal pursuant to the district court's inherent authority, even when the plaintiff has paid the filing fee"). Pursuant to Federal Rule of Civil Procedure Rule 12(h)(3), the Court may *sua sponte* consider the issue of subject matter jurisdiction at any time. Where the Court determines "that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also Foy v. State Farm Mut. Ins. Co.*, No. 320CV00261KDBDCK, 2022 WL 135917, at *1 (W.D.N.C. Jan. 14, 2022); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) ("[t]he objection that a federal court lacks subject-matter jurisdiction [ ] may be raised by a party, or by a court on its own initiative, at any stage in the litigation"). Federal Courts' subject matter jurisdiction is "limited and [a court] may exercise only that jurisdiction which Congress has prescribed." *Chris v. Tenet*, 221 F.3d 648, 655 (4th Cir. 2000) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

Thurman moves to dismiss Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted" tests whether the complaint is legally and factually sufficient. *See* Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007); *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom*. *Coleman v. Court of Appeals of Maryland*, 566 U.S. 30 (2012). In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, ... bare assertions devoid of further factual enhancement[,] ... unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc*., 591 F.3d 250, 255 (4th Cir. 2009). Construing the facts in this manner, a complaint must only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. (internal quotations omitted). In sum, a motion to dismiss under Rule 12(b)(6) determines only whether a claim is stated; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

When deciding a motion to dismiss, "a court considers the pleadings and any materials 'attached or incorporated into the complaint.'" *Fitzgerald Fruit Farms LLC v. Aseptia, Inc.*, 527 F. Supp. 3d 790, 796 (E.D.N.C. 2019) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Further, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted). Further, this Court is required to liberally construe pro se complaints, which are held to a less stringent standard than those drafted by attorneys. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016). Nonetheless, the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleading to allege facts which set forth a claim cognizable in a federal district court. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684

(2009) (outlining pleading requirements under Rule 8 of the Federal Rules of Civil Procedure for "all civil actions").

## II. FACTS AND PROCEDURAL HISTORY

Plaintiff Sylvester Sylvan lives in the Quail Run on Sharon neighborhood in Mecklenburg County, North Carolina. (Doc. No. 1 ⁋ 7). He alleges that, beginning in December 2022, "special assessments," increased dues and an "emergency assessment" were improperly imposed and other homeowners by the Defendant Quail Run on Sharon Homeowner's Association, Inc. (the "HOA"). (*Id*. at ⁋⁋ 15-20). Also, he complains that the HOA refused to fully comply with his records requests for HOA minutes, accounting data and other documents. (*Id*. at ⁋⁋ 18, 23-25).

Plaintiff filed this action in November 2025, against the HOA; Jixian "Joyce" Mu ("Mu"), a volunteer director of the HOA; Cedar Management Group, LLC, ("Cedar"), the Association's property management company; Rolando Velasquez, the Association's property manager ("Velasquez"); the HOA's attorney, Thomas Thurman; and Thurman's law firm. (*Id*. at ⁋⁋ 8-13). He asserts four federal and one state causes of action, including an alleged violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(c)), an alleged RICO conspiracy (18 U.S.C. § 1962(d)), violation of 42 U.S.C. § 1983 and Misprision of Felony (18 U.S.C. § 4) and a claim for Unfair and Deceptive Trade Practices pursuant to N.C.G.S. § 75-1.1. (*Id*. at ⁋⁋ 34-60). Thurman has moved to dismiss all of Plaintiff's claims. (Doc. No. 34). The remaining Defendants have filed an Amended Answer to the Complaint, denying Plaintiff's claims of wrongdoing as failing to state a valid claim. (*See* Doc. No. 40).

## III. DISCUSSION

Most simply put, whatever the merits of Plaintiff's complaints against his HOA, this action does not belong in federal court. The HOA, its volunteer leader, management company and

attorney are not a "RICO enterprise," nor has Plaintiff sufficiently alleged unlawful racketeering. Rather, at most, he has alleged that the HOA was not authorized to impose the assessments and dues increase he challenges and should have provided more documents to him under North Carolina law. Also, neither of the other federal statutes he claims have been violated are applicable to his claims. None of the Defendants are state actors, so 42 U.S.C. § 1983 does not apply, and there is no private right to assert a violation of the Misprision of Felony statute in a civil action. Accordingly, all of Plaintiff's federal claims must be dismissed as to all the Defendants. Further, with all the federal claims dismissed, the basis of the Court's "federal question" subject matter is removed, and the Court will decline supplemental jurisdiction over the remaining state law cause of action.

A. **RICO**

In Counts I and II, Plaintiff alleges Defendants committed various violations of the federal RICO statute, 18 U.S.C. §§ 1962(c) and 1962(d). Doc. No. 1 ¶¶ 34-44. RICO imposes civil liability on "any person" "employed by or associated with [a RICO] enterprise" who "conducts or participates in the conduct of its affairs 'through a pattern of racketeering activity.'" *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232-33 (1989). Congress enacted the Organized Crime Control Act of 1970 to "seek eradication of organized crime in the United States." Pub. L. No. 91-452, § 1. The RICO law authorizes both civil and criminal enforcement of alleged violations. 18 U.S.C. §§ 1963, 1964.

Although federal courts "read the terms of the statute 'liberally' in order to 'effectuate its remedial purposes.'" *US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (quoting *Boyle v. United States*, 556 U.S. 938, 944 (2009)), the Court, "must also exercise caution to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial

transactions" and to prevent "treble damage suits [from being] brought against isolated offenders for their harassment and settlement value[.]" *Id.* (internal quotation marks and citations omitted).

Again, to recover civil damages under RICO, a plaintiff must establish: "(1) conduct [causing injury to business or property]; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." *Brown v. Registrar of Deeds for Cleveland Cnty.*, No. 1:24-CV-00283-MR-WCM, 2024 WL 4896698, at *4 (W.D.N.C. Nov. 26, 2024), *aff'd*, No. 25-1267, 2025 WL 2506094 (4th Cir. Sept. 2, 2025) (quoting *Whitney, Bradley & Brown, Inc. v. Kammermann*, 436 F. App'x 257, 258 (4th Cir. 2011)) (citation omitted). The "enterprise" element requires allegations of two distinct entities: a "person" and "an enterprise" through which the person acts. *Id.* (quoting *Gilchrist v. Cook*, No. 7:07-0508-HFF-WMC, 2007 WL 950386, at *3 (D.S.C. Mar. 26, 2007)). A "pattern of racketeering activity" requires at least two predicate acts; *see* 18 U.S.C. § 1961(5), and "racketeering activity" includes enumerated federal crimes such as murder, kidnapping, robbery, bribery, extortion, and drug trafficking. *See* § 1961(1).

To state a civil RICO claim, a plaintiff must also allege continuity sufficient to distinguish racketeering activity from "garden variety commercial disputes." *Brown*, 2024 WL 4896698, at *4 (quoting *Cook*, 2007 WL 950386, at *3) (citation omitted). Even construing Plaintiff's pro se Complaint liberally, he has failed to allege facts, as distinguished from conclusory legal labels, that plausibly the existence of separate "persons" and a distinct enterprise, the requisite continuity, or any predicate acts that would establish a pattern of racketeering activity. "Mere conclusory language that Defendants" and supposed enterprise participants "operated as a RICO enterprise fails to satisfy the requirements of Rule 12(b)(6)." *Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1005–08 (E.D. Va. 2021); *see also Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d 462, 473 (D. Md. 2012) (observing that naked assertions devoid of further factual enhancement need not be

credited when evaluating the sufficiency of enterprise allegations on a motion to dismiss). Indeed, Plaintiff's allegations fall far short of the statutory requirements; if they did not, then every HOA and its volunteer members and agents would become potentially subject to civil RICO liability for each homeowner complaint about an assessment or dues increase. Accordingly, the RICO claim will be dismissed.

B. **42 U.S.C. § 1983**

Count III of Plaintiff's Complaint alleges that Defendants' conduct violated 42 U.S.C. § 1983 ("Section 1983"). To state a constitutional claim pursuant to Section 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Here, Plaintiff fails to allege any facts to indicate that the supposed constitutional violation was committed by a person acting under color of state law.

"[T]o be sued under § 1983, a defendant must either be a state actor or have a sufficiently close relationship with state actors such that a court would conclude that [it] engaged in the state's actions." *Cox v. Duke Energy, Inc.*, 876 F.3d 625, 632 (4th Cir. 2017) (internal citation omitted). Plaintiff has alleged no facts to indicate that Defendants, which are all private individuals or entities, are state actors or engaged in state action. Private parties and entities are not state actors and are not amenable to suit under § 1983, and Plaintiff has cited no authority that an HOA's exercise of its typical fine or lien authority constitutes state action. *See Lugar v Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982); *Levine v. Stein*, 560 F.2d 1175 (4th Cir. 1977) (holding that statutory foreclosure sales did not create sufficient "state action" to buttress a 14th amendment claim). Thus, Plaintiff's claims under § 1983 will also be dismissed.

C. **Misprision of Felony**

Plaintiff's final federal cause of action alleges that Defendants violated the Misprision of Felony statute, 18 U.S.C. § 4, which makes it unlawful to know about the commission of a felony and fail to report it. However, as Plaintiff acknowledges in his response, "misprision of felony cannot stand as an independent civil cause of action." Doc. No. 37 at 6. Therefore, Plaintiff's misprision of felony claim will be dismissed.

D. **State Law Claims**

In addition to his federal claims, Plaintiff asserts state law claims under North Carolina's Unfair and Deceptive Trade Practices Act. The Court need not address the merits of these claims. In the absence of a viable federal claim, the federal question jurisdiction under which this action was filed is lacking and the court may decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012); *Mann v. Power Home Solar, LLC*, No. 521CV00166KDBDSC, 2022 WL 602196, at *2 (W.D.N.C. Feb. 28, 2022). In the exercise of its discretion, the Court will decline any further consideration of Plaintiff's state law claims, leaving the merits of those claims to potentially be determined in state court. Accordingly, this matter will be dismissed as to all of Plaintiff's federal claims against all Defendants and dismissed without prejudice as to Plaintiff's state law claims.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendants Thomas Thurman and Thurman, Wilson, Boutwell & Galvin, P.A.'s Motion to Dismiss (Doc. No. 34) is **GRANTED** as to each of Plaintiff's federal causes of action;

2. Plaintiff's federal causes of action are **DISMISSED** as to the remaining Defendants;

3. Plaintiff's state law cause of action is **DISMISSED** without prejudice against all Defendants; and

4. The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: March 12, 2026

Kenneth D. Bell
United States District Judge

**Tab D**

**Kirby Parkway Professional Condominium Ass'n v. Cindy-Jarvis Ltd. LP**

No. W2019-02280-COA-R3-CV (Tenn. Ct. App. Dec. 30, 2020)

Opinion of the Court of Appeals of Tennessee at Jackson

Donovan v. Bent Creek Homeowners Association, Inc.,

No. 3:26-cv-00700 (M.D. Tenn.)

FILED
12/30/2020
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 18, 2020 Session

# KIRBY PARKWAY PROFESSIONAL CONDOMINIUM ASSOCIATION INC. v. CINDY-JARVIS LIMITED LP ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT-002434-18 Valerie L. Smith, Judge**

---

**No. W2019-02280-COA-R3-CV**

---

This is an appeal from a case between a nonprofit development management association and a condominium unit owner regarding the unit owner's failure to pay monthly fees as well as a special assessment approved by the Board of the association. The trial court held in favor of the association, finding that it was well within its authority to assess both the monthly fees as well as the special assessment against the unit owner. The unit owner now appeals. For the reasons contained herein, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which KENNY ARMSTRONG and CARMA DENNIS MCGEE, JJ., joined.

Jerome C. Payne, Memphis, Tennessee, for the appellants, Cindy-Jarvis Limited, L.P., and Barbara A. Duncan-Cody.

Homer L. Cody, Millington, Tennessee, Pro se.

Brandon F. McNary and Peter D. Baskind, Memphis, Tennessee, for the appellee, Kirby Parkway Professional Condominium Association, Inc.

## OPINION

### BACKGROUND AND PROCEDURAL HISTORY

Kirby Parkway Professional Condominium Association, Inc. ("the Appellee") is a nonprofit development management association. Cindy-Jarvis Limited, L.P. is a limited partnership in which Homer L. Cody and Barbara A. Duncan-Cody are the general partners

Case 3:26-cv-00700 Document 43-1 Filed 09/11/26 Page 28 of 47 PageID #: 1790

(collectively "the Appellants").[1] Cindy-Jarvis Limited, L.P. is the owner of a unit in a professional condominium development located in Memphis, Tennessee. Pursuant to the Master Deed of Kirby Parkway Professional Condominiums ("Master Deed"), the Appellee, through its Board of Managers ("Board"), is charged with administering the general affairs of the development, as well as maintaining its common elements. The Master Deed also enables the Board to assess the unit owners fees relating to the costs of maintenance and administration of the development.

On March 4, 2010, the Board held a meeting at which it passed a special assessment in the amount of $385,000.00 that was to become due from the unit owners on April 1, 2010. This special assessment was designed to fund roof and HVAC replacements on both buildings in the development. Each unit owner was charged for their share of the special assessment based on their ownership interest. In addition to approving the special assessment at the March 4 meeting, the Board also approved a 20% increase in monthly fees, which was to become effective on April 1, 2010. Unit owners were informed of the special assessment and increase in monthly fees by a letter dated March 19, 2010. Several years later, on May 29, 2018, the Appellee initiated a collection action against the Appellants, alleging that they were in arrears for both the special assessment and their monthly fees.

It is undisputed that the funds due for both the special assessment and the monthly fees remained unpaid by the Appellants despite repeated requests for payment by the Appellee over this eight (8) year period. At trial, the Appellants argued that the assessments may have resulted in excess revenues which were owed to tenants. They further argued that the special assessment was intended to "be financed by an increase in the [monthly] assessment for a five-year period."

The trial court ruled in favor of the Appellee, finding that the Appellants had failed to pay $19,277.52 in past due monthly assessments as well as $18,095.00 for the unpaid special assessment. The trial court also concluded that the Appellee had authority to assess both the increase in the monthly fees and the special assessment and that the Appellants were in breach of the Master Deed by failing to pay. Finally, the trial court concluded that the Board had the authority to designate the excess funds received from the assessments as reserves. A judgment against the Appellants was entered in the total amount of $49,829.52, which included an award of attorneys' fees. The Appellants now appeal the trial court's judgment.

## ISSUES PRESENTED

The Appellants raise four issues for our review on appeal:

[1] In the underlying case, the Appellee brought suit against Cindy-Jarvis Limited, L.P. as well as Barbara A. Duncan-Cody and Homer L. Cody.

1. Whether the Appellee's special assessment was actually a special assessment as defined by the Master Deed and its restated bylaws.
2. Whether the Appellants are entitled to setoffs of excess profits and reserves.
3. Whether Tennessee Code Annotated section 28-3-109(a) bars the trial court's subject matter jurisdiction over this matter.
4. Whether the trial court abused its discretion.

The Appellee presents two additional issues for our review:

1. Whether the Appellants' failure to comply with certain Tennessee Rules of Appellate Procedure precludes their brief from consideration by this Court.
2. Whether the Appellants' defense at the trial court was improper as it should have been brought in the form of a derivative complaint.

## DISCUSSION

At the outset, we address the Appellee's assertion that the Appellants' brief fails to comply with the Tennessee Rules of Appellate Procedure and that this failure precludes the brief from consideration by this Court. The Appellee contends that the Appellants' Statement of the Case is deficient under Rule 27(a)(5) of the Tennessee Rules of Appellate Procedure as it "is quite short, but makes sweeping, unsubstantiated statements and claims." Rule 27(a)(5) of the Tennessee Rules of Appellate Procedure provides that a party's statement of the case must "indicate briefly the nature of the case, the course of proceedings, and its disposition in the court below." *Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000); *see also* Tenn. R. App. P. 27(a)(5). The Appellee also notes that nowhere in the brief, including in the Statement of the Case, is there any citation to the appellate technical record. Finally, the Appellee argues that the Appellants' Statement of Facts is "equally deficient" as it again fails to cite to the record, in noncompliance with Rule 27(a)(6) of the Tennessee Rules of Appellate Procedure, which requires that a party's statement of facts must "[set] forth facts relevant to the issues presented for review with appropriate references to the record." Tenn. R. App. P. 27(a)(6).

Generally, "[o]ur Courts have 'routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief . . . constitutes a waiver of the issue[s] [raised].'" *Chiozza v. Chiozza*, 315 S.W.3d 482, 489 (Tenn. Ct. App. 2009) (quoting *Bean*, 40 S.W.3d at 55). However, there are times when this Court, "using its discretion afforded it under [Rule 2 of the Tennessee Rules of Appellate Procedure] may waive the briefing requirements to adjudicate the issues on their merits."[2] *Id.* Although in the present case we agree that there are deficiencies in the

[2] Rule 2 of the Tennessee Rules of Appellate Procedure provides that:

For good cause, including the interest of expediting decision upon any matter, the Supreme Court,

Appellants' brief, we have concluded that our review of the matter has not been hindered by them. Accordingly, we will proceed to address the Appellants' issues on appeal in spite of the deficiencies in the Appellants' brief.

The Appellants raise four issues for our review. We briefly turn first to the third issue, which asks us to find a lack of subject matter jurisdiction on the part of the trial court based on Tennessee Code Annotated section 28-3-109(a).[3] However, contrary to the Appellants' framing of this issue, this particular statute pertains not to a trial court's subject matter jurisdiction but rather to the statute of limitations on certain claims. As the Tennessee Supreme Court has previously noted,

> [t]rue statutes of limitations do not constitute grants of subject matter jurisdiction but rather restrict the powers of a court to act on a claim over which it has subject matter jurisdiction. *See Pugh v Brook (In re Pugh)*, 158 F.3d 530, 533-34 (11th Cir. 1998). A statute of limitations defense challenges the sufficiency of a particular claim, not the subject matter jurisdiction of the court in which the claim is filed. *See Grass Valley Terrace v. United States*, 69 Fed. CL. at 347. **Thus, unlike challenges to subject matter jurisdiction which cannot be waived, defenses based on the statute of limitations are affirmative defenses that can be waived unless they are specifically pleaded.** *George v. Building Materials Corp. of Am.*, 44 S.W.3d 481, 486 (Tenn. 2001); *see also United States v. Crossley*, 224 F.3d 847, 858 (6th Cir. 2000); *McLendon v. South Carolina Dep't of Highways & Pub. Transp.*, 313 S.C. 525, 443 S.E.2d 539, 540 (1994).

*Estate of Brown*, 402 S.W.3d 193, 198-99 (Tenn. 2013) (emphasis added). As such, any defense asserting the statute of limitations may be waived if not properly pleaded. Consequently, in the present case, we find the statute of limitations defense waived as the Appellants raised this defense for the first time on appeal rather than before the trial court.

---

Court of Appeals, or Court of Criminal Appeals may suspend the requirements or provisions of any of these rules in a particular cause on motion of a party or on its motion and may order proceedings in accordance with its discretion[.]

Tenn. R. App. 2.

[3] Tennessee Code Annotated section 28-3-109(a) provides:

> The following actions shall be commenced within six (6) years after the cause of action accrued: (1) Actions for the use and occupation of land and for rent; (2) Actions against the sureties of guardians, executors and administrators, sheriffs, clerks, and other public officers, for nonfeasance, misfeasance, and malfeasance in office; and (3) Actions on contracts not otherwise expressly provided for.

Tenn. Code Ann. § 28-3-109(a).

We perceive the remaining issues and arguments offered by the Appellants to be a challenge to the Board's authority by arguing that it was not authorized to order a special assessment or to act in retaining the funds. Additionally, the Appellants contend that the trial court abused its discretion in granting the Appellee a judgment against them. For their part, the Appellee argues that the Appellants are not permitted to even bring such arguments against it in their individual capacity. Specifically, the Appellee asserts that the Appellants are effectively challenging the Board's authority to act as it did in retaining what the Appellants refer to as "excess revenue" obtained from the special assessment and the monthly fees. We agree with the Appellee's analysis of the nature of the Appellants' challenge. The Appellants argue that the Board was required to pay back the special assessment funds to tenants over a period of time from what they referred to as "excess revenue." For the reasons stated below, we conclude that the defense asserted by the Appellants may only have been raised in the form of a derivative complaint for the benefit of the association, not for their individual benefit and, as a result, we find no occasion to disturb the trial court's judgment. Furthermore, to the extent that the Appellants assert that the trial court abused its discretion, we agree with the Appellee that the Appellants' argument on this point is simply a restatement of the Appellants' previous arguments which were ill-founded. As such, we conclude that the Appellants' claims in this regard are also without merit.

The Tennessee Nonprofit Corporation Act ("the Act") provides certain requirements that must be met before a party may challenge the authority of a nonprofit association to act through its board of directors. Tennessee Code Annotated section 48-53-104(b) provides that: "A corporation's power to act may be challenged in a proceeding against the corporation to enjoin an act where a third party has not acquired rights. The proceedings may be brought by . . . a member or members in a derivative proceeding." Furthermore, expanding on the derivative proceeding requirement, Tennessee Code Annotated section 48-56-401(a) provides, "[a] proceeding may be brought in the right of a domestic or foreign corporation to procure a judgment in its favor by: (1) Any member or members having five percent (5%) or more of the voting power or by fifty (50) members, whichever is less[.]" Therefore, in order for a party challenging the authority of a board of directors to act on behalf of a nonprofit association to have standing to assert such challenge, they must satisfy both section 48-53-104(b) and section 48-56-401(a)'s requirements.

This Court previously addressed the applicability of these requirements in *Germantown Manor Homeowners Ass'n, Inc. v. GGAT Development Corp.*, No. W2016-01461-COA-R3-CV, 2017 WL 3668926 (Tenn. Ct. App. Aug. 24, 2017). In that case, a homeowner's association filed suit against owners of lots in a development in order to collect association fees. The lot owners challenged the authority of the homeowner's association's board to assess these fees, arguing that, as majority owners of the lots, "their votes were usurped when the board was empaneled and voted to assess fees without first giving notice of those actions such that [the lot owners] could attend the meetings and vote." *Id.* at *5. The homeowner's association, as a nonprofit corporation, was subject to



Case 3:26-cv-00700 Document 43-1 Filed 09/11/26 Page 32 of 47 PageID #: 1794

the Act and therefore, this Court determined that the authority of its board could only be challenged through a derivative proceeding brought in the right of the corporation to procure a judgment in its favor as set forth in Tennessee Code Annotated section 48-53-104(b) and Tennessee Code Annotated section 48-56-401(a)(1). *Id.* This Court ultimately found that, as members of the homeowner's association with at least 5% or more of the voting power, the lot owners "had standing to bring a derivative proceeding to contest the authority of the board of directors." *Id.* at *5-6. However, the Court noted that the lot owners had not brought their challenge as a derivative proceeding. Thus, this Court held that, even though they had standing, the lot owners had not properly challenged the association's authority to collect assessments. *Germantown Manor Homeowner's Ass'n*, 2017 WL 3668926, at *7.

As we alluded to previously, a derivative proceeding is one that is "brought on behalf of the corporation to redress injury sustained by, or to enforce a duty owed to, the corporation." *Id.* at *6 (citing *Keller v. Estate of McRedmond*, 495 S.W.3d 852, 867-68 (Tenn. Ct. App. 2016)). Here, the Appellants did not initiate suit against the Appellee and challenge the Appellee's Board's authority to retain the excess funds. However, as noted, the Appellants did assert a defense that amounted to a challenge of the Board's authority to retain this "excess revenue" rather than credit the Appellants. Therefore, although it did not initiate the underlying cause of action against the Appellee, it nonetheless challenged its authority to act in its argument at the trial court level. As such, in order for the Appellants to proceed against the Board, it must do so in the form of a derivative proceeding.

Moreover, not only did the Appellants fail to initiate their challenges to the Board's authority in the form of derivative proceeding but, as the Appellee correctly points out, the Appellants do not even have standing to bring such a proceeding. Pursuant to Tennessee Code Annotated section 48-56-401(a), a derivative proceeding may only be brought by "[a]ny member or members having five percent (5%) or more of the voting power or by fifty (50) members, whichever is less." Therefore, in order for the Appellants to have legal standing to bring a derivative proceeding to challenge the Appellee's authority, they must hold 5% or more of the voting power. Here, the evidence in the record on appeal clearly reflects that the Appellants ownership interest only comprises 4.7% of the total voting power within the association. Therefore, even if the Appellants had properly challenged the Appellee's authority by filing a derivative proceeding, it would still fail since the Appellants do not have the requisite statutory standing to bring such a proceeding.

Based on our review of the record and the applicable law, we conclude that, any counterarguments set forth against the Appellee by the Appellants have not been properly asserted in their current form.



Case 3:26-cv-00700 Document 43-1 Filed 09/11/26 Page 33 of 47 PageID #: 1795

## CONCLUSION

For the reasons stated herein, the trial court's judgment is affirmed in its entirety.

s/ Arnold Goldin
ARNOLD GOLDIN, JUDGE

**Tab E**

**Germantown Manor Homeowners Ass'n v. GGAT Development Corp.**

No. W2016-01461-COA-R3-CV (Tenn. Ct. App. Aug. 24, 2017)

Opinion of the Court of Appeals of Tennessee at Jackson

Donovan v. Bent Creek Homeowners Association, Inc.,

No. 3:26-cv-00700 (M.D. Tenn.)

FILED
08/24/2017
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 28, 2017 Session

**THE GERMANTOWN MANOR HOMEOWNERS ASSOCIATION, INC. v. GGAT DEVELOPMENT CORP., ET AL.**

**Appeal from the Circuit Court for Shelby County**
**No. CT-000239-15 Felicia Corbin Johnson, Judge**

---

**No. W2016-01461-COA-R3-CV**

---

Appellee, homeowner's association, filed suit against Appellants, owners of lots in the development, to collect association fees. The trial court held that Appellee, a non-profit corporation, was not authorized to formally assess association fees until it elected a board of directors. Tenn. Code Ann. § 48-58-101. The trial court charged Appellants' with association fees accruing after the election of the board and also denied Appellants' counter-complaint for quantum meruit damages allegedly accrued for upkeep of certain common areas, which remained under Appellants' ownership. Discerning no error, we affirm and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

Robert W. Reid and Eugene G. Douglass, Jr., Bartlett, Tennessee, for the appellants, GGAT Development Corporation, and Charleston II Builders, Inc.

Brandon F. McNary and Peter D. Baskind, Memphis, Tennessee, for the appellee, The Germantown Manor Homeowners Association, Inc.

## OPINION

### I. Background

Germantown Manor consists of 29 lots, which were all initially owned by William

Tagg, who is the sole shareholder of Charleston II Builders, Inc. ("Charleston II") and GGAT Development Corporation ("GGAT," and together with Charleston II, "Appellants"). Charleston II owns two of the 29 Germantown Manor lots; GGAT owns twelve lots and certain common areas. The original plat for Germantown Manor was filed with the Shelby County Registrar on November 14, 2005; the plat contains the following, relevant provision:

> 19. All lot owners shall become members of the Germantown Manor Homeowners Association and shall pay dues as set by its members and shall comply with the Germantown Manor Home Owners Association's bylaws and regulations. The holder or holders of fee simple title of each lot in this subdivision shall be a fee simple "owner" with one vote.

From approximately 2004 to 2008, Bud Hurley, a Germantown Manor homeowner, informally collected association fees from other homeowners (not lot owners).[1] In 2008, Mr. Hurley moved from Germantown Manor, and the task of collecting association fees fell to another homeowner, Misty Patel. It was at this time that the homeowners decided to formally organize the Germantown Manor Homeowners Association ("Association," or "Appellee"). To this end, Ms. Patel met with a local attorney, and the Association filed its Corporate Charter with the Tennessee Secretary of State on March 25, 2008. The Charter was filed pursuant to Tennessee Code Annotated Section 48-52-102; however, no board members were identified in the Charter. On or about April 23, 2008, after the Charter was filed, Ms. Patel sent a letter to the homeowners (not lot owners), stating that the Association had been incorporated and calling for a meeting on April 26, 2008. The meeting was subsequently rescheduled for May 3, 2008.

On or about August 15, 2008, a second letter was sent to the homeowners (not lot owners), inviting them to attend a special meeting called for August 25, 2008. The purpose of the August 25, 2008 meeting was to discuss proposed bylaws and a proposed declaration of covenants, restrictions, and conditions for the Association. The meeting notice made no mention of establishing an annual assessment to be paid by all lot owners. At the August 25, 2008 meeting, Wayne Mink (an attorney) discussed proceeding with the enactment of formal bylaws, covenants, assessments, and liability issues related to the common areas. At the August 25, 2008 meeting, the homeowners voted to begin collecting homeowner association assessments in the amount of $750.00 per year effective January 1, 2009. Importantly, the Association members did not hold an election of board members at either of the 2008 meetings.

[1] The terms, "association fees," "fees," "dues," and "assessments" are used interchangeably throughout the opinion.



Case 3:26-cv-00700 Document 43-1 Filed 09/11/26 Page 37 of 47 PageID #: 1799

In September of 2008, Attorney Mink sent a letter to Mr. Tagg discussing issues with the development, including the possibility of an arrangement by which Charleston II could be exempt from assessments under the new covenants, conditions, and restrictions for Germantown Manor. Mr. Mink testified that Mr. Tagg contacted him shortly after he received the letter to discuss his concerns. Mr. Mink sent Mr. Tagg a second letter on or about September 24, 2008, referencing the discussion. The second letter included proposed covenants, conditions and restrictions, and indicated that the documents would, *inter alia*, exempt Mr. Tagg and his related entities from assessments. The letter also included a quit claim deed for conveyance of the common areas (held by GGAT) to the Association. Mr. Tagg allegedly did not agree with the proposed covenants, conditions, and restrictions, and did not execute and return the quit claim deed.

In January of 2009, the Association began to collect assessments formally. Despite allegedly receiving bills for assessments, neither Mr. Tagg nor his entities paid association fees. The Association did not hold a meeting in 2009, 2010, 2011, 2012, or 2013. On June 23, 2014, the Association mailed notice of a June 23, 2014 meeting to its members. It was not until the June 23, 2014 meeting that a quorum of the Association members elected a board of directors.

On January 20, 2015, the Association filed, in the Circuit Court for Shelby County ("trial court"), a complaint for breach of contract against GGAT, seeking damages for unpaid association fees. On January 29, 2015, the Association filed a civil warrant in the Shelby County General Sessions Court against Charleston II. The Association received a judgment against Charleston II in the general sessions court and appealed the judgment to the trial court. On September 14, 2015, the trial court entered a consent order, consolidating the two cases into the present action. By its complaint, the Association sought damages, against GGAT and Charleston II, for unpaid homeowners association fees dating back to 2009. On April 4, 2015, GGAT filed an answer and counter-complaint, seeking compensation for amounts it claimed were incurred in maintaining certain common areas at Germantown Manor.

The trial was held on April 29 and May 3, 2016. By order of June 20, 2016, the trial court awarded the Association a judgment against Charleston II in the amount of $1,800 and awarded the Association a judgment against GGAT in the amount of $10,800. The trial court awarded the Association its assessments dating no earlier than 2014, concluding that the Association's board of directors was not empowered to act before that time. The trial court denied GGAT's counterclaims, finding that it had failed to satisfy the requirements for recoupment of *quantum meruit* damages.

## II. Issues

Appellants appeal, raising nine issues as stated in their brief:

1. Whether the trial court erred in assessing dues from January 2015 up to and including January 2016 against Charleston II in the amount of $1,800.00?
2. Whether the trial court erred in assessing dues from January 2015 up to and including January 2016 against GGAT in the amount of $10,800.00?
3. Whether the trial court erred in finding that The Germantown Manor Homeowners Association was properly incorporated and organized?
4. Whether the trial court erred in finding that Charleston II and GGAT are members of The Germantown Manor Homeowners Association by virtue of Paragraph 19 of the Plat?
5. Whether the trial court erred in finding that The Germantown Manor Homeowners Association elected a valid board of directors on June 23, 2014?
6. Whether the trial court erred in finding that Charleston II received notice of meetings and bills beginning in 2008?
7. Whether the trial court erred in finding that GGAT received notice of meetings and bills beginning in 2008?
8. Whether the trial court erred in finding that GGAT received inquiry notice by virtue of the fact that a separate and distinct corporate entity, Charleston II, received notice of bills and meetings?
9. Whether the trial court erred in dismissing Appellants' Counter-Complaint for recoupment based o[n] quantum meruit?

Appellee raises the following, additional issues for review:

1. Whether the trial court erred by failing to find that Charleston II Builders, Inc. owed homeowner association assessments beginning in January, 2009?
2. Whether the trial court erred by failing to find that GGAT Development Corp. owed homeowner association assessments beginning in January, 2009?
3. Whether the trial court erred by failing to find that the Association was properly organized in 2008?

We perceive that there are three dispositive issues in this appeal, which we state as follows:

1. Whether the trial court erred in finding that GGAT and Charleston II were bound by Paragraph 19 of the Germantown Manor Plat.

2. If so, whether the trial court erred in calculating the date when GGAT and Charleston II were required to pay association fees.
3. Whether the trial court erred in dismissing Appellant's Counter-Complaint for quantum meruit damages.

### III. Standard of Review

Because this case was tried by the court sitting without a jury, we review the trial court's findings of fact de novo with a presumption of correctness, unless the evidence preponderates against those findings. ***McGarity v. Jerrolds***, 429 S.W.3d 562, 566 (Tenn. Ct. App. 2013); ***Wood v. Starko***, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). For the evidence to preponderate against a trial court's finding of fact, the weight of the evidence must "demonstrate... that a finding of fact other than the one found by the trial court is more probably true." ***Williams v. City of Burns***, 465 S.W.3d 96, 108 (Tenn. 2015); ***The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.***, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). This Court conducts a de novo review of the trial court's resolution of questions of law, with no presumption of correctness. ***Kelly v. Kelly***, 445 S.W.3d 685, 691-92 (Tenn. 2014); ***Armbrister v. Armbrister***, 414 S.W.3d 685, 692 (Tenn. 2013).

### IV. Analysis

### A. Applicability of Paragraph 19 of the Plat

As set out in context above, Paragraph 19 of the original plat for Germantown Manor states that "[a]ll lot owners shall become members of the Germantown Manor Homeowners Association and shall pay dues as set by its members." The type of restriction set out in the Germantown Manor plat was discussed by this Court in ***Maples v. Homeowners Ass'n v. T & R Ltd. P'ship***, to wit:

> Covenants, conditions, and restrictions . . . are property interests that run with the land. *See* ***Turnley v. Garfinkel***, 211 Tenn. 125, 130, 362 S.W.2d 921, 923 (1962). They arise, however, from a series of overlapping contractual transactions. *See* Restatement (Third) of Property: Servitudes § 4.1 cmt. c (Tentative Draft No. 4, 1994). Accordingly, they should be viewed as contracts, *see* ***Clem v. Christole***, 582 N.E.2d 780, 782 (Ind. 1991); ***Russell v. Williams***, 964 P.2d 231, 234 (Okla. Ct. App.1998); ***Houck v. Rivers***, 316 S.C. 414, 450 S.E.2d 106, 108 (1994); ***Shafer v. Board of Trustees of Sandy Hook Yacht Club Estates, Inc***., 76 Wash. App. 267, 883 P.2d 1387, 1392-93 (1994), and they should be construed using the rules of construction generally applicable to the construction of other contracts. *See* ***Xinos v. Village of Oak Brook***, 298 Ill.App.3d 520, 232 Ill. Dec. 576, 698 N.E.2d 667, 669 (1998); ***Hoag v. McBride & Son Inv. Co***., 967 S.W.2d 157, 169 (Mo. Ct. App. 1998); ***Toavs v. Sayre***, 281

> Mont. 243, 934 P.2d 165, 166 (1997); ***Pilarcik v. Emmons***, 966 S.W.2d 474, 478 (Tex.1998).
>
> The courts enforce restrictions according to the clearly expressed intentions of the parties manifested in the restrictions themselves. *See* ***Lapray v. Smith***, 804 S.W.2d 87, 89 (Tenn. Ct. App. 1990); ***Benton v. Bush***, 644 S.W.2d 690, 691 (Tenn. Ct. App. 1982). We give the terms used in restrictions their fair and reasonable meaning, *see* ***Parks v. Richardson***, 567 S.W.2d 465, 467-68 (Tenn. Ct. App. 1977), and we decline to extend them beyond their clearly expressed scope. *See* ***Central Drug Store v. Adams***, 184 Tenn. 541, 545-46, 201 S.W.2d 682, 684 (1947); ***Hamilton v. Broyles***, 57 Tenn. App. 116, 123-24, 415 S.W.2d 352, 355 (1966). We also construe the terms of a restriction in light of the context in which they appear. *See* ***Hillis v. Powers***, 875 S.W.2d 273, 276 (Tenn. Ct. App. 1993).
>
> When the restriction's terms are capable of more than one construction, we should adopt the construction that advances the unrestricted use of the property. *See* ***Southern Advertising Co., Inc. v. Sherman***, 43 Tenn. App. 323, 327, 308 S.W.2d 491, 493 (1957). We should also resolve ambiguities in the restrictions against the party who drafted them, *see* ***Maxwell v. Land Developers, Inc***., 485 S.W.2d 869, 874 (Tenn. Ct. App. 1972), and finally we should resolve all doubts concerning a covenant's applicability against applying the covenant. *See* ***Richards v. Abbottsford Homeowners Ass'n***, 809 S.W.2d 193, 195 (Tenn. Ct. App. 1990).

***Maples v. Homeowners Ass'n v. T & R Ltd. P'ship***, 933 S.W.2d 36, 38-39 (Tenn. Ct. App. 1998).

In its June 20, 2016 order, the trial court held that, "[b]y virtue of Paragraph 19 of the Plat, Mr. Tagg contemplated that each lot owner would become a member of the Germantown Manor Homeowners Association, that each member would pay dues, and [would] comply with the bylaws or regulations of the Association." In their brief, Appellants state that, "[b]y providing no notice or at the very least insufficient notice [notice is discussed below], Appellee attempted to force owners of Germantown Manor, including Appellants, to become members of an association they otherwise would not be legally bound to join." In the first instance, the plain language of Paragraph 19 states that "[a]ll lot owners **shall** become members of the Germantown Manor Homeowners Association" (Emphasis added). This language is not ambiguous. To become a member of the association, a party need only be the owner of a lot. Ownership of a lot automatically enrolls the owner of the lot as a member of the Association without further action. It is undisputed that, at all relevant times, Charleston II owned two of the 29 Germantown Manor lots, and GGAT owned twelve lots. As the "owner" of these lots, both Charleston II and GGAT are "members" of the Association, i.e., "[a]ll lot owners shall become members of the Germantown Manor Homeowners Association." As

"members" of the Association, under the plain language of Paragraph 19, both Charleston II and GGAT are obligated to pay association fees so long as those fees are properly set (*see* discussion *infra*). Accordingly, we cannot conclude that the trial court erred in holding that Charleston II and GGAT, as members of the Association, were obligated to pay association fees. We now turn to the question of whether the trial court erred in its calculation of the date on which Charleston II and GGAT's respective association fees began to accrue.

**B. Date of Assessment of Association Fees**

Paragraph 19 of the Germantown Manor Plat further states that the association fees will be "set by [Association] members (i.e., lot owners) and shall comply with the Germantown Manor Home Owners Association's bylaws and regulations. The holder or holders of fee simple title of each lot in this subdivision shall be a fee simple 'owner' with one vote." In its final order, the trial court held that "Paragraph 19 of the Plat does not state a specific amount of dues to be assessed and does not by itself implicitly or explicitly create lot owner liability for dues." Had the Association never been incorporated, Paragraph 19 may have been sufficient to create a contractual obligation for members to pay assessments (*see* discussion *supra*), but this argument was not raised in the trial court, and the Association does not seek association fees, from Appellants, accruing earlier than January of 2009. It is undisputed that the Association filed its Charter with the State on March 25, 2008. It is also undisputed that, at least up to the date of the hearing in this case, the Association had not passed bylaws, covenants, or regulations. As such, from the date of its incorporation, i.e., March 25, 2008, the operation of the Association was governed by the Tennessee Non-Profit Corporation Act, Tennessee Code Annotated Section 48-51-101, *et seq.* (the "Act").[2]

Tennessee Code Annotated Section 48-58-101 of the Act provides that:

> (a) Each corporation must have a board of directors.
> (b) Except as provided in subsection (c), all corporate powers shall be exercised by or under the authority of, and the affairs of the corporation managed under the direction of, its board.
> (c) The charter may authorize a person or persons to exercise some or all of the powers which would otherwise be exercised by a board. To the extent so authorized, any such person or persons shall have the duties and responsibilities of the directors, and the directors shall be relieved to that extent from such duties and responsibilities.[3]

---

[2] Because Appellees do not seek payment of association fees that Appellants may have accrued prior to the date of incorporation of the Association, we will not address whether the Plat obligated payment of association fees prior to the March 25, 2008 date of incorporation.

[3] There is no dispute or argument that the Association's Charter authorized any person or persons to exercise any power designated to the board under the Act.

Appellants' argument on appeal focuses primarily on the question of notice and, specifically, whether the Association failed to give proper notice to Appellants of the meetings, at which the board was elected and/or association fees were set. *See* Tenn. Code Ann. § 48-57-105. However, the trial court's disposition of the case does not rest on the question of notice. Rather, the trial court determined that any action by the Association regarding fee assessments was invalid until after it elected its board of directors. Specifically, the trial court held that:

> 33. New board members were validly elected at the June 23, 2014 meeting.
> 34. All Association actions conducted prior to the formal election of the Board of Directors were invalid as to [Appellants], including the assessment of dues.
> 35. The Board's actions after the June, 2014 meeting were valid.

The trial court's order further notes that "Charleston II received notice of meetings and bills beginning in 2008," and "GGAT received notice of meetings and bills beginning in 2014." However, regardless of whether Appellants received proper notice of the meetings, any action taken in those meetings, which were held after incorporation but prior to the election of the board of directors, was not binding under Tennessee Code Annotated Sections 48-58-101(a) and (b). Accordingly, Appellants cannot be held liable for association fees for any period of time before the Association elected its board of directors, and this is what the trial court ultimately held:

> 41. GGAT is liable for assessments in the amount of . . . $10,800.00, for the January, 2015 assessments, July, 2015 assessments, and January, 2016 assessments.
>
> 42. Charleston II is liable for assessments in the amount of . . . $1,800.00, for the January, 2015 assessments, July, 2015 assessments, and the January, 2016 assessments.

Although the board of directors was empaneled in 2014, Appellants argue that "the trial court erred in finding that Charleston II received notice of meetings and bills beginning in 2008 and [in] finding that GGAT received notice of the same beginning in 2014." Appellants concede that they received "billing notices," but argue that "[b]illing notices do not, in and of themselves, provide notice of Association meetings nor do they impart liability for dues on Appellants." The type of notice underlying Appellants' argument is notice as to the actions taken by the board, i.e., notice of the election of the board and the board's decision to collect association fees. Specifically, because Appellants owned the majority of the lots in the development, they contend that their votes were usurped when the board was empaneled and voted to assess fees without first giving notice of those actions such that Appellants could attend the meetings and vote. This argument goes directly to the incorporated Association's authority to act through its

board of directors. As such, the Act provides only one means of recourse—a derivative proceeding brought in the right of the corporation:

> (a) Except as provided in subsection (b), the validity of corporate action may not be challenged on the ground that the corporation lacks or lacked power to act.
> (b) A corporation's power to act may be challenged in a proceeding against the corporation to enjoin an act . . . . The proceedings may be brought by . . . a member or members in a derivative proceeding.

Tenn. Code Ann § 45-53-104; *see also* Tenn. Code Ann. § 48-56-401.

As "members" of the Association, pursuant to Paragraph 19 of the Plat (*see* discussion *supra*), with at least 5% or more of the voting power, Tenn. Code Ann. § 48-56-401(a)(1), Appellants had standing to bring a derivative proceeding to contest the authority of the board of directors to act on the ground that the board was improperly elected in the absence of notice to all lot owners/members. However, Appellants did not file a derivative action in this case. Appellants' counter-complaint, as discussed below, is only for quantum meruit damages. Nonetheless, Appellants contend that the allegations contained in their answer and counter-complaint make out a derivative claim. The trial court addressed this argument in its oral ruling on Appellants' motion for involuntary dismissal:

> Counsel, it's not a derivative suit. I mean, a derivative proceeding—and I've looked at [Appellants'] counter-complaint. I've looked at [Appellants] answer. A derivative suit has to be brought in the name of the corporation. Now, [Appellants'] counter-complaint was brought in the name of GGAT and . . . Charleston II . . . ."
>
> ***
>
> So a derivative lawsuit is—the statute very clearly addresses what the Tennessee legislature intended by derivative lawsuits. . . . So the code [citing Tenn. Code Ann. §48-56-401] sets out . . . a process where the action is brought by a member. . . in the name of the corporation . . . because . . . it's on behalf of the corporation.

We agree with the trial court that derivative actions must follow specific conventions, including: (1) alleging, with particularity, the demand on the corporation; (2) verification of the complaint, and (3) brought in the right of the corporation. As this Court has instructed:

> Tennessee's corporation statutes and [] the procedural rules governing derivative actions, Tenn. Code Ann. § 48-17-401(b) (1988) [currently Tenn. Code Ann. §48-17-401(c)], requires that
>
>> [a] complaint in a proceeding in the right of a corporation must be verified and allege with particularity the demand made, if any, to obtain action by the board of directors and either that the demand was refused or ignored or why he did not make the demand.
>
> Similarly, Tenn. R. Civ. P. 23.06 requires that
>
>> [t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort.

***Lewis on Behalf of Citizens Sav. Bank & Trust Co. v. Boyd***, 838 S.W.2d 215, 221-22 (Tenn. Ct. App. 1992). Additionally, as noted by the trial court, a derivative action is brought on behalf of the corporation to redress injury sustained by, or to enforce a duty owed to, the corporation. *See, e.g.,* ***Keller v. Estate of McRedmond***, 495 S.W.3d 852, 867-68 (Tenn. Ct. App. 2016).

Liberal interpretation of the averments in pleadings has long been the rule in Tennessee. *See, e.g.*, ***Lazarov v. Nunnally***, 217 S.W.2d 11 (Tenn. 1949); ***Read v. Memphis Gayoso Gas Co.***, 56 Tenn. 545, 550 (Tenn. 1872). However, even applying the most liberal interpretation to Appellants' answer and counter-complaint, it is clear that Appellants have not satisfied the statutory requirements for a derivative action. Because a derivative proceeding is the sole recourse for Appellants to contest the authority of the board of directors to act, Appellants cannot challenge the board's assessment of association fees absent a properly pled derivative action. Tenn. Code Ann. § 48-53-404(b).

### C. Quantum Meruit Damages

A quantum meruit action is an equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another if the following circumstances are shown:

> (1) There is no existing, enforceable contract between the parties covering the same subject matter;
> (2) The party seeking recovery proves that it provided valuable goods or services;

(3) The party to be charged received the goods or services;
(4) The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and
(5) The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

***Doe v. HCA Health Servs. of Tenn., Inc.***, 46 S.W.3d 191, 197-98 (Tenn. 2001) (quoting ***Swafford v. Harris***, 967 S.W.2d 319, 324 (Tenn. 1998)).

In its counter-claim, GGAT states, in relevant part:

COMES NOW the Defendant, GGAT Development Corp., who now assumes the role of Counter-Plaintiff and would state as follows:

***

2. Counter-Plaintiff has maintained the common areas in the subdivision by cutting grass from the completion of the subdivision in every month necessary since March, 2008.

3. The plat calls for the [Association] to assume responsibility of the design and review of the new completed plans, take title, pay taxes of the common areas and maintenance of common areas and said [Association] has failed to do so and has breached its duties. A reasonable cost of cutting the grass alone when necessary would be approximately $2,800.00 annually. Counter-Plaintiff has cut the grass and otherwise maintained the common areas since 2008 and has expended approximately $19,600.00 which has damaged Counter-Plaintiff and benefitted [the Association].

Importantly, the counter-claim for quantum meruit damages was brought in the name of GGAT, and Mr. Tagg is not listed as a counter-plaintiff to the action. However the evidence indicates that Mr. Tagg, as opposed to GGAT, performed the maintenance on the common areas. Mr. Tagg testified that he uses his own lawn equipment to cut the grass and trim the common spaces, pays for said equipment and fuel, and even hires another contractor when he is unable to do so. In its June 20, 2016 order, the trial court found, in relevant part, that:

45. Mr. Tagg, on behalf of GGAT and/or Charleston II, was maintaining some of the common areas and cutting grass.
46. Mr. Tagg, on behalf of GGAT and/or Charleston II, voluntarily took it upon himself to maintain the common areas.

Because Mr. Tagg undertook to mow the common areas, the trial court held that GGAT could not satisfy the fourth criterion for quantum meruit damages, i.e., "the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated." The record does not preponderate against this holding.

Furthermore, although the plat specifies that "[a]ll common open space [will be] owned and maintained by the Homeowner's Association," as discussed above, Mr. Tagg has not transferred the common areas to the Association. Therefore, these areas remain under the ownership of GGAT and Charleston II. Having declined to transfer ownership of the common areas to the Association, it is illogical that Mr. Tagg, or his entities, should expect compensation for maintenance and upkeep of lots they own. Because GGAT has not met its prima facie case for recovery under the theory of quantum meruit, we conclude that the trial court properly denied its counter-petition.

**V. Conclusion**

For the foregoing reasons, we affirm the order of the trial court. The case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellants, GGAT Development Corporation, Charleston II Builders, Inc., and their surety, for all of which execution may issue if necessary.

________________________________________
KENNY ARMSTRONG, JUDGE